ERIKSON LAW GROUP
Antoinette Waller (SBN 152895)
David Alden Erikson (SBN 189838)
S. Ryan Patterson (SBN 279474)
200 North Larchmont Boulevard
Los Angeles, California 90004
Telephone: 323.465.3100
Facsimile: 323.465.3177

Attorneys for Plaintiff Francesca Gregorini

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| FRANCESCA GREGORINI, | Case No. |
| Plaintiff, | **COMPLAINT AGAINST APPLE, INC., ET AL, FOR COPYRIGHT INFRINGEMENT; REQUEST FOR PERMANENT INJUNCTION** |
| v. | |
| APPLE, INC, a California corporation; M. NIGHT SHYAMALAN, an individual, BLINDING EDGE PICTURES, INC., a Pennsylvania corporation; UNCLE GEORGE PRODUCTIONS; a Pennsylvania corporation; ESCAPE ARTISTS LLC, a California limited liability company; DOLPHIN BLACK PRODUCTIONS, a California corporation; TONY BASGALLOP, an individual; ASHWIN RAJAN, an individual; JASON BLUMENTHAL, an individual; TODD BLACK, an individual; STEVE TISCH, an individual; and DOES 1-10, inclusive | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff Francesca Gregorini brings this action against Defendants Apple, Inc.
("Apple"); M. Night Shyamalan ("Shyamalan"); Blinding Edge Pictures, Inc.
("Blinding Edge"); Uncle George Productions; Escape Artists LLC; Dolphin Black
Productions; Tony Basgallop; Ashwin Rajan; Jason Blumenthal; Todd Black; Steve
Tisch; and DOES 1-10, inclusive.

# I.    INTRODUCTION

1.     Apple TV+ and M. Night Shyamalan are heavily promoting their original series *Servant*—one of eleven shows launching the ambitious new streaming service billed as a game-changing new product from the world's most valuable company. Apple claims that what distinguishes its foray into television is breathtakingly *original* content: the world's best stories told by the world's best storytellers.

## A.    *Servant* is a brazen copy of Plaintiff's 2013 feature film.

2.     There is one big hole in Apple's messaging: *Servant* is a wholesale copy of Plaintiff Francesca Gregorini's 2013 feature film *The Truth About Emanuel*. As demonstrated by the long list of key parallels catalogued in Section III(C) of this Complaint, the misappropriation is not a mere borrowed premise, idea or story. Mr. Shyamalan has gone so far as to appropriate not just the plot of *Emanuel*—but also its use of cinematic language, creating a substantially similar feeling, mood, and theme.

3.     *Emanuel* is a successful 2013 psychological thriller, written directed and produced by Ms. Gregorini as her second feature film. After premiering at the Sundance Film Festival in the prestigious dramatic competition category in 2013, the film was released theatrically in the U.S. by Tribeca Film, followed by release on DVD and Blu-ray. Since 2014, Apple itself has offered *Emanuel* for sale or rental through iTunes (as has Amazon and other platforms).

4.     Starring Kaya Scodelario and Jessica Biel, the film tells the story of a troubled and withholding 18-year old girl, newly hired by a white, sophisticated, privileged yet gracious, mid-30's, first-time mom—to help care for her new baby. After fleeting images of what seems to be a healthy three-month-old infant, the audience discovers that the "baby" is really an ultra-realistic "reborn" doll—shattering the illusion of an uber-competent modern mom. The cause of the mother's delusion, the father later reveals, is the unspeakable grief of recently losing their real three-month-old baby. Rather than recoil, the nanny plays along with the mother's delusion even before knowing its explanation, in part for deep-seated reasons relating to the

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

absence of her own mother. Soon enough, she too is doting over the doll as if it were real, nurturing a deep emotional connection with the mother but creating danger and ultimately crisis as prying eyes threaten to expose shared secrets. While the baby's apparent rebirth offers an emotional high point, progress comes from confronting reality. Although the film is a tense psychological thriller, it also features strong elements of magical realism, which leaves the audience with a measure of doubt about what's real.

5.        Shockingly, this plot description of *Emanuel* could just as easily be applied to *Servant*, made six years later. And that's just the beginning of the commonalities between the two works. These similarities include not just parallel plot points, but also strikingly similar—and highly idiosyncratic—characters, scenes, directorial choices, and modes of storytelling. Below, Plaintiff enumerates a long list of striking similarities between the works, and explains why each is unusual and artistically significant. This non-exhaustive list involves everything from shared grand themes and character arcs, to identical granular details. While it's impossible to completely capture the deep parallels between these two works with a bullet list, Plaintiff easily describes more than sufficient similarity to establish copyright infringement. More important, anyone who takes the time to view and compare the works will reach the inescapable conclusion that their overlap is far too striking to result from coincidence, as Defendants quite preposterously claim.



*Nanny and doll, in Emanuel (left) and Servant (right)*



ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

6.      As in *Emanuel*, a central theme of *Servant* involves the extraordinary and almost irrational reciprocal devotion between mother and nanny. In both works, the mother's adoration of the nanny stems from her grief and denial over losing a child. She delusionally channels her maternal instincts towards a doll—but also more genuinely directs them to the real-life vulnerable surrogate-daughter caring for her "baby." In both works, the nanny's strong feelings for her employer stem from longings for a lost mother, which she finds being fulfilled by a new mother figure in dire need of a child.

7.      As described below, these are extremely rare themes in Hollywood. But what made *Emanuel* even more unique were a number of Ms. Gregorini's artistic choices, driven by her own very personal inspirations for the story, that are surprising because they are incongruous with themes of loss and longing. For example, *Emanuel* plays as a psychological thriller in that shared secrets are always one false move away from being exposed, which threatens to destroy the cherished but tenuous equilibrium the central characters have found in the obviously unsustainable status quo. To reinforce this tension, Ms. Gregorini uses the cinematic vernacular of classic suspense, including camera angles, lighting, music, and pace. Astonishingly, and as more fully explained below, *Servant* appropriates all of these idiosyncratic artistic choices, which define *Emanuel* as a film.



*Dark and foreboding tones in Emanuel (left) and Servant (right)*

8.      In both works, the proxy mother-daughter bond between mother and nanny co-exists with a jarring unspoken sexual tension—felt throughout and more

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

overtly displayed in a surprisingly intimate bathroom scene. Again, this was a startling and bold artistic choice by Ms. Gregorini—and one that Defendants appropriated for *Servant*.



*Bathroom intimacy culminating in a kiss on the hand Emanuel (left); Servant (right)*

9.      In addition to these key thematic commonalities, *Servant* bears a number of striking similarities to *Emanuel* even with regard to its details and imagery. The two nannies look alike—and are similarly difficult and enigmatic. In both works, imagery of water plays a prominent role. We learn more about each nanny when she directs her shy young date to steal a bottle of red wine (to be paired with French bread and cheese). Both mothers are remarkably self-possessed and positive for someone in a psychosis, and have put together magazine-worthy homes and nurseries. Even the dolls look remarkably alike (each having replaced babies who died at three months). In each work, the nanny's troubles are highlighted by a trip to her mother's grave. As explained below, the similarity of scenes and sequence are often uncanny.



*The nanny, underwater in Emanuel (left) and Servant (right)*


ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

**B.    Defendants' infringement is emblematic of gender injustice in the entertainment industry.**

10.    As mentioned, *Servant* is meant to showcase Apple's new streaming service. But if *Servant* showcases anything, it is the gender arrogance and inequity still infecting Hollywood (and apparently Cupertino). *Emanuel* tells a nuanced emotional story about motherhood and daughterhood—real, lost, and imagined. It is clearly a woman's story, inspired by Ms. Gregorini's very personal struggles with her inability to conceive a child and growing up with an absent mother (as discussed in specific detail in the ample media coverage the film received). It is about grief, longing, motherhood, secrets (the ones we keep from ourselves, the ones we carry for others), and the inescapable collision course with reality. It took the collective talents and tremendous efforts of many strong and capable women to tell this story and put it in on the screen, in a film world dominated by men.

11.    *Servant* tells a substantially similar story, in a substantially similar manner, using substantially similar tools of the trade. But what is equally damaging and disturbing to Ms. Gregorini is a layer added to *Servant* by its all-male team of creators and producers (including creator and writer Tony Basgallop, and executive producer/director M. Night Shyamalan), in which this female-centric story is sometimes seen through the eyes of two men—who watch and comment on the women's "insanity" while pounding tequila shots and pondering whether the nanny is "fuckable."

12.    The result of this caricature of the male gaze is the utter bastardization of Ms. Gregorini's work. It's an apt metaphor for the real-life version of what could happen here: It takes only a few old guard Hollywood men, such as Mr. Shyamalan and Mr. Basgallop, and their new silicon valley partner Apple TV+, to negate the considerable achievements and life experiences of the women behind *Emanuel*, and to irredeemably tarnish their work. Just as the male perspective cheapens the female

experience in *Servant*, Mr. Shyamalan and Apple TV+ diminish Ms. Gregorini and her largely female team.

13.     A review in *The Atlantic* makes a similar point: that *Servant* squanders a compelling premise by missing the female perspective on an extremely female story:

> Servant could be a series about the otherworldliness of grief, and the ways in which it seems to fragment and distort reality… Servant, though, doesn't seem to have the emotional curiosity to earn its premise…
> And this is the truly uncomfortable part of Servant: It urges you, over and over, to loathe and condemn a woman whose baby has died. Look at the spectacle of this woman's delusion, the series seems to say, lingering on the frozen plasticity of Jericho's features. Note her narcissism, her vanity, the ridiculousness of her newscasts. **All six of the show's executive producers are men and all 10 episodes are written by Basgallop, which perhaps makes it unsurprising that Servant, far from sketching out the contours of maternal grief, instead treats Dorothy with such casual disdain.**[1]

14.     Gender injustice in Hollywood is not a formal part of Ms. Gregorini's claim, which stands on its own under the basic principles of copyright law. But it is certainly part of the broader picture of Defendants' misappropriation of *Emanuel*. While Hollywood's patriarchal system sometimes manifests in explicit and raw ways, it can also operate more subtly, as it has here. But the injury to women deserving of equality is no less grievous. Women graduating from film school know—or soon learn—that they face far more daunting odds than their male peers. The perception that no one is going to stop the already-powerful (usually white men) from simply taking the artistic output of those outside the power structure serves to perpetuate the patriarchy for another generation. This is not only unjust; it also stifles the progress of good cinema and television.[2]

---

[1] Someone should tell the reviewer that the movie she wants to see already exists and can be rented anytime on Apple's platform: *The Truth about Emanuel*.

[2] Over the last 13 years, females directed less than 5% of top films—even though their movies were as well received as those directed by men. See Clark and Pieper, *Inclusion in the Director's Chair: Analysis of Director Gender & Race/Ethnicity Across 1,300 Top Films from 2007 to 2019* (Annenberg Foundation 2020).


ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

**C.  Defendants have arrogantly brushed aside Ms. Gregorini's protests.**

15.  The result of Defendants' misappropriation and mangling of Ms. Gregorini's work is that any intention of adapting her work for premium television—where she has concentrated her efforts and built a successful career over the past several years—are now dashed.

16.  Despite this very real damage, Defendants have arrogantly dismissed Ms. Gregorini's protests by vaguely claiming that *Servant* was in development long before *Emanuel* was made, and that any similarity is a coincidence. Indeed, Mr. Shyamalan and Mr. Basgallop implausibly claim they have never seen *Emanuel*—apparently not even curious enough to watch after hearing Ms. Gregorini's objections. Worse, Apple has brought stonewalling to a new level by simply referring inquiries to Mr. Shyamalan's lawyer (who in turns says he cannot speak for Apple).

17.  Steve Jobs acknowledged that Apple has "always been shameless about stealing great ideas." Mr. Shyamalan too has been publicly and credibly accused of infringement more than once. In 2004, it was widely reported that Mr. Shyamalan's film *The Village* shared uncanny similarities with Margaret Peterson Haddix's well-received book published nine years earlier.[3] Mr. Shyamalan was also sued (in this Court) by screenwriter Robert McIlhinney who alleged Mr.' Shyamalan's film *Signs* was a misappropriation of his script. Once again, it appears that the powerful men of Hollywood and Big Tech believe that appropriation of others' intellectual property is their right. The purpose of this lawsuit is to hold Apple and Mr. Shyamalan accountable for their misconduct.

---

[3] See *Shyamalan's "Village" Villainy?* E News August 10, 2004.



COMPLAINT

## II.    JURISDICTION AND VENUE

18.    Plaintiff brings this action for copyright infringement (17 U.S.C. Section 101, *et seq.*).

19.    This Court has original subject matter jurisdiction over this action and the claims asserted herein, pursuant to 28 U.S.C. Section 1331 ("federal question jurisdiction") and 1338(a)-(b) ("patent, copyright, trademark and unfair competition jurisdiction") in that this action arises under the laws of the United States and, more specifically, Acts of Congress relating to patents, copyrights, trademarks, and unfair competition.

20.    Venue is proper in this District pursuant to 28 U.S.C. Section 1391(b)(1)-(3) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

21.    Each of the Defendants is subject to the personal jurisdiction of this court. As described below, each Defendant distributed and promoted the subject infringing material in California, including by expressly aiming marketing and distribution efforts at consumers in this state.

## III.    THE PARTIES

22.    Plaintiff Francesca Gregorini is, and at all times relevant herein has been, a resident of California.

23.    Defendant Apple, Inc. is a California corporation doing business in California, with its principal place of business located in Cupertino, California.

24.    On information and belief, Defendant M. Night Shyamalan is a resident of Pennsylvania.

25.    Defendant Blinding Edge Pictures, Inc. is a Pennsylvania corporation doing business in California, with its principal place of business located in Berwyn, Pennsylvania.

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

26.     Defendant Uncle George Productions, LLC is a Pennsylvania limited liability company doing business in California, with its principal place of business located in Newtown Square, Pennsylvania.

27.     Defendant Escape Artists LLC, a motion picture and television production company, is a California limited liability company, doing business in California, with its principal place of business located in Culver City, California. Defendants Tisch, Black, and Blumenthal are principles of Escape Artists.

28.     On information and belief, Defendant Steve Tisch is a resident of California.

29.     On information and belief, Defendant Todd Black is a resident of California.

30.     On information and belief, Defendant Jason Blumenthal is a resident of California.

31.     On information and belief, Defendant Ashwin Rajan is a resident of California.

32.     On information and belief, Defendant Tony Basgallop is a resident of California.

33.     Defendant Dolphin Black Productions is a California corporation, doing business in California, with its principal place of business located in Beverly Hills, California. Dolphin Black is Mr. Basgallop's company.

34.     Plaintiff is ignorant of the true names and capacities of the Defendants sued herein as Does 1-10, inclusive, and therefore sues said Defendants by such fictitious names. Plaintiff will amend this Complaint to allege the true names and capacities when the same has been ascertained. On information and belief, each fictitiously-named Defendant is responsible in some manner for the occurrences herein alleged, and that Plaintiff's damages as herein alleged were proximately caused by their conduct.



ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

35.    Each of the Defendants acted as an agent for each of the other Defendants in doing the acts alleged, and each Defendant ratified and otherwise adopted the acts and statements performed, made or carried out by the other Defendants so as to make them directly and vicariously liable to the Plaintiff for the conduct complained of herein. Each Defendant is the alter ego of each of the other Defendants.

## IV.    GENERAL ALLEGATIONS

**A.    Ms. Gregorini is the writer, director and producer of *The Truth About Emanuel*.**

36.    A graduate of Brown University, Plaintiff Francesca Gregorini co-wrote and sold television pilot scripts to both HBO and Paramount before co-writing and co-helming her directorial feature film debut *Tanner Hall* (starring Rooney Mara and Brie Larson). *Emanuel*, which she wrote, produced, and directed, is Ms. Gregorini's second feature film.

37.    Ms. Gregorini is female and gay. While her identity informs her work, it does not define her as an artist. Like all successful women in the entertainment industry, Ms. Gregorini has learned to navigate the gender inequity endemic to her profession. She regularly works on mainstream projects with mainstream male and female producers and actors. In television, she has recently directed Emma Chan in *Humans* (AMC), Bryan Cranston in *Electric Dreams* (Amazon), Uma Thurman in *Chambers* (Netflix), Sandra Oh in *Killing Eve* (AMC) and Heather Graham in *The Hypnotist's Love Story* (ABC, as the pilot director). She is currently attached to direct a $10 million feature film, and is in the process of pitching a television series.

38.    The idea for *The Truth about Emanuel*[4] came to Ms. Gregorini in 2010, borne from personal struggles. She created the mother character, Linda, as a means to explore and heal grief related to her inability to become pregnant. Pained, Ms.

---

[4] The work was formerly known as *Emanuel and the Truth About Fishes*.

Gregorini imagined a scenario that would be even worse than hers: giving birth to a child only to see it die. This is, of course, Linda's story.

39.     It is human nature is to avoid pain. Ms. Gregorini found her ways (including writing *Emanuel*) and Linda found hers (parenting Chloe, the "reborn" doll).

40.     The nanny character, Emanuel, is the carrier of, and co-conspirator in, Linda's secret/delusion. Growing up in a home with alcoholism, Ms. Gregorini too was the carrier of secrets for the adults in her life—and at times she bought into those delusions in order to stay connected, keep the peace, and navigate unfathomable situations. The character of Emanuel is borne of that deep-seated knowledge of what it means to want connection with a mother figure so badly, one will live in a fiction in order to maintain it.

41.     In the film *Emanuel*, Ms. Gregorini took her two biggest and most personal wounds—growing up with an often absent mother and her inability to become a mother herself—and fashioned a psychological thriller that would explore their complexities.

42.     *Emanuel* was a labor of love for Ms. Gregorini. She worked for years to develop it, and to raise the shoestring budget needed to produce it. She finally cobbled together the $1.2 million budget from mostly small-dollar investors—and later was forced to raise additional money for post-production work.

43.     The nanny role was originally written for Rooney Mara, who was replaced by Kaya Scodelario due to scheduling. Ms. Mara remained on the project as a co-producer of *Emanuel*. Jessica Biel replaced Helena Bonham Carter as the mother.

44.     Ms. Gregorini and her accomplished cast and crew filmed the production in 2012.

45.     *Emanuel* premiered in Dramatic Competition at the 2013 Sundance Film Festival, and was selected to showcase at Sundance UK later that same year. The film

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

went on to screen at many other film festivals in the U.S and around the world. The film was released in U.S. theaters on January 10, 2014.

46.     Ms. Gregorini earned a nomination at the Sundance Film Festival for the 2013 Grand Jury Prize – Dramatic, and earned the Best Feature Director prize at the 2013 L.A. Femme Film Festival. The film earned awards at the 2013 Ashland Independent Film Festival and 2013 Brooklyn Film Festival. Tribeca Enterprises chief creative officer Geoffrey Gilmore said "Francesca Gregorini's superb *Emanuel and the Truth About Fishes* is a rare and remarkable work of mixed genres and expectations. A taut, surprising and original thriller featuring a career best performance from Jessica Biel and a breakout role by Kaya Scodelario."

**B.     Defendants had access to *Emanuel*—years before making *Servant*.**

47.     There is no question that *Emanuel* preceded *Servant*, and that Defendants had access to it continually since 2013. Ms. Gregorini penned the screenplay to *Emanuel* in 2011, and registered it with the Writer's Guild on January 19, 2012— nearly eight years before Servant premiered. Copyright protection of the film commenced when filming was completed in 2012. The work was widely disseminated to the public beginning in 2013. Emanuel Film, LLC first applied to register the copyright in 2012. Since 2014, *Emanuel* has been available for purchase or rental on Apple's own iTunes.

48.     Given the striking similarities, it is inconceivable that Servant's creators developed the television series without reference to *Emanuel*. And indeed, Mr. Basgallop has had specific access to *Emanuel*. In addition to the Sundance premier (U.S. and U.K.) and nationwide theatrical release of *Emanuel*, and the film's availability on streaming platforms, Mr. Basgallop had occasion to screen the film in 2017, when Ms. Gregorini's agents at CAA pitched her to direct episodes of *Berlin Station*, a series Mr. Basgallop executive produced. On information and belief, Mr. Basgallop (as well as the other executives of *Berlin Station*) received an email from

ERIKSON LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

Ms. Gregorini's agents at CAA, submitting her for the *Berlin Station* project, that included a link to Ms. Gregorini's most prominent work to date, *Emanuel*.

**C.**  ***Servant* is one of eleven original series that Apple chose to showcase the launch of its ambitious new streaming service Apple TV+.**

49.    Apple TV+ is the ambitious new streaming service of Defendant Apple, Inc.—the world's most valuable company.

50.    By all accounts, Apple sees Apple TV+ as its future. According to the New York Times, "Apple has gone Hollywood for a reason. With iPhone sales flattening, the company sought out other ways to generate revenue. In addition to Apple TV Plus, it has unveiled a credit card and started a video-game subscription service."

51.    And indeed, Apple used its considerable economic might to hire some of Hollywood's most established names. As recently reported in the New York Times: "Led by the veteran Hollywood executives Zack Van Amburg and Jamie Erlicht, Apple TV Plus has made deals with Oprah Winfrey, Steven Spielberg, J.J. Abrams and M. Night Shyamalan, among others." In other words, Apple touts M. Night Shyamalan's *Servant* as one of its marquee series.

52.    Apple certainly has competitors in the entertainment arena. Netflix and HBO are seen as the titans of original content for television. Netflix, HBO Max, Disney, Amazon Prime, and Hulu offer rival streaming services, each coupling original programming with a deep reservoir of existing content.

53.    Amidst this competition, Apple's marketing strategy is to push the message that what sets it apart from its rivals is its unparalleled stories and storytellers. In short, Apple has staked its claim on doing what only it can do (similar to what it did with the personal computer, the iPhone, and tablets): gathering the best minds on earth to come up with new and revolutionary ideas.

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

54.     This theme was very much on display at the announcement of Apple TV+ last year. There, Apple CEO Tim Cook told a hushed and rapturous live audience:

> Apple has always tried to make the world a better place, and we believe deeply in the power of creativity… We feel we can contribute something important to our culture and to society through great storytelling, so we partnered with the most thoughtful, accomplished, and award-winning group of creative visionaries who have ever come together in one place to create a new service unlike anything that's been done before.

55.     Cook then handed off the presentation to Erlicht and Van Amburg, who were on-message:

> At Apple, we know that great stories begin and end with the incredible artists who tell them, the artists who are thoughtful enough and brave enough to share their best story with us and the world.
> …
> We've partnered with the most accomplished storytellers as well as a new generation of the most exciting voices who together will define Apple TV+ as the destination with the highest quality originals. The original shows and movies will intellectually challenge and thrill, define and redefine our expectations, inspire us, make us laugh, transform our mood and brighten our day, but make us believe anything is possible, from documentaries to dramas, from kids to comedies, the highest quality of storytelling in one single place. This is Apple TV+.

56.     Apple has put its money where its marketing mouth is. The company's annual content budget has come in at a staggering $6 billion, according to the *Financial Times*. Unlike Facebook and Google, which have tentatively dipped their toes in entertainment, Apple has gone all-in. Within a year, Apple TV+ could feature as much original content as longtime cable networks such as Showtime. Its advertising budget for September and October 2019 alone was $40 million—and that's not counting November when advertising really ramped up.

57.     The staggering amount of money and energy Apple has put behind Apple TV+ has so far resulted in the eleven original shows that comprise the launch of the service. One of those shows, of course, is *Servant*. In other words, *Servant* is what all the fuss and money is about. Notably, *Servant* was released on Thanksgiving, a day known in the entertainment industry as one of the best times for an important rollout,

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

15                                                    COMPLAINT

1   due to high viewer engagement. Ahead of the series premiere, on November 22, 2019,

2   Apple renewed the series for a second season.

3       58.    In the case of *Servant*, the "creative visionaries" are two men with long

4   Hollywood histories: executive producer M. Night Shyamalan, touted by Apple as the

5   creative force behind the show; and Tony Basgallop, the creator and writer.[5]

6   Mr. Basgallop wrote every episode and executive produces alongside Mr. Shyamalan

7   and four other men.

8       59.    Mr. Basgallop offers his own vague and implausible account of his

9   personal inspiration for the story:

> It's been something I've been writing for a very long time — since I've
> had children, really, which is 17 years ago. I wanted to write about the
> changes that children bring into your life and the fears they bring and
> how the slightest thing that goes wrong can affect you — just disaster
> scenarios. That was the initial idea. Over the years I've been developing
> these characters and trying to tell a story that's very contained. I've
> thrown away a lot of the rules I've learned about writing in television for
> this one; I've very consciously tried to make it personal and yet keep it
> genre-specific — play it as a thriller.[6]

**D.   *Servant* is substantially similar to *Emanuel*.**

16      60.    *Servant* is substantially similar to *The Truth About Emanuel*, in its

17  themes, setting, characters, plot, sequence of events, mood, pace, and dialogue. Again,

18  the central subject matter of both works is the mutual dependence of a mother and a

19  nanny who serves as a surrogate daughter figure—ameliorating the unfulfilled

20  longings the mother has for a child, and the nanny for a mother. To explore this

21  subject, the works tell remarkably similar stories, using remarkably similar (and

22  unique) techniques. Any one of the many commonalities enumerated below would be

23  surprising—but the odds of them *all* appearing in two independent works would be

---

[5] The New York Times reports that Mr. Shyamalan is "the glamour name among the executive producers, and he directed two episodes, but the show was created and written by the British TV veteran Tony Basgallop.

[6] In contrast, years ago, Ms. Gregorini very specifically described her very personal inspiration and how it led to the creation of *Emanuel* and its characters. See ¶¶ 38-41, above.

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

astronomical. Further, the unique selection and arrangement of these elements—which is common to *Emanuel* and *Servant*—make it a statistical certainty that Defendants copied *Emanuel* in making *Servant.*

61.     As mentioned above, the following list of commonalities is necessarily an abbreviation. The only way to fully appreciate the extent of *Servant*'s overlap with *Emanuel* is to view the entirety of both works (i.e. the film *Emanuel* and Episodes 1-3 of Season 1 of *Servant*), with the benefit of further explanation and facts regarding the nature of the similarities, their significance in the works, the rarity/idiosyncrasy of the relevant artistic choice in *Emanuel*, and an analysis of the point of comparison in light of conventions in film and television. For this reason, the entirety of both works (the film *Emanuel* and Episodes 1-3 of Season 1 of *Servant,* both approximately an hour and a half of content) are incorporated by this reference—and digital copies will be furnished to the court.

**Theme**

62.     The themes of *Servant* are remarkably similar to those of *Emanuel*. For example, the key themes of both works include:

- The unspeakable grief of losing a baby.
- Denial and self-delusion as a means of avoiding grief; and the dangerous and precarious nature of this coping mechanism.
- The incredible complexity of the mother/child bond and especially its absence (including manners in which the severing of such a bond might give rise to psychological pathologies).
- The relationship between familial and maternal longing, and sexuality.
- Shared secrets and complicity in another's delusion—particularly in the context of a mother/daughter relationship.
- The dangers of shared delusion; and how such collusion can lead to crisis, including a collision with reality.
- The mystery/danger of a stranger coming to town, or a new person in the mix.

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

- The redemptive potential of confronting reality (or equivalently, the lack of redemption in failing to confront reality).
- The safety, sanctity and comfort of home—and the obverse dangers of the outside world.

63.     Some of the themes mentioned above are extremely rare in Hollywood, which renders the commonalities between *Emanuel* and *Servant* all the more striking, and thus all the more probative of Defendants' appropriation of Ms. Gregorini's protected expression. For example, while many of the industry's most iconic films explore the troubles between fathers and sons (from *The Godfather*, *There Will Be Blood*, and *Star Wars*; to *Mrs. Doubtfire* and *Finding Nemo*), the same cannot be said of the troubled mother/daughter theme explored by the proxy mother/nanny relationship in *Emanuel* and *Servant*. Indeed, *Emanuel* was the *first* film to explore maternal longing by examining its delusional misplacement, while also studying a daughter's misplaced longings for her mother. *Servant* was the second. Likewise, *Emanuel's* surprising depiction of sexual longing as related to misguided maternal sentiments was unprecedented until *Servant* offered a similar take.

**Setting**

64.     In addition, Servant unfolds in a setting that is substantially similar to that in Emanuel, including as follows:

- As in *Emanuel*, the main characters (especially the nanny and mother) live in such close proximity that truths are often revealed by snooping, spying, voyeurism, or inevitable casual observation.
- To facilitate this idea of the characters watching each other, both works showcase a dark but often dramatically lit exposed wood staircase, overlooking the first floor where much of the action unfolds—perfect for listening and snooping.



ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

1
2
3
4
5
6
7
8



9
10
11
12
13
14
15
16



17 *The nanny, watching from the top of the stairs in Emanuel (previous) and Servant (above)*

18

19 • As in *Emanuel*, *Servant* unfolds in the mother's beautiful, immaculate, old-
20 world, remarkably well-put-together home. Both homes are filled with
21 expensive furnishings: Just the right touches and somehow everything is in its
22 place.

23 • As in *Emanuel*, the nanny in *Servant* is in awe of her employer's house. When
24 first alone there, each nanny takes a long and introspective opportunity to soak
25 in her surroundings, taken by how different it is from what she is used to. In
26 both works, the nannies seem to imagine themselves becoming their employer's
27 daughter and living in her fantasy house.

28

- As in *Emanuel*, the house in *Servant* is so important as to almost become a character. In both works, the house is a safe and comfortable sanctuary—as contrasted with the dangers of the outside world, including the key danger of the mother's secrets being exposed.

- As in *Emanuel*, *Servant* furthers this sanctuary theme by prominently featuring a large show-piece entry hallway, which functions as a kind of portal from the outside world to the inner sanctum where the family secrets reside. These hallways facilitate scenes of prying eyes entering the house. As in *Emanuel*, the importance of the doorway—as dividing worlds—is highlighted by close-up shots of the nanny's feet as she crosses the home's threshold.



*The entry hallway in Emanuel (left) and Servant (right)*

- Both works feature a critical trip to the nanny's mother grave.



*The nanny's mother's grave in Emanuel (left) and Servant (right)*

- The nurseries in the two works are similar, including vertically striped wallpaper, old-fashioned cribs, beautiful vintage baby items, and remarkably,



ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

an antique rocking horse that obviously won't be pressed into service for a few years.



*The rocking horse in nursery, in Emanuel (left) and Servant (right)*

- In both works, the nurseries are magazine-worthy—almost to the point of being hyper-real. In each work, the second-story nursery is introduced by the same infrequently-used camera technique: a shot from outside the house, pushing in on the second story window, to show a figure fussing over the baby. The shot introduces the nursery in an voyeuristic way.



*Beautiful nurseries, in Emanuel (left) and Servant (right)*



*First look at nursery and baby, through the window, in Emanuel (left) and Servant (right)*


ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

- Like *Emanuel*, *Servant* includes a number of scenes of family and extended-family dinners around the traditional family dinner table. In both works, these scenes seem to deconstruct conventional ideas of domestic bliss. If one didn't know better, the scene looks like typical domesticity—which is of course at odds with the troubles and secrets bubbling to the surface. For this reason, cracks and tensions reveal themselves at these family dinners—creating a tense mood.

## Characters

65.   *Emanuel* and *Servant* revolve around strikingly similar characters, with similar backgrounds and story arcs. In one sense, plot similarities dictate similarities in characters—but here the similarities go much further.

### The Nannies: Emanuel (*Emanuel*) and Leanne (*Servant*)

66.   Emanuel and Leanne are extraordinarily similar, especially in the following respects:

- Both are pretty, white, 18-year old girls. Emanuel says that she will be "18 in a month." Leanne reports that she is 18. In both works, the nannies' youth and attendant quirks are remarked upon by other characters.

- As shown above, Leanne looks very much like Emanuel. Not only are they the same age and race, they also share a slight frame, fair skin, blue eyes, and long dark hair.

- Both are played by young English actresses—a common Hollywood tool to lend an "outsider" quality to a character.

- Like Emanuel, Leanne is moody, withholding, unpredictable, mysterious and reticent. Neither speaks freely, nor smiles frequently. In both works, other characters must put in considerable effort to get them to enjoy themselves and must coax personal information from them because they are both so private.

- Leanne and Emanuel have similarly troubled histories: Each exists without her mother, who died many years prior—and as a result gravitates to and



ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

sympathizes with the mother who has delusionally hired them.

- Both take on a double maternal role: outwardly caring for the baby, but more fundamentally, caring for the grieving mother.

- Both also take on a daughterly role, acting as a receptacle for the mother's maternal instincts, while also sating their own longing for a mother figure.

- Both Leanne and Emanuel "shouldn't be here." They each should have died when their mothers did.

### The Mothers: Linda (*Emanuel*) and Dorothy (*Servant*)

67.    Linda and Dorothy are remarkably similar, especially in the following respects:

- Both are in their mid-thirties (slightly older than the average new mom).

- Both are white, sophisticated, and privileged.

- Both are remarkably confident and self-possessed for women in the midst of psychosis—especially in the ease and grace in which they direct their nannies.

- Both mothers share the same positive, effervescent, "type A" personality. If they are sad, they do not show it. In fact, quite the opposite: they are preternaturally happy, flitting around arranging flower vases in their pristine homes wearing pristine clothing.

- Both are extremely stylish in their clothing and home décor.

- Both suffered the tragic loss of their first and only baby—resulting in the delusion that a reborn doll is that baby. In other words, both channel their maternal love into a doll—so fully committed to the fantasy that they hire a nanny (towards whom they feel motherly).

- Both are affectionate and doting mothers.

- Both mothers' displaced maternal longing is channeled not only into a reborn doll, but also into the nanny. In both works, an early indicator of this dynamic is a scene in which the mother chooses clothes from her closet for the nanny to wear.



ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

- In both mother characters, there is an unspoken, perhaps unconscious, sexual longing that seems to be fulfilled only by the nanny. Neither work consummates an affair, but both maintain an ambiguous attraction that has the audience wondering how far it might go.

### The Dolls: Chloe (*Emanuel*) and Jericho (*Servant*)

68.     The doll in *Servant* looks almost identical to its extremely realistic precursor in *Emanuel*. For example:

- Both dolls are as physically realistic as possible.[7] As a result, both works include a number of "creepy" shots of the almost-but-not-quite lifelike "baby" (especially shots of the baby's open eyes). Once again, the physical resemblance of the dolls is the result of casting. Both are ultra-lifelike "reborn" baby dolls.

- Both dolls look to be about three months old (which of course reflects another remarkable similarity between the works: that both babies died at around this same age).

- Both dolls "come back to life," as part of the nanny's effort to resolve her own and the mother's grief.

- Both dolls have patchy dark hair—which was not at all an obvious choice in *Servant* given that Dorothy has red hair.

 

*The dolls, in Emanuel (left) and Servant (right)*

---

[7] The basic premise—of a mother so traumatized by her baby's death that she cares for a doll she believes to be her real baby—does not dictate the look of that doll. For example, in the acclaimed 2007 film *Lars and the Real Girl*, the main character "dates" a doll he believes to be real, but no effort is made to make the doll appear lifelike.



ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

### The Fathers: Thomas (*Emanuel*) and Sean (*Servant*)

69.    In both works, the fathers serve the important role of explaining to the nanny and audience what has happened—birth, death, lack of certainty regarding cause of death, grief, and then a doll. In each work, we find the father somewhat insensitive—perhaps out of exhaustion but perhaps also because he cannot understand a mother's grief. In *Emanuel*, this is shown by Thomas's principal reaction to his wife's grief-induced psychosis: to have her committed to a psychiatric facility. In *Servant*, this is shown by the husband's crass reference to his wife as crazy and talk of whether the nanny is "hot."

70.    Casting of the fathers is also similar. Sean and Thomas are cut from the same cloth: Both are tall, hipster-type white men who look like they've stepped out of a beer commercial.

### The Nannies' Love Interests: Tobe (*Emanuel*) and Claude (*Servant*)

71.    Both Emanuel and Leanne have romantic interludes with a boy their own age. In both works, the boy is timid, shy, sexually immature, and diminutive—although surprisingly intelligent and sophisticated. Both are taken aback by, and unsure how to handle the nanny's intensity. Both nannies take the romantic initiative: arranging the date and taking control of it. This is depicted in both works by the nanny directing the boy to steal a bottle of red wine; and by the nanny's choreographing the date. The boys in both works are thrilled that an attractive young girl has taken an interest, and happy to do as they are told.

### The Antagonists: Arthur (*Emanuel*) and Julian (*Servant*)

72.    Both works feature a nebbish, petulant, persnickety, quirky, professorial, twenty-something man who poses a threat to the nanny, and acts as the nanny's primary foil and antagonist. In *Emanuel*, this character is Arthur, whom she works with. Arthur ultimately insinuates himself into the household and questions the nanny's motives, competency, and possible criminality. In *Servant*, this character is Julian, the mother's brother, who also insinuates himself into the household and



ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

questions the nanny's motives, competency, and possible criminality. In both works, there is a powerful scene where this character confronts the nanny and threatens to expose her lies and alert the authorities.

73.     The two actors who play these characters are very similar in appearance: bowl haircuts, and rumpled suits with loose knit ties. They are both medium height white guys who could be brothers or fraternal twins.

 

*The antagonists, in Emanuel (left) and Servant (right)*

**Plot**

74.     The plot of *Servant* is substantially similar to that of *Emanuel*. As explained above, and as a threshold matter, *Servant's* premise is identical to *Emanuel's*. Out of grief, a mother replaces her dead infant with a life-like reborn doll. To her husband's concern, she cares for the doll as if it were their living baby. When she hires a nanny who also treats the doll as if it were alive, conflicts of loyalty arise that cause dangerous fissures. But the plot similarities between the two works go much deeper than this premise. For example:

- In both works, the nanny is the focal point—as the titles make clear.
- As in *Emanuel*, *Servant's* nanny is newly hired by a sophisticated and privileged white new mother, to care for a roughly three-month old baby. As in *Emanuel*, the mother in *Servant* appears to be confident, competent, cheerful, positive and self-possessed; and gives direction with kindness.

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

- In both works, the nanny seemingly appears in the mother's life through happenstance. In *Emanuel,* she happens to live next door to the mother's new house. In *Servant*, the nanny is "a friend of a colleague of an acquaintance," procured with the help of a "shout on Twitter."

- As in *Emanuel*, the nanny in *Servant* endures an awkward yet cute "get to know you" question and answer scene with her employer—in which the nanny is likely cringing at some of her answers as soon as they escape her lips, but the mother is forgiving. In *Emanuel*, the awkwardness is shown when the nanny struggles to remedy a bad answer. In *Servant*, the awkwardness is shown when Leanne cannot capitalize on an initially promising answer.

- As in *Emanuel*, the nanny in *Servant* is quickly in awe of the mother, which is partly communicated through her voyeurism: In *Emanuel,* she watches the mother through her bedroom window. In *Servant*, the nanny oddly watches the mother do her local news broadcasts on television.

- In both works, the nanny quietly and contemplatively takes in each detail of the mother's beautiful home, clearly seduced by what she sees and wanting to become a part of it.

- Early on in each work, the audience might be struck by how easy the baby is to care for. In each work, the audience catches a few fleeting and unremarkable glimpses of the baby.

- Relatively early in both works, the audience learns that the baby is not real, but rather an ultra-realistic "reborn" doll. This reveals that the mother, far from being competent and self-possessed, is in the midst of a psychosis.

- In both works, the mother is caring for the doll, and treating it as real, as the result of the trauma caused by the death of her real baby at three months.

- As in Emanuel, the nanny in *Servant* very quickly realizes the mother truly believes the doll to be real, and decides to play along with the delusion. Notably, neither nanny has even a moment where she confronts the mother or

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

laughs at the absurdity of the situation. Rather, both nannies almost immediately treat the doll as real.

- In scenes that are uncannily similar, the nannies in both works sing and speak to the doll/baby as if it were alive, even when they are alone and there would be no need to keep up the ruse.

- Both works feature a scene in which the father explains what has happened: the death of the baby, the psychotic break which was ameliorated only when the mother came to believe the reborn doll was her baby. In both works, the father reports that the precise cause of death is unknown—although the viewer does not know whether this is true. In both works, the nanny appears annoyed by the father's insensitivity to his wife's grief and odd coping mechanism, which causes the nanny to feel closer and more protective of the mother.

- Both works contain a scene showing the mother, alone in front a mirror, considering her post-baby body and stretch marks. The disconcerting effect is that we see the mother as a normal mom with normal post-partum concerns.

 

*Inspecting stretch marks, in Emanuel (left) and Servant (right)*

- In both works, the absence of the nanny's mother has left a hole in her life that her relationship with the mother begins to fill—in a way that complements the hole in the mother's life caused by the death of her baby.

- In both works, the nanny and mother develop an extraordinary reciprocal fondness. In both works, there are hints that the mother's immediate fondness

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

for the nanny—which seems somewhat unwarranted—is in part motherly, and may stem from a further warping of her already-displaced maternal instincts.

- In both works, the mothers go so far as to comment that they see themselves in the nanny (as one might say of a daughter).[8]

- Likewise, both nannies emulate the mothers (including by sitting at the mother's vanity while applying the mother's makeup).

- In both works, despite the reciprocal mother-daughter bond between mother and nanny, the relationship is nuanced with sexual tension. In both works, this is communicated primarily through a scene in the bathroom, where one helps the other with a painful condition. In *Emanuel*, it is the mother tending to Emanuel's cut in an unmistakably and spontaneously erotic manner, culminating in a lingering kiss on the hand. In *Servant*, it is the nanny tending to the mother's painful mastitis with a breast massage, which turns spontaneously erotic, culminating in a lingering kiss on the forearm.[9]

- In both works, the odd dynamics of the maternal/erotic relationship between nanny and mother is also communicated in a scene where the mother helps dress and then beautify the nanny. In both scenes, the mother takes in and marvels at the nanny's beauty.

---

[8] In *Emanuel*, the mother says "In a lot of ways I see myself in you." In *Servant*, the mother says "I love this girl. She's just like me."

[9] The clumsiness of *Servant*'s eroticism serves as another reminder that this is a woman's story told by men. Who else but a man could find mastitis sexy? As one reviewer put it: "By this time, Leanne has become firmly entrenched in the house as a friend, caregiver, and oddly erotic breast masseuse. In a particularly bizarre scene, Leanne helps Dorothy massage her breast while in the bathtub to relieve her mastitis. A normal part of womanhood gets an icky sexual treatment." Not knowing how to competently depict this nuanced relationship, *Servant* slavishly mimics *Emanuel* by including the surprisingly intimate wound-tending interlude in the master bathroom—but hits us over the head with the sexuality by giving Dorothy a faux orgasm. As another commentator puts it: "What I wasn't expecting, though, is the odd sexuality that permeates the first three episodes. It begins with Dorothy's mastitis as Leanne discovers her, moaning in pain in the bathtub. And after an awkward moment, Leanne kneels next to the tub, reaches over and begins massaging Dorothy's breast. As she grinds on it, Dorothy moans and figuratively climaxes with an orgasmic moan and a squirt of milk that looks vaguely seminal."

- In both works, other characters question the mother/nanny bond and question the nanny's experience and motivations.
- In both works, the bizarreness of the mother/nanny relationship is also expressed by the nanny looking on with a measure of discomfort as the mother readies herself for a date. Both works show the mother applying her makeup at a vanity, with the nanny shown out of focus on a bed behind her. In both works, the nanny remarks on the mother's beauty as they discuss the impending date. The similarity of these scenes goes beyond their plot points—each looks and feels the same.
- Following this scene, in each work, the nanny is shown seated at the mother's vanity. In each work, we watch the nanny in the mirror as she oddly applies the mother's makeup to herself—quite out of character and without any apparent reason. The purpose of this scene, in each work, is to show the nanny's emulation of the mother.
- As in *Emanuel*, the mother in *Servant* enters a trance-like state several times, which we understand to involve a moment when the awful truth of her baby's death might be percolating toward the surface of her consciousness. In both works, the mothers snap out of these states rather easily due to external distractions.
- In both works, the plot advances by way of a long and key scene involving an intimate home birthday dinner celebration at a formal dining room table. In both, the birthday setting facilitates an added measure of intimacy (in part forced and in part real) between the characters. At each dinner, conflicts send certain of the characters into other rooms for private conversations, leaving awkward moments for those remaining at the table.
- In both works, the absurdity of the situation (which the viewer could easily forget given how committed the nanny and mother are to the delusion) is

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

sometimes depicted through unnerving or "creepy" shots of the doll—still (of course), with wide open eyes.

 

*The dolls, in Emanuel (left) and Servant (right)*

- Taking the idea a step further, *Servant*, like *Emanuel*, features a slightly comical scene in which the doll is dropped in the entrance hall, only to be picked up just before the mother sees. These scenes make the viewer slightly uncomfortable because we have come to think of the doll as real.

 

*The doll, dropped in entrance hall, in Emanuel (left) and Servant (right)*

- Both works include a scene of the nanny taking the initiative to arrange a date with a boy. In each, the nanny is shown to be more of a "bad girl" than we might have thought, by directing her timid date to steal a bottle of red wine. In *Emanuel*, the wine is to be paired with French bread and cheese, but we never see the meal to fruition because Emanuel takes the date in a different direction. In *Servant*, the nanny's date suggests French bread and cheese, which is not in fact consumed because the nanny has other ideas.

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

- Both works feature a re-birth of the dead child as an emotional high point. The rebirth in each work is ambiguous in the sense that the reality and/or identity of the baby is open to debate. In each work, the nanny is the key to bringing the dead child back to life, partly in service of moving the mother beyond delusion, and partly as a result of her fascination with the mother.



*The dolls, come back to life, in Emanuel (left) and Servant (right)*

- Both works feature key imagery involving rain, puddles, and water. For example, in *Emanuel*, the notable and extended scene where the doll comes back to life takes place entirely underwater (as shown in beautiful sequences of Emanuel underwater, but with a natural face). Likewise, the nanny in *Servant* is shown underwater, but with a natural face. Also, in both works, water (in the form of rain and puddles) helps delineate the boundary between the safe interior of the home and the perilous outside world.

**Sequence of Events**

75.     Because the plots of *Emanuel* and *Servant* are so similar, and because each unfolds in roughly linear chronology, the sequence of events in the two works are extremely similar. But even beyond these stark similarities, there are several examples where the similarity of sequencing is shocking. For example:

- As mentioned above, both works include an awkward job interview scene (which obviously occurs early on). The scenes following the "interviews" are uncannily similar as well. In *Emanuel*, it's now night, and we cut back and forth between Emanuel looking out her bedroom window (at the mother) as she falls

asleep; and the mother as she rocks her baby to sleep. In *Servant*, it's also now night, and we cut back and forth between the nanny and the mother in their respective bathtubs. In each scene, the mother and nanny are shown alternatively in solitary moments—but with a strong sense that they are connected during those moments.

- As also mentioned, each work includes a scene of the nanny looking on as the mother applies makeup at her vanity in preparation for a date; followed by a scene of the nanny sitting at the same vanity, applying the mother's makeup in the same manner as was the mother (which we observe in vanity mirror).



*The mother, readying for date, in Emanuel (left) and Servant (right)*



*The nanny, emulating the mother, in Emanuel (left) and Servant (right)*

- In both works, the nanny faints under stress—followed by the nanny's point-of-view shot as she regains consciousness to the sight of concerned faces.

**Mood and Pace**

76.    The mood of the two works is substantially similar. Both are played as ominous "psychological thrillers," with elements of magical realism—a rare combination. Indeed, Ms. Gregorini's choice to tell her nuanced emotional tale of



motherhood as a thriller was a bold and surprising one—and one parroted by Defendants in *Servant*. In particular:

- Both works are tense throughout. In both works, the risk of secrets being exposed, and the urgent and emotional need to protect those secrets, is meant to feel like a ticking time bomb. One false move, or one prying eye, and the house of cards would come tumbling down. As a result, the audience experiences heightened feelings of suspense, excitement, surprise, anticipation and anxiety.

- Both works have an ominous mood, created by the use of camera angles, lighting, and the choice of music (which is heavily featured to signify danger). Both works use opera, for example, to achieve this result.

- As in *Emanuel*, *Servant* employs a technique where actors' eyelines are so close to being directly into the lens that the audience is invited directly into the center of the uncomfortable tension. This technique of breaking the fourth wall is extremely unusual, and uncomfortably amplifies the urgency and intimacy of the mood.



*The nanny looking into the camera in Emanuel (left) and Servant (right)*

- Indeed, both works go so far as to show characters purposefully looking directly into the camera—as a way of depicting the nanny's point of view when, after fainting from stress, she awakens to the gaze of concerned faces.

COMPLAINT

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

 

*Concerned faces gazing into camera, in Emanuel (left) and Servant (right)*

- As in *Emanuel*, *Servant* employs unusually tight shots of characters' faces, sometimes to the point where chins and hairline are cut off. The effect of this camera and cinematographic technique is to create a feeling of uncomfortable intimacy.

 

*Cropped faces, in Emanuel (left) and Servant (right)*

- Both works use magical realism to create an otherworldly mood. In *Emanuel*, this takes the form of water imagery. At first water escapes from under the nursery door, then it rises up from nowhere in a subway car, culminating in an underwater "rebirth" scene where the entire nursery is submerged. In *Servant*, it's not water but rather wood—that keeps finding a way into the father's body. At first, he gets a splinter in his finger, then in his rear end, then in his mouth, and so on. In both works, the otherworldly magical realism is foreboding and escalating.

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

- As in *Emanuel*, *Servant* uses the unusual cinematographic technique of featuring characters in conversation in dark shadowy rooms—but with the sun in their eyes (through horizontal blinds). In both works, the technique is mixed with quick editing between tightly framed shots of the characters. The overall effect again reflects the mood of both works: uncomfortable and dark.

- Both works proceed at a rapid pace. In each, the characters can barely keep up with events as they unfold.

- As mentioned above, scenes of extended-family dinners are often used to juxtapose intimacy and tension. This mood is furthered by the theme, in both works, of cooking and food. In *Emanuel*, dinners are not simply prepared—they are narrated. The menu is reported in detail, in the manner of a fine restaurant ("herb roasted chicken with porcini mushroom stuffing"). Emanuel's birthday cake is painstakingly decorated by hand. So too in *Servant*, where elaborate and exotic food, and its preparation, are keys to each episode.

**Dialogue**

77.   *Emanuel* and *Servant* share similar dialogue, including as follows:

- Both works feature scenes where the mother expresses that she sees herself in the nanny—followed by surprisingly strong exclamations of affection.

- Both works feature scenes where the mother gives baby-care direction in extremely realistic terms, demonstrating the depth of her commitment to the delusion that the doll is real.

- Both works feature awkward question-and-answer scenes, where the mother attempts to better know the nanny.

- Both works feature scenes where the father explains that the cause of the baby's death is unknown.

- Both works feature scenes in which the nanny tells the mother "you look beautiful" as they discuss an impending date.

COMPLAINT

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

- Both works feature scenes where characters speculate that the nanny's youth is the explanation for her quirks and reticence.

**Differences in the works**

78.    Defendants will point to differences between *Emanuel* and *Servant*. But what they call differences are really just content that was tacked on to Ms. Gregorini's story—usually in ways required when adapting a motion picture for use as an episodic television series. Indeed, Defendants misappropriated the ninety-minute film *Emanuel* for use as their first three half-hour episodes of *Servant*, which were released as a unit on Thanksgiving 2019, and can be thought of as the series "pilot." That each of the subsequent thirty-minute weekly episodes introduces new self-contained vignettes or sub-plots does not detract from the substantial similarity of *Emanuel* and Episodes 1-3 of *Servant*.[10]

## First Claim For Relief For Copyright Infringement
### (Against All Defendants)

79.    Plaintiff incorporates by this reference all other paragraphs in this pleading, as if fully set forth in full in this claim.

80.    In 2012, Emanuel Film LLC authored the motion picture *The Truth About Emanuel,* then entitled *Emanuel and the Truth About Fishes* (the "Work"). The

---

[10] Indeed, in television, it is quite common for a series to offer a movie-like pilot—which establishes characters within a self-contained story—and then build on those elements in subsequent weekly episodes that use the story of the pilot as backstory to the series. The episodes can continue for many years, of course—which is Mr. Shyamalan's publicly-expressed ambition for *Servant*. Imagine, for example, that *Romeo and Juliet* was still protected by copyright, and was improperly adapted as a television pilot. That years of subsequent episodes—which might focus on the hilarious continued misadventures of the Montagues and Capulets—did not continue to directly derive from the original play would not somehow cure the original infringement. As Judge Learned Hand famously remarked, "No plagiarist can excuse the wrong by showing how much of his work he did not pirate." The original infringement remains, of course, even if later episodes alter the meaning of the pilot. If it were revealed at the end of Season 5 that Romeo was an alien, for example, that would have no bearing on the substantial similarity of play and pilot.

Work is creative and original, constituting copyrightable subject matter under United States law.

81.     In 2017, Emanuel Film LLC was dissolved and cancelled, and the copyright in the Work was assigned to Plaintiff, who is the screenwriter, director, and producer. Since that assignment, Plaintiff has been and still is the sole proprietor of all rights, title, and interest in and to the copyright in the Work. Plaintiff has complied in all respects with the Copyright Act and all other laws governing copyright. Plaintiff has complied with 17 U.S.C. § 411 in that the deposit, application, and fee required for registration have been delivered to the Copyright Office in proper form, and the work has registered—U.S. Copyright Office Reg. No. PA0002213169.

82.     Defendants had access to Plaintiff's work, as described above (including its premier at Sundance and nationwide release).

83.     Defendants, with full knowledge of Plaintiff's rights, infringed Plaintiff's copyrights by preparing an unauthorized derivative work; and by producing, distributing, streaming, and transmitting Episodes 1 through 3, of Season 1, of the television show entitled *Servant*.[11]

84.     As explained above, *Servant* is substantially similar to *Emanuel*.

85.     All such acts were performed by Defendants without the permission, license, or consent of Plaintiff. Plaintiff has notified Defendants in writing of the infringements. As described above, all Defendants have continued to stream and otherwise distribute the infringing material even after receiving Plaintiff's protests and demands that such infringement cease.

86.     By reason of Defendants' acts of copyright infringement, Plaintiff has suffered, and will continue to suffer substantial damages to her business in the form of diversion of trade, loss of profits, and a dilution in the value of Plaintiff's rights and reputation, all in amounts that are not yet ascertainable, but not less than the

---

[11] For the purposes of this Complaint, "*Servant*" refers to Season One, Episodes 1-3, of the Apple TV+'s original series *Servant*, which were first available for streaming on November 28, 2019.

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

jurisdictional minimum of this Court. In particular, the value of Ms. Gregorini's intellectual property related to the Work has been greatly diminished. For example, were it not for the Defendants' infringement, *Emanuel* would be a valuable asset, including as a television property. As it is, the market likely does not have room for another television series about a nanny caring for a doll.

87.     By reason of Defendants' infringement of Plaintiff's copyright, Defendants are liable to Plaintiff for the actual damages incurred by Plaintiff as a result of the infringement, and for any profits of Defendants directly or indirectly attributable to such infringement.

88.     In addition to compensating Ms. Gregorini for rendering *Emanuel* un-adaptable for television, the Defendants must turn over their ill-gotten gains. In the case of Apple, that is likely to be a staggering sum—given the unabashed manner in which it has leveraged what it considers to be one of *the best stories ever told* to aggrandize and promote its multi-billion-dollar foray into television.

**Second Claim For Relief For**

**Contributory And Vicarious Copyright Infringement**

**(Against All Defendants)**

89.     Plaintiff incorporates by this reference all other paragraphs in this pleading, as if fully set forth in full in this claim.

90.     Each Defendant is contributorily liable for the infringement alleged herein because each Defendant knowingly induced, participated in, aided and abetted, and profited from the production of and/or subsequent sales of the infringing work.

91.     Each Defendant is vicariously liable for the infringement alleged herein because each Defendant had the right and ability to supervise the infringing conduct, including the practical ability to do so, and because each Defendant had a direct financial interest in the infringing conduct.



ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

## PRAYER

WHEREFORE, Plaintiff prays judgment against Defendants as follows:

1.      That Plaintiff is awarded all damages, including future damages, that Plaintiff has sustained, or will sustain, as a result of the acts complained of herein, subject to proof at trial;

2.      That Plaintiff is awarded her costs, attorneys' fees and expenses in this action;

3.      That Plaintiff is awarded pre-judgment interest;

4.      For an order permanently enjoining Defendants and their employees, agents, servants, attorneys, representatives, successors, and assigns; and any and all persons in active concert or participation with any of them, from engaging in the misconduct referenced herein;

5.      That Defendants be ordered to immediately recall and sequester inventories of the infringing material, and to supply accountings to Plaintiff's counsel;

6.      That Defendants be ordered to deliver their entire inventories of infringing materials to a mutually selected third party for supervised destruction;

7.      That Defendants be ordered to file with this Court and serve upon Plaintiff's counsel within thirty (30) days after service of the judgment demanded herein, a written report submitted under oath setting forth in detail the manner in which they have complied with the judgment;

8.      For disgorgement of all proceeds, and restitution of all monies received by Defendants as the result of their wrongful conduct;

9.      For punitive damages in an amount sufficient to deter Defendants from their wrongful conduct; and

10.     Such other damages and further relief as the Court may deem appropriate.

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

DATED: January 15, 2020

ERIKSON LAW GROUP

By:  _____
     DAVID ERIKSON
Attorneys for Plaintiff Francesca Gregorini

COMPLAINT

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on her claims on all issues triable by a jury.

DATED: January 15, 2020       ERIKSON LAW GROUP

By:   _____
            DAVID ERIKSON
      Attorneys for Plaintiff Francesca Gregorini



ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT