NICOLAS A. JAMPOL (State Bar No. 244867)
  nicolasjampol@dwt.com
DIANA PALACIOS (State Bar No. 290923)
  dianapalacios@dwt.com
CYDNEY SWOFFORD FREEMAN (State Bar No. 315766)
  cydneyfreeman@dwt.com
CAMILA PEDRAZA (State Bar No. 329984)
  camilapedraza@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone:  (213) 633-6800
Fax:  (213) 633-6899

Attorneys for Defendants
BLINDING EDGE PICTURES, INC.; UNCLE
GEORGE PRODUCTIONS, LLC; APPLE INC.;
ESCAPE ARTISTS, INC. (erroneously sued as
ESCAPE ARTISTS LLC); DOLPHIN BLACK
PRODUCTIONS; M. NIGHT SHYAMALAN;
TONY BASGALLOP; ASHWIN RAJAN;
JASON BLUMENTHAL; TODD BLACK;
STEVE TISCH

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCESCA GREGORINI, | Case No. 2:20-cv-00406-JFW-JC |
| Plaintiff, | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT** |
| vs. | |
| APPLE INC., a California corporation; M. NIGHT SHYAMALAN, an individual, BLINDING EDGE PICTURES, INC., a Pennsylvania corporation; UNCLE GEORGE PRODUCTIONS, a Pennsylvania corporate; ESCAPE ARTISTS LLC, a California limited liability company; DOLPHIN BLACK PRODUCTIONS, a California corporation; TONY BASGALLOP, an individual; ASHWIN RAJAN, an individual; JASON BLUMENTHAL, an individual; TODD BLACK, an individual; STEVE TISCH, an individual; and DOES 1-10, inclusive, | Date:    March 23, 2020<br>Time:    1:30 p.m.<br>Crtrm:   7A |
| Defendants. | |

**TO PLAINTIFF AND HER ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on March 23, 2020, at 1:30 p.m. or as soon as may be heard in Courtroom 7A of the United States District Court for the Central District of California, First Street Courthouse, 350 West First Street, Los Angeles, California 90012, defendants Blinding Edge Pictures, Inc., Uncle George Productions, LLC, Apple Inc., Escape Artists, Inc. (erroneously sued as Escape Artists LLC), Dolphin Black Productions, M. Night Shyamalan, Tony Basgallop, Ashwin Rajan, Jason Blumenthal, Todd Black, and Steve Tisch (collectively, "Defendants") will and hereby do move this Court for an order dismissing with prejudice the complaint filed by plaintiff Francesca Gregorini ("Plaintiff").

This motion is made pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that Plaintiff's complaint fails to state a claim. Her first cause of action for copyright infringement fails because there is no substantial similarity of protected expression between the works at issue. Because her claim for direct copyright infringement fails, so too does her second cause of action for contributory and vicarious copyright infringement.

This motion is based on this notice of motion, the memorandum of points and authorities, the request for judicial notice, the declaration of Cydney Swofford Freeman, the notice of lodging with exhibits, and all other matters of which this Court may take judicial notice, the pleadings, files, and records in this action, and on any argument heard by this Court.

This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on February 11, 2020. *See* Dkt. 18.

DATED: February 18, 2020            DAVIS WRIGHT TREMAINE LLP

                                    By: ___/s/ Nicolas A. Jampol_____
                                         Nicolas A. Jampol

                                    Attorneys for Defendants

1

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................ 1

II.   FACTUAL BACKGROUND.............................................................. 2

    A.    *The Truth About Emanuel* ...................................................... 2

    B.    *Servant* ...................................................................................... 3

    C.    The Complaint ........................................................................... 5

III.  THE WORKS ARE NOT SUBSTANTIALLY SIMILAR............................ 5

    A.    Lack of Substantial Similarity May Be Decided on a Motion to Dismiss ...................................................................................... 6

    B.    Courts Must Filter Out Unprotectable Expression............................... 7

    C.    The Works' Protected Expression Is Not Substantially Similar ......... 8

        1.    Plot .................................................................................. 9

            a.    Most of the Alleged Plot Similarities Are Unprotectable.................................................... 9

            b.    The Complaint Mischaracterizes Alleged Plot Similarities. .................................................... 10

            c.    The Works' Plots Are Not Substantially Similar. ......... 11

        2.    Sequence of Events ....................................................... 13

        3.    Theme.............................................................................. 14

        4.    Characters ...................................................................... 16

            a.    Emanuel and Leanne.................................... 16

            b.    Linda and Dorothy ....................................... 18

            c.    Thomas and Sean ......................................... 19

            d.    Arthur and Julian ......................................... 19

            e.    Claude and Tobe .......................................... 20

            f.    The Dolls ....................................................... 21

            g.    Other Characters .......................................... 21

        5.    Setting............................................................................. 21

**DAVIS WRIGHT TREMAINE** LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

|   |   | 6. | Mood .................................................................................... | 23 |
|   |   | 7. | Pace ..................................................................................... | 24 |
|   |   | 8. | Dialogue .............................................................................. | 24 |
|   | D. |   | Plaintiff's Claim for Vicarious and Contributory Infringement Fails ........................................................................................ | 25 |
| IV. | CONCLUSION........................................................................................... | | | 25 |

DEFENDANTS' MOTION TO DISMISS COMPLAINT

4838-2051-0130v.8 0113237-000003

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

# <u>TABLE OF AUTHORITIES</u>

<u>**Page**</u>

**Cases**

*Apple v. Microsoft,*
   35 F.3d 1435 (9th Cir. 1994) ................................................................. 7

*Arica Inst. v. Palmer,*
   970 F.2d 1067 (2d Cir. 1992) ................................................................. 8

*Benay v. Warner Bros.,*
   607 F.3d 620 (9th Cir. 2010) ............................................................. 7, 21

*Berkic v. Crichton,*
   761 F.2d 1289 (9th Cir. 1985) ............................................................. 11

*Bernal v. Paradigm Talent & Lit. Agency,*
   788 F. Supp. 2d 1043 (C.D. Cal. 2010) ................................................ 8

*Cavalier v. Random House, Inc.,*
   297 F.3d 815 (9th Cir. 2002) ................................................................. 7

*Christianson v. West Pub. Co.,*
   149 F.2d 202 (9th Cir. 1945) ................................................................. 6

*Dellar v. Samuel Goldwyn, Inc.,*
   150 F.2d 612 (2d Cir. 1945) ................................................................. 1

*DuckHole v. NBC Universal,*
   2013 WL 5797279 (C.D. Cal. Sep. 6, 2013) ........................................ 6

*Fillmore v. Blumhouse,*
   2017 WL 4708018 (C.D. Cal. July 7, 2017) ................................ 6, 8, 23

*Fox Broad. Co. v. Dish Network,*
   747 F.3d 1060 (9th Cir. 2014) ............................................................. 25

*Funky Films v. Time Warner Entm't,*
   462 F.3d 1072 (9th Cir. 2006) ......................................................... 7, 11

*Gadh v. Spiegel,*
   2014 WL 1778950 (C.D. Cal. Apr. 2, 2014) ....................................... 6

**DAVIS WRIGHT TREMAINE** LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

*Gallagher v. Lions Gate Entm't,*
    2015 WL 12481504 (C.D. Cal. Sept. 11, 2015) ................................................. 24

*Heusey v. Emmerich,*
    2015 WL 12765115 (C.D. Cal. Apr. 9, 2015) ..................................................... 6

*Kouf v. Walt Disney Pictures,*
    16 F.3d 1042 (9th Cir. 1994) ............................................................................. 8

*Litchfield v. Spielberg,*
    736 F.2d 1352 (9th Cir. 1984) ....................................................................... 1, 8

*Marcus v. ABC Signature Studios,*
    279 F. Supp. 3d 1056 (C.D. Cal. 2017) .............................................................. 6

*Olson v. Nat'l Broad. Co.,*
    855 F.2d 1446 (9th Cir. 1988) ......................................................................... 24

*Rentmeester v. Nike,*
    883 F.3d 1111 (9th Cir. 2018) ........................................................................... 6

*Shame on You Prods. v. Banks,*
    120 F. Supp. 3d 1123 (C.D. Cal. 2015) .....................................7, 8, 16, 18, 19

*Silas v. Home Box Office,*
    201 F. Supp. 3d 1158 (C.D. Cal. 2016) ................................................... *passim*

*Stern v. Does,*
    978 F. Supp. 2d 1031 (C.D. Cal. 2011) ............................................................ 24

*Three Boys Music Corp. v. Bolton,*
    212 F.3d 477 (9th Cir. 2000) .............................................................................. 5

*Walker v. Time Life Films,*
    784 F.2d 44 (2d Cir. 1986) ................................................................................. 8

*Wild v. NBC Universal,*
    788 F. Supp. 2d 1083 (C.D. Cal. 2011) .............................................................. 6

*Zella v. E.W. Scripps Co.,*
    529 F. Supp. 2d 1124 (C.D. Cal. 2007) .......................................................... 6, 7

**Rules**

Federal Rule of Evidence 201 ................................................................................. 6

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Plaintiff Francesca Gregorini's lawsuit is another example of "that obsessive conviction, so common among authors and composers, that all similarities between their works and any others which appear later must inevitably be ascribed to plagiarism." *Litchfield v. Spielberg*, 736 F.2d 1352, 1358 (9th Cir. 1984) (quoting *Dellar v. Samuel Goldwyn, Inc.*, 150 F.2d 612, 613 (2d Cir. 1945)).  This truism is particularly applicable to Plaintiff's attempt to claim ownership over unprotectable ideas, including a grieving mother who believes a therapy doll is her deceased child or "white, sophisticated, and privileged" parents hiring a nanny for their "well-put-together home."  These concepts are taken from real life and are found in countless movies, television programs, and other works.

While Plaintiff's film *The Truth About Emanuel* ("*Emanuel*") and Defendants' television series *Servant* both employ aspects of these unprotectable concepts, the similarities end there.  In *Emanuel*, a quintessential American teenager struggling to cope with the loss of her mother and her next-door neighbor struggling to cope with the loss of her baby together experience the catharsis of acceptance.  In *Servant*, a deeply religious self-flagellating young woman leaves her cult to be a nanny for a family that she has targeted, and seemingly transforms a doll into a real baby while—in the midst of various supernatural events—other characters attempt to find out where the baby and nanny are from.  As one character ominously asks in the trailer, "do you know who you welcomed into your home?"  *See* RJN § 1.

To divert attention from the fact that *Emanuel* and *Servant* tell vastly different stories, Plaintiff has assembled a laundry list of alleged similarities.  Many of these alleged similarities flow from unprotectable concepts, while others are ubiquitous in film and television.  Plaintiff relies heavily on these common elements, such as the "mystery/danger of a stranger coming to town," a home with a wooden staircase, "tight shots of characters' faces," or, incredibly, ominous music

1

used to "signify danger."  Once these elements are disregarded, as they must be, there is almost no similarity of protectable expression.[1]

Defendants agree that "anyone who takes the time to view and compare the works" will reach an "inescapable conclusion" (Compl. ¶ 5), but the conclusion will be that *Emanuel* and *Servant* are not substantially similar.  Accordingly, Defendants respectfully request that this Court dismiss the complaint with prejudice.

## II.   FACTUAL BACKGROUND

### A.   *The Truth About Emanuel*

*Emanuel* is an "emotional story about motherhood and daughterhood." Compl. ¶ 10; Dkt. 13.[2]  It is told from the point of view of Emanuel, a typical teenager who struggles with the guilt of knowing her mother died giving birth to her, and attempts to coexist with her new stepmother.  Most days, she takes the train to her job at a medical supply store, listening to music or sitting with her boyfriend Claude.  After a single mother (Linda)—who "bears a striking resemblance" to Emanuel's deceased mother—moves in next door, Emanuel offers to babysit.  *See* Dkt. 13 (DVD back cover); *id.* at 7:57. When Emanuel finally meets the "baby," she is stunned to discover that the child is a doll.  *Id.* at 21:00.

Despite this discovery, Emanuel continues to visit Linda (when she is not working or with her family or boyfriend).  At first, Emanuel remains uncomfortable with the doll and refuses to help Linda with it, but she later acquiesces.  Emanuel begins to pretend the doll is a baby in Linda's presence, but generally not when

---

[1] Plaintiff believes that her lawsuit advances the interests of creators, but just the opposite is true: asserting copyright claims based on unprotectable concepts and common elements creates a chilling effect, as the various entities that are needed to produce and distribute a work exercise more caution about new projects that share unprotectable elements or themes with prior works.  This results in more roadblocks for new creators and jeopardizes the creation of works with new perspectives on unprotectable concepts or new uses of common elements.

[2] References to "Dkt. 13" throughout this brief are to the DVD of *Emanuel* that Plaintiff lodged with the Court at Dkt. 13.  *See also* RJN § 1.

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Linda is gone.  Emanuel's affection for Linda grows as she (and the audience) attempts to figure out why Linda is pretending the doll is a real baby.  Emanuel is protective of Linda and concerned about others discovering the truth, routinely making excuses as to why others cannot meet the baby.  She falls deeper into Linda's orbit, until Linda brings home a date (Arthur) who discovers the doll and, assuming that Emanuel harmed the actual child, calls the police.  Dkt. 13 at 1:07:15.

Linda is committed to an institution, and while she is there, her ex-husband (Thomas) comes to Emanuel's house to explain that his and Linda's baby died of an unknown cause.  Dkt. 13 at 1:18:30.  Thomas reveals that Linda refused to go to her daughter's burial and was given a therapy doll.  When Linda started to believe the doll was real, Thomas tried to have her committed, but Linda fled.  After this discovery, Emanuel decides to free Linda from the institution.  She breaks into the facility and takes Linda to Emanuel's mother's grave, the first time Emanuel has visited.  *Id.* at 1:21:05.  She sobs while she digs a hole at the gravesite, and the two bury the doll next to Emanuel's mother, each processing her own grief.  *Id.* at 1:27:00.  The film closes on the pair looking up at the stars, finally headed toward acceptance.  *Id.* at 1:29:50.

**B.**   *Servant*

*Servant* is a psychological thriller that explores the question asked in the trailer: "do you know who you welcomed into your home?"[3]  The series portrays a wealthy couple (Dorothy and Sean Turner) that hires a full-time, live-in nanny (Leanne) for their baby son Jericho, which—as the audience already knows from the trailer—is a doll that was given to Dorothy to cope with the loss of their child.  *See* RJN § 1.  Jericho died after Dorothy inadvertently left him in her car for hours in the middle of summer, which Dorothy never accepted, instead slipping into

---

[3] Defendants are lodging Episodes 1-10 of *Servant* as Exhibits 1-10 to the declaration of Cydney Swofford Freeman.  *See also* RJN § 1.

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

denial and delusion.  From the outset, viewers discover that Leanne is no ordinary teenager, but instead a creepy, deeply religious, possibly paranormal, self-flagellating cult member who subsists on cans of tomato soup and creates wooden crosses (and who, the audience later learns, specifically targeted the Turners).

When the audience first sees Leanne with the doll, she picks it up like a real baby, sings to it, changes its diaper, and never treats the doll as anything other than a living child even *when nobody is watching* and despite Sean telling Leanne she need not pretend around him.  *E.g.*, Ex. 1 at 13:11, 17:17, 29:01.  Sean explains to Leanne that the doll is a "reborn doll" (a real-life therapy doll, RJN § 2), which was prescribed to Dorothy after Jericho died.  But Leanne continues interacting with the doll just as she would a real baby.  She never acknowledges that the doll is not real, and does not attempt to shield the doll from public view in any way, taking him on walks and otherwise out in public.  *E.g.*, *id.* at 17:17.

At the end of the first episode, Sean hears crying on the baby monitor and walks into the nursery to find a real baby.  Ex. 1 at 34:08.  In the next episode, he confronts Leanne, who has no reaction to the child being any different.  When Sean asks her whose baby the child is, she calmly replies, "that's your baby Mr. Turner, it's Jericho."  Ex. 2 at 3:17.  From there, the seemingly supernatural occurrences take flight, each tied back to Leanne.  For example, as Sean's relationship with Leanne sours, he begins to get wooden splinters all over his body, including unlikely places like his throat, and then loses his ability to taste, smell, and, eventually, feel.  *E.g.*, *id.* at 10:38, 17:44, 27:10, 28:11.  Leanne also seemingly has the ability to bring the dead back to life, including a cricket, a stray dog, and, possibly, a human baby.  Ex. 1 at 34:08; Ex. 5 at 30:59; Ex. 7 at 28:02.

Wary of Leanne, Dorothy's protective brother Julian—an abrasive character with drink always in hand—hires a private investigator (Roscoe) to track down information about Leanne, who he believes may have kidnapped the baby that is currently in the Turners' home.  Julian and Roscoe visit Leanne's hometown and

discover gravestones belonging to Leanne's parents, *and to Leanne herself.*  Ex. 3 at 8:31, 10:17, 26:12.  This ominous and confusing discovery is explained later in the season—Leanne's cult-member aunt (May) and uncle (George) took Leanne in after a fire killed her parents, and pretended Leanne had died so they could raise her "as God instructed."  Ex. 10 at 12:15.

At the end of the first season, Aunt May pressures Leanne to rejoin their cult, telling her that Dorothy is undeserving of the "second chance" Leanne is giving her.  Leanne leaves the Turners, and when Dorothy hurries to the nursery after finding Leanne's room empty, she finds the doll instead of the baby.  In the last scene of the season, Dorothy seems to realize that the doll is not her son.  Ex. 10 at 31:39.

Apple released the first three episodes to Apple TV+ subscribers on November 28, 2020, with the remaining seven episodes released weekly after that.

## C.   The Complaint

On January 15, 2020, Plaintiff filed her complaint for direct, contributory, and vicarious copyright infringement.  The complaint alleges that three of the ten episodes of *Servant* are "strikingly similar" to *Emanuel*.  The works themselves reveal that there is almost no similarity of protectable expression between them—let alone substantial similarity.  Accordingly, Defendants move to dismiss Plaintiff's complaint in its entirety with prejudice.

## III.   THE WORKS ARE NOT SUBSTANTIALLY SIMILAR

To survive a motion to dismiss, Plaintiff must demonstrate the protected expression in *Emanuel* and *Servant* is substantially similar.  She cannot.  *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000).[4]

---

[4] Plaintiffs in copyright actions must also establish that the defendants had access to the allegedly infringing work.  *Three Boys Music Corp.*, 212 F.3d at 481.  Though Defendants dispute that any of them ever had access to *Emanuel*, solely for purposes of this motion, Defendants do not challenge access.

DEFENDANTS' MOTION TO DISMISS COMPLAINT
4838-2051-0130v.8 0113237-000003

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

## A.    Lack of Substantial Similarity May Be Decided on a Motion to Dismiss

A court may compare the works at issue in a copyright-infringement claim and dismiss the claim as a matter of law if they are not substantially similar. As this Court explained, "[t]here is ample authority for holding that when the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on a motion to dismiss." *Gadh v. Spiegel*, 2014 WL 1778950, at *3 n.2 (C.D. Cal. Apr. 2, 2014) (Walter, J.) (quoting *Christianson v. West Pub. Co.*, 149 F.2d 202, 203 (9th Cir. 1945)). *See also Rentmeester v. Nike*, 883 F.3d 1111, 1123 (9th Cir. 2018) (same). Indeed, for nearly 75 years, "courts have followed this rather obvious principle and dismissed copyright claims that fail from the face of the complaint (and in light of all matters properly considered on a motion to dismiss)." *Gadh*, 2014 WL 1778950, at *3 n.2 (citing *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1130 (C.D. Cal. 2007)). *See also Heusey v. Emmerich*, 2015 WL 12765115, at *3 (C.D. Cal. Apr. 9, 2015) (granting motion to dismiss copyright claim for lack of substantial similarity), *aff'd*, 692 Fed. Appx. 928 (9th Cir. 2017); *Wild v. NBC Universal*, 788 F. Supp. 2d 1083, 1097 (C.D. Cal. 2011) (same), *aff'd*, 513 Fed. Appx. 640 (9th Cir. 2013).

In considering a motion to dismiss, courts may also "consider matters subject to judicial notice pursuant to Federal Rule of Evidence 201." *Zella*, 529 F. Supp. 2d at 1128. In particular, courts may consider facts "not subject to reasonable dispute," *Marcus v. ABC Signature Studios*, 279 F. Supp. 3d 1056, 1062-1063 (C.D. Cal. 2017), and "generic elements of creative works," *Zella*, 529 F. Supp. 2d at 1129. *See also Heusey*, 2015 WL 12765115, at *4 (judicial notice of "historical events, theories commonly-held by historians, and the political atmosphere of the Elizabethan era"); *Fillmore v. Blumhouse*, 2017 WL 4708018, at *3 (C.D. Cal. July 7, 2017) (judicial notice that "[b]ringing the dead back to life" is common in horror, fantasy, and sci-fi, and that "[d]ream sequences are a common narrative device in works of fiction"); *DuckHole v. NBC Universal*, 2013 WL 5797279, at *4

DEFENDANTS' MOTION TO DISMISS COMPLAINT
4838-2051-0130v.8 0113237-000003

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

1  (C.D. Cal. Sep. 6, 2013) (judicial notice of generic elements of veterinary-themed

2  sitcoms, like (1) settings of an operating room, exam room, and lobby; (2) pets;

3  (3) a comedic tone; and (4) romantic relationships).

4  **B.  Courts Must Filter Out Unprotectable Expression**

5      To assess substantial similarity on a motion to dismiss, the Ninth Circuit uses

6  the "extrinsic test," which focuses on objective "articulable similarities" between

7  the works.  *Zella*, 529 F. Supp. 2d at 1133.  In comparing the works, "a court must

8  filter out and disregard the non-protectible elements."  *Cavalier v. Random House,*

9  *Inc.*, 297 F.3d 815, 822 (9th Cir. 2002).  Indeed, courts "may place *no* reliance upon

10  any similarity in expression resulting from unprotectable elements."  *Apple v.*

11  *Microsoft*, 35 F.3d 1435, 1446 (9th Cir. 1994) (emphasis in original).  This is

12  because "similarities derived from the use of common ideas cannot be protected;

13  otherwise, the first to come up with an idea will corner the market."  *Id.* at 1443.

14      Accordingly, courts filter out so-called *scenes a faire*, or elements that flow

15  naturally from a basic premise.  *Cavalier*, 297 F.3d at 823.  For example, in *Benay*

16  *v. Warner Bros.*, 607 F.3d 620 (9th Cir. 2010), the Ninth Circuit disregarded

17  numerous similarities that flowed from the works' shared "basic plot premise" of

18  "an American war veteran [who] travels to Japan in the 1870s to train the Imperial

19  Army in modern Western warfare."  *Id.* at 625.  *See also Shame on You Prods. v.*

20  *Banks*, 120 F. Supp. 3d 1123, 1151 (C.D. Cal. 2015), *aff'd*, 690 F. App'x 519 (9th

21  Cir. 2017) (dismissing copyright claim after disregarding similarities flowing from

22  the works' shared premise, such as "[g]etting drunk, spending a 'one-nighter' with

23  someone you just met, waking up disoriented the next morning at the individual's

24  house or apartment, and putting on the clothes worn the night before"); *Funky Films*

25  *v. Time Warner Entm't*, 462 F.3d 1072, 1077-1081 (9th Cir. 2006) (finding that the

26  plaintiff's extensive alleged similarities relied "heavily on *scenes a faire* – not

27  concrete renderings specific to [plaintiff's work] – and are, at best, coincidental").

28

DEFENDANTS' MOTION TO DISMISS COMPLAINT
4838-2051-0130v.8 0113237-000003

**DAVIS WRIGHT TREMAINE** LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Courts also routinely filter out generic or common elements before analyzing for substantial similarity.  *See, e.g.*, *Fillmore*, 2017 WL 4708018, at *3 (finding that "[d]ream sequences" and "[b]ringing the dead back to life" are unprotectable); *Shame on You Prods.*, 120 F. Supp. 3d at 1159 ("outdoor chase on wheels" was too generic of a concept to be protectable).

## C.    The Works' Protected Expression Is Not Substantially Similar

Once unprotectable elements are filtered out, courts must then compare the objective, "specific expressive elements" of the works at issue.  *Kouf v. Walt Disney Pictures*, 16 F.3d 1042, 1045 (9th Cir. 1994).  This comparison focuses on "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in the two works."  *Id.*

Importantly, courts repeatedly find that lists of "random similarities scattered throughout the works" are insufficient to satisfy the extrinsic test because they are "inherently subjective and unreliable."  *See Litchfield*, 736 F.2d at 1356.  Indeed, courts have readily disposed of copyright claims even where the list of alleged similarities is extensive.  *See, e.g.*, *Bernal v. Paradigm Talent & Lit. Agency*, 788 F. Supp. 2d 1043, 1061, 1063 (C.D. Cal. 2010) (133-page chart with side-by-side comparisons of the works); *Arica Inst. v. Palmer*, 970 F.2d 1067, 1073 (2d Cir. 1992) (70-page appendix of similarities).  To assess similarity, the law requires a review of the actual works, not a plaintiff's characterization of them.  *See Walker v. Time Life Films*, 784 F.2d 44, 50 (2d Cir. 1986) ("[T]he works themselves, not descriptions or impressions of them, are the real test for claims of infringement.").

Plaintiff attempts to limit the Court's analysis by alleging infringement in only the first three episodes of *Servant* and suggesting that the latter seven episodes merely add "self-contained vignettes or sub-plots."  Compl. ¶¶ 78, 83 n.11.  In fact, each of the ten episodes reveals crucial information about characters and events *from the first three episodes*, for example how Jericho died and why Leanne applied for a position with the Turners.  The complaint's own allegations also extend

8

beyond the first three episodes.  *See* RJN § 1.  Regardless of whether the Court reviews three or ten episodes, however, there is no substantial similarity of protected expression between *Emanuel* and *Servant* (or any part of *Servant*). Notably, in alleging infringement in only three episodes of *Servant*, Plaintiff herself concedes that most of the series is completely different than *Emanuel*.

### 1.    Plot

#### a.    Most of the Alleged Plot Similarities Are Unprotectable.

Most of the alleged similarities between the works' plots are unprotectable concepts, *scenes a faire*, and generic elements in film and television.

*First*, many alleged similarities flow from both works featuring a new mother, including having help with the baby, holding a baby, and considering her body.  *See* Compl. ¶ 74.  Other alleged similarities flow from the unprotectable premise of hiring a babysitter or nanny.  For example, people who have the resources to hire help are often "privileged," a mother first meeting a nanny or babysitter would normally ask "get to know you" questions, and a nanny or babysitter in a new home will look around.  *Id.*

*Second*, a grieving mother using a reborn doll to cope with losing a child is an unprotectable idea, particularly as it is a real therapy.  *See, e.g.*, RJN § 2.  *See also* Compl. ¶ 68 n.7 (conceding that a "mother so traumatized by her baby's death that she cares for a doll she believes to be her real baby" is a "basic premise").  Numerous alleged similarities flow from this premise.  For example, reborn dolls are designed to be lifelike, and thus it naturally flows that the dolls would be "physically realistic."  *Id.* ¶ 68.  In works where a grieving mother treats a doll as her baby, it is unsurprising that others would stop pretending the doll was real when the mother was gone (*id.* ¶ 74).  Such works also would naturally have moments where the mother's delusion seems to fade.  *Id.*

*Third,* the concept of parents treating a doll as their child has been explored in many works, from film and television to video games and comic books.  *See* RJN

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

§ 3.a.  In the 2016 film *The Boy*, for example, a young American woman becomes a nanny to a wealthy couple's young son, who the nanny soon learns is actually a doll that the couple treats as their son (after their real son's apparent death years earlier). *See id.*  Or in the 2009 to 2011 television series *Psychoville*, a character treats a doll as her child while her husband is forced to pretend that the doll is real.  *Id.*  The concept is so often explored that it has its own entry on the website "TV Tropes," which catalogs tropes in entertainment.  *See* "Baby-Doll Baby," https://tvtropes.org/pmwiki/pmwiki.php/Main/BabyDollBaby ("This trope is when a mother, in a delusion, thinks that a doll is her child.").

*Fourth*, beyond these *scenes a faire*, the complaint alleges numerous similarities that consist of ubiquitous elements from film and television.  The complaint even contains side-by-side comparisons that only serve to highlight the complaint's misplaced reliance on such unprotectable elements, including a woman holding a doll (Compl. ¶ 5), a woman walking down a staircase (*id.* ¶ 7), a woman underwater (*id.* ¶ 9), or, incredibly, a character "looking into the camera" (*id.* ¶ 76).

### b.   The Complaint Mischaracterizes Alleged Plot Similarities.

Many of the remaining similarities in the complaint's section on plot are mischaracterizations of one or both of the works at issue.

As one example, Plaintiff alleges that the dolls in both works "come back to life"—using quotes around "come back to life" because the doll in *Emanuel* does not, in fact, come back to life.  Compl. ¶¶ 68, 74.  Instead, there is a "notable and extended scene" in which Emanuel faints in the nursery and has a vision in which the room fills up with water.  Compl. ¶ 74.  In this dream sequence, a real baby takes the place of the doll and swims to Emanuel's deceased mother.  *Id.* & Dkt. 13 at 1:12:42.  The baby is shown for approximately 15 seconds and does not leave the audience wondering whether the doll is alive—it is clear the baby was "alive" only in Emanuel's vision.  *Id.*  In *Servant*, on the other hand, the doll is replaced with a living, breathing infant *in the first episode*, and stays that way most of the season.

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

*See* Ex. 1 at 34:08.  In fact, this is *the* defining plot device of *Servant*, and the storylines and characters all flow from this foundational creative choice.  Moreover, a doll coming to life is hardly a new concept, having been explored in countless works, from the classic 1883 children's novel *Pinocchio* to last year's remake of *Child's Play*.  Plaintiff also alleges that this water-filled scene is similar to a scene in which "the nanny in *Servant* is shown underwater, but with a natural face."  Compl. ¶ 74.  In reality, the nanny in *Servant* takes a bath and dunks her head under the water for 7 seconds.  Ex. 2 at 6:13.  That is the extent of the alleged similarity.

The complaint also alleges that Leanne in *Servant*, like Emanuel in *Emanuel*, "very quickly realizes the mother truly believes the doll to be real, and decides to play along with the delusion."  Compl. ¶ 74.  This is not true in *Emanuel*; there are a number of scenes in Linda's house before Emanuel discovers the doll.  *E.g.*, Dkt. 13 at 9:22, 14:45.  Emanuel also does not immediately play along with the decision; at first, she is bewildered and hesitant.  *Id.* at 21:00.  This alleged similarity also is untrue in *Servant*, in which Leanne treats the doll as real and never seems to be pretending.  Similarly, the complaint alleges that in both works the "nanny's mother has left a hole in her life that her relationship begins to fill—in a way that complements the hole in the mother's life caused by the death of her baby."  Compl. ¶ 74.  Again, this is true for *Emanuel*, but untrue for *Servant*, in which Leanne never expresses any longing for either of her parents, and Dorothy often treats Leanne as an employee, not like a daughter.

### c.     The Works' Plots Are Not Substantially Similar.

Once unprotectable elements are removed, the works have different storylines and lack similarity in their "actual concrete" plot elements.  *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985); *Funky Films*, 462 F.3d at 1077-1078.[5]

---

[5] If this lawsuit survives dismissal, Defendants will show that Mr. Basgallop independently conceived of what became *Servant* years before *Emanuel* was released, and that many of the allegedly copied elements predate Plaintiff's film.

DEFENDANTS' MOTION TO DISMISS COMPLAINT
4838-2051-0130v.8 0113237-000003

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

*Emanuel* follows a normal teenager struggling to cope with the guilt of knowing that her mother died giving birth to her.  The audience learns all about Emanuel from the start; indeed, some of the first words in the film are Emanuel telling the audience that she killed her mother. Dkt. 13 at 1:00.  Emanuel works at a medical supply store, lives with her father and stepmother, and begins to babysit for a new next-door neighbor Linda, who "bears a striking resemblance" to Emanuel's deceased mother.  *Id.* (DVD back cover).  When Emanuel first encounters Linda's therapy doll, she is stunned and initially does not play along.  *Id.* at 21:00.  She ultimately treats the doll as a child in front of Linda, but generally not when Linda is gone.  Emanuel even drops and pushes the doll across the floor with her foot at one point (*id.* at 32:50), in contrast to Leanne, who never treats the doll any differently than she would a baby.  When Linda brings home a date (Arthur) and Arthur refuses to pretend the doll is a child, Linda's delusion is shattered, and Emanuel suffers her own breakdown.  *Id.* at 1:08:05.  The film ends with Emanuel breaking Linda out of a mental institution and taking her to bury the doll next to Emanuel's mother's grave, each experiencing her own catharsis.  *Id.* at 1:21:00.

*Servant* tells an entirely different story.  In *Servant*, an old-money couple hires a full-time, live-in nanny (Leanne) for their baby son, which is a therapy doll given to the mother (Dorothy) to cope with her son's death.  From the beginning of the series, Leanne is portrayed as possibly other-worldly.  The audience is shown upfront that she is a seemingly paranormal, self-flagellating, deeply religious teenager, and the rest of the season is spent puzzling over who she is.  Leanne always treats the doll as a real baby, holding it, singing to it, or taking it on walks, regardless of whether anyone is around.  *E.g.*, Ex. 1 at 13:11, 17:17, 29:01.  She also has no reaction when the doll becomes a baby: she treats the doll and the baby exactly the same without expressing any surprise when the doll becomes a baby, leaving the audience to wonder whether she brought the doll to life and leaving other characters wondering what, if anything, should be done about it.  Lastly,

DEFENDANTS' MOTION TO DISMISS COMPLAINT
4838-2051-0130v.8 0113237-000003

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Leanne seems to use paranormal powers to inflict harm on the couple whenever she is angry with them, especially Sean, who loses his senses of taste, smell, and touch.

There are numerous other differences between the plots of the works. *Emanuel* is portrayed from Emanuel's perspective—indeed, the film starts with her voiceover.  In *Servant*, the perspective is the opposite, as the series explores who (or what) Leanne is and where she came from.  Unlike in *Emanuel*, in which the doll is an unexpected "twist," in *Servant* the existence of the doll is not hidden and is fully explained in the trailer.  *See* RJN § 1.  In addition, in *Servant* the doll is replaced by a real baby at the end of the first episode, whereas in *Emanuel* it remains a doll until it is ultimately buried at the end.  Also unlike *Emanuel*, in *Servant* there is no moment where the mother is "found out."  While Emanuel attempts to prevent others from discovering the doll, Leanne seems to have no awareness of anything amiss, and takes it out in public.  *E.g.*, Ex. 1 at 17:17.  And unlike the cathartic end of *Emanuel*, *Servant*'s first season ends with uncertainty and suspense—Leanne seemingly turns the baby back into a doll and rejoins her cult, the private investigator looking into Leanne disappears, and Dorothy possibly realizes that the doll is no longer her baby.  *See* Ex. 10.  Unlike in *Emanuel*, there is no catharsis and certainly no peace at any point in *Servant*.

### 2.    Sequence of Events

Plaintiff alleges that *Emanuel* and *Servant* "each unfolds in a roughly linear chronology," Compl. ¶ 75, which is not something that is protectable.  Even if that were protectable, only *Emanuel* unfolds in a linear chronology.  *Servant*, by contrast, jumps back and forth through time throughout the entire season, showing various incidents from the past to explain events in the present.

The other alleged similarities in sequence of events consist of several discrete scenes that are unrelated to the overall sequence of events of the works.  Moreover, those alleged similarities are unprotectable and also portrayed differently in the works.  For example, Plaintiff alleges that "both works include an awkward

interview scene" (*id.*), but a parent asking a new caregiver questions flows from the unprotectable concept of hiring a babysitter or nanny. Regardless, in *Servant*, Leanne arrives at the Turners' home in the first scene of the first episode with her suitcase in hand. Ex. 1 at 1:34. She is not coming to an interview; she has already been hired. In *Emanuel*, Linda also does not "interview" Emanuel, but instead asks her a few questions before leaving her with the "baby." Dkt. 13 at 9:40.

Similarly, Plaintiff alleges that at some point following the "interviews," the "nanny" and mother are "shown alternatively in solitary moments—but with a strong sense that they are connected during those moments." Compl. ¶ 75. But characters experiencing "solitary moments" is not a protectable sequence of events. Regardless, the scene in *Servant* that Plaintiff references is one in which Leanne and Dorothy are shown in their respective bathtubs (*id.*)—Dorothy in her spacious bathroom in a large bathtub with jets and Leanne in her smaller tub with plain tile and water-damaged ceiling (Ex. 1 at 10:38)—whereas in *Emanuel*, Emanuel is watching Linda and her "baby" from across the street (to demonstrate Emanuel's growing fascination with Linda). Dkt. 13 at 12:01.

Plaintiff also alleges that the works have a similar sequence of events because there is a scene in both in which the mother applies makeup, and then the "nanny" does the same after the mother leaves, Compl. ¶ 75, but this concept has been explored in countless other works. Likewise, Plaintiff alleges that in both works the "nanny faints under stress" and regains consciousness to the sight of concerned faces, *id.*, which is another frequently portrayed concept. Moreover, while Emanuel faints "under stress" after being accused of taking Linda's baby (Dkt. 13 at 1:09:52), Leanne does not faint "under stress," but rather after watching Sean brutally kill an eel in preparation for an exotic dish (Ex. 3 at 6:31).

### 3. Theme

"A work's theme is its overarching message," and "there is no protection for stock themes or themes that flow necessarily from a basic premise." *Silas v. Home*

*Box Office*, 201 F. Supp. 3d 1158, 1180 (C.D. Cal. 2016), *aff'd*, 713 Fed. Appx. 626 (9th Cir. 2018).  Plaintiff alleges that both *Emanuel* and *Servant* include themes like "[t]he unspeakable grief of losing a baby," "[d]enial and self-delusion as a means of avoiding grief," and "[t]he dangers of shared delusion," including "[t]he safety, sanctity and comfort of home—and the obverse dangers of the outside world." Compl. ¶ 62.  Beyond the fact that these themes are extremely broad and encompass innumerable works, they flow naturally from the unprotectable premise of a mother treating a therapy doll as if it were her baby and thus must be filtered out before comparing the works' themes.

The primary themes in *Emanuel* and *Servant*, beyond grief and delusion, are drastically different.  As Plaintiff alleges, *Emanuel* is an "emotional story about motherhood and daughterhood," culminating in its two main characters finding peace with their grief.  Compl. ¶ 10.  It explores the pain of a teenager who never knew her mother and intense guilt for (she believes) causing her mother's death, and a mother who feels grief and guilt for the loss of her only child.  The film also examines what it means to be a family, including exploring stepfamily bonds as Emanuel shuts down her stepmother's attempt at a relationship at every turn, while instead opening herself up to Linda.  Ultimately, *Emanuel* is hopeful and positive, exploring themes such as forgiveness, healing, acceptance, and redemption.

*Servant*'s primary theme is very different, and much darker (literally and metaphorically).  In *Servant*, little is known of Leanne's past and she does not express any longing for her parents.  The series walks the line between thriller and horror, with Leanne's seemingly paranormal powers front and center, as she appears to bring a doll to life and to punish Sean and Dorothy when she finds them undeserving of her assistance.  *E.g.*, Ex. 5 at 14:00, 21:25.  *Servant* also explores themes such as wealth (expensive wines, gourmet food) juxtaposed with the treatment of those without such privilege, as the title of the series suggests.  Lastly,

1   no character in *Servant* finds redemption or acceptance like in *Emanuel*.  Instead,

2   *Servant* is just the opposite: there is no peace for any character.

3         Notably, Plaintiff alleges that *Emanuel* explores themes such as the

4   complexity of the mother/daughter bond and maternal longing, and contends that it

5   is the first film to "explore maternal longing by examining its delusional

6   misplacement, while also studying a daughter's misplaced longings for her mother."

7   Compl. ¶ 63.  But Plaintiff concedes that *Servant* does *not* explore these and similar

8   themes by claiming that *Servant* is an "utter bastardization" of *Emanuel* that

9   completely "miss[es] the female perspective."  Compl. ¶ 13.

10      **4.**    **Characters**

11        "In determining whether characters are similar, a court looks at the totality of

12  the characters' attributes and traits as well as the extent to which the defendants'

13  characters capture the total concept and feel of the figures in the plaintiff's work."

14  *Shame on You Prods.*, 120 F. Supp. 3d at 1165 (internal brackets omitted).  Even

15  some shared traits between characters are not enough to prove substantial similarity

16  when the characters "have noticeable differences."  *Silas*, 201 F. Supp. 3d at 1177.

17        **a.**    **Emanuel and Leanne**

18        The complaint repeatedly compares the nanny in *Servant* to the "nanny" in

19  *Emanuel*.  But the title character in *Emanuel* is not a nanny—she lives with her

20  family next door, has a day job, and simply babysits a few times for her neighbor.

21  In the film, Emanuel's stepmother expressly tells Emanuel that Linda was "looking

22  for a *babysitter*" (Dkt. 13 at 7:55) (emphasis added), and Plaintiff's own website

23  describes Emanuel as offering "to babysit."[6]

24        Emanuel is a quintessential teenager who is struggling to cope with the loss

25  of her mother who died in childbirth and to coexist with her stepmother (while also

26

27  _____

28       [6] *See* https://www.francescagregorini.com/features/the-truth-about-emanuel/
    (describing *Emanuel*'s plot: "Emanuel offers to babysit [Linda's] newborn").

16

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

1    trying to push her buttons).  Her brash, acerbic wit is on display any time she is in a

2    crowd, including, for example, when she lies to train passengers to get them to give

3    up their seats, or riles up her stepmother during a family dinner.  Dkt. 13 at 3:37,

4    8:37.  In contrast, Leanne in *Servant* is a live-in nanny to Dorothy and Sean,

5    routinely demeaned by them both.  They refer to her as "staff" (Ex. 1 at 5:08, Ex. 2

6    at 23:25), convince her to spend her meager earnings on shoes that Dorothy

7    immediately asks to borrow (Ex. 3 at 15:04), and even send her out in a

8    thunderstorm on a fool's errand so they can be intimate (Ex. 5 at 12:18).

9       Emanuel and Leanne are almost nothing alike.  Unlike Emanuel, Leanne is

10    quiet and deferential—the "servant."  Unlike Emanuel, Leanne appears to have

11    paranormal powers she uses to punish or reward the Turners depending on their

12    behavior toward her, including the apparent power to create life.  Leanne is deeply

13    involved in her religion and whips herself.  *E.g.*, Ex. 1 at 11:36, Ex. 5 at 30:01.  In

14    contrast to Emanuel and Linda's tender relationship in *Emanuel*, Leanne has a

15    complicated relationship with Dorothy in *Servant*, at times seeming obsessed with

16    her (and wanting to be her) and other times torturing her, such as repeatedly setting

17    off her car alarm once Leanne found out that Jericho died in the car.  Ex. 9 at 22:25.

18    Emanuel understands that Linda is suffering from a delusion and pretends for her

19    sake that her doll is real, while attempting to prevent anyone else from discovering

20    the doll.  Leanne, on the other hand, treats the doll as real and does not make any

21    attempt to prevent others from seeing the doll.  *E.g.*, Ex. 1 at 17:17.  Also, in

22    *Servant*, Leanne did not find the Turners through "happenstance," Compl. ¶ 74, but

23    instead targeted them based on her childhood meeting of and interest in Dorothy.

24    Ex. 4 at 30:42.

25       Beyond a few generic and unprotectable traits shared by Emanuel and

26    Leanne, they could hardly be more different.  Emanuel is the epitome of a teenager,

27    who is also grappling with the loss of her mother and related guilt.  Leanne is a

28    paranormal cult member who can seemingly cause physical harm to those who

DEFENDANTS' MOTION TO DISMISS COMPLAINT
4838-2051-0130v.8 0113237-000003

**DAVIS WRIGHT TREMAINE** LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

cross her (and seemingly can resurrect the dead).  The contention that Emanuel and Leanne are "extraordinarily similar," Compl. ¶ 66, is belied by even the most cursory review of the works at issue.

### b. Linda and Dorothy

Nor are Linda and Dorothy similar.  As explained above, the concept of a mother using a reborn doll as a therapeutic tool to cope with the grief of losing a child is not protectable.  The similarities between the characters flow naturally from that premise, including their bouts of delusion.  Their confidence is a byproduct of fighting to keep that delusion alive, as is their turn as "affectionate and doting mothers."  Compl. ¶ 67.  And that women wealthy enough to hire help for dolls would be "in their mid-thirties," "sophisticated," "privileged," and "stylish in their clothing and home décor" is no surprise, and those similarities are too ubiquitous to merit protection. *Id.*  *See also Shame on You Prods.*, 120 F. Supp. 3d at 1165.

Plaintiff mischaracterizes various "similarities" between Linda and Dorothy.  She describes both as holding a "displaced maternal longing" that each "channel[s] not only into a reborn doll, but also into the nanny," and alleges "there is an unspoken, perhaps unconscious sexual longing that seems to be fulfilled only by the nanny."  Compl. ¶ 67.  This may be true of Linda in *Emanuel*, but not of Dorothy in *Servant*.  Dorothy does not channel "displaced maternal longing" into Leanne.  *Id.*  For example, she takes Leanne shopping and convinces her to buy new shoes, and as soon as they are back home, Dorothy manipulates Leanne into lending them to her.  Ex. 3 at 15:04.  And the one moment between Dorothy and Leanne that the complaint describes as being erotic (Compl. ¶ 74) is not: Leanne helps Dorothy to relieve her painful mastitis.  Ex. 1 at 29:30.

Linda is a grieving mother who ran away from her husband to start a new life where no one knows of her loss.  She is not an "effervescent, 'type A' personality" (Compl. ¶ 67), but instead is laid-back, calm, and warm.  She does not seem to have a job, instead tending to her garden and home, and spending time with Emanuel.

1  *Servant*, on the other hand, is set in motion due to Dorothy's desire to return to her

2  job as an on-air reporter.  She hires Leanne to watch her "child" while she works,

3  and the news segments she creates provide key plot and mood moments in the show

4  (as well as being revealed as a reason Leanne targeted the Turners).  Dorothy does

5  all this with the (at times begrudging) support of her husband and brother.  Overall,

6  beyond the shared unprotectable concepts in both works, there are many "noticeable

7  differences" between Linda and Dorothy, who are not substantially similar.  *See*

8  *Silas*, 201 F. Supp. 3d at 1177.

9              **c.    Thomas and Sean**

10             Plaintiff alleges that the father in *Emanuel*, Thomas, is similar to the father in

11 *Servant*, Sean, because both explain how their child died and how their wife came

12 to use a doll.  Compl. ¶ 69.  That is no surprise: who better to understand the

13 situation, or to convey that, than the other parent.  More importantly, this is the

14 extent of the similarities between the characters.  In fact, there is nothing more to

15 Thomas at all—he appears in a single scene in *Emanuel* near the end of the film and

16 we learn almost nothing about him.  Sean, on the other hand, is a vital, fully

17 developed character in every episode of *Servant*, and his interactions with Leanne

18 are central the story.  *Compare* Dkt. 13 at 1:18:30 with Exs. 1-10.  *See Shame on*

19 *You Prods.*, 120 F. Supp. 3d at 1164 (only "distinctive characters are protectable").

20             **d.    Arthur and Julian**

21             Plaintiff overstates Arthur (in *Emanuel*) and Julian (in *Servant*) as

22 "antagonists" (Compl. ¶ 72) and just like with Thomas and Sean, compares a

23 secondary character in *Emanuel* with a central character in *Servant*.

24             Arthur is a nerdy, shy, "professorial" (Compl. ¶ 72) man who works with

25 Emanuel.  Arthur takes Linda on a date (to Emanuel's displeasure) and comes back

26 to Linda's home to meet the baby (something Emanuel repeatedly attempts to

27 prevent).  When Arthur discovers the child is actually a doll, he refuses to play

28 along, sending Linda into a spiral as she finally confronts her loss.  As Arthur was

told Emanuel was babysitting, he initially blames Emanuel for the mishap and begins to frantically search for the "missing" child.  Dkt. 13 at 1:08:50.

In *Servant*, Julian is a devoted brother to Dorothy, and knows from the start about how Jericho died (in fact, he discovers Jericho's body in the midst of Dorothy's delusion). Ex. 1 at 16:22, Ex. 8 at 22:57.  Crass and constantly drinking, he mistrusts Leanne and spends significant resources looking into her background, even flying to her hometown with a private investigator.  Ex. 3 at 8:31.  As with the other main characters, Arthur and Julian's many "noticeable differences" cut against a finding of substantial similarity.  *Silas*, 201 F. Supp. 3d at 1177.

### e.    Claude and Tobe

Plaintiff contends that Claude and Tobe are Emanuel and Leanne's "love interests," Compl. ¶ 71, but this grossly oversimplifies these characters.

Claude is Emanuel's boyfriend.  In *Emanuel*, he meets Emanuel on a train and they see who can come up with a more outlandish story to get a stranger to give up their seat.  *E.g.*, Dkt. 13 at 8:37, 26:06.  Claude is happy to date Emanuel, but like any couple they go through their ups (talking and kissing by the lake) and downs (fighting over Emanuel's relationship with Linda).  The couple's evolving relationship is one of the central storylines of *Emanuel*.

Tobe is Sean's assistant chef and highlights one of the themes of *Servant*, namely, the treatment of the less privileged by those with more.  At one point, Tobe cooks dinner with Leanne (because he is stuck at the house, having accepted $100 from Sean to stay there).  Ex. 3 at 18:51.  Later in the season, Tobe and Leanne go bowling, and when she tries to kiss him afterward, he recoils and rejects her advance.  Ex. 8 at 16:00.  That is the extent of their "romantic" interlude.  Compl. ¶ 71.  Moreover, even if Plaintiff's description of both characters as "timid, shy, sexually immature, and diminutive" were accurate (it is not), those are generic traits that are not protectable.  Compl. ¶ 71.

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

### f.      The Dolls

The complaint alleges that the dolls in *Emanuel* and *Servant* are "physically realistic" and "ultra-lifelike," Compl. ¶ 68, but this is an unprotectable concept.  In fact, the entry on the TV Tropes website about the "trope" in which "a mother, in a delusion, thinks that a doll is her child" specifically refers to "the famous *Reborn* line" of dolls.  *See* https://tvtropes.org/pmwiki/pmwiki.php/Main/BabyDollBaby. The dolls also are not "almost identical" as Plaintiff contends: one is a boy and one is a girl, with features and clothing that would be expected of a realistic doll.

### g.      Other Characters

Plaintiff fails to mention other characters in both *Emanuel* and *Servant*.  This includes Emanuel's father, who Emanuel lives with and is close with.  It is through him that we learn about Emanuel's mother and explore *Emanuel*'s themes of losing a spouse and raising a child as a single parent.  Nor does Plaintiff mention Emanuel's stepmother (or the theme in *Emanuel* of adjusting to new family relationships).  Plaintiff also does not mention Roscoe, the private investigator who is looking into Leanne's past (and who was possibly kidnapped or killed for that). Nor does she mention the other characters that are introduced later in the season, including Leanne's Aunt May and Uncle George, Dorothy's therapist Natalie, Dorothy and Julian's father Todd, and Wanda (who Julian hired to spy on Leanne).

### 5.      Setting

Most of the alleged similarities in setting flow from the premise of a new mother, hiring a babysitter or nanny, or using a therapy doll to cope with the loss of a child, none of which are protectable.  *See, e.g., Benay*, 607 F.3d at 627-628 (finding that given the works' shared, unprotectable premise of "an American war veteran who travels to Japan to help the Emperor fight a samurai rebellion," it was "not surprising" that the works shared settings like "a scene of the protagonist sailing into Japan, scenes in the Imperial Palace, scenes on the Imperial Army's training grounds, and battle scenes in various places in Japan").  Here, it makes

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

1  sense that someone wealthy enough to hire help would live in an upscale house.

2  Compl. ¶ 64.  And when a nanny lives in the same house with her employers, as in

3  *Servant*, it naturally follows that she would see various goings on in the home.  *Id.*

4       Beyond the *scenes a faire*, Plaintiff points to generic elements as evidence of

5  copying, from having a staircase "overlooking the first floor" to a nursery with

6  "old-fashioned cribs," rocking horses, and even "striped wallpaper," to having

7  "family dinners."  Compl. ¶ 64.  These elements are not protectable, and even if

8  they were, they have been used in countless works before *Emanuel*.

9       Plaintiff also mischaracterizes purported similarities between settings.  In

10  particular, she highlights that each work features a trip to Leanne's or Emanuel's

11  mother's grave, Compl. ¶ 64, but these scenes are incredibly different.  In *Emanuel*,

12  Emanuel takes Linda to visit Emanuel's mother's grave, which Emanuel had never

13  visited, and digs a hole in which to bury Linda's doll.  Dkt. 13 at 1:26:21.  The trip

14  to the grave is film's climax, and comes with emotional significance for both

15  Emanuel and Linda as they seemingly come to terms with their losses.  In *Servant*,

16  Julian and a private investigator travel to the Midwest to track down information

17  about Leanne.  Julian uncovers remnants of Leanne's family home (which burned

18  down), and then discovers not only Leanne's parents' graves, but also *Leanne*'s

19  grave.  Ex. 3 at 26:12.  Thus, while there is technically a grave visit in each work,

20  they are expressed quite differently and have an extremely different significance to

21  each work.  Moreover, scenes taking place at a grave are hardly unique.

22       The works' other settings are also very different.  In *Emanuel*, the story takes

23  place in numerous locations, including Emanuel's home, Linda's home, the train,

24  her work, a market, a lake, and the institution where Linda is kept following her

25  breakdown.  In *Servant*, almost all of the action takes place in and around the house.

26  When other settings are shown, they are generally seen through a screen at the

27  Turners' residence.

28

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

### 6.     Mood

Plaintiff alleges that both *Emanuel* and *Servant* are psychological thrillers and, accordingly, are "tense throughout," invoking "heightened feelings of suspense, excitement, surprise, anticipation, and anxiety."  Compl. ¶ 76.  But these moods are ubiquitous.  *See* *Fillmore*, 2017 WL 4708018, at *8 (even where both works contain "suspenseful and serious" moods, "general suspense is not protectable expression and cannot establish the extrinsic similarity necessary to support a copyright infringement claim").  In fact, Plaintiff even acknowledges that in creating tension in her film, she "uses the cinematic vernacular of classic suspense, including camera angles, lighting, music, and pace."  Compl. ¶ 7.

In an attempt to plead more than unprotectable similarities, Plaintiff falsely alleges that both works employ "magical realism."  *Id.* ¶ 4.  In *Emanuel*, Emanuel often has visions of water rushing into wherever she is, be it on a train or in a bedroom, but the audience knows that the visions are not actually happening—*e.g.*, the train and the bedroom did not actually fill with water.  *E.g.*, Dkt. 13 at 24:39.  In contrast, in *Servant*, Leanne's potentially supernatural powers are presented as real.  Sean really loses his sense of taste and smell and really pulls out a splinter from his throat.  Ex. 2 at 28:11.  A doll is presented as turning into a real baby, and then back again.  Ex. 1 at 34:10, Ex. 8 at 9:15.  Somehow, after Leanne notices them, a dead cricket and a dead dog are each brought back to life.  Ex. 5 at 30:59, Ex. 7 at 28:02.  These are not fantastical visions; they are actual events in *Servant*.

Beyond generic elements, *Emanuel* and *Servant* have drastically different moods.  *Emanuel* largely focuses on each of its main characters' grief and their attempts to cope with that grief.  It is, at its core, a story of healing.  In contrast, *Servant* is creepy, and of course suspenseful.  Plaintiff contends that the works' reliance on food contributes to a similar mood, Compl. ¶ 76, but this an exaggeration.  In *Emanuel*, there are several family dinners, whereas in *Servant*, food plays a pervasive role throughout the series.  Specifically, beyond Sean's

profession as a chef and the significance of his lost taste and smell, the preparation and consumption of exotic foods highlight the Turners' wealth and privilege, particularly as compared to what Leanne eats (tomato soup, every day).  Lastly, there is no mood of healing or positivity in *Servant*, as there is in *Emanuel*.

### 7.   Pace

Plaintiff contends only that "[b]oth works proceed at a rapid pace.  In each, the characters can barely keep up with events as they unfold."  Compl. ¶ 76.  As an initial matter, having a rapid pace is hardly protectable.  *See id.* ¶ 7 (acknowledging that the pace she used was part of the "cinematic vernacular of classic suspense").  Moreover, this is not an accurate characterization of either work.  In *Emanuel*, there are numerous periods of calm, such as during family dinners, gardening, Emanuel and Claude's night sitting by a lake and sharing wine, and Emanuel and Linda's scene in which they come to terms with their losses and gaze peacefully at the stars.  In *Servant*, on the other hand, the pace quickens toward the ultimate, chaotic end, in which Leanne seemingly leaves, the baby appears to be a doll again, Roscoe disappears, Sean loses the ability to feel, and Dorothy possibly realizes that the doll is not her baby.  Ex. 10.

### 8.   Dialogue

Copyright law does not protect "fragmentary words and phrases."  *Stern v. Does*, 978 F. Supp. 2d 1031, 1040 (C.D. Cal. 2011), *aff'd sub nom.*, *Stern v. Weinstein*, 512 F. App'x 701 (9th Cir. 2013).  Accordingly, "for a plaintiff to demonstrate substantial similarity of dialogue, it must show 'extended similarity of dialogue.'"  *Silas*, 201 F. Supp. 3d at 1181 (quoting *Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1450 (9th Cir. 1988)).  *See also Gallagher v. Lions Gate Entm't*, 2015 WL 12481504, at *10 (C.D. Cal. Sept. 11, 2015) (three instances of similar dialogue could not demonstrate "extended similarity").

Here, Plaintiff's dialogue allegations are largely duplicative of her plot allegations.  For example, she alleges that in both works, "the mother gives baby-

DEFENDANTS' MOTION TO DISMISS COMPLAINT
4838-2051-0130v.8 0113237-000003

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

care direction in extremely realistic terms" (Compl. ¶ 77), but does not allege any *specific* dialogue shared between the works.  The sole overlapping piece of dialogue alleged in her complaint is that Emanuel and Leanne each say to Linda and Dorothy, "you look beautiful." *Id.*  Leanne does not actually say that, and even if she did, a single instance of allegedly shared dialogue—a generic phrase—is not remotely enough to find that *Emanuel* and *Servant* contain the "extended similarity of dialogue" necessary to find substantial similarity.  *E.g.*, *Silas*, 201 F. Supp. 3d at 1181 (one instance of similar dialogue insufficient to show substantial similarity).

**D.    Plaintiff's Claim for Vicarious and Contributory Infringement Fails**

Because Plaintiff's claim for direct infringement fails, her claim for contributory and vicarious infringement also fails.  *See Fox Broad. Co. v. Dish Network*, 747 F.3d 1060, 1068 (9th Cir. 2014) ("Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party.").

## IV.    CONCLUSION

*Emanuel* and *Servant* are not substantially similar.  Once unprotectable elements are disregarded, the works' plot, sequence of events, themes, characters, setting, mood, pace, and dialogue are different, and Plaintiff's cherry-picking of unprotectable elements or generic details does not enable her to survive dismissal.  Plaintiff's claims should be dismissed with prejudice.  *See Silas*, 201 F. Supp. 3d at 1184 (dismissing complaint with prejudice where the works were "not extrinsically similar and no amendment could possibly cure that defect in Plaintiffs' case").

DATED: February 18, 2020          DAVIS WRIGHT TREMAINE LLP
                                  NICOLAS A. JAMPOL
                                  DIANA PALACIOS
                                  CYDNEY SWOFFORD FREEMAN
                                  CAMILA PEDRAZA

                                  By:   /s/ Nicolas A. Jampol
                                            Nicolas A. Jampol

                                  Attorneys for Defendants

25

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899