

ERIKSON LAW GROUP
Antoinette Waller (SBN 152895)
David Alden Erikson (SBN 189838)
S. Ryan Patterson (SBN 279474)
200 North Larchmont Boulevard
Los Angeles, California 90004
Telephone: 323.465.3100
Facsimile: 323.465.3177

Attorneys for Plaintiff Francesca Gregorini

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

FRANCESCA GREGORINI,

          Plaintiff,

      v.

APPLE INC., a California corporation;
M. NIGHT SHYAMALAN, an
individual, BLINDING EDGE
PICTURES, INC., a Pennsylvania
corporation; UNCLE GEORGE
PRODUCTIONS; a Pennsylvania
corporation; ESCAPE ARTISTS LLC,
a California limited liability company;
DOLPHIN BLACK PRODUCTIONS,
a California corporation; TONY
BASGALLOP, an individual; ASHWIN
RAJAN, an individual; JASON
BLUMENTHAL, an individual; TODD
BLACK, an individual; STEVE TISCH,
an individual; and DOES 1-10,
inclusive

          Defendants.

Case No. 2:20-cv-00406-JFW-JC
Hon. John F. Walter

**FIRST AMENDED COMPLAINT;
REQUEST FOR PERMANENT
INJUNCTION**

**DEMAND FOR JURY TRIAL**

Complaint Filed: January 15, 2020

    Plaintiff Francesca Gregorini submits this First Amended Complaint against

Defendants Apple Inc. ("Apple"); M. Night Shyamalan ("Shyamalan"); Blinding

Edge Pictures, Inc. ("Blinding Edge"); Uncle George Productions; Escape Artists

LLC; Dolphin Black Productions; Tony Basgallop; Ashwin Rajan; Jason Blumenthal;

Todd Black; Steve Tisch; and DOES 1-10, inclusive.

COMPLAINT

**I.      INTRODUCTION**

1.      Apple TV+ and M. Night Shyamalan are heavily promoting their original series *Servant*—one of eleven shows launching the ambitious new streaming service billed as a game-changing new product from the world's most valuable company. Apple claims that what distinguishes its foray into television is breathtakingly *original* content: the world's best stories told by the world's best storytellers.

**A.      *Servant* is a brazen copy of Plaintiff's 2013 feature film.**

2.      There is one big hole in Apple's messaging: *Servant*[1] is a wholesale copy and unauthorized television adaptation of Plaintiff Francesca Gregorini's 2013 feature film *The Truth About Emanuel*. As demonstrated by the long list of key parallels catalogued in Section III(C) of this Complaint, the misappropriation is not merely a borrowed premise or idea. Mr. Shyamalan has gone so far as to appropriate not just the plot and characters of *Emanuel*—but also its use of cinematic language, creating a substantially similar feeling, setting, mood, and theme.

3.      *Emanuel* is a successful 2013 psychological thriller, written, directed and produced by Ms. Gregorini as her second feature film. After premiering at the Sundance Film Festival in the prestigious dramatic competition category in 2013, the film was released theatrically in the U.S. by Tribeca Film, followed by release on DVD and Blu-ray. Since 2014, Apple itself has offered *Emanuel* for sale or rental through iTunes (as has Amazon and other platforms).

4.      Starring Kaya Scodelario, Jessica Biel, and Alfred Molina, the film tells the story of a troubled and withholding 18-year old girl, newly hired by a white, pretty, sophisticated, privileged yet gracious, mid-30's, first-time mom—to help care for her new baby. After fleeting images of what the audience assumes to be a healthy

_____

[1] For the purposes of this Complaint, "*Servant*" refers to Season One, Episodes 1-3, of the Apple TV+'s original series "Servant," which were made available for streaming on November 28, 2019. Plaintiff's claim is that her work is infringed by these three episodes, which make up an organic and self-contained unit.

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

2                                          COMPLAINT

Deleted: mere
Deleted: ,
Deleted: or story
Deleted: and
Deleted: seems

1   three-month-old infant, in the mother's picture-perfect nursery and home, it is
2   dramatically revealed that the "baby" is really an ultra-realistic "reborn" doll—
3   shattering the illusion of an uber-competent modern mom and rendering the
4   orderliness of the house suddenly unsettling. Rather than recoil, the nanny plays along
5   with the mother's delusion even before the father explains that the cause of the
6   mother's delusion is the overwhelming grief of recently losing their real three-month-
7   old baby (the precise cause of death remaining unknown). The nanny buys into the
8   mother's delusion in part for deep-seated reasons relating to the absence and tragic
9   death of her own mother. Finding comfort in the mother's nurturing, the nanny too is
10  soon enough doting over the doll as if it were real, building a deep emotional
11  connection with the mother but also creating danger and ultimately crisis as prying
12  eyes threaten to expose the shared secrets. While the baby's apparent rebirth offers an
13  emotional high point, its "reality" remains open to question. Although the film is a
14  tense psychological thriller, it is paired—quite unusually—with strong and escalating
15  supernatural elements which might be characterized as "magical realism," which
16  leaves the audience with a measure of uncertainty about what's real.[2]

17       5.    Shockingly, this plot description of *Emanuel* could just as easily be
18  applied to *Servant*, made six years later.

19       6.    And incredibly, this is just the beginning of the commonalities between
20  the two works. As catalogued below, the plot similarities run even deeper. In addition,
21  the works share strikingly similar—and highly idiosyncratic—characters, themes,
22  scenes, moods, directorial choices, and modes of storytelling.

23       7.    With regard to the central characters, the mother and nanny are even
24  more alike than the shared plot would dictate. The two nannies look very much
25  alike—and are similarly difficult and enigmatic. Both mothers are remarkably self-

26  _____

27  [2] The Cambridge Dictionary defines Magical Realism as "a style of writing, films, art,
28  etc. that mostly represents life as it really is but with some events or features that are
    magical or supernatural."

COMPLAINT

Deleted: the audience discovers

Deleted: . The

Deleted: , the father later reveals,
Deleted: unspeakable
Deleted: . Rather than recoil,
Deleted: plays along with
Deleted: even before knowing its explanation,
Deleted: Soon enough, she

Deleted: nurturing

Deleted: progress comes from confronting
Deleted: :
Deleted: also features
Deleted: of
Deleted: ,
Deleted: doubt

Deleted: that's

Deleted: These
Deleted: include not just parallel plot points, but also

Deleted: Below, Plaintiff enumerates a long list of striking similarities between the works, and explains why each is unusual and artistically significant. This non-exhaustive list involves everything from shared grand themes and character arcs,
Formatted: Space After:  6 pt
Deleted: identical granular details. While it's impossible to completely capture the deep parallels between these two works with a bullet list, Plaintiff easily describes more than sufficient similarity to establish copyright infringement. More important, anyone who takes …
Deleted: time to view and compare
Deleted: works will reach
Deleted: inescapable conclusion that their overlap is far too striking to result from coincidence, as Defendants quite preposterously claim.

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

possessed, gracious, and high-functioning for a woman in the midst of a psychosis, and have put together neat and organized magazine-worthy homes and nurseries.



*Nanny and doll, in Emanuel (left) and Servant (right)*

8.     The works' themes are also strikingly similar. As in *Emanuel*, a central theme of *Servant* involves the extraordinary and almost irrational reciprocal devotion between mother and nanny. In both works, the mother's adoration of the nanny stems from her grief and denial over losing a child. She delusionally channels her maternal instincts towards a doll—but also more genuinely directs them to the real-life vulnerable surrogate-daughter caring for her "baby." In both works, the nanny's strong feelings for her employer stem from longings for a missing mother figure, which she finds being fulfilled by a new mother figure in dire need of a child.



*Bathroom intimacy culminating in a kiss on the hand Emanuel (left); Servant (right)*

9.     In both works, the proxy mother-daughter bond between mother and nanny co-exists with a subtle and unspoken sexual tension—felt throughout and more overtly displayed in surprisingly intimate first-aid scenes in the mother's bathroom.

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

4                    COMPLAINT

Again, this was a startling and bold artistic/directorial choice by Ms. Gregorini—and one that Defendants appropriated for *Servant*.

10.    The mood and pace of the works are also strikingly similar. While the themes mentioned just above are extremely rare in Hollywood, what made *Emanuel* even more unique were a number of Ms. Gregorini's unique artistic and directorial choices, driven by her own very personal inspirations for the story, that are surprising because they are incongruous with themes of loss and longing. For example, *Emanuel* plays as a psychological thriller in that shared secrets are always one false move away from being exposed, which threatens to destroy the cherished but tenuous equilibrium the central characters have found in the obviously unsustainable status quo. To reinforce this tension, Ms. Gregorini uses the cinematic vernacular of classic suspense, including camera angles, lighting, music, and pace—coupled surprisingly with escalating and ominous elements of the supernatural. Astonishingly, and as more fully explained below, *Servant* appropriates all of these idiosyncratic artistic/directorial choices, which define *Emanuel* as a film.



*Dark and foreboding tones in Emanuel (left) and Servant (right)*

12.    Below, Plaintiff enumerates a long list of remarkable similarities between the works, and explains why each is idiosyncratic, deliberate, and artistically significant. This non-exhaustive list involves everything from shared grand themes and character arcs, to identical granular details. While it's impossible to completely capture the deep parallels between these two works with a bullet list, Plaintiff easily describes more than sufficient similarity to establish the substantial similarity of the

COMPLAINT

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

works. More important, anyone who takes the time to view and compare the works will reach the inescapable conclusion that their vast overlap is far too striking to result from pure coincidence, as Defendants quite preposterously claim.

13. The implausibility of Defendants' denial that they saw or even were aware of *Emanuel* is further highlighted by the many very surprising commonalities in granular details, whose purpose would be equally well served by any of a thousand alternatives. For example, we learn that each nanny is more assertive than we may have thought when she directs her shy young date to steal a bottle of red wine (to be paired with French bread and cheese). In both works, water imagery plays a prominent role—including scenes of the nannies underwater but acting quite naturally. In both works, fine food and cooking play a prominent role. In each work, the nanny's troubles are highlighted by a trip to her mother's grave. The names of the nannies—Emanuel and Leanne—are almost anagrams. Even the dolls look remarkably alike (each having replaced babies who died at three months).



*The nanny, underwater in Emanuel (left) and Servant (right)*

14. Defendants will point to differences between *Emanuel* and *Servant*. But what they call differences are usually just content that was "tacked on" to Plaintiff's work—usually in ways required when adapting a motion picture for use as an episodic television series. Indeed, Defendants misappropriated the ninety-minute film *Emanuel* for use as their first three half-hour episodes (i.e. ninety minutes) of their series, which were written as a unit long before all other episodes, released as a "series premiere" unit on Thanksgiving 2019, and constitute the entirety of what Mr. Shyamalan and his

6                    COMPLAINT

1  colleagues shopped to Apple when pitching the series. In every relevant sense,
2  Episodes 1-3 represent the self-contained "pilot" of the series. That each of the
3  subsequent thirty-minute weekly episodes introduces new vignettes, characters, or
4  sub-plots does not detract from the substantial similarity of *Emanuel* and Episodes 1-3
5  of *Servant*.[3]

6  **B.    Defendants' infringement is emblematic of gender injustice in the**
7  **entertainment industry.**

8      15.    As mentioned, *Servant* is meant to showcase Apple's new streaming
9  service. But if *Servant* showcases anything, it is the gender arrogance and inequity
10 still infecting Hollywood (and apparently Cupertino). *Emanuel* tells a nuanced
11 emotional story about motherhood and daughterhood—real, lost, and imagined. It is
12 clearly a woman's story, inspired by Ms. Gregorini's very personal struggles with her
13 inability to conceive a child and growing up with an absent mother (as discussed in
14 specific detail in the ample media coverage the film received). It is about grief,
15 longing, motherhood, secrets (the ones we keep from ourselves, the ones we carry for
16 others), and the inescapable collision course with reality. It took the collective talents
17

18 [3] Indeed, in television, it is quite common for a series to offer a movie-like pilot—
19 which establishes characters within a self-contained story—and then build on those
20 elements (and the world that has been constructed) in subsequent weekly episodes that
   use the story of the pilot as backstory to the series. The episodes can continue for
21 many years, of course—which is Mr. Shyamalan's publicly-expressed ambition for
22 *Servant*. It makes sense that Plaintiff alleges only that the first three episodes infringe.
   Imagine, for example, that *Romeo and Juliet* was still protected by copyright, and was
23 improperly adapted as a television pilot. That years of subsequent episodes—which
24 might focus on the hilarious continued misadventures of the Montagues and
   Capulets—did not continue to directly derive from the original play would not
25 somehow cure the original infringement. As Judge Learned Hand famously remarked,
26 "No plagiarist can excuse the wrong by showing how much of his work he did not
   pirate." The original infringement remains, of course, even if later episodes alter the
27 meaning of the pilot. If it were revealed at the end of Season 5 that Romeo was an
28 alien, for example, that would have no bearing on the substantial similarity of play
   and pilot.



and tremendous efforts of many strong and capable women to tell this story and put it
in on the screen, in a film industry dominated by men.

**Deleted:** world

16.     *Servant* tells a substantially similar story, in a substantially similar
manner, using substantially similar tools of the trade. But what is equally damaging
and disturbing to Ms. Gregorini is a layer added to *Servant* by its all-male team of
creators and producers (including creator and writer Tony Basgallop, and executive
producer/director M. Night Shyamalan), in which this female-centric story is
sometimes seen through the eyes of two men—who watch and comment on the
women's "insanity" while pounding tequila shots and pondering whether the nanny is
"fuckable."

17.     The result of this caricature of the male gaze is the utter bastardization of
Ms. Gregorini's work. It's an apt metaphor for the real-life version of what could
happen here: It takes only a few old guard Hollywood men, such as Mr. Shyamalan
and Mr. Basgallop, and their new silicon valley partner Apple TV+, to negate the
considerable achievements and life experiences of the women behind *Emanuel*, and to
irredeemably tarnish their work. Just as the male perspective cheapens the female
experience in *Servant*, Mr. Shyamalan and Apple TV+ diminish Ms. Gregorini and
her largely female team.

18.     A review in *The Atlantic* makes a similar point: that *Servant* squanders a
compelling premise by missing the female perspective on an extremely female story:

> Servant could be a series about the otherworldliness of grief, and the
> ways in which it seems to fragment and distort reality… Servant, though,
> doesn't seem to have the emotional curiosity to earn its premise...
> And this is the truly uncomfortable part of Servant: It urges you, over and
> over, to loathe and condemn a woman whose baby has died. Look at the
> spectacle of this woman's delusion, the series seems to say, lingering on
> the frozen plasticity of Jericho's features. Note her narcissism, her vanity,
> the ridiculousness of her newscasts. **All six of the show's executive**
> **producers are men and all 10 episodes are written by Basgallop,**
> **which perhaps makes it unsurprising that Servant, far from**

**sketching out the contours of maternal grief, instead treats Dorothy with such casual disdain.**[4]

19.     Gender injustice in Hollywood is not a formal part of Ms. Gregorini's claim, which stands on its own merit under the basic principles of copyright law. But it is certainly part of the broader picture of Defendants' misappropriation of *Emanuel*. While Hollywood's patriarchal system sometimes manifests in explicit and raw ways, it can also operate more subtly, as it has here. But the injury to women deserving of equality is no less grievous. Women graduating from film school know—or soon learn—that they face far more daunting odds than their male peers. The perception that no one is going to stop the already-powerful (usually white men) from simply taking the artistic output of those outside the power structure serves to perpetuate the patriarchy for another generation. This is not only unjust; it also stifles the progress of good cinema and television.[5]

**C.     Defendants have arrogantly brushed aside Ms. Gregorini's protests.**

20.     The result of Defendants' misappropriation and mangling of Ms. Gregorini's work is that any intention of adapting her work for premium television— where she has concentrated her efforts and built a successful career over the past several years—are now dashed.

21.     Despite this very real damage, Defendants have arrogantly dismissed Ms. Gregorini's protests by vaguely claiming that *Servant* was in development long before *Emanuel* was made, and that any similarity is a coincidence. Indeed, Mr. Shyamalan and Mr. Basgallop implausibly claim they have never seen *Emanuel*—apparently not even curious enough to watch after hearing Ms. Gregorini's objections. Worse, Apple

---

[4] Someone should tell the reviewer that the movie she wants to see already exists and can be rented anytime on Apple's platform: *The Truth about Emanuel*.

[5] Over the last 13 years, females directed less than 5% of top films—even though their movies were as well received as those directed by men. See Clark and Pieper, *Inclusion in the Director's Chair: Analysis of Director Gender & Race/Ethnicity Across 1,300 Top Films from 2007 to 2019* (Annenberg Foundation 2020).

COMPLAINT

1    has brought stonewalling to a new level by simply referring inquiries to Mr.

2    Shyamalan's lawyer (who in turns says he cannot speak for Apple).

3        22.    Steve Jobs acknowledged that Apple has "always been shameless about

4    stealing great ideas." Mr. Shyamalan too has been publicly and credibly accused of

5    infringement more than once. In 2004, it was widely reported that Mr. Shyamalan's

6    film *The Village* shared uncanny similarities with Margaret Peterson Haddix's well-

7    received book published nine years earlier.[6] Mr. Shyamalan was also sued (in this

8    Court) by screenwriter Robert McIlhinney who alleged Mr. Shyamalan's film *Signs*

9    was a misappropriation of his script. Once again, it appears that the powerful men of

10   Hollywood and Big Tech believe that appropriation of others' intellectual property is

11   their right. The purpose of this lawsuit is to hold Apple, Mr. Shyamalan, Mr.

12   Basgallop, and the producers of *Servant* accountable for their misconduct.

13                        **JURISDICTION AND VENUE**

14       23.    Plaintiff brings this action for copyright infringement (17 U.S.C. Section

15   101, *et seq.*).

16       24.    This Court has original subject matter jurisdiction over this action and

17   the claims asserted herein, pursuant to 28 U.S.C. Section 1331 ("federal question

18   jurisdiction") and 1338(a)-(b) ("patent, copyright, trademark and unfair competition

19   jurisdiction") in that this action arises under the laws of the United States and, more

20   specifically, Acts of Congress relating to patents, copyrights, trademarks, and unfair

21   competition.

22       25.    Venue is proper in this District pursuant to 28 U.S.C. Section 1391(b)(1)-

23   (3) because a substantial part of the events or omissions giving rise to the claims

24   occurred in this District.

25       26.    Each of the Defendants is subject to the personal jurisdiction of this

26   court. As described below, each Defendant distributed and promoted the subject

27

28   _____

[6] See *Shyamalan's "Village" Villainy?* E News August 10, 2004.

10                              COMPLAINT

1  infringing material in California, including by expressly aiming marketing and

2  distribution efforts at consumers in this state.

3                        **III.   THE PARTIES**

4       27.   Plaintiff Francesca Gregorini is, and at all times relevant herein has been,

5  a resident of California.

6       28.   Defendant Apple Inc. is a California corporation doing business in

7  California, with its principal place of business located in Cupertino, California.

8       29.   On information and belief, Defendant M. Night Shyamalan is a resident

9  of Pennsylvania.

10      30.   Defendant Blinding Edge Pictures, Inc. is a Pennsylvania corporation

11  doing business in California, with its principal place of business located in Berwyn,

12  Pennsylvania.

13      31.   Defendant Uncle George Productions, LLC is a Pennsylvania limited

14  liability company doing business in California, with its principal place of business

15  located in Newtown Square, Pennsylvania.

16      32.   Defendant Escape Artists LLC, a motion picture and television

17  production company, is a California limited liability company, doing business in

18  California, with its principal place of business located in Culver City, California.

19  Defendants Tisch, Black, and Blumenthal are principles of Escape Artists.

20      33.   On information and belief, Defendant Steve Tisch is a resident of

21  California.

22      34.   On information and belief, Defendant Todd Black is a resident of

23  California.

24      35.   On information and belief, Defendant Jason Blumenthal is a resident of

25  California.

26      36.   On information and belief, Defendant Ashwin Rajan is a resident of

27  California.

28

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

                          11                         COMPLAINT

Deleted: .

37.   On information and belief, Defendant Tony Basgallop is a resident of California.

38.   Defendant Dolphin Black Productions is a California corporation, doing business in California, with its principal place of business located in Beverly Hills, California. Dolphin Black is Mr. Basgallop's company.

39.   Plaintiff is ignorant of the true names and capacities of the Defendants sued herein as Does 1-10, inclusive, and therefore sues said Defendants by such fictitious names. Plaintiff will amend this Complaint to allege the true names and capacities when the same has been ascertained. On information and belief, each fictitiously-named Defendant is responsible in some manner for the occurrences herein alleged, and that Plaintiff's damages as herein alleged were proximately caused by their conduct.

40.   Each of the Defendants acted as an agent for each of the other Defendants in doing the acts alleged, and each Defendant ratified and otherwise adopted the acts and statements performed, made or carried out by the other Defendants so as to make them directly and vicariously liable to the Plaintiff for the conduct complained of herein. Each Defendant is the alter ego of each of the other Defendants.

### IV.   GENERAL ALLEGATIONS

**A.   Ms. Gregorini is the writer, director and producer of *The Truth About Emanuel*.**

41.   A graduate of Brown University, Plaintiff Francesca Gregorini co-wrote and sold television pilot scripts to both HBO and Paramount before co-writing and co-helming her directorial feature film debut *Tanner Hall* (starring Rooney Mara and Brie Larson). *Emanuel*, which she wrote, produced, and directed, is Ms. Gregorini's second feature film.

42.   Ms. Gregorini is female and gay. While her identity informs her work, it does not define her as an artist. Like all successful women in the entertainment

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

industry, Ms. Gregorini has learned to navigate the gender inequity endemic to her profession. She regularly works on mainstream projects with mainstream male and female producers and actors. In television, she has recently directed Emma Chan in *Humans* (AMC), Bryan Cranston in *Electric Dreams* (Amazon), Uma Thurman in *Chambers* (Netflix), Sandra Oh in *Killing Eve* (AMC) and Heather Graham in *The Hypnotist's Love Story* (ABC, as the pilot director). She is currently attached to direct a $10 million feature film and is in the process of pitching a television series. Until she brought this claim, Apple itself was poised to hire Ms. Gregorini to direct an upcoming episode of its marquee offering, *The Morning Show.*

43.    The idea for *The Truth about Emanuel*[7] came to Ms. Gregorini in 2010, borne from personal struggles. She created the mother character, Linda, as a means to explore and heal grief related to her inability to become pregnant. Pained, Ms. Gregorini imagined a scenario that would be even worse than hers: giving birth to a child only to see it die. This is, of course, Linda's story.

44.    It is human nature to avoid pain. Ms. Gregorini found her ways (including writing *Emanuel*) and Linda found hers (parenting Chloe, the "reborn" doll).

45.    The nanny character, Emanuel, is the carrier of, and co-conspirator in, Linda's secret/delusion. Growing up in a home with alcoholism, Ms. Gregorini too was the carrier of secrets for the adults in her life—and at times she bought into those delusions in order to stay connected, keep the peace, and navigate unfathomable situations. The character of Emanuel is borne of that deep-seated knowledge of what it means to want connection with a mother figure so badly, one will live in a fiction in order to maintain it.

46.    In the film *Emanuel*, Ms. Gregorini took her two biggest and most personal wounds—growing up with an often absent mother and her inability to

_____
[7] The work was formerly known as *Emanuel and the Truth About Fishes.*

become a mother herself—and fashioned a psychological thriller that would explore
their complexities.[8]

47.     *Emanuel* was a labor of love for Ms. Gregorini. She worked for years to
develop it, and to raise the shoestring budget needed to produce it. She finally cobbled
together the $1.2 million budget (including an additional raise for post-production
work) from mostly small-dollar investors.

48.     The nanny role was originally written for Rooney Mara, who was
replaced by Kaya Scodelario due to scheduling. Ms. Mara remained on the project as
a co-producer of *Emanuel*. Jessica Biel replaced Helena Bonham Carter as the mother.

49.     Ms. Gregorini and her accomplished cast and crew filmed the production
in 2012.

50.     *Emanuel* premiered in Dramatic Competition at the 2013 Sundance Film
Festival and was selected to showcase at Sundance UK later that same year. The film
went on to screen at many other film festivals in the U.S and around the world. The
film was released in U.S. theaters on January 10, 2014.

51.     Ms. Gregorini earned a nomination at the Sundance Film Festival for the
2013 Grand Jury Prize – Dramatic, and earned the Best Feature Director prize at the
2013 L.A. Femme Film Festival. The film earned awards at the 2013 Ashland
Independent Film Festival and 2013 Brooklyn Film Festival. Tribeca Enterprises chief
creative officer Geoffrey Gilmore said "Francesca Gregorini's superb *Emanuel and
the Truth About Fishes* is a rare and remarkable work of mixed genres and

---

[8] In contrast, Mr. Basgallop has offered an account of his personal inspiration for the
story that comes off as vague and implausible: "It's been something I've been writing
for a very long time — since I've had children, really, which is 17 years ago. I wanted
to write about the changes that children bring into your life and the fears they bring
and how the slightest thing that goes wrong can affect you — just disaster scenarios.
That was the initial idea. Over the years I've been developing these characters and
trying to tell a story that's very contained. I've thrown away a lot of the rules I've
learned about writing in television for this one; I've very consciously tried to make it
personal and yet keep it genre-specific — play it as a thriller."

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

14                                                    COMPLAINT

1  expectations. A taut, surprising and original thriller featuring a career best

2  performance from Jessica Biel and a breakout role by Kaya Scodelario."

3  **B.    Defendants had access to *Emanuel*—years before making *Servant*.**

4        52.    There is no question that *Emanuel* preceded *Servant*, and that Defendants

5  had access to it continually since 2013. Ms. Gregorini penned the screenplay to

6  *Emanuel* in 2011, and registered it with the Writer's Guild on January 19, 2012—

7  nearly eight years before Servant premiered. Copyright protection of the film

8  commenced when filming was completed in 2012. The work was widely disseminated

9  to the public beginning in 2013. Emanuel Film, LLC first applied to register the

10  copyright in 2012. Since 2014, *Emanuel* has been available for purchase or rental on

11  Apple's own iTunes.

12        53.    Additionally, Mr. Basgallop has had specific access to *Emanuel*. In

13  addition to the Sundance premier (U.S. and U.K.) and theatrical release of *Emanuel*,

14  and the film's availability on multiple streaming platforms, Mr. Basgallop had

15  occasion to screen the film in 2017, when Ms. Gregorini's agents at CAA pitched her

16  to direct episodes of *Berlin Station*, a series Mr. Basgallop co-executive produced. On

17  information and belief, Mr. Basgallop (as well as the other executives of *Berlin*

18  *Station*) received an email from Ms. Gregorini's agents at CAA, submitting her for the

19  *Berlin Station* project, that included a link to Ms. Gregorini's most prominent work to

20  date, *Emanuel*.

21  **C.    *Servant* is one of eleven original series that Apple chose to showcase the**

22        **launch of its ambitious new streaming service Apple TV+.**

23        54.    Apple TV+ is the ambitious new streaming service of Defendant Apple

24  Inc.—the world's most valuable company.

25        55.    By all accounts, Apple sees Apple TV+ as its future. According to the

26  New York Times, "Apple has gone Hollywood for a reason. With iPhone sales

27  flattening, the company sought out other ways to generate revenue. In addition to

28

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

**Deleted:** : Given the striking similarities, it is inconceivable that Servant's creators developed the television series without reference to *Emanuel*. And indeed, Mr.

**Deleted:** nationwide

**Deleted:** ,

1  Apple TV Plus, it has unveiled a credit card and started a video-game subscription

2  service."

3      56.     And indeed, Apple used its considerable economic might to hire some of

4  Hollywood's most established names. As recently reported in the New York Times:

5  "Led by the veteran Hollywood executives Zack Van Amburg and Jamie Erlicht,

6  Apple TV Plus has made deals with Oprah Winfrey, Steven Spielberg, J.J. Abrams

7  and M. Night Shyamalan, among others." In other words, Apple touts M. Night

8  Shyamalan's *Servant* as one of its marquee series.

9      57.     Apple certainly has competitors in the entertainment arena. Netflix and

10  HBO are seen as the titans of original content for television. Netflix, HBO Max,

11  Disney, Amazon Prime, and Hulu offer rival streaming services, each coupling

12  original programming with a deep reservoir of existing content.

13      58.     Amidst this competition, Apple's marketing strategy is to push the

14  message that what sets it apart from its rivals is its unparalleled stories and

15  storytellers. In short, Apple has staked its claim on doing what only it can do (similar

16  to what it did with the personal computer, the iPhone, and tablets): gathering the best

17  minds on earth to come up with new and revolutionary ideas.

18      59.     This theme was very much on display at the announcement of Apple

19  TV+ last year. There, Apple CEO Tim Cook told a hushed and rapturous live

20  audience:

21          Apple has always tried to make the world a better place, and we believe
22          deeply in the power of creativity… We feel we can contribute something
           important to our culture and to society through great storytelling, so we
23          partnered with the most thoughtful, accomplished, and award-winning
           group of creative visionaries who have ever come together in one place
24          to create a new service unlike anything that's been done before.

25      61.     Apple has put its money where its marketing mouth is. The company's

26  annual content budget has come in at a staggering $6 billion, according to the

27  *Financial Times*. Unlike Facebook and Google, which have tentatively dipped their

28  toes in entertainment, Apple has gone all-in. Within a year, Apple TV+ could feature

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

16                              COMPLAINT

**Deleted:** 60.  →Cook then handed off the presentation to Erlicht and Van Amburg, who were on-message:¶
¶
At Apple, we know that great stories begin and end with the incredible artists who tell them, the artists who are thoughtful enough and brave enough to share their best story with us and the world.¶
…¶
We've partnered with the most accomplished storytellers as well as a new generation of the most exciting voices who together will define Apple TV+ as the destination with the highest quality originals. The original shows and movies will intellectually challenge and thrill, define and redefine our expectations, inspire us, make us laugh, transform our mood and brighten our day, but make us believe anything is possible, from documentaries to dramas, from kids to comedies, the highest quality of storytelling in one single place. This is Apple TV+. ¶
¶

1   as much original content as longtime cable networks such as Showtime. Its

2   advertising budget for September and October 2019 alone was $40 million—and

3   that's not counting November when advertising really ramped up.

4        62.    The staggering amount of money and energy Apple has put behind Apple

5   TV+ has so far resulted in the eleven original shows that comprise the launch of the

6   service. One of those shows, of course, is *Servant*. In other words, *Servant* is what all

7   the fuss and money is about. Notably, *Servant* was released on Thanksgiving, a day

8   known in the entertainment industry as one of the best times for an important rollout,

9   due to high viewer engagement. Ahead of the series premiere, on November 22, 2019,

10  Apple renewed the series for a second season.

11       63.    In the case of *Servant*, the "creative visionaries" are two men with long

12  Hollywood histories: executive producer M. Night Shyamalan, touted by Apple as the

13  creative force behind the show; and Tony Basgallop, the creator and writer.[9]

14  Mr. Basgallop wrote every episode and executive produces alongside Mr. Shyamalan

15  and four other men.

16       64.    The first three episodes of *Servant* function as a pilot. They were

17  conceived of and written long prior to all the other episodes. On information and

18  belief (based on news reports and interviews), Mr. Basgallop and Mr. Blumenthal

19  showed this content to Mr. Shyamalan in their successful attempt to interest him in the

20  show—resulting in a deal to develop the series together. On information and belief

21  (based on news reports and interviews), Mr. Shyamalan and the other Defendants

22  presented scripts only to those first three episodes in shopping the series, including to

23  Apple—resulting in a deal to stream the series on Apple TV+. Further, Episodes 1-3

24  make up an organic and self-contained whole, in terms of their story structure and

25  conflict. This self-contained story was judged by Mr. Shyamalan and by Apple (and to

26  _____

27  [9] The New York Times reports that Mr. Shyamalan is "the glamour name among the
    executive producers, and he directed two episodes, but the show was created and
28  written by the British TV veteran Tony Basgallop.

17                                           COMPLAINT

all who signed on, along the way) a sufficient foundation upon which to build an episodic television series.

**D.  *Servant* is substantially similar to *Emanuel*.**

65.    *Servant* is substantially similar to *The Truth About Emanuel*, in its themes, setting, characters, plot, sequence of events, mood, pace, and dialogue. Accordingly, *Servant* is an unauthorized derivative work of *Emanuel*—a television adaptation of the motion picture. Again, the central subject matter of both works is the relationship between a troubled mother and the nanny who serves as a surrogate daughter figure—ameliorating the unfulfilled longings the mother has for a child, and the nanny for a mother. To explore this subject, the works tell remarkably similar stories, using remarkably similar (and unique) techniques. Any one of the many commonalities enumerated below would be surprising because they represent unique expression and unusual directorial choices—but the odds of them *all* appearing in two independent works would be astronomical. Further, the unique selection and arrangement of these elements—which is substantially similar in *Emanuel* and *Servant*—make it a statistical certainty that Defendants copied *Emanuel* in making *Servant* and are thus being less than candid when they claim that they have never seen *Emanuel*.

66.    As mentioned above, the following list of commonalities is necessarily an abbreviation. The only way to fully appreciate the extent of *Servant*'s overlap with *Emanuel* is to view the entirety of both works (i.e. the film *Emanuel* and Episodes 1-3 of Season 1 of *Servant*), with the benefit of further explanation and facts regarding the nature of the similarities, their significance in the works, the rarity/idiosyncrasy of the relevant artistic choices in *Emanuel*, and an analysis of the point of comparison in light of conventions in literature, film, and television. For this reason, the entirety of both works (the film *Emanuel* and Episodes 1-3 of Season 1 of *Servant*, both approximately an hour and a half of content) are incorporated by this reference—and digital copies have been furnished to the court.

COMPLAINT

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

Moved up [6]: Mr.

Deleted: Basgallop offers his own vague and implausible account of his personal inspiration for the story:¶
¶
It's been something I've been writing for a very long time — since I've had children, really, which is 17 years ago. I wanted to write about the changes that children bring into your life and the fears they bring and how the slightest thing that goes wrong can affect you — just disaster scenarios. That was the initial idea. Over the years I've been developing these characters and trying to tell a story that's very contained. I've thrown away a lot of the rules I've learned about writing in television for this one; I've very consciously tried to make it personal and yet keep it genre-specific — play it as a thriller.[19]¶
¶

Deleted: mutual dependence of a

Deleted: a

Deleted: common to

Deleted: choice

Deleted: will be

67.     One of Defendants' most brazen misappropriations from Emanuel—which runs throughout plot, characters, themes, etc.—is their liberal use of magical realism: the escalating presence of supernatural elements into an otherwise realistic story. This realism makes *Emanuel* and *Servant* different than most horror or supernatural movies. Like Plaintiff's highly unusual artistic/directorial choice for *Emanuel*, *Servant* purposefully keeps the audience wondering—in a way that is not answerable—as to the objective reality of supernatural elements.

**Theme**

68.     The themes of *Servant* are remarkably similar to those of *Emanuel*. For example, key themes of both works include:

- Denial and self-delusion as a means of avoiding the unspeakable grief of losing a baby; and the dangerous, precarious, and ineffective nature of this pathological coping mechanism.

- The incredible complexity of the mother/child bond and especially its absence (including manners in which the severing of such a bond might give rise to psychological pathologies).

- Shared secrets and complicity in another's delusion—particularly in the context of a mother/daughter relationship.

- The dangers of shared delusion; and how such collusion can lead to crisis, including a collision with reality.

- The mystery/danger of a stranger coming to town, or a new person in the mix.

- The redemptive potential of confronting reality (or equivalently, the lack of redemption in failing to confront reality).

- The safety, sanctity and comfort of home—and the obverse dangers of the outside world.

- The relationship between familial and maternal longing, and sexuality.

69.     Most of the themes mentioned above are extremely rare in Hollywood, which renders the commonalities between *Emanuel* and *Servant* all the more striking,

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

and thus all the more probative of Defendants' illicit appropriation of Ms. Gregorini's protected expression. For example, while many of the industry's most iconic films explore troublesome bonds between fathers and sons (from *The Godfather*, *There Will Be Blood*, and *Star Wars*; to *Mrs. Doubtfire* and *Finding Nemo*), the same cannot be said of the troubled mother/daughter theme explored by the proxy mother/nanny relationship in *Emanuel* and *Servant*. Indeed, *Emanuel* was the *first* film to explore maternal longing by examining its delusional misplacement, while also studying a young woman's misplaced longings for a mother. *Servant* was the second. Likewise, *Emanuel's* surprising depiction of sexual longing as related to misguided maternal sentiments was unprecedented until *Servant* offered a similar take.

**Setting**

70.     In addition, *Servant* unfolds in a setting that is substantially similar to that in *Emanuel*, including as follows:

- As in *Emanuel*, the central characters in *Servant* (the nanny and mother) live in such close proximity that truths are often revealed by snooping, spying, voyeurism, or inevitable casual observation.
- As in *Emanuel*, the key action in *Servant* takes place in the mother's home.
- To facilitate this idea of the characters watching each other, both works showcase a dark but often dramatically lit exposed wood staircase, overlooking the first floor and entry hall where much of the action unfolds—perfect for watching, listening, and snooping.



*The nanny, watching from the top of the stairs in Emanuel (previous) and Servant (above)*

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

- As in *Emanuel*, *Servant* unfolds in the mother's beautiful, immaculate, old-world, well-appointed, home. In both works, the fact that the house is so well put together becomes somewhat disturbing as the story progresses. Obviously, it dawns on the audience, it is easier to maintain a house when the new baby is not real. In both works, the house becomes a symbol of the false edifice of domestic tranquility that the mothers are building and the nannies are buying into and sustaining.

- As in *Emanuel*, the house in *Servant* is so important as to almost become a character. In both works, the house is a safe and comfortable sanctuary—as contrasted with the dangers of the outside world, including the key danger of the mother's secrets being exposed.

- As in *Emanuel*, *Servant* furthers this sanctuary theme by prominently featuring the show-piece entry hall mentioned above, as a kind of portal from the outside world to the inner sanctum where the family secrets reside. These hallways facilitate scenes of prying eyes entering the house. As in *Emanuel*, the importance of the doorway in *Servant*—as dividing worlds—is highlighted by highly unusual close-up shots of the nanny's feet as she crosses the home's threshold. [*Emanuel* at 18:11 and 39:19; *Servant* Ep. 1 at 2:39.]



*The entry hallway in Emanuel (left) and Servant (right)*

- Both works feature a critical trip to the nanny's mother grave, where important truths are revealed.



*The nanny's mother's grave in Emanuel (left) and Servant (right)*

- In both works, the nurseries are magazine-worthy—almost to the point of being hyper-real—including vertically striped wallpaper, old-fashioned cribs, beautiful vintage baby items, and remarkably, an antique rocking horse that obviously won't be pressed into service for a few years. Again, these picture-perfect nurseries, in each work, highlight the lack of a real baby.



*The rocking horse in nursery, in Emanuel (left) and Servant (right)*



*Beautiful nurseries, in Emanuel (left) and Servant (right)*

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

22                                    COMPLAINT

- In each work, the second-story nursery is introduced by the same idiosyncratic camera technique: a shot from outside the house, pushing in on the second story window, to show a figure fussing over the baby. The shot introduces the nursery in a voyeuristic way.

 

*First look at nursery and baby, through the window, in Emanuel (left) and Servant (right)*

- Like *Emanuel*, *Servant* includes a number of scenes of family and extended-family dinners. For example, both works feature a key birthday dinner scene in a formal dining room (discussed in more detail below). [*Emanuel* at 55:20; *Servant* Ep. 2 at 25:30.] Both works also contain dinner scenes in which the pleasant mood (and elaborately prepared and described food) is compromised when the conversation moves to talk of the "baby." [*Emanuel* at 24:45; *Servant* Ep. 1 at 20:20.] In both works, these scenes seem to deconstruct conventional ideas of domestic bliss. If one didn't know better, the scene looks like typical domesticity—which is of course at odds with the troubles and secrets bubbling to the surface. For this reason, cracks and tensions reveal themselves at these family dinners—creating a tense mood.

**Characters**

71.   *Emanuel* and *Servant* revolve around strikingly similar characters, with similar backgrounds and story arcs. In a sense, the striking plot similarities dictate significant similarities in characters—but here the similarities go much further.

COMPLAINT

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

**The Nannies: Emanuel (*Emanuel*) and Leanne (*Servant*)**

72.     Emanuel and Leanne are extraordinarily similar, including in the following obvious respects:

- Both are pretty, white, 18-year old girls. Emanuel says that she will be "18 in a month." Leanne reports that she is 18. In both works, the nannies' youth and attendant quirks are remarked upon by other characters.

- As shown above, Leanne looks very much like Emanuel. Not only are they the same age and race, they also share a slight frame, fair skin, blue eyes, and long dark hair.

- Like Emanuel, Leanne is moody, withholding, unpredictable, enigmatic to others, and reticent. Neither speaks freely, nor smiles frequently. In both works, other characters must put in considerable effort to get them to enjoy themselves and must coax personal information from them because they are both so private.

- Both are played by young English actresses—which has the effect of lending an "outsider" quality to their characters.

- Leanne and Emanuel have similarly troubled histories: Each exists without a mother, who died tragically many years prior—and as a result gravitates to and sympathizes with the mother who has delusionally hired them.

- Both take on a double maternal role: outwardly caring for the baby, but more fundamentally, caring for the grieving mother.

- Both also take on a daughterly role, acting as a receptacle for the mother's maternal instincts gone haywire, while also addressing their own longing for a mother figure.

- Both Leanne and Emanuel "shouldn't be here." They each should have died when their mothers did.

- Both works include a scene of the nanny taking the initiative to arrange a date with a boy. In each, the nanny is shown to be more of a "bad girl" than we

24                                      COMPLAINT

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

1   might have thought, by directing her timid date to steal a bottle of red wine. In

2   *Emanuel*, the wine is to be paired with French bread and cheese, but we never

3   see the meal to fruition because Emanuel takes the date in a different direction.

4   In *Servant*, the nanny's date suggests French bread and cheese, which is not in

5   fact consumed because the nanny has other ideas.

6   **The Mothers: Linda (*Emanuel*) and Dorothy (*Servant*)**

7   73.   Linda and Dorothy are remarkably similar, including in the following

8   respects:

9   • Both mothers are sensitive and delicate enough that their grief sends them

10   around the bend into delusion—but at the same time they each have the strength

11   to appear remarkably confident and self-possessed.

12   • Both mothers suffered the tragic loss of their first and only baby—resulting in

13   the delusion that a reborn doll is that baby. In other words, both channel their

14   tragically displaced maternal love into a doll—so fully committed to the fantasy

15   that they hire a nanny (towards whom they feel motherly).[11]

16   • Both mother characters are in their mid-thirties (slightly older than the average

17   new mom).

18   • As in *Emanuel*, the mother in *Servant* enters a trance-like state several times,

19   which we understand to involve a moment when the awful truth of her baby's

20   death might be percolating toward the surface of her consciousness. In both

21   ───────────

22   [11] It's worth noting that the idea of a bereaved parent using a realistic doll

22   therapeutically after the death of an infant is exceedingly unusual even standing alone

23   (ignoring for a moment the commonalities of the parent coming to believe the doll is

23   real, and hiring a nanny who buys into the delusion). No doctor or therapist has or

24   would recommend such a "therapy," as *Servant* acknowledges by calling it quackery.

25   The reason no serious therapist would recommend using a doll to deal with a mother's

25   grief is that it is antithetical to all goals of bereavement therapy, which emphasizes

26   recognizing and genuinely working through authentic emotions. Indeed, use of a doll

27   for grief would not even qualify as a fringe therapy, or even as a myth. It's not a

27   therapy that has ever been studied, and most doctors have never heard of it (which

28   renders its mirror-image treatment in Emanuel and Servant all the more remarkable).

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

25                                                     COMPLAINT

Deleted: especially

Deleted: in

Deleted: mid-thirties (slightly older than

Deleted: average new mom).

Moved down [11]: Both are white, sophisticated, and privileged.

Deleted: Both are

Deleted: for women in the midst of psychosis—especially in the ease and grace in which they direct their nannies

Deleted: <#>Both mothers share the same positive, effervescent, "type A" personality. If they are sad, they do not show it. In fact, quite the opposite: they are preternaturally happy, flitting around arranging flower vases in their pristine homes wearing impeccable clothing.¶
<#>Both are extremely stylish in their clothing and home décor.¶
<#>Both

Deleted: Both are

Moved (insertion) [12]

works, the mothers snap out of these states rather easily due to external distractions.

- Both are white, sophisticated, and privileged.

- Both mothers share the same positive, almost effervescent, "type A" personality, flitting around arranging flower vases in their pristine homes wearing stylish clothing.

- Both are apparently affectionate and doting mothers.

- Both mothers' displaced maternal longing is channeled not only into a reborn doll, but also into the nanny. In both works, an early indicator of this dynamic is a scene in which the mother takes great joy in choosing clothes from her closet for the nanny to wear. The audience naturally feels even greater sympathy for the mothers, seeing how naturally nurturing they are.

- In both mother characters, there is an unspoken, perhaps unconscious or repressed, sexual longing, that is subtly directed towards the nanny. This is depicted, in both works, in a key scene in the mother's bathroom, where the mother helps the nanny with a painful condition (*Emanuel*) or vice-versa (*Servant*).

**The Dolls: Chloe (*Emanuel*) and Jericho (*Servant*)**

74.    The doll in *Servant* looks almost identical to its extremely realistic precursor in *Emanuel*. For example:

- Both dolls are as physically realistic as possible.[12] As a result, both works include a number of "creepy" shots of the almost-but-not-quite lifelike "baby" (especially shots of the baby's open eyes). Once again, the physical

---

[12] The basic premise—of a mother so traumatized by her baby's death that she cares for a doll she believes to be her real baby—does not dictate the look of that doll. For example, in the acclaimed 2007 film *Lars and the Real Girl*, the main character "dates" a doll he believes to be real, but no effort is made to make the doll appear lifelike.

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

resemblance of the dolls is the result of casting. Both are ultra-lifelike "reborn" baby dolls.

- Both dolls look to be about three months old (which of course reflects another remarkable similarity between the works: that both babies died at around this same age).

- Both dolls appear to "come back to life," as part of the nanny's effort to resolve her own and the mother's grief. In both works, the "reality" of the rebirth is ambiguous, which is achieved through the use supernatural elements or "magical realism."

- Both dolls have patchy dark hair—which was not at all an obvious choice in *Servant* given that Dorothy has red hair.

 

*The dolls, in Emanuel (left) and Servant (right)*

**The Fathers: Thomas (*Emanuel*) and Sean (*Servant*)**

75.    In both works, the fathers serve the important role of explaining to the nanny and audience what has happened—birth, death, lack of certainty regarding cause of death, grief, and then a doll. In each work, we find the father somewhat insensitive—perhaps out of exhaustion but perhaps also because he cannot understand a mother's grief. In *Emanuel*, this is shown by Thomas's principal reaction to his wife's grief-induced psychosis: to have her committed to a psychiatric facility. In *Servant*, this is shown by the husband's crass reference to his wife as crazy and talk of whether the nanny is "hot."

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

27                                    COMPLAINT

76.     Casting of the fathers is also similar. Sean and Thomas are cut from the same cloth: Both are tall, hipster-type white men who look like they've stepped out of a beer commercial.

**The Nannies' Love Interests: Tobe (*Emanuel*) and Claude (*Servant*)**

77.     Both Emanuel and Leanne have romantic interludes with a boy their own age. In both works, the boy is timid, shy, sexually immature, and diminutive— although surprisingly intelligent and sophisticated. Both are taken aback by, and unsure how to handle, the nanny's intensity. Both nannies take the romantic initiative: arranging the date and taking control of it. This is depicted in both works by the nanny directing the boy to steal a bottle of red wine; and by the nanny's choreographing the date. The boys in both works simply do as they are told.

**The Antagonists: Arthur (*Emanuel*) and Julian (*Servant*)**

78.     Both works feature a nebbish, petulant, persnickety, quirky, professorial, twenty-something man who poses a threat to the nanny, and acts as the nanny's primary foil and antagonist. In *Emanuel*, this character is Arthur, whom she works with. Arthur ultimately insinuates himself into the household and questions the nanny's motives, competency, and possible criminality. In *Servant*, this character is Julian, the mother's brother, who also insinuates himself into the household and questions the nanny's motives, competency, and possible criminality. In both works, there is a powerful scene where this character confronts the nanny and threatens to expose her lies and alert the authorities.

 

*The antagonists, in Emanuel (left) and Servant (right)*

COMPLAINT

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

79.     The two actors who play these characters are very similar in appearance: bowl haircuts, and rumpled suits with loose knit ties. They are both medium height white guys who could be brothers.

**Plot**

80.     The plot of *Servant* is substantially similar to that of *Emanuel*. As explained above, and as a threshold matter, *Servant's* premise is identical to *Emanuel's*. Out of grief, a mother replaces her dead infant with a life-like reborn doll. To her husband's concern, she cares for the doll believing it to be their living baby. When she hires a nanny who also treats the doll as if it were alive, the two form a reciprocal fascination and bond stemming from their reciprocal troubled pasts. As a result of the nanny's complicity in the mother's delusion, conflicts of loyalty arise that cause dangerous fissures. But the plot similarities between the two works go much deeper than this premise. For example:

- In both works, the nanny is the focal point—as the titles of the works make clear.
- As in *Emanuel*, *Servant's* nanny is newly hired by a sophisticated and privileged white new first-time mother, to care for a roughly three-month old baby. As in *Emanuel*, the mother in *Servant* appears to be confident, competent, and cheerful; and gives direction with kindness.
- In both works, the nanny seemingly appears in the mother's life through happenstance. In *Emanuel,* she happens to live next door to the mother's new home. In *Servant*, the nanny is presented as "a friend of a colleague of an acquaintance," procured with the help of a "shout on Twitter."
- Existing alongside this idea that the nanny appears at random is the more important truth, in both works, that the nanny has "chosen" the mother. Emanuel first sees the mother through her window, and is immediately intrigued—probably due in large part to the uncanny resemblance to her own deceased mother. Emanuel seizes the first opportunity to get closer to the

29                                                    COMPLAINT

---

**Deleted:** or fraternal twins

**Formatted:** s1

**Moved up [13]:** ¶
¶
¶
*The antagonists, in Emanuel (left) and Servant (right)*¶

**Deleted:** <object><object>

**Deleted:** ¶

**Deleted:** as if

**Deleted:** were

**Deleted:** , positive and self-possessed

**Deleted:** house

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

mother, after learning that she might help with childcare—asking without hesitation "when do I start?" She acts casually, but the effort is extremely deliberate. As in *Emanuel*, the nanny in *Servant* is revealed to have targeted the mother—to the point where she seemingly has a live baby at the ready.

- Like Emanuel, Leanne's palpable fascination with the mother is expressed through voyeurism. In *Emanuel*, Emanuel frequently watches the mother through windows, between their houses [12:19], even using binoculars [7:40]. In *Servant*, the nanny goes so far as to watch the mother's news broadcasts [Ep 1 at 19:45]. In both works, the nanny watches surreptitiously as the mother greets a love-interest. [See, e.g., *Emanuel* at 54:44; *Servant* Ep. 3 at 16:20.]

- As in *Emanuel*, the nanny in *Servant* endures an awkward yet cute "get to know you" question and answer scene with her employer—in which the nanny is likely cringing at some of her answers as soon as they escape her lips. In both works, the mother is forgiving. In *Emanuel*, the awkwardness is shown when the nanny struggles to remedy a bad answer. In *Servant*, the awkwardness is shown when the nanny cannot capitalize on an initially promising answer. In each work, the nanny ultimately salvages the moment by demonstrating knowledge of French.

- In both works, the nanny quietly and contemplatively takes in each detail of the mother's beautiful home when first alone there, clearly seduced by what she sees and wanting to become a part of it. In both works, the nannies seem to imagine themselves becoming their employer's daughter and living in her fantasy house.

- Early on in each work, the audience is struck by how easy the baby is to care for. The familiar troubles of being a new parent are not present: there are no neglected messes, harrowing bouts of crying, or googling of symptoms.

- In each work, early on, the audience catches a fleeting and unremarkable glimpse of the baby.

Deleted: , but

Moved (insertion) [14]

Moved up [14]: In *Emanuel*, the awkwardness is shown when the nanny struggles to remedy a bad answer.

Deleted: Leanne

Deleted: ¶
As in *Emanuel*, the nanny in *Servant* is quickly in awe of the mother, which is partly communicated through her voyeurism: In *Emanuel*, she watches the mother through her bedroom window. In *Servant*, the

Deleted: oddly watches the mother do her local news broadcasts on television.

Moved (insertion) [8]

Deleted: <#>¶

Deleted: <#>might be

Deleted: few

Deleted: glimpses

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

- Relatively early in both works—minute 21 in *Emanuel* and minute 12 in *Servant*—the audience learns that the baby is not real, but rather an ultra-realistic "reborn" doll. In both works, the audience learns this fact by way of a dramatic and jarring "reveal" when the doll is lifted in the crib to reveal its lifelike but lifeless body and face. [*Emanuel* at 21:18; *Servant* Ep 1 at 12:24.] This moment, in each work, is the so-called "catalyst" or inciting incident, which usually occurs like clockwork just after the "setup" phase of a motion picture (especially in high-concept narratives). This catalyst—the reveal of the doll—is arguably the single most important moment in each work, defining the "conflict," and setting the characters' goals and interrelationships.[13]

- As in *Emanuel*, the nanny in *Servant* very quickly realizes the mother truly believes the doll to be real, and plays along with the delusion for reasons of her own. Notably, neither nanny has even a moment where she confronts the mother or laughs at the absurdity of the situation. Rather, both nannies almost immediately treat the doll as real. Within minutes, Emanuel has processed that the mother is delusional and has decided to treat the baby as real herself [*Emanuel* at 23:50]——and soon after she treats the doll as human even while alone with her. In *Servant*, the nanny's first sight of the doll comes when she wanders into the nursery soon after first entering the house. We see her reach into the crib—and within minutes she is seated at the table with the mother, showing no sign of shock or surprise. [*Servant* Ep 1 at 5:15-5:45.]

- It is a remarkable turn and the engine that drives future events: the presence of the doll in the crib demonstrates that the mother, far from being a self-

_____

[13] Of note, the works' "setups" (introduction of characters, setting, mood, dynamic, and the emergence of the catalyst) are also remarkably similar. In each, the audience is introduced to a seemingly happy and high-functioning mother, surrounded by all the traditional post-partum trappings—which renders the catalyst all the more unsettling.

31                                          COMPLAINT

possessed supermom, is in the midst of a psychosis. Now, her high functioning is disturbing.

- As in *Emanuel*, the cause of the mother's delusion in *Servant* is the trauma caused by the death of her real baby at three months old. In each work, the precise cause of the baby's death is said to be unknown.

- The nannies in both works speak to the doll/baby as if it were alive, even when they are alone and there would be no need to keep up the ruse. In scenes that are uncannily similar, the nanny dresses and speaks to the doll on the changing table. [*Emanuel* 31:22; *Servant* Ep 1 at 13:30.]

- Both works feature a scene in which the father explains what has happened: the death of the baby, the psychotic break which was ameliorated only when the mother came to believe the reborn doll was her baby (putting the mother into what appears to be a hyper-normal state). In both works, the father reports that the precise cause of the baby's death is unknown—although the viewer does not know whether this is true. In both works, the nanny appears annoyed by the father's insensitivity to his wife's grief and her desperate coping mechanism, which causes the nanny to feel closer and more protective of the mother.

- Both works contain a scene showing the mother, alone in front a mirror, considering her post-baby body and stretch marks. The disconcerting effect is that we see the mother as a normal mom with normal, if quotidian, post-partum concerns, when of course far more serious issues are looming.



*Inspecting stretch marks, in Emanuel (left) and Servant (right)*

COMPLAINT

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

**Deleted:** .

**Deleted:** odd

**Deleted:** <*object*><*object*>

- In both works, the nanny's mother died years prior, in a tragic and sudden manner. In both works, the absence of the nanny's mother has left a hole in her life that her relationship with the mother begins to fill—in a way that complements the hole in the mother's life caused by the death of her baby.

- In both works, the nanny and mother develop an extraordinary reciprocal fondness. In both works, there are hints that the mother's immediate and over-the-top fondness for the nanny is in part motherly, and may stem from a further warping of her already-displaced maternal instincts.

- In both works, the mothers see themselves in the nanny (as one might say of a daughter).

- In both works, the mother/daughter bond between the mother and nanny is expressed in a scene where the mother inquires into the nanny's past, culminating with the mother gently and affectionately stroking the nanny's face. [See, e.g., *Emanuel* at 14:29; *Servant* ep. 3 at 14:36.]



*The mother stroking the nanny's face, in Emanuel (left) and Servant (right)*

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

**Deleted:** —which seems somewhat unwarranted—

**Deleted:** go so far as to comment that they

**Deleted:** ¹⁴

**Formatted:** Normal,  No bullets or numbering

- Likewise, both nannies emulate the mothers (including by sitting at the mother's vanity while applying the mother's makeup).
- In both works, despite the reciprocal motherly-daughterly bond between mother and nanny, the relationship is nuanced with subtle, perhaps unconscious, sexual tension. In both works, this comes to the surface primarily through a scene in the bathroom, where one character helps the other with a painful condition. In *Emanuel*, it is the mother tending to Emanuel's cut in an unmistakably and spontaneously erotic manner, culminating in a lingering kiss on the hand. In *Servant*, it is the nanny tending to the mother's painful mastitis with a breast massage, which turns oddly and spontaneously erotic, culminating in a lingering kiss on the forearm.[15]
- In both works, the odd dynamics of the maternal/erotic relationship between nanny and mother is also communicated in a scene where the mother helps dress and then beautify the nanny. In both scenes, the mother takes in and marvels at the nanny's beauty.
- In both works, other characters question the mother/nanny bond and question the nanny's experience and motivations.

---

[15] The clumsiness of *Servant*'s eroticism serves as another reminder that this is a woman's story told by men. Who else but a man could find mastitis sexy? As one reviewer put it: "By this time, Leanne has become firmly entrenched in the house as a friend, caregiver, and oddly erotic breast masseuse. In a particularly bizarre scene, Leanne helps Dorothy massage her breast while in the bathtub to relieve her mastitis. A normal part of womanhood gets an icky sexual treatment." Not knowing how to competently depict this nuanced relationship, *Servant* slavishly mimics *Emanuel* by including the surprisingly intimate wound-tending interlude in the master bathroom—but hits us over the head with the sexuality by giving Dorothy a faux orgasm. As another commentator puts it: "What I wasn't expecting, though, is the odd sexuality that permeates the first three episodes. It begins with Dorothy's mastitis as Leanne discovers her, moaning in pain in the bathtub. And after an awkward moment, Leanne kneels next to the tub, reaches over and begins massaging Dorothy's breast. As she grinds on it, Dorothy moans and figuratively climaxes with an orgasmic moan and a squirt of milk that looks vaguely seminal."

COMPLAINT

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

**Deleted:** mother-daughter

**Deleted:** is communicated

**Formatted:** Font: 14 pt

**Formatted:** Font: 14 pt

- In both works, the bizarreness of the mother/nanny relationship is also expressed by the nanny looking on with a measure of discomfort as the mother readies herself for a date. Both works show the mother applying her makeup at a vanity, with the nanny shown out of focus on a bed behind her. In both works, the nanny remarks on the mother's beauty as they discuss the impending date. The similarity of these scenes goes beyond their plot points—each looks and feels the same down to blocking (the physical placement of actors/characters) and unusual camera focus techniques (a focus pull in a mirror).

- Following this scene, in each work, the nanny is shown seated at the mother's vanity. In each work, we watch the nanny in the mirror as she oddly applies the mother's makeup to herself—childlike, out of character, and without any apparent reason. The purpose of this scene, in each work, is to show the nanny's daughterly emulation of the mother.

- In both works, the plot advances by way of a long and key scene involving an intimate home birthday dinner celebration at a formal dining room table. In both, the birthday setting facilitates an added measure of intimacy (in part forced and in part real) between the characters. At each dinner, conflicts send certain of the characters into other rooms for private conversations, leaving awkward moments for those remaining at the table.

- In both works, the absurdity of the situation (which the viewer could easily forget given how committed the nanny and mother are to the delusion) is sometimes depicted through unnerving or "creepy" shots of the doll—still (of course), with wide open eyes.

COMPLAINT

ERIKSON LAW GROUP
ATTORNEYS
LOS ANGELES CA

**Deleted:** .

**Deleted:** quite

**Moved up [12]:** <#>As in *Emanuel*, the mother in *Servant* enters a trance-like state several times, which we understand to involve a moment when the awful truth of her baby's death might be percolating toward the surface of her consciousness. In both works, the mothers snap out of these states rather easily due to external distractions. ¶

**Deleted:** <object><object>¶



*The dolls, in Emanuel (left) and Servant (right)*

- Taking the idea a step further, *Servant*, like *Emanuel*, features a slightly comical scene in which the doll is dropped in the entrance hall, only to be picked up just before the mother sees. These scenes make the viewer slightly uncomfortable because we have come to think of the doll as real, and because the mother seeing the "baby" on the floor would be potentially catastrophic.



*The doll, dropped in entrance hall, in Emanuel (left) and Servant (right)*

- Both works feature a re-birth of the dead child as an emotional high point. In each work, the nanny is the key to bringing the dead child back to life, partly in service of moving the mother beyond delusion, and partly as a result of her fascination with the mother. The rebirth in each work is ambiguous in the sense that the reality and/or identity of the baby is open to debate—in keeping with the unusual magical realism elements in each work. In *Servant*, it is not clear whether the nanny smuggled a live baby into the nanny's home (which of course is a "natural" explanation); or whether she has the (supernatural) ability

to make the other characters perceive the doll as a live baby.[16] Likewise, in *Emanuel*, while the magical realism elements can appear to be digressions in an otherwise realistic story, they can also leave some traces in the "real" world of the film. For example, soon after water appears to flow from under the nursery door, and after water appears to fill a subway car, Emanuel is shown stepping in puddles even when there has been no rainfall.



*The dolls, come back to life, in Emanuel (left) and Servant (right)*

- Both works feature key imagery involving rain, puddles, and water. For example, in *Emanuel*, the notable and extended scene where the doll comes back to life takes place entirely underwater (as shown in beautiful sequences of Emanuel underwater, but with a natural face). Likewise, the nanny in *Servant* is shown underwater, with a natural face. Also, in both works, water (in the form of rain and puddles) helps delineate the boundary between the safe interior of the home and the perilous outside world.

**Sequence of Events**

81.    Because the plots of *Emanuel* and *Servant* are so similar, and because each unfolds in roughly linear chronology, the sequence of events in the two works

---

[16] The same is true for all possibly-supernatural phenomena in *Servant*: they have a perfectly natural and rational alternative explanation. In interviews, Mr. Basgallop accepts the description of the series as having elements of magical realism, and makes clear that one challenge in writing *Servant* was to preserve the ability to explain all key events as either or both supernatural/miraculous or having a rational explanation. In other words, like the rebirth in *Emanuel*, there is no correct answer to the question of whether the reborn Jericho is "real."

37                    COMPLAINT

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

are extremely similar. But even beyond these stark similarities, there are several examples where the similarity of sequencing is shocking. For example:

- As mentioned above, both works include an awkward job interview scene (which obviously occurs early on). The scenes following the "interviews" are uncannily similar as well. In *Emanuel*, it's now night, and we cut back and forth between Emanuel looking out her bedroom window (at the mother as she falls asleep); and the mother as she rocks her baby to sleep. In *Servant*, it's also now night, and we cut back and forth between the nanny and the mother in their respective bathtubs. In each scene, the mother and nanny are shown alternatively in solitary moments—but with a strong sense that they are connected during those moments.

- As also mentioned, each work includes a scene of the nanny looking on as the mother applies makeup at her vanity in preparation for a date; followed by a scene of the nanny sitting at the same vanity, applying the mother's makeup in the same manner as was the mother (which we observe in vanity mirror).



*The mother, readying for date, in Emanuel (left) and Servant (right)*



*The nanny, emulating the mother, in Emanuel (left) and Servant (right)*

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

- In both works, the nanny faints under stress—followed by the nanny's point-of-view shot as she regains consciousness to the sight of concerned faces.

**Mood and Pace**

82.     The mood of the two works is substantially similar. Both are played as ominous "psychological thrillers," with elements of magical realism—a rare combination. Indeed, Ms. Gregorini's choice to tell her nuanced emotional tale of motherhood as a thriller was a bold and surprising one—and one parroted by Defendants in *Servant*. In particular:

- Both works are tense throughout. In both works, the risk of secrets being exposed, and the urgent and emotional need to protect those secrets, is meant to feel like a ticking time bomb. One false move, or one prying eye, and the house of cards would come tumbling down. As a result, the audience experiences heightened feelings of suspense, excitement, surprise, anticipation and anxiety.

- Both works have an ominous mood, created by the use of camera angles, lighting, and the choice of music (including opera playing in the mother's house).

- As in *Emanuel*, *Servant* employs a technique where actors' eyelines are so close to being directly into the lens that the audience is invited directly into the center of the uncomfortable tension. This technique of breaking the fourth wall is extremely unusual, and uncomfortably amplifies the urgency and intimacy of the mood.

 

*The nanny looking into the camera in Emanuel (left) and Servant (right)*

COMPLAINT

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

- Indeed, both works go so far as to show characters purposefully looking directly into the camera—as a way of depicting the nanny's point of view when, after fainting from stress, she awakens to the gaze of concerned faces.



*Concerned faces gazing into camera, in Emanuel (left) and Servant (right)*

- As in *Emanuel*, *Servant* employs unusually tight shots of characters' faces, sometimes to the point where chins and hairline are cut off. The effect of this camera and cinematographic technique is to create a feeling of uncomfortable intimacy. [See, e.g., *Emanuel* at 25:54; *Servant* Ep. 3 at 24:55.]



*Cropped faces, in Emanuel (left) and Servant (right)*

- Both works use magical realism to create an otherworldly mood. In *Emanuel*, this takes the form of water imagery. At first water escapes from under the nursery door, then it rises up from nowhere in a subway car, culminating in an underwater "rebirth" scene where the entire nursery is submerged. In *Servant*, it's not water but rather wood—that keeps finding a way into the father's body. At first, he gets a splinter in his finger, then in his rear end, then in his mouth,

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

40                                    COMPLAINT

1    and so on. In both works, the otherworldly magical realism is foreboding and

2    escalating.

3    • Both works create a mood of discomfort and awkwardness by employing the

4    unusual device of featuring long pauses in the characters' dialogue—often in

5    wide shots where both characters are in the frame. This technique is used

6    throughout both works—including in parallel scenes showing the first meeting

7    between nanny and mother. In *Emanuel*, after mother and nanny exchange

8    hesitant greetings, there is an awkward pause before Linda invites Emanuel in.

9    In *Servant*, a wide shot shows the mother at the front door inquiring

10   "Leanne?...Leanne Grayson?" Five awkward seconds pass before the nanny

11   responds with a hello, even though she is standing right in front of her.

12   [*Emanuel* at 9:20; *Servant* Ep. 1 at 2:12.]

13   • As in *Emanuel*, *Servant* uses the unusual cinematographic technique of

14   featuring characters in conversation in dark shadowy rooms—but with the sun

15   in their eyes (through horizontal blinds).  In both works, the technique is mixed

16   with quick editing between tightly framed shots of the characters. The overall

17   effect again reflects the mood of both works: uncomfortable and dark.

18   [*Emanuel* at 51:44; *Servant* Ep. 1 at 24:08.]

19   • Both works proceed at a rapid pace. In each, the characters can barely keep up

20   with events as they unfold.

21   • As mentioned above, scenes of family dinners are often used to juxtapose

22   intimacy and tension. This mood is furthered by the theme, in both works, of

23   cooking and food. In *Emanuel*, dinners are not simply prepared—they are

24   narrated. The menu is reported in detail, in the manner of a fine restaurant

25   ("herb roasted chicken with porcini mushroom stuffing"). Emanuel's birthday

26   cake is painstakingly decorated by hand. So too in *Servant*, where elaborate and

27   exotic food, and its preparation, are keys to each episode.

28

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

41                                    COMPLAINT

**Deleted:** extended-

**Dialogue**

83.   *Emanuel* and *Servant* share similar dialogue, including as follows:

• Both works feature scenes where the mother expresses that she sees herself in the nanny—followed by surprisingly strong exclamations of affection.

• Both works feature scenes where the mother gives baby-care direction in extremely realistic terms, demonstrating the depth of her commitment to the delusion that the doll is real.

• Both works feature awkward question-and-answer scenes, where the mother attempts to better know the nanny, and the nanny does her best to impress by demonstrating a knowledge of French.

• Both works feature scenes where the father explains that the cause of the baby's death is unknown.

• Both works feature scenes in which the nanny compliments the mother as they discuss an impending date.

• Both works feature scenes where characters speculate that the nanny's youth is the explanation for her quirks and reticence.

**Differences in the works are mostly elements tacked on to Servant, as required when adapting a feature film into a television series.**

85.   Defendants will surely cite differences between *Servant* and *Emanuel*. But most of these "differences" are dictated by the change of platform from feature film to episodic television. When creating an episodic television adaptation of a movie (i.e. a derivative work), one must make certain kinds of changes. In narrative feature films, especially high-concept films, it is preferred to simplify all non-central elements (such as characters and subplots), to avoid distractions from the key elements that define the movie. In episodic television like *Servant*—which Defendants say they hope will run for many years— fleshed-out ancillary character and subplots are necessary, in order to provide fodder for an endless demand for new episodes and vignettes. Rather than introduce these elements in an ad hoc manner, it is better to

42                                    COMPLAINT

*Deleted:* tells

*Deleted:* "you look beautiful"

*Formatted:* Indent: Left:  0.5", First line:  0", Don't keep with next

*Formatted:* s1

*Moved up [5]:* 84.  →Defendants will point to differences between *Emanuel* and *Servant*.

*Deleted:* But what they call differences are really just content that was tacked on to Ms. Gregorini's story—usually in ways required when adapting a motion picture for use as an episodic television series. Indeed, Defendants misappropriated the ninety-minute film *Emanuel* for use as their first three half-hour episodes of *Servant*, which were released as a unit on Thanksgiving 2019, and can be thought of as the series "pilot." That each of the subsequent thirty-minute weekly episodes introduces new self-contained vignettes or sub-plots does not detract from the substantial similarity of *Emanuel* and Episodes 1-3 of *Servant*.[17] ¶

introduce a fertile world early on, that naturally lends itself to explorations. For
example, it was wise for Defendants to give the mother in *Servant* a job, complete
with an annoying and overambitious coworker—because the workplace will provide
opportunities for new intrigues, subplots and characters. So too was it wise to include
a present father and even a brother—more fodder for later episodes and seasons. The
necessity of tacking on such elements early in a series is even more pressing in the
modern age of episodic television (including cable series and now streaming). From *I
Love Lucy* to *Seinfeld*, when individual episodes existed without great need for an
overall story arc beyond an unchanging premise, new subplots and characters could be
introduced at will. Today, when episodic shows with overarching stories dominate
(*The Sopranos, Breaking Bad, Mad Men*), such ad hoc constructs would be too
distracting—and thus the critical ability to manufacture new and different scenarios
and digressions within the world already constructed is key to a series' success.

### First Claim For Relief For Copyright Infringement re *Servant*

### (Against All Defendants)

86.    Plaintiff incorporates by this reference all other paragraphs in this
pleading, as if fully set forth in full in this claim.

87.    In 2012, Emanuel Film LLC authored the motion picture *The Truth
About Emanuel,* then entitled *Emanuel and the Truth About Fishes* (the "Work"). The
Work is creative and original, constituting copyrightable subject matter under United
States law.

88.    In 2017, Emanuel Film LLC was dissolved and cancelled, and the
copyright in the Work was assigned to Plaintiff, who is the screenwriter, director, and
producer. Since that assignment, Plaintiff has been and still is the sole proprietor of all
rights, title, and interest in and to the copyright in the Work. Plaintiff has complied in
all respects with the Copyright Act and all other laws governing copyright. Plaintiff
has complied with 17 U.S.C. § 411 in that the deposit, application, and fee required



43                          COMPLAINT

for registration have been delivered to the Copyright Office in proper form, and the work has registered—U.S. Copyright Office Reg. No. PA0002213169.

89.    Defendants had access to Plaintiff's work, as described above (including its premier at Sundance and nationwide release).

90.    Defendants, with full knowledge of Plaintiff's rights, infringed Plaintiff's copyrights by preparing an unauthorized derivative work; and by producing, distributing, streaming, and transmitting Episodes 1 through 3, of Season 1, of the television show entitled "Servant."

91.    As explained above, *Servant* is an unauthorized derivative work of, and substantially similar to, *Emanuel*.

92.    All such acts were performed by Defendants without the permission, license, or consent of Plaintiff. Plaintiff has notified Defendants in writing of the infringements. As described above, all Defendants have continued to stream and otherwise distribute the infringing material even after receiving Plaintiff's protests and demands that such infringement cease.

93.    By reason of Defendants' acts of copyright infringement, Plaintiff has suffered, and will continue to suffer substantial damages to her business in the form of diversion of trade, loss of profits, and a dilution in the value of Plaintiff's rights and reputation, all in amounts that are not yet ascertainable, but not less than the jurisdictional minimum of this Court. In particular, the value of Ms. Gregorini's intellectual property related to the Work has been greatly diminished. For example, were it not for the Defendants' infringement, *Emanuel* would be a valuable asset, including as a television property. As it is, the market likely does not have room for another television series about a nanny caring for a doll.

94.    By reason of Defendants' infringement of Plaintiff's copyright, Defendants are liable to Plaintiff for the actual damages incurred by Plaintiff as a result of the infringement, and for any profits of Defendants directly or indirectly attributable to such infringement.

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

44                                          COMPLAINT

**Formatted:** Font: Not Italic

**Deleted:** :*

1    95.    In addition to compensating Ms. Gregorini for rendering *Emanuel* un-
2    adaptable for television, the Defendants must turn over their ill-gotten gains. In the
3    case of Apple, that is likely to be a staggering sum—given the unabashed manner in
4    which it has leveraged what it considers to be one of *the best stories ever told* to
5    aggrandize and promote its multi-billion-dollar foray into television.
6    **Second Claim For Relief For Copyright Infringement re Early *Servant* Script**
7            **(Against Basgallop and Blumenthal)**
8            96.    Plaintiff incorporates by this reference all other paragraphs in this
9    pleading, as if fully set forth in full in this claim.
10           97.    Basgallop and Blumenthal, with full knowledge of Plaintiff's rights,
11   infringed Plaintiff's copyright in *Emanuel* by preparing an unauthorized derivative
12   work in authoring and distributing a script corresponding to what eventually became
13   Episodes 1 through 3, of Season 1, of the television show entitled "Servant" ("The
14   Early Servant Script") and successfully shopping that script to Mr. Shyamalan—
15   resulting in a deal that Basgallop, Blumenthal, and Shyamalan would together further
16   develop and shop the series. This deal resulted in distinct profits and benefits accruing
17   to Basgallop and Blumenthal and a distinct injury to Plaintiff (including harm to the
18   prospects of developing Emanuel into a television series, now that it was being
19   shopped in the industry).
20           98.    The Early Servant Script is very similar to *Servant*—including in that the
21   story description in paragraphs 4, 63, and 78-80 above, and description of further
22   characteristics in paragraphs 10, 66-68, and 70-77 above, apply equally to The Early
23   Servant Script. Indeed, the script hews even closer to *Emanuel* than *Servant* does, in
24   part because even less of Defendants own decisions had been incorporated (although
25   the sum total of such decisions was never sufficiently significant to render *Servant* not

26
27
28

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

substantially similar to *Emanuel*). For reasons explained above, The Early Servant Script is an unauthorized derivative work of, and substantially similar to, *Emanuel*.[19]

99.   All such acts were performed by Basgallop and Blumenthal without the permission, license, or consent of Plaintiff.

100.   By reason of Defendants' acts of copyright infringement, Plaintiff has suffered, and will continue to suffer substantial damages to her business in the form of diversion of trade, loss of profits, and a dilution in the value of Plaintiff's rights and reputation, all in amounts that are not yet ascertainable, but not less than the jurisdictional minimum of this Court.

101.   By reason of Defendants' infringement of Plaintiff's copyright, Basgallop and Blumenthal are liable to Plaintiff for the actual damages incurred by Plaintiff as a result of the infringement, and for any profits of Defendants directly or indirectly attributable to such infringement.

**Third Claim For Relief For Copyright Infringement re Later *Servant* Script (Against All Defendants except Apple Inc.)**

102.   Plaintiff incorporates by this reference all other paragraphs in this pleading, as if fully set forth in full in this claim.

103.   Defendants Shyamalan, Blinding Edge, Uncle George Productions, Escape Artists LLC; Dolphin Black Productions; Tony Basgallop; Ashwin Rajan; Jason Blumenthal; Todd Black; Steve Tisch (the "Non-Apple Defendants"), with full knowledge of Plaintiff's rights, infringed Plaintiff's copyright in *Emanuel* by preparing an unauthorized derivative work in authoring and distributing a script corresponding to what eventually became Episodes 1 through 3, of Season 1, of the television show entitled "Servant" ("The Later Servant Script") and successfully shopping that script to Apple—resulting in a deal that Apple and the Non-Apple

_____

[19] The allegations of this and the preceding paragraph are made on information and belief, based on media interviews with the Defendants, and the finished product, *Servant.*

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

COMPLAINT

Formatted: Font: Not Bold

Defendants would produce and stream the series *Servant*. This deal resulted in distinct profits and benefits accruing to the Non-Apple Defendants, and a distinct injury to Plaintiff (including harm to the prospects of developing Emanuel into a television series, now that it was being produced).

104. The Later Servant Script is very similar to *Servant*— including in that the story description in paragraphs 4, 63, and 78-80 above, and description of further characteristics in paragraphs 10, 66-68, and 70-77 above, apply equally to The Later Servant Script. Indeed, the script hews even closer to *Emanuel* than *Servant* does, in part because even less of Defendants own decisions had been incorporated (although the sum total of such decisions was never sufficiently significant to render *Servant* not substantially similar to *Emanuel*). For reasons explained above, The Later Servant Script is an unauthorized derivative work of, and substantially similar to, *Emanuel*.[20]

105. All such acts were performed by the Non-Apple Defendants without the permission, license, or consent of Plaintiff.

106. By reason of the Non-Apple Defendants' acts of copyright infringement, Plaintiff has suffered, and will continue to suffer substantial damages to her business in the form of diversion of trade, loss of profits, and a dilution in the value of Plaintiff's rights and reputation, all in amounts that are not yet ascertainable, but not less than the jurisdictional minimum of this Court.

107. By reason of the Non-Apple Defendants' infringement of Plaintiff's copyright, the Non-Apple Defendants are liable to Plaintiff for the actual damages incurred by Plaintiff as a result of the infringement, and for any profits of Defendants directly or indirectly attributable to such infringement.

_____

[20] The allegations of this and the preceding paragraph are made on information and belief, based on media interviews with the Defendants, and the finished product, *Servant*.

COMPLAINT

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

## Fourth Claim For Relief For
## Contributory And Vicarious Copyright Infringement
## (Against All Defendants)

108.   Plaintiff incorporates by this reference all other paragraphs in this pleading, as if fully set forth in full in this claim.

109.   Each Defendant is contributorily liable for the infringements alleged herein because each Defendant knowingly induced, participated in, aided and abetted, and profited from the production of and/or subsequent sales of the infringing work.

110.   Each Defendant is vicariously liable for the infringements alleged herein because each Defendant had the right and ability to supervise the infringing conduct, including the practical ability to do so, and because each Defendant had a direct financial interest in the infringing conduct.

## PRAYER

WHEREFORE, Plaintiff prays judgment against Defendants as follows:

1.     That Plaintiff is awarded all damages, including future damages, that Plaintiff has sustained, or will sustain, as a result of the acts complained of herein, subject to proof at trial;

2.     That Plaintiff is awarded her costs, attorneys' fees and expenses in this action;

3.     That Plaintiff is awarded pre-judgment interest;

4.     For an order permanently enjoining Defendants and their employees, agents, servants, attorneys, representatives, successors, and assigns; and any and all persons in active concert or participation with any of them, from engaging in the misconduct referenced herein;

5.     That Defendants be ordered to immediately recall and sequester inventories of the infringing material, and to supply accountings to Plaintiff's counsel;

6.     That Defendants be ordered to deliver their entire inventories of infringing materials to a mutually selected third party for supervised destruction;

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

48                                          COMPLAINT

Deleted: infringement

Deleted: infringement

Deleted: ¶

7.     That Defendants be ordered to file with this Court and serve upon Plaintiff's counsel within thirty (30) days after service of the judgment demanded herein, a written report submitted under oath setting forth in detail the manner in which they have complied with the judgment;

8.     For disgorgement of all proceeds, and restitution of all monies received by Defendants as the result of their wrongful conduct;

9.     For punitive damages in an amount sufficient to deter Defendants from their wrongful conduct; and

10.    Such other damages and further relief as the Court may deem appropriate.

DATED: March 10, 2020          ERIKSON LAW GROUP

**Deleted:** January 15

By:  _____
        DAVID ERIKSON
        Attorneys for Plaintiff Francesca Gregorini

**Formatted:** Font: Bold, All caps, Kern at 14 pt

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

49                                    COMPLAINT

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on her claims on all issues triable by a jury.

DATED: March 10, 2020          ERIKSON LAW GROUP

By: _____
    DAVID ERIKSON
    Attorneys for Plaintiff Francesca Gregorini

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

50                                    COMPLAINT

Deleted: January 15