NICOLAS A. JAMPOL (State Bar No. 244867)
  nicolasjampol@dwt.com
DIANA PALACIOS (State Bar No. 290923)
  dianapalacios@dwt.com
CYDNEY SWOFFORD FREEMAN (State Bar No. 315766)
  cydneyfreeman@dwt.com
CAMILA PEDRAZA (State Bar No. 329984)
  camilapedraza@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone:  (213) 633-6800
Fax:  (213) 633-6899

Attorneys for Defendants
BLINDING EDGE PICTURES, INC.; UNCLE
GEORGE PRODUCTIONS, LLC; APPLE INC.;
ESCAPE ARTISTS, INC. (erroneously sued as
ESCAPE ARTISTS LLC); DOLPHIN BLACK
PRODUCTIONS; M. NIGHT SHYAMALAN;
TONY BASGALLOP; ASHWIN RAJAN;
JASON BLUMENTHAL; TODD BLACK;
STEVE TISCH

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCESCA GREGORINI, | Case No. 2:20-cv-00406-JFW-JC |
| Plaintiff, | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT** |
| vs. | |
| APPLE INC., a California corporation; M. NIGHT SHYAMALAN, an individual, BLINDING EDGE PICTURES, INC., a Pennsylvania corporation; UNCLE GEORGE PRODUCTIONS, a Pennsylvania corporate; ESCAPE ARTISTS LLC, a California limited liability company; DOLPHIN BLACK PRODUCTIONS, a California corporation; TONY BASGALLOP, an individual; ASHWIN RAJAN, an individual; JASON BLUMENTHAL, an individual; TODD BLACK, an individual; STEVE TISCH, an individual; and DOES 1-10, inclusive, | Date:      April 27, 2020<br>Time:     1:30 p.m.<br>Crtrm:   7A |
| Defendants. | |

**TO PLAINTIFF AND HER ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on April 27, 2020, at 1:30 p.m. or as soon as may be heard in Courtroom 7A of the United States District Court for the Central District of California, First Street Courthouse, 350 West First Street, Los Angeles, California 90012, defendants Blinding Edge Pictures, Inc., Uncle George Productions, LLC, Apple Inc., Escape Artists, Inc. (erroneously sued as Escape Artists LLC), Dolphin Black Productions, M. Night Shyamalan, Tony Basgallop, Ashwin Rajan, Jason Blumenthal, Todd Black, and Steve Tisch (collectively, "Defendants") will and hereby do move this Court for an order dismissing with prejudice the first amended complaint ("FAC") filed by plaintiff Francesca Gregorini ("Plaintiff").[1]

This motion is made pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that Plaintiff's FAC fails to state a claim.  Her first cause of action for copyright infringement as to Defendants' television series *Servant* fails because there is no substantial similarity of protected expression between the series and her film *The Truth About Emanuel*.  Her second and third causes of action for copyright infringement as to two iterations of scripts for *Servant* suffer from the same defect (*i.e.*, a lack of substantial similarity of protected expression) and, in addition, are improperly based on "information and belief."  Because her claims for direct copyright infringement fail, so too does her fourth cause of action for contributory and vicarious copyright infringement.

---

[1] Defendants have noticed this hearing for April 27, 2020, which is the latest permissible date under Paragraph 5(a) of this Court's Standing Order. Dkt. 15.  To the extent the Court anticipates holding a hearing on this motion, Defendants request that the Court allow the parties to appear remotely or continue the hearing to a later date.  The parties have met and conferred and will ask the Courtroom Deputy Clerk for guidance on whether to file a joint stipulation regarding moving the hearing.

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT
4830-6416-5815v.1 0113237-000003

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

This motion is based on this notice of motion, the memorandum of points and authorities, the request for judicial notice, the declaration of Cydney Swofford Freeman, the notice of lodging with exhibits, and all other matters of which this Court may take judicial notice, the pleadings, files, and records in this action, and on any argument heard by this Court.

This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on March 16, 2020. *See* Dkt. 29.

DATED: March 24, 2020

DAVIS WRIGHT TREMAINE LLP
NICOLAS A. JAMPOL
DIANA PALACIOS
CYDNEY SWOFFORD FREEMAN
CAMILA PEDRAZA

By: ___/s/ Nicolas A. Jampol_____
             Nicolas A. Jampol

Attorneys for Defendants

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT
4830-6416-5815v.1 0113237-000003

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................. 1

II.   FACTUAL BACKGROUND ................................................... 2

A.    *The Truth About Emanuel* ...................................... 2

B.    *Servant* .................................................................. 3

C.    The Lawsuit ............................................................. 5

III.  *SERVANT* AND *EMANUEL* ARE NOT SUBSTANTIALLY SIMILAR ........................................................................... 6

A.    Lack of Substantial Similarity May Be Decided on a Motion to Dismiss ............................................................................ 6

B.    Courts Must Filter Out Unprotectable Expression ............................... 7

C.    The Works' Protected Expression Is Not Substantially Similar .......... 8

1.    Plot ................................................................. 9

a.    Most of the Alleged Plot Similarities Are Unprotectable. ................................................ 9

b.    The FAC Mischaracterizes Alleged Plot Similarities. ..................................................... 10

c.    The Works' Plots Are Not Substantially Similar. ......... 11

2.    Sequence of Events ...................................... 13

3.    Theme .......................................................... 14

4.    Characters .................................................... 15

a.    Emanuel and Leanne ................................... 16

b.    Linda and Dorothy ...................................... 17

c.    Thomas and Sean ........................................ 18

d.    Arthur and Julian ........................................ 19

e.    Claude and Tobe ......................................... 19

f.    The Dolls..................................................... 20

g.    Other Characters ......................................... 20

5.    Setting.......................................................... 21

6. Mood .......................................................................................... 22

7. Pace ............................................................................................ 23

8. Dialogue .................................................................................... 24

IV. PLAINTIFFS' NEW CLAIMS OVER THE *SERVANT* SCRIPTS FAIL....................................................................................................... 24

V. PLAINTIFF'S SECONDARY LIABILITY CLAIM FAILS ...................... 25

VI. CONCLUSION........................................................................................... 25

ii

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

# <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

**Cases**

*Apple v. Microsoft,*
  35 F.3d 1435 (9th Cir. 1994) ...................................................................7

*Arica Inst. v. Palmer,*
  970 F.2d 1067 (2d Cir. 1992)...................................................................8

*Benay v. Warner Bros.,*
  607 F.3d 620 (9th Cir. 2010) ...........................................................7, 21

*Berkic v. Crichton,*
  761 F.2d 1289 (9th Cir. 1985) ..............................................................11

*Bernal v. Paradigm Talent & Lit. Agency,*
  788 F. Supp. 2d 1043 (C.D. Cal. 2010) ..................................................8

*Cavalier v. Random House, Inc.,*
  297 F.3d 815 (9th Cir. 2002) ..................................................................7

*Christianson v. West Pub. Co.,*
  149 F.2d 202 (9th Cir. 1945) ..................................................................6

*Dellar v. Samuel Goldwyn, Inc.,*
  150 F.2d 612 (2d Cir. 1945)....................................................................1

*Fillmore v. Blumhouse,*
  2017 WL 4708018 (C.D. Cal. July 7, 2017)................................7, 8, 22

*Fox Broad. Co. v. Dish Network,*
  747 F.3d 1060 (9th Cir. 2014) ..............................................................25

*Funky Films v. Time Warner Entm't,*
  462 F.3d 1072 (9th Cir. 2006) ........................................................8, 11

*Gadh v. Spiegel,*
  2014 WL 1778950 (C.D. Cal. Apr. 2, 2014) ..........................................6

*Gallagher v. Lions Gate Entm't,*
  2015 WL 12481504 (C.D. Cal. Sept. 11, 2015) ...................................24

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT
4830-6416-5815v.1 0113237-000003

**Davis Wright Tremaine** LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

*Heusey v. Emmerich*,
 2015 WL 12765115 (C.D. Cal. Apr. 9, 2015) ................................................. 6, 7

*Kouf v. Walt Disney Pictures*,
 16 F.3d 1042 (9th Cir. 1994) ........................................................................... 8

*Litchfield v. Spielberg*,
 736 F.2d 1352 (9th Cir. 1984) ..................................................................... 1, 8

*Marcus v. ABC Signature Studios*,
 279 F. Supp. 3d 1056 (C.D. Cal. 2017) ........................................................... 7

*McCormick v. Sony Pictures*,
 2008 WL 11338582 (C.D. Cal. Feb. 4, 2008) ................................................ 25

*Olson v. Nat'l Broad. Co.*,
 855 F.2d 1446 (9th Cir. 1988) ....................................................................... 24

*Shame on You Prods. v. Banks*,
 120 F. Supp. 3d 1123 (C.D. Cal. 2015) .................................................*passim*

*Silas v. Home Box Office*,
 201 F. Supp. 3d 1158 (C.D. Cal. 2016) .................................................*passim*

*Tarantino v. Gawker Media*,
 2014 WL 2434647 (C.D. Cal. Apr. 22, 2014) ................................................ 25

*Three Boys Music Corp. v. Bolton*,
 212 F.3d 477 (9th Cir. 2000) ........................................................................... 6

*Walker v. Time Life Films*,
 784 F.2d 44 (2d Cir. 1986)............................................................................... 8

*Wild v. NBC Universal*,
 788 F. Supp. 2d 1083 (C.D. Cal. 2011) ........................................................... 6

*Zella v. E.W. Scripps Co.*,
 529 F. Supp. 2d 1124 (C.D. Cal. 2007) ........................................................ 6, 7

**Rules**

Federal Rule of Evidence 201 ................................................................................. 6

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

**DAVIS WRIGHT TREMAINE** LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

4830-6416-5815v.1 0113237-000003

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION

Plaintiff Francesca Gregorini's lawsuit is another example of "that obsessive conviction, so common among authors and composers, that all similarities between their works and any others which appear later must inevitably be ascribed to plagiarism." *Litchfield v. Spielberg*, 736 F.2d 1352, 1358 (9th Cir. 1984) (quoting *Dellar v. Samuel Goldwyn, Inc.*, 150 F.2d 612, 613 (2d Cir. 1945)). This truism is particularly applicable to Plaintiff's attempt to claim ownership over unprotectable ideas, including a grieving mother who believes a therapy doll is her deceased child or "white, sophisticated, and privileged" parents hiring a nanny for their "well put together" home. These concepts are taken from real life and are found in countless movies, television programs, and other works.

While Plaintiff's film *The Truth About Emanuel* ("*Emanuel*") and Defendants' television series *Servant* both employ aspects of these unprotectable concepts, the similarities end there. In *Emanuel*, a quintessential American teenager struggling to cope with the loss of her mother and her next-door neighbor struggling to cope with the loss of her baby together experience the catharsis of acceptance. In *Servant*, a deeply religious self-flagellating young woman leaves her cult to be a nanny for a family that she has targeted, and seemingly transforms a doll into a real baby while—in the midst of various supernatural events—other characters attempt to find out where the baby and nanny are from. As one character ominously asks in the trailer, "do you know who you welcomed into your home?" *See* RJN § 1.

To divert attention from the fact that *Emanuel* and *Servant* tell vastly different stories, Plaintiff has assembled a laundry list of alleged similarities. Many of these alleged similarities flow from unprotectable concepts, while others are ubiquitous in film and television. Plaintiff relies heavily on these common elements, such as the "mystery/danger of a stranger coming to town," a home with a wooden staircase, or "tight shots of characters' faces," all of which are featured in

numerous films and television series.  Once these elements are disregarded, as they must be, there is almost no similarity of protectable expression.

Despite previously refusing to amend (Dkt. 18), Plaintiff changed her mind after Defendants filed their motion to dismiss the initial complaint.  Plaintiff's first amended complaint ("FAC") removed several of her more incredible allegations, including that *Servant* copied Plaintiff's use of ominous music to "signify danger."  *See* Dkt. 1 ("Compl.") ¶ 76.  Plaintiff also added two meritless copyright claims regarding various iterations of scripts for *Servant*, which, among other defects, are based entirely on "information and belief."  FAC ¶¶ 93-104.  These amendments do not strengthen Plaintiff's lawsuit, but instead reveal the weakness of her claims.  *Emanuel* and *Servant* are not substantially similar as a matter of law, and Defendants respectfully request that this Court dismiss the FAC with prejudice.

## II.   FACTUAL BACKGROUND

### A.   *The Truth About Emanuel*

*Emanuel* is an "emotional story about motherhood and daughterhood."  FAC ¶ 14; Dkt. 13.[2]  It is told from the point of view of Emanuel, a typical teenager who struggles with the guilt of knowing her mother died giving birth to her, and attempts to coexist with her new stepmother.  Most days, she takes the train to her job at a medical supply store, listening to music or sitting with her boyfriend Claude.  After a single mother (Linda)—who "bears a striking resemblance" to Emanuel's deceased mother—moves in next door, Emanuel offers to babysit.  *See* Dkt. 13 (DVD back cover); *id.* at 7:57.  When Emanuel finally meets the "baby," she is stunned to discover that the child is a doll.  *Id.* at 21:00.

Despite this discovery, Emanuel continues to visit Linda (when she is not working or with her family or boyfriend).  At first, Emanuel remains uncomfortable

---

[2] References to "Dkt. 13" throughout this brief are to the DVD of *Emanuel* that Plaintiff lodged with the Court at Dkt. 13.  *See also* RJN § 1.

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

1    with the doll and refuses to help Linda with it, but she later acquiesces.  Emanuel

2    begins to pretend the doll is a baby in Linda's presence, but generally not when

3    Linda is gone.  Emanuel's affection for Linda grows as she (and the audience)

4    attempts to figure out why Linda is pretending the doll is a real baby.  Emanuel is

5    protective of Linda and concerned about others discovering the truth, routinely

6    making excuses as to why others cannot meet the baby.  She falls deeper into

7    Linda's orbit, until Linda brings home a date (Arthur) who discovers the doll and,

8    assuming that Emanuel harmed the actual child, calls the police.  Dkt. 13 at 1:07:15.

9        Linda is committed to an institution, and while she is there, her ex-husband

10    (Thomas) explains that his and Linda's baby died of an unknown cause.  Dkt. 13 at

11    1:18:30.  Thomas reveals that Linda refused to go to her daughter's burial and was

12    given a therapy doll.  When Linda started to believe the doll was real, Thomas tried

13    to have her committed, but Linda fled.  After this discovery, Emanuel decides to

14    free Linda from the institution.  She breaks into the facility and takes Linda to

15    Emanuel's mother's grave, the first time Emanuel has visited.  *Id.* at 1:21:05.  She

16    sobs while she digs a hole at the gravesite, and the two bury the doll next to

17    Emanuel's mother, each processing her own grief.  *Id.* at 1:27:00.  The film closes

18    on the pair looking up at the stars, finally headed toward acceptance.  *Id.* at 1:29:50.

19   **B.**     *Servant*

20        *Servant* is a psychological thriller that explores the question asked in the

21    trailer: "do you know who you welcomed into your home?"[3]  The series portrays a

22    wealthy couple (Dorothy and Sean Turner) that hires a full-time, live-in nanny

23    (Leanne) for their baby son Jericho, which—as the audience already knows from

24    the trailer—is a doll that was given to Dorothy to cope with the loss of their child.

25    *See* RJN § 1.  Jericho died after Dorothy inadvertently left him in her car for hours

26

27 ———————————

28       [3] Defendants are lodging Episodes 1-10 of *Servant* as Exhibits 1-10 to the declaration of Cydney Swofford Freeman.  *See also* RJN § 1.

in the middle of summer, which Dorothy never accepted, instead slipping into denial and delusion. From the outset, viewers discover that Leanne is no ordinary teenager, but instead a creepy, deeply religious, possibly paranormal, self-flagellating cult member who subsists on cans of tomato soup and creates wooden crosses (and who, the audience later learns, specifically targeted the Turners).

When the audience first sees Leanne with the doll, she picks it up like a real baby, sings to it, changes its diaper, and never treats the doll as anything other than a living child even *when nobody is watching* and despite Sean telling Leanne she need not pretend around him. *E.g.*, Ex. 1 at 13:11, 17:17, 29:01. Sean explains to Leanne that the doll is a "reborn doll" (a real-life therapy doll, RJN § 2), which was prescribed to Dorothy after Jericho died. But Leanne continues interacting with the doll just as she would a real baby. She never acknowledges that the doll is not real, and does not attempt to shield the doll from public view. *E.g.*, *id.* at 17:17.

At the end of the first episode, Sean hears crying on the baby monitor and walks into the nursery to find a real baby. Ex. 1 at 34:08. In the next episode, he confronts Leanne, who has no reaction to the child being any different. When Sean asks her whose baby the child is, she calmly replies, "that's your baby Mr. Turner, it's Jericho." Ex. 2 at 3:17. From there, the seemingly supernatural occurrences take flight, each tied back to Leanne. For example, as Sean's relationship with Leanne sours, he begins to get wooden splinters all over his body, including unlikely places like his throat, and then loses his ability to taste, smell, and, eventually, feel. *E.g.*, *id.* at 10:38, 17:44, 27:10, 28:11. Leanne also seemingly has the ability to bring the dead back to life, including a cricket, a stray dog, and, possibly, a human baby. Ex. 1 at 34:08; Ex. 5 at 30:59; Ex. 7 at 28:02.

Wary of Leanne, Dorothy's protective brother Julian—an abrasive character with drink always in hand—hires a private investigator (Roscoe) to track down information about Leanne. Julian and Roscoe visit Leanne's hometown and discover gravestones for Leanne's parents, *and for Leanne herself*. Ex. 3 at 8:31,

10:17, 26:12.  This discovery is explained later—Leanne's cult-member aunt (May) and uncle (George) took Leanne in after a fire killed her parents, and pretended Leanne had died so they could raise her "as God instructed."  Ex. 10 at 12:15.

At the end of the first season, Aunt May pressures Leanne to rejoin their cult, telling her that Dorothy is undeserving of the "second chance" Leanne is giving her. Leanne leaves the Turners, and when Dorothy hurries to the nursery after finding Leanne's room empty, she finds the doll instead of the baby.  In the last scene of the season, Dorothy seems to realize that the doll is not her son.  Ex. 10 at 31:39.

Apple released the first three episodes to Apple TV+ subscribers on November 28, 2020, with the remaining seven episodes released weekly after that.

## C.    The Lawsuit

On January 15, 2020, Plaintiff filed her complaint for direct, contributory, and vicarious copyright infringement, alleging that three of the ten episodes of *Servant* are "strikingly similar" to *Emanuel*.  Dkt. 1.  Because the works themselves reveal that there is almost no similarity of protectable expression between them, let alone substantial similarity, Defendants moved to dismiss Plaintiff's complaint on February 18, 2020.  Dkt. 20.  On March 2, 2020, Plaintiff filed a notice of non-opposition (Dkt. 24) and, on March 10, 2020, filed the FAC (Dkt. 25).

The FAC asserts the same direct, contributory, and vicarious infringement claims against all Defendants as to the first three episodes of *Servant*.  *See* FAC. The FAC also asserts two new copyright-infringement claims: one against *Servant*'s writer Tony Basgallop and executive producer Jason Blumenthal, alleging that the pair created an "early" infringing draft script for *Servant*'s first three episodes; and one against all Defendants except Apple, alleging that the non-Apple Defendants created a "later" infringing draft script.  *Id.* ¶¶ 93-104.  Both of these new claims are made solely "on information and belief, based on media interviews with the Defendants, and the finished project, *Servant*."  *Id.* ¶ 95 n.15 & 101 n.16. Defendants again move to dismiss Plaintiff's claims with prejudice.

## III. *SERVANT* AND *EMANUEL* ARE NOT SUBSTANTIALLY SIMILAR

To avoid dismissal of her first cause of action alleging that *Servant* infringes her purported copyright in *Emanuel*, Plaintiff must demonstrate that the works' protected expression is substantially similar. *Three Boys Music Corp. v. Bolton,* 212 F.3d 477, 481 (9th Cir. 2000). She cannot.[4]

### A. Lack of Substantial Similarity May Be Decided on a Motion to Dismiss

A court may compare the works at issue in a copyright-infringement claim and dismiss the claim as a matter of law if they are not substantially similar. As this Court explained, "[t]here is ample authority for holding that when the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on a motion to dismiss." *Gadh v. Spiegel,* 2014 WL 1778950, at *3 n.2 (C.D. Cal. Apr. 2, 2014) (Walter, J.) (quoting *Christianson v. West Pub. Co.,* 149 F.2d 202, 203 (9th Cir. 1945)). Indeed, for nearly 75 years, "courts have followed this rather obvious principle and dismissed copyright claims that fail from the face of the complaint (and in light of all matters properly considered on a motion to dismiss)." *Gadh,* 2014 WL 1778950, at *3 n.2 (citing *Zella v. E.W. Scripps Co.,* 529 F. Supp. 2d 1124, 1130 (C.D. Cal. 2007)). *See also Heusey v. Emmerich,* 2015 WL 12765115, at *3 (C.D. Cal. Apr. 9, 2015) (granting motion to dismiss copyright claim for lack of substantial similarity), *aff'd,* 692 Fed. Appx. 928 (9th Cir. 2017); *Wild v. NBC Universal,* 788 F. Supp. 2d 1083, 1097 (C.D. Cal. 2011) (same), *aff'd,* 513 Fed. Appx. 640 (9th Cir. 2013).

In considering a motion to dismiss, courts may also "consider matters subject to judicial notice pursuant to Federal Rule of Evidence 201." *Zella,* 529 F. Supp. 2d at 1128. In particular, courts may consider facts "not subject to reasonable dispute,"

---

[4] Plaintiffs in copyright actions must also establish that the defendants had access to the allegedly infringing work. *Three Boys Music Corp.,* 212 F.3d at 481. Though Defendants dispute that any of them ever had access to *Emanuel*, solely for purposes of this motion, Defendants do not challenge access.

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT
4830-6416-5815v.1 0113237-000003

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

1  *Marcus v. ABC Signature Studios*, 279 F. Supp. 3d 1056, 1062-1063 (C.D. Cal.

2  2017), and "generic elements of creative works," *Zella*, 529 F. Supp. 2d at 1129.

3  *See also Heusey*, 2015 WL 12765115, at *4 (judicial notice of "historical events,

4  theories commonly-held by historians, and the political atmosphere of the

5  Elizabethan era"); *Fillmore v. Blumhouse*, 2017 WL 4708018, at *3 (C.D. Cal.

6  July 7, 2017) (judicial notice that "[b]ringing the dead back to life" is common in

7  horror, fantasy, and sci-fi, and that "[d]ream sequences are a common narrative

8  device in works of fiction").

9  **B.   Courts Must Filter Out Unprotectable Expression**

10      To assess substantial similarity on a motion to dismiss, the Ninth Circuit uses

11  the "extrinsic test," which focuses on objective "articulable similarities" between

12  the works. *Zella*, 529 F. Supp. 2d at 1133.  In comparing the works, "a court must

13  filter out and disregard the non-protectible elements." *Cavalier v. Random House,*

14  *Inc.*, 297 F.3d 815, 822 (9th Cir. 2002).  Indeed, courts "may place *no* reliance upon

15  any similarity in expression resulting from unprotectable elements." *Apple v.*

16  *Microsoft*, 35 F.3d 1435, 1446 (9th Cir. 1994) (emphasis in original).  This is

17  because "similarities derived from the use of common ideas cannot be protected;

18  otherwise, the first to come up with an idea will corner the market." *Id.* at 1443.

19      Accordingly, courts filter out so-called *scenes a faire*, or elements that flow

20  naturally from a basic premise. *Cavalier*, 297 F.3d at 823.  For example, in *Benay*

21  *v. Warner Bros.*, 607 F.3d 620 (9th Cir. 2010), the Ninth Circuit disregarded

22  numerous similarities that flowed from the works' shared "basic plot premise" of

23  "an American war veteran [who] travels to Japan in the 1870s to train the Imperial

24  Army in modern Western warfare." *Id.* at 625.  *See also Shame on You Prods. v.*

25  *Banks*, 120 F. Supp. 3d 1123, 1151 (C.D. Cal. 2015), *aff'd*, 690 F. App'x 519 (9th

26  Cir. 2017) (dismissing copyright claim after disregarding similarities flowing from

27  the works' shared premise, such as "[g]etting drunk, spending a 'one-nighter' with

28  someone you just met, waking up disoriented the next morning at the individual's

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT
4830-6416-5815v.1 0113237-000003

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

house or apartment, and putting on the clothes worn the night before"); *Funky Films v. Time Warner Entm't*, 462 F.3d 1072, 1077-1081 (9th Cir. 2006) (finding that the plaintiff's extensive alleged similarities relied "heavily on *scenes a faire* – not concrete renderings specific to [plaintiff's work] – and are, at best, coincidental").

Courts also routinely filter out generic or common elements before analyzing for substantial similarity. *See, e.g.*, *Fillmore*, 2017 WL 4708018, at *3 (finding that "[d]ream sequences" and "[b]ringing the dead back to life" are unprotectable); *Shame on You Prods.*, 120 F. Supp. 3d at 1159 ("outdoor chase on wheels" was too generic of a concept to be protectable).

## C.   The Works' Protected Expression Is Not Substantially Similar

Once unprotectable elements are filtered out, courts must then compare the objective, "specific expressive elements" of the works at issue, specifically the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in the two works." *Kouf v. Walt Disney Pictures*, 16 F.3d 1042, 1045 (9th Cir. 1994).

Importantly, courts repeatedly find that lists of "random similarities scattered throughout the works" are insufficient to satisfy the extrinsic test because they are "inherently subjective and unreliable." *See Litchfield*, 736 F.2d at 1356. Indeed, courts have readily disposed of copyright claims even where the list of alleged similarities is extensive. *See, e.g.*, *Bernal v. Paradigm Talent & Lit. Agency*, 788 F. Supp. 2d 1043, 1061, 1063 (C.D. Cal. 2010) (133-page chart with side-by-side comparisons of the works); *Arica Inst. v. Palmer*, 970 F.2d 1067, 1073 (2d Cir. 1992) (70-page appendix of similarities). To assess similarity, the law requires a review of the actual works, not a plaintiff's characterization of them. *See Walker v. Time Life Films*, 784 F.2d 44, 50 (2d Cir. 1986) ("[T]he works themselves, not descriptions or impressions of them, are the real test for claims of infringement.").

Plaintiff attempts to limit the Court's analysis by alleging infringement in only the first three episodes of *Servant*, which she claims are a "self-contained unit," and suggesting that the latter seven episodes merely add "new vignettes,

characters, or sub-plots." FAC ¶¶ 2 n.1, 13. In fact, each of the ten episodes reveals crucial information about characters and events *from the first three episodes*, for example how Jericho died and why Leanne applied for a position with the Turners. The FAC's own allegations also extend beyond the first three episodes. *See* RJN § 1. Regardless of whether the Court reviews three or ten episodes, however, there is no substantial similarity between *Emanuel* and *Servant* (or any part of *Servant*). Notably, in alleging infringement in only three episodes of *Servant*, Plaintiff herself concedes that most of the series is different from *Emanuel*.

### 1. Plot

#### a. Most of the Alleged Plot Similarities Are Unprotectable.

Most of the alleged similarities between the works' plots are unprotectable concepts, *scenes a faire*, and generic elements in film and television.

*First*, many alleged similarities flow from the works featuring a new mother, including having help with the baby, holding a baby, and considering her body. *See* FAC ¶ 78. Other alleged similarities flow from the unprotectable premise of hiring a babysitter or nanny. For example, people who can afford to hire help are often "privileged," a mother first meeting a nanny or babysitter often asks "get to know you" questions, and a nanny or babysitter in a new home will look around. *Id.*

*Second*, a grieving mother using a reborn doll to cope with losing a child is an unprotectable idea. *See* FAC ¶ 72 n.11 (conceding that a "mother so traumatized by her baby's death that she cares for a doll she believes to be her real baby" is a "basic premise"). Despite Plaintiff's emphatic denial, using a doll to cope with grief is a real therapy. *Compare* FAC ¶ 71 n.10 *with* RJN § 2. Numerous alleged similarities flow from this premise. For example, reborn dolls are designed to be lifelike, and thus it naturally flows that the dolls would be "physically realistic." FAC ¶ 72. In works where a grieving mother treats a doll as her baby, it is unsurprising that others would stop pretending the doll was real when the mother was gone (*id.* ¶ 78), or that there would be no "harrowing bouts of crying" from the doll (*id.*).

*Third,* the concept of parents treating a doll as their child has been explored in many works. *See* RJN § 3.a.  In the film *The Boy*, for example, a young woman becomes a nanny to a wealthy couple's young son, which turns out to be a doll that the couple treats as their son (after their son's apparent death years earlier).  *See id*. And in the television series *Psychoville*, a character treats a doll as her child as her husband is forced to pretend it is real.  *Id.*  The concept is so often explored that it has an entry on the website "TV Tropes," which catalogs tropes in entertainment. "Baby-Doll Baby," https://tvtropes.org/pmwiki/pmwiki.php/Main/BabyDollBaby ("This trope is when a mother, in a delusion, thinks that a doll is her child.").

*Fourth*, beyond these *scenes a faire*, the FAC alleges numerous similarities that consist of ubiquitous elements from film and television.  The FAC even contains side-by-side comparisons that only serve to highlight the FAC's misplaced reliance on such unprotectable elements, like a woman holding a doll (FAC ¶ 7), walking down a staircase (*id.* ¶ 10), and underwater (*id.* ¶ 12), or, incredibly, a character "looking into the camera" (*id.* ¶ 80).

### b.    The FAC Mischaracterizes Alleged Plot Similarities.

Many of the remaining similarities in the FAC's section on plot are mischaracterizations of one or both of the works at issue.

As one example, Plaintiff alleges that the dolls in both works "come back to life"—using quotes around "come back to life" because the doll in *Emanuel* does not, in fact, come back to life.  FAC ¶ 72.  Instead, there is a "notable and extended scene" near the end of *Emanuel* in which Emanuel faints in the nursery and has a vision in which the room fills up with water.  FAC ¶¶ 78-79; Dkt. 13 at 1:10:00.  In this dream sequence, a real baby takes the place of the doll and swims to Emanuel's deceased mother.  Dkt. 13 at 1:12:42.  The baby is shown for approximately 15 seconds and despite Plaintiff's allegations that "[t]he rebirth in each work is ambiguous" (FAC ¶ 78), the scene does not leave the audience confused—it is clear that the baby was "alive" only in Emanuel's vision.  Dkt. 13 at 1:12:42.

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

In *Servant*, on the other hand, the doll is replaced with a living baby in the first episode, and stays that way most of the season. *See* Ex. 1 at 34:08. There is no ambiguity in *Servant* regarding whether the baby is real or not. More importantly, unlike in *Emanuel*, the fact that a real baby takes the place of the doll in *Servant* is *the* defining plot device of the series, and the storylines and characters all flow from this foundational choice. Regardless, a doll coming to life is hardly a new concept, having been explored in countless works, including the classic *Pinocchio*.

As another example, Plaintiff alleges that the "notable and extended" water-filled scene is similar to a scene in which "the nanny in *Servant* is shown underwater, but with a natural face." FAC ¶ 78. In reality, the nanny takes a bath and dunks her head underwater for 7 seconds. Ex. 2 at 6:13. That is it.

The FAC also alleges that Leanne in *Servant*, like Emanuel in *Emanuel*, "very quickly realizes the mother truly believes the doll to be real, and plays along with the delusion." FAC ¶ 78. This is not true in *Emanuel*; there are a number of scenes in Linda's house before Emanuel discovers the doll. *E.g.*, Dkt. 13 at 9:22, 14:45. Emanuel does not immediately play along with the decision; at first, she is bewildered and hesitant. *Id.* at 21:00. This alleged similarity also is untrue in *Servant*, in which Leanne treats the doll as real and never seems to be pretending.

The FAC also alleges that in both works the "nanny's mother has left a hole in her life that her relationship with the mother begins to fill—in a way that complements the hole in the mother's life caused by the death of her baby." FAC ¶ 78. Again, this is true for *Emanuel*, but untrue for *Servant*, in which Leanne never expresses longing for either of her parents, and Dorothy often treats Leanne as the help, not a daughter.

### c. The Works' Plots Are Not Substantially Similar.

Once unprotectable elements are removed, the works have different storylines and lack similarity in their "actual concrete" plot elements. *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985); *Funky Films*, 462 F.3d at 1077-1078.

*Emanuel* follows a normal teenager struggling to cope with the guilt of knowing that her mother died giving birth to her.  The audience learns about Emanuel from the start; indeed, some of the first words in the film are Emanuel telling the audience that she killed her mother.  Dkt. 13 at 1:00.  Emanuel works at a medical supply store, lives with her father and stepmother, and begins to babysit for a new next-door neighbor Linda.  When Emanuel first encounters Linda's therapy doll, she is stunned and initially does not play along.  *Id.* at 21:00.  She ultimately treats the doll as a child in front of Linda, but generally not when Linda is gone.  Emanuel even drops and pushes the doll across the floor with her foot at one point (*id.* at 32:50), in contrast to Leanne, who never treats the doll any differently than she would a baby.  When Linda brings home a date (Arthur) and Arthur refuses to pretend the doll is a child, Linda's delusion is shattered, and Emanuel suffers her own breakdown.  *Id.* at 1:08:05.  The film ends with Emanuel breaking Linda out of a mental institution and taking her to bury the doll next to Emanuel's mother's grave, each experiencing her own catharsis.  *Id.* at 1:21:00.

*Servant* tells an entirely different story.  In *Servant*, an old-money couple hires a full-time, live-in nanny (Leanne) for their baby son, which is a therapy doll given to the mother (Dorothy) to cope with her son's death.  From the beginning of the series, Leanne is portrayed as possibly other-worldly.  The audience is shown upfront that she is a seemingly paranormal, self-flagellating, deeply religious teenager, and the rest of the season is spent puzzling over who she is.  Leanne always treats the doll as a real baby, holding it, singing to it, or taking it on walks, regardless of whether anyone is around.  *E.g.*, Ex. 1 at 13:11, 17:17, 29:01.  She also has no reaction when the doll becomes a baby: she treats the doll and the baby exactly the same without expressing any surprise when the doll becomes a baby, leaving the audience to wonder whether she brought the doll to life and leaving other characters wondering what, if anything, should be done about it.  Lastly,

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Leanne seems to use paranormal powers to inflict harm on the couple whenever she is angry with them, especially Sean, who loses his senses of taste, smell, and touch.

There are numerous other differences between the plots of the works. *Emanuel* is portrayed from Emanuel's perspective—indeed, the film starts with her voiceover.  In *Servant*, the perspective is the opposite, as the series explores who (or what) Leanne is and where she came from.  Unlike in *Emanuel*, in which the doll is an unexpected "twist," in *Servant* the existence of the doll is not hidden and is fully explained in the trailer.  *See* RJN § 1.  In addition, in *Servant* the doll is replaced by a real baby at the end of the first episode, whereas in *Emanuel* it remains a doll throughout.  Also unlike *Emanuel*, in *Servant* there is no moment where the mother is "found out."  While Emanuel attempts to prevent others from discovering the doll, Leanne seems to have no awareness of anything amiss, and takes it out in public.  *E.g.*, Ex. 1 at 17:17.  And unlike the cathartic end of *Emanuel*, *Servant*'s first season ends with uncertainty and suspense.  *See* Ex. 10.  Unlike in *Emanuel*, there is no catharsis and certainly no peace at any point in *Servant*.

### 2.    Sequence of Events

Plaintiff alleges that *Emanuel* and *Servant* "each unfolds in a roughly linear chronology," FAC ¶ 79, which is not something that is protectable.  Even if that were protectable, only *Emanuel* unfolds in a linear chronology.  *Servant*, by contrast, jumps back and forth through time throughout the entire season, showing various incidents from the past to explain events in the present.

The other alleged similarities in sequence of events consist of several discrete scenes that are unrelated to the overall sequence of events of the works.  Moreover, those alleged similarities are unprotectable and also portrayed differently in the works.  For example, Plaintiff alleges that "both works include an awkward job interview scene" (*id.*), but a parent asking a new caregiver questions flows from the unprotectable concept of hiring a babysitter or nanny.  Regardless, in *Servant*, Leanne arrives at the Turners' home in the first scene of the first episode with her

13
DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT
4830-6416-5815v.1 0113237-000003

**DAVIS WRIGHT TREMAINE** LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

suitcase in hand.  Ex. 1 at 1:34.  She is not coming to an interview; she has already been hired.  In *Emanuel*, Linda also does not "interview" Emanuel, but instead asks her a few questions before leaving her with the "baby."  Dkt. 13 at 9:40.

Similarly, Plaintiff alleges that at some point following the "interviews," the "nanny" and mother are "shown alternatively in solitary moments—but with a strong sense that they are connected during those moments."  FAC ¶ 79.  But characters experiencing "solitary moments" is not a protectable sequence of events. Regardless, the scene in *Servant* that Plaintiff references is one in which Leanne and Dorothy are shown in their respective bathtubs (*id.*)—Dorothy in her spacious bathroom in a large bathtub with jets and Leanne in her smaller tub with plain tile and water-damaged ceiling (Ex. 1 at 10:38)—whereas in *Emanuel*, Emanuel is watching Linda and her "baby" from across the street (to demonstrate Emanuel's growing fascination with Linda).  Dkt. 13 at 12:01.

Plaintiff also alleges that the works have a similar sequence of events because there is a scene in both in which the mother applies makeup, and then the "nanny" does the same after the mother leaves (FAC ¶ 79), but this concept has been explored in countless other works.  Likewise, Plaintiff alleges that in both works the "nanny faints under stress" and "regains consciousness to the sight of concerned faces" (*id.*), which is another frequently portrayed concept.

### 3. Theme

"A work's theme is its overarching message," and "there is no protection for stock themes or themes that flow necessarily from a basic premise."  *Silas v. Home Box Office*, 201 F. Supp. 3d 1158, 1180 (C.D. Cal. 2016), *aff'd*, 713 Fed. Appx. 626 (9th Cir. 2018).  Plaintiff alleges that both *Emanuel* and *Servant* include themes like "[d]enial and self-delusion as a means of avoiding the unspeakable grief of losing a baby" and "[t]he dangers of shared delusion," including "[t]he safety, sanctity and comfort of home—and the obverse dangers of the outside world."  FAC ¶ 66.  But these themes are extremely broad and encompass innumerable works, and they also

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT
4830-6416-5815v.1 0113237-000003

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

flow naturally from the unprotectable premise of a mother treating a therapy doll as if it were her baby and thus must be filtered out before comparing themes.

Beyond grief and delusion, the primary themes in *Emanuel* and *Servant* are drastically different. As Plaintiff alleges, *Emanuel* is an "emotional story about motherhood and daughterhood," culminating in its main characters finding peace with their grief. FAC ¶ 14. It explores the pain of a teenager who never knew her mother and guilt for her mother's death, and a mother who feels grief and guilt for the loss of her only child. The film also examines what it means to be a family, including exploring stepfamily bonds. Ultimately, *Emanuel* is hopeful and positive, exploring themes such as forgiveness, healing, acceptance, and redemption.

*Servant*'s primary theme is very different, and much darker (literally and metaphorically). In *Servant*, little is known of Leanne's past and she does not express any longing for her parents. The series walks the line between thriller and horror, with Leanne's seeming powers front and center, as she appears to bring a doll to life and to punish Sean and Dorothy when she finds them undeserving of her assistance. *E.g.*, Ex. 5 at 14:00, 21:25. *Servant* also explores themes such as wealth juxtaposed with the treatment of those without such privilege. Lastly, no character in *Servant* finds redemption or acceptance like in *Emanuel*.

Notably, Plaintiff alleges that *Emanuel* explores themes such as the complexity of the mother/daughter bond and maternal longing, and contends that it is the first film to "explore maternal longing by examining its delusional misplacement, while also studying a young woman's misplaced longings for a mother." FAC ¶ 67. But Plaintiff concedes that *Servant* does *not* explore these and similar themes by claiming that *Servant* is an "utter bastardization" of *Emanuel* that completely "miss[es] the female perspective." FAC ¶¶ 16-17.

### 4. Characters

"In determining whether characters are similar, a court looks at the totality of the characters' attributes and traits as well as the extent to which the defendants'

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

characters capture the total concept and feel of the figures in the plaintiff's work." *Shame on You Prods.*, 120 F. Supp. 3d at 1165 (internal brackets omitted). Even some shared traits between characters are not enough to prove substantial similarity when the characters "have noticeable differences." *Silas*, 201 F. Supp. 3d at 1177.

### a.   Emanuel and Leanne

The FAC repeatedly compares the nanny in *Servant* to the "nanny" in *Emanuel*. But Emanuel is not a nanny—she lives with her family, has a day job, and simply babysits for her neighbor. In fact, Emanuel's stepmother expressly tells Emanuel that Linda was "looking for a *babysitter*" (Dkt. 13 at 7:55) (emphasis added), and Plaintiff's own website describes Emanuel as offering "to babysit."[5]

Emanuel is a quintessential teenager who is struggling to cope with the loss of her mother who died in childbirth and to coexist with her stepmother (while also trying to push her buttons). Her brash, acerbic wit is on display any time she is in a crowd, including, for example, when she lies to train passengers to get them to give up their seats, or riles up her stepmother during a family dinner. Dkt. 13 at 3:37, 8:37. In contrast, Leanne in *Servant* is a live-in nanny to Dorothy and Sean, routinely demeaned by them both. They refer to her as "staff" (Ex. 1 at 5:08, Ex. 2 at 23:25), convince her to spend her meager earnings on shoes that Dorothy immediately asks to borrow (Ex. 3 at 15:04), and even send her out in a thunderstorm on a fool's errand so they can be intimate (Ex. 5 at 12:18).

Emanuel and Leanne are almost nothing alike. Unlike Emanuel, Leanne is quiet and deferential—the "servant." Unlike Emanuel, Leanne appears to have paranormal powers she uses to punish or reward the Turners depending on their behavior toward her, including the apparent power to create life. Leanne is deeply involved in her religion and whips herself. *E.g.*, Ex. 1 at 11:36, Ex. 5 at 30:01. In

---

[5] *See* https://www.francescagregorini.com/features/the-truth-about-emanuel/ (describing *Emanuel*'s plot: "Emanuel offers to babysit [Linda's] newborn").

contrast to Emanuel and Linda's tender relationship in *Emanuel*, Leanne has a complicated relationship with Dorothy in *Servant*, at times seeming obsessed with her (and wanting to be her) and other times torturing her, such as repeatedly setting off her car alarm once Leanne found out that Jericho died in the car.  Ex. 9 at 22:25. Emanuel understands that Linda is suffering from a delusion and pretends for her sake that her doll is real, while attempting to prevent anyone else from discovering the doll.  Leanne, on the other hand, treats the doll as real and does not make any attempt to prevent others from seeing the doll.  *E.g.*, Ex. 1 at 17:17.  Also, in *Servant*, Leanne targeted the Turners based on her childhood meeting of and interest in Dorothy.  Ex. 4 at 30:42.  Notably, Plaintiff deleted her allegation from the initial complaint that Emanuel became Linda's babysitter out of "happenstance" (Compl. ¶ 74), and now falsely contends Emanuel's offer to babysit was "extremely deliberate" and was evidence that she "targeted" Linda (FAC ¶ 78).  Plaintiff got it right the first time; Emanuel did not "target" Linda, she happened to live next door.

Beyond a few generic and unprotectable traits shared by Emanuel and Leanne, they could hardly be more different.  Emanuel is the epitome of a teenager, grappling with the loss of her mother.  Leanne is a paranormal cult member who can seemingly cause physical harm to those who cross her (and seemingly can resurrect the dead).  The contention that Emanuel and Leanne are "extraordinarily similar" (FAC ¶ 70) is belied by even the most cursory review of the works at issue.

### b.    Linda and Dorothy

Nor are Linda and Dorothy similar.  As explained above, the concept of a mother using a reborn doll as a therapeutic tool to cope with the grief of losing a child is not protectable.  The similarities between the characters flow naturally from that premise, including their bouts of delusion.  Their confidence is a byproduct of fighting to keep that delusion alive, as is their turn as "affectionate and doting mothers."  FAC ¶ 71.  And that women wealthy enough to hire help for dolls would be "in their mid-thirties," "sophisticated," "privileged," and "wearing stylish

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

clothing" is no surprise, and those similarities are too ubiquitous to merit protection. *Id.* *See also* *Shame on You Prods.*, 120 F. Supp. 3d at 1165.

Plaintiff mischaracterizes various "similarities" between Linda and Dorothy. She describes both as holding a "displaced maternal longing" that each "channel[s] not only into a reborn doll, but also into the nanny," and alleges "there is an unspoken, perhaps unconscious or repressed, sexual longing, that is subtly directed toward the nanny." FAC ¶ 71.  This may be true of Linda in *Emanuel*, but not of Dorothy in *Servant*.  Dorothy does not channel "displaced maternal longing" into Leanne (*id.*) or explore a "mother/daughter bond" with her (FAC ¶ 78).  For example, she takes Leanne shopping and convinces her to buy new shoes, and then manipulates Leanne into lending them to her.  Ex. 3 at 15:04.  And the one moment between Dorothy and Leanne that the FAC describes as being erotic (FAC ¶ 78) is not: Leanne helps Dorothy to relieve her painful mastitis.  Ex. 1 at 29:30.

Linda is a grieving mother who ran away from her husband to start a new life where no one knows of her loss.  She is not an "effervescent, 'type A' personality" (FAC ¶ 71), but instead is laid-back, calm, and warm.  She does not seem to have a job, instead tending to her garden and home, and spending time with Emanuel. *Servant*, on the other hand, is set in motion due to Dorothy's desire to return to her job as an on-air reporter.  She hires Leanne to watch her "child" while she works, and the news segments she creates provide key plot and mood moments in the show.  Dorothy does all this with the (at times begrudging) support of her husband and brother.  Overall, beyond the shared unprotectable concepts in both works, there are many "noticeable differences" between Linda and Dorothy, who are not substantially similar.  *See* *Silas*, 201 F. Supp. 3d at 1177.

### c. Thomas and Sean

Plaintiff alleges that the father in *Emanuel*, Thomas, is similar to the father in *Servant*, Sean, because both explain how their child died and how their wife came to use a doll.  FAC ¶ 73.  That is no surprise: who better to understand the situation,

or to convey that, than the other parent.  More importantly, this is the extent of the similarities between the characters.  In fact, there is nothing more to Thomas at all—he appears in a single scene in *Emanuel* near the end of the film and we learn almost nothing about him.  Sean, on the other hand, is a vital, fully developed character in every episode of *Servant*, and his interactions with Leanne are central the story.  *Compare* Dkt. 13 at 1:18:30 with Exs. 1-10.  *See Shame on You Prods., 120 F. Supp. 3d at 1164* (only "distinctive characters are protectable").

### d.   Arthur and Julian

Plaintiff overstates Arthur (in *Emanuel*) and Julian (in *Servant*) as "antagonists" (FAC ¶ 76) and just like with Thomas and Sean, compares a secondary character in *Emanuel* with a central character in *Servant*.

Arthur is a nerdy, shy, "professorial" (FAC ¶ 76) man who works with Emanuel.  Arthur takes Linda on a date (to Emanuel's displeasure) and comes back to Linda's home to meet the baby (something Emanuel repeatedly attempts to prevent).  When Arthur discovers the child is actually a doll, he refuses to play along, sending Linda into a spiral as she finally confronts her loss.  As Arthur was told Emanuel was babysitting, he initially blames Emanuel for the mishap and begins to frantically search for the "missing" child.  Dkt. 13 at 1:08:50.

In *Servant*, Julian is a devoted brother to Dorothy, and knows from the start about how Jericho died (in fact, he discovers Jericho's body in the midst of Dorothy's delusion).  Ex. 1 at 16:22, Ex. 8 at 22:57.  Crass and constantly drinking, he mistrusts Leanne and spends significant resources looking into her background, even flying to her hometown with a private investigator.  Ex. 3 at 8:31.  As with the other main characters, Arthur and Julian's many "noticeable differences" cut against a finding of substantial similarity.  *Silas, 201 F. Supp. 3d at 1177.*

### e.   Claude and Tobe

Plaintiff contends that Claude and Tobe are Emanuel and Leanne's "love interests" (FAC ¶ 75), but this grossly oversimplifies these characters.

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Claude is Emanuel's boyfriend. In *Emanuel*, he meets Emanuel on a train and they see who can come up with a more outlandish story to get a stranger to give up their seat. *E.g.*, Dkt. 13 at 8:37, 26:06. Claude is happy to date Emanuel, but like any couple they go through their ups (talking and kissing by the lake) and downs (fighting over Emanuel's relationship with Linda). The couple's evolving relationship is one of the central storylines of *Emanuel*.

Tobe is Sean's assistant chef and highlights one of the themes of *Servant*: the treatment of the less privileged by those with more. At one point, Tobe cooks dinner with Leanne (because he is stuck at the house, having accepted $100 from Sean to stay there). Ex. 3 at 18:51. Later in the season, Tobe and Leanne go bowling, and when she tries to kiss him afterward, he rejects her advance. Ex. 8 at 16:00. That is the extent of their "romantic" interlude. FAC ¶ 75. Moreover, even if Plaintiff's description of both characters as "timid, shy, sexually immature, and diminutive" were accurate (it is not), those are unprotectable generic traits. *Id.*

### f. The Dolls

The FAC alleges that the dolls in *Emanuel* and *Servant* are "physically realistic" and "ultra-lifelike," FAC ¶ 72, but this is an unprotectable concept. In fact, the entry on the TV Tropes website about the "trope" in which "a mother, in a delusion, thinks that a doll is her child" specifically refers to "the famous *Reborn* line" of dolls. *See* https://tvtropes.org/pmwiki/pmwiki.php/Main/BabyDollBaby. The dolls also are not "almost identical" as Plaintiff contends: one is a boy and one is a girl, with features and clothing that would be expected of a realistic doll.

### g. Other Characters

Plaintiff fails to mention other characters in both *Emanuel* and *Servant*. This includes Emanuel's father, who Emanuel lives with and is close with. It is through him that we learn about Emanuel's mother and explore *Emanuel*'s themes of losing a spouse and raising a child as a single parent. Nor does Plaintiff mention Emanuel's stepmother (or the theme in *Emanuel* of adjusting to new family

20

relationships). Plaintiff also does not mention Roscoe, the private investigator who is looking into Leanne's past (and who was possibly kidnapped or killed for that). Nor does she mention the other characters that are introduced later in the season, including Leanne's Aunt May and Uncle George, Dorothy's therapist Natalie, Dorothy and Julian's father Todd, and Wanda (who Julian hired to spy on Leanne).

### 5.   Setting

Most of the alleged similarities in setting flow from the premise of a new mother, hiring a babysitter or nanny, or using a therapy doll to cope with the loss of a child, none of which are protectable. *See, e.g., Benay*, 607 F.3d at 627-628 (finding that given the works' shared unprotectable premise, it was "not surprising" that the works shared settings like "a scene of the protagonist sailing into Japan, scenes in the Imperial Palace, scenes on the Imperial Army's training grounds, and battle scenes in various places in Japan"). Here, it makes sense that someone wealthy enough to hire help would live in an upscale house. FAC ¶ 68. And when a nanny lives in the same house with her employers, as in *Servant*, it naturally follows that she would see various goings on in the home. *Id.*

Beyond the *scenes a faire*, Plaintiff points to generic elements as evidence of copying, from having a staircase "overlooking the first floor" to a nursery with "old-fashioned cribs," rocking horses, and even "striped wallpaper," to having "family dinners." FAC ¶ 68. These elements are not protectable, and even if they were, they have been used in countless works before *Emanuel*.

Plaintiff also mischaracterizes purported similarities between settings. In particular, she highlights that each work features a trip to Leanne's or Emanuel's mother's grave (FAC ¶ 68), but these scenes are incredibly different. In *Emanuel*, Emanuel takes Linda to visit Emanuel's mother's grave, which Emanuel had never visited, and digs a hole to bury Linda's doll. Dkt. 13 at 1:26:21. The trip to the grave is film's climax, as Emanuel and Linda seemingly come to terms with their losses. In *Servant*, Julian and a private investigator travel to the Midwest to track

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

4830-6416-5815v.1 0113237-000003

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

down information about Leanne.  Julian uncovers remnants of Leanne's family home (which burned down), and then discovers Leanne's parents' graves, and also *Leanne*'s grave.  Ex. 3 at 26:12.  Thus, while there is a grave visit in each work, they are expressed quite differently and have an extremely different significance to each work.  Moreover, scenes taking place at a grave are hardly unique.

The works' other settings are also very different.  In *Emanuel*, the story takes place in numerous locations, including Emanuel's home, her work, Linda's home, the train, a market, a lake, and a mental institution.  In *Servant*, almost all of the action takes place in and around the house.  When other settings are shown, they are generally seen through a screen at the Turners' residence.

### 6. Mood

Plaintiff alleges that both *Emanuel* and *Servant* are psychological thrillers and, accordingly, are "tense throughout," invoking "heightened feelings of suspense, excitement, surprise, anticipation, and anxiety."  FAC ¶ 80.  But these moods are ubiquitous.  *See Fillmore*, 2017 WL 4708018, at *8 ("[G]eneral suspense is not protectable expression and cannot establish the extrinsic similarity necessary to support a copyright infringement claim").  Plaintiff acknowledges that in creating tension, she "uses the cinematic vernacular of classic suspense."  FAC ¶ 10.

Plaintiff also alleges that both works employ "magical realism," which Plaintiff contends "leaves the audience with a measure of uncertainty about what's real."  *Id.* ¶ 4.  *See also id.* ¶ 65.  This is untrue.  In *Emanuel*, Emanuel has visions of water rushing into wherever she is, be it on a train or in a bedroom, but the audience knows that the visions are not actually happening—*e.g.*, the train and the bedroom did not actually fill with water.  *E.g.*, Dkt. 13 at 24:39.  These scenes certainly do not keep "the audience wondering."  FAC ¶ 65.  In contrast, in *Servant*, Leanne's potentially supernatural powers are presented as real.  Sean really loses his sense of taste and smell and really pulls out a splinter from his throat.  Ex. 2 at 28:11.  A doll is presented as turning into a real baby, and then back again.  Ex. 1 at

34:10, Ex. 8 at 9:15.  Somehow, after Leanne notices them, a dead cricket and a dead dog are each brought back to life.  Ex. 5 at 30:59, Ex. 7 at 28:02.  These are not fantastical visions; they are actual events in *Servant*.

Beyond generic elements, *Emanuel* and *Servant* have drastically different moods.  *Emanuel* largely focuses on each of its main characters' grief and their attempts to cope with that grief.  It is, at its core, a story of healing.  In contrast, *Servant* is creepy, and of course suspenseful.  Plaintiff contends that the works' reliance on food contributes to a similar mood, FAC ¶ 80, but this an exaggeration.  In *Emanuel*, there are several family dinners, whereas in *Servant*, food plays a pervasive role throughout the series.  Specifically, beyond Sean's profession as a chef and the significance of his lost taste and smell, the preparation and consumption of exotic foods highlight the Turners' wealth and privilege, particularly as compared to what Leanne eats (tomato soup, every day).  Lastly, there is no mood of healing or positivity in *Servant*, as there is in *Emanuel*.

### 7.  Pace

Plaintiff contends that "[b]oth works proceed at a rapid pace."  FAC ¶ 80.  But having a rapid pace is hardly protectable.  *See id.* ¶ 10 (acknowledging that the pace she used was part of the "cinematic vernacular of classic suspense").  Moreover, this is not an accurate characterization of either work.  In *Emanuel*, there are numerous periods of calm, such as during family dinners, gardening, Emanuel and Claude's night sitting by a lake, and Emanuel and Linda's scene in which they come to terms with their losses and gaze at the stars.  In *Servant*, the pace quickens toward the ultimate, chaotic end of the first season, in which Leanne seemingly leaves, the baby appears to be a doll again, and Dorothy possibly realizes that the doll is not her baby.  Ex. 10.  In an attempt to bolster the pace allegations in the FAC, Plaintiff alleges that both works employ "long pauses in the characters' dialogue" (FAC ¶ 80), but this undermines Plaintiff's allegation about the works proceeding at a "rapid pace" and, regardless, is hardly unique or protectable.

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

### 8.    Dialogue

"[F]or a plaintiff to demonstrate substantial similarity of dialogue, it must show 'extended similarity of dialogue.'"  *Silas*, 201 F. Supp. 3d at 1181 (quoting *Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1450 (9th Cir. 1988)).  *See Gallagher v. Lions Gate Entm't*, 2015 WL 12481504, at *10 (C.D. Cal. Sept. 11, 2015) (three instances of similar dialogue could not demonstrate "extended similarity").

Here, Plaintiff's dialogue allegations are largely duplicative of her plot allegations.  For example, she alleges that in both works, "the mother gives baby-care direction in extremely realistic terms" and "the father explains that the cause of the baby's death is unknown" (FAC ¶ 81), but does not allege *any* specific dialogue shared between the works.  Alleging that thematically similar conversations take place in both works is not enough to find the "extended similarity of dialogue" necessary for substantial similarity.  *E.g.*, *Silas*, 201 F. Supp. 3d at 1181 (even an instance of overlapping dialogue insufficient to show substantial similarity).

## IV.    PLAINTIFFS' NEW CLAIMS OVER THE *SERVANT* SCRIPTS FAIL

The FAC adds two direct-infringement claims targeted at "early" and "later" *Servant* scripts (the "Scripts"), alleging "on information and belief" that each script is "very similar to *Servant*," and that certain of the alleged similarities between *Emanuel* and *Servant* are equally applicable to the Scripts.  *See* FAC ¶¶ 95, 95 n.15, 101, 101 n.16.  Each claim fails on its face.

*First*, the alleged similarities between *Emanuel* and the Scripts are a subset of the alleged similarities between *Emanuel* and *Servant*.  FAC ¶¶ 95, 101.  Because Plaintiff's more expansive allegations are insufficient to prove substantial similarity, her allegations that the Scripts infringe also must fail.

*Second*, Plaintiff alleges in a conclusory fashion that each "script hews even closer to *Emanuel* than *Servant* does" (FAC ¶¶ 95, 101), but fails to allege any similarities between the Scripts and *Emanuel* that are not alleged as between *Servant* and *Emanuel*.  "Without such facts neither [the defendant] nor the court has

notice of what it is that [plaintiff] alleges was copied." *McCormick v. Sony Pictures*, 2008 WL 11338582, at *5 (C.D. Cal. Feb. 4, 2008) (dismissing copyright-infringement claim where plaintiff "plead[ed] no facts regarding the similarities between [the works]").  Accordingly, the unsupported allegation that each Script "hews closer" to *Emanuel* than the episodes of *Servant* must be disregarded.

*Third*, unsupported allegations "on information and belief" do not state a valid claim as a matter of law.  *See Tarantino v. Gawker Media*, 2014 WL 2434647, at *4 (C.D. Cal. Apr. 22, 2014) (Walter, J.) (dismissing claim where plaintiff "merely speculate[d]" that direct copyright infringement "must have taken place").

## V.   PLAINTIFF'S SECONDARY LIABILITY CLAIM FAILS

Because the direct-infringement claims fail, Plaintiff's fourth cause of action for contributory and vicarious infringement also fails.  *See Fox Broad. Co. v. Dish Network*, 747 F.3d 1060, 1068 (9th Cir. 2014) ("Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party.").

## VI.   CONCLUSION

*Emanuel* and *Servant* are not substantially similar.  Once unprotectable elements are disregarded, the works' plot, sequence of events, themes, characters, setting, mood, pace, and dialogue are different, and Plaintiff's cherry-picking of unprotectable elements or generic details does not enable her to survive dismissal. Plaintiff's claims should be dismissed with prejudice.  *See Silas*, 201 F. Supp. 3d at 1184 (dismissing complaint with prejudice where the works were "not extrinsically similar and no amendment could possibly cure that defect in Plaintiffs' case").

DATED: March 24, 2020

DAVIS WRIGHT TREMAINE LLP
NICOLAS A. JAMPOL
DIANA PALACIOS
CYDNEY SWOFFORD FREEMAN
CAMILA PEDRAZA

By:   /s/ Nicolas A. Jampol
Nicolas A. Jampol

Attorneys for Defendants

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT
4830-6416-5815v.1 0113237-000003

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899