1
2
3
4
5
6
7
8

ERIKSON LAW GROUP
David Alden Erikson (SBN 189838)
  david@daviderikson.com
Antoinette Waller (SBN 152895)
  antoinette@daviderikson.com
S. Ryan Patterson (SBN 279474)
  ryan@daviderikson.com
200 North Larchmont Boulevard
Los Angeles, California 90004
Telephone: 323.465.3100
Facsimile: 323.465.3177

Attorneys for Plaintiff Francesca Gregorini

9
10
11
12

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FRANCESCA GREGORINI,

        Plaintiff,

      v.

APPLE INC., a California corporation;
M. NIGHT SHYAMALAN, an
individual, BLINDING EDGE
PICTURES, INC., a Pennsylvania
corporation; UNCLE GEORGE
PRODUCTIONS; a Pennsylvania
corporation; ESCAPE ARTISTS LLC,
a California limited liability company;
DOLPHIN BLACK PRODUCTIONS,
a California corporation; TONY
BASGALLOP, an individual; ASHWIN
RAJAN, an individual; JASON
BLUMENTHAL, an individual; TODD
BLACK, an individual; STEVE TISCH,
an individual; and DOES 1-10,
inclusive

        Defendants.

Case No. 2:20-cv-00406-JFW-JC
Hon. John F. Walter

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO
DISMISS FIRST AMENDED
COMPLAINT**

Date:  April 27, 2020
Time:  1:30 p.m.
Crtrm: 7A

OPPOSITION TO MOTION TO DISMISS

1    Plaintiff respectfully submits this Opposition to Defendant Apple Inc.;
2  M. Night Shyamalan; Blinding Edge Pictures, Inc.; Uncle George Productions;
3  Escape Artists LLC; Dolphin Black Productions; Tony Basgallop; Ashwin Rajan;
4  Jason Blumenthal; Todd Black; and Steve Tisch's (collectively "Apple") Motion to
5  Dismiss (the "MTD") her First Amended Complaint (the "FAC"). Plaintiff is
6  concurrently filing Objections (the "Objections" or "Obj.") to Apple's Request for
7  Judicial Notice ("RJN").

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................ 1

II.   PLAINTIFF'S ALLEGATIONS ......................................................... 2

      A.   Plaintiff alleges that Episodes of 1-3 of *Servant* infringe *Emanuel*. ....... 2

      B.   Plaintiff alleges that certain earlier scripts for Episodes 1-3 also
           infringe.................................................................................. 3

III.  DISMISSAL IS RESERVED FOR CASES WHERE "NO
      REASONABLE JUROR" COULD FIND SUBSTANTIAL
      SIMILARITY. ...................................................................................... 3

IV.   PLAINTIFF PROPERLY PLEADS SUBSTANTIAL SIMILARITY. ........... 4

      A.   Only Episodes 1-3 are at issue, and properly before the Court............. 4

      B.   Apple relies on disputed "facts." ................................................... 5

      C.   Six modern 9th Circuit cases show the proper contours of the
           extrinsic test. ............................................................................ 6

           1.   In comparing elements, courts articulate the full extent of
                overlap before filtering out unprotectable elements. .................. 6

           2.   Apple's four of the six Ninth Circuit cases employ this
                approach. ............................................................................ 7

           3.   The cases Apple avoids follow the same approach—and
                employ the "selection and arrangement" test........................... 9

      D.   Applying the properly understood extrinsic test yields the
           conclusion that a reasonable juror could find substantial similarity. .... 10

           1.   The plot similarities between *Emanuel* and *Servant* are
                remarkable........................................................................ 10

           2.   Apple ignores many similarities—and uses gimmicks to
                avoid others. .................................................................... 12

                a.   Apple speciously dismisses similarities as not
                     protectable in isolation.............................................. 13

                b.   Apple relies on mischaracterizations of the works.......... 14

                c.   Apple greatly exaggerates the importance of its
                     additions................................................................ 14

                d.   Apple exaggerates what can constitute a scène à faire.... 15

                e.   Apple neglects to examine "selection and
                     arrangement."......................................................... 18

OPPOSITION TO MOTION TO DISMISS

3. Apple's comparison of the other elements is similarly misguided. ................................................................ 18

    a.   Sequence ........................................................ 19

    b.   Theme ........................................................... 19

    c.   Characters .................................................... 19

    d.   Setting .......................................................... 21

    e.   Mood ............................................................ 21

    f.   Pace .............................................................. 22

    g.   Dialogue....................................................... 22

4. Evaluating similarities requires discovery and expert testimony. ...................................................................... 23

E. The conclusion is the same even if Episodes 4-10 are considered. ..... 24

V. THE SAME ANALYSIS APPLIES TO PLAINTIFF'S OTHER CLAIMS ................................................................................. 24

VI. CONCLUSION............................................................................ 25

PROOF OF SERVICE ............................................................................ 26

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

iv

1

## TABLE OF AUTHORITIES

2

3

<u>**Cases**</u>

4   *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435 (9th Cir. 1994) ................. 10

5   *Astor-White v. Strong*, 733 F. App'x 407 (9th Cir. 2018) ........................................... 1

6   *Baxter v. MCA, Inc.,* 812 F.2d 421 (9th Cir. 1987) ............................................. 3, 24

7   *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620 (9th Cir. 2010) ........................... 8

8   *Bradbury v. CBS*, 287 F.2d 478 (9th Cir. 1961) ....................................................... 15

9   *Cabell v. Zorro Prods.*, 2017 U.S.Dist.LEXIS 82413 (N.D.Cal. 2017) ................... 23

10  *Cavalier v. Random House, Inc.*, 297 F.3d 815 (9th Cir. 2002) ....................... 6, 7, 15

11  *Fillmore v. Blumhouse Prods., LLC*, 2017 U.S. Dist. LEXIS 211021
     (C.D. Cal. July 7, 2017) ........................................................................................ 6

12  *Fleener v. Trinity Broad. Network*, 203 F. Supp. 2d 1142 (C.D. Cal. 2001) ..... 18, 25

13  *French West, Inc. v. Macy's Inc.*, 2013 U.S.Dist.LEXIS 197448 (C.D.Cal. 2013).. 23

14  *Funky Films v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072 (9th Cir. 2006)......... 8

15  *Gadh v. Spiegel*, 2014 U.S. Dist. LEXIS 64081 (C.D. Cal. 2014) ....................... 4, 8

16  *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996 (2d Cir. 1995).................................. 1

17  *Kouf v. Walt Disney Pictures & Telev'n*, 16 F.3d 1042 (9th Cir. 1994)................. 3, 7

18  *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841 (9th Cir. 2012) ............ 3

19  *Metcalf v. Bochco*, 294 F.3d 1069 (9th Cir. 2002) ....................................... 1, 7, 9, 23

20  *MGM, Inc. v. Am. Honda Motor Co., Inc.*, 900 F. Supp. 1287 (C.D. Cal. 1995)..... 16

21  *Minx Int'l, Inc. v. Around the World Apparel, Inc.*, 2016 U.S. Dist. LEXIS 187021
     (C.D. Cal. 2016)...................................................................................................... 3

22

23  *Olson v. Nat'l Broad. Co.,* 855 F.2d 1446 (9th Cir. 1988)....................................... 22

24  *Park v. Thompson*, 851 F.3d 910 (9th Cir. 2017) .................................................... 25

25  *Satava v. Lowry*, 323 F.3d 805 (9th Cir. 2003)....................................................... 10

26  *Shame on You Prods. v. Banks*, 120 F. Supp. 3d 1123 (C.D. Cal. 2015) .............. 6, 9

27  *Shaw v. Lindheim*, 919 F.2d 1353 (9th Cir. 1990).............................................. 18, 23

28  *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49 (2d Cir. 1936).................... 15

*Silas v. HBO, Inc.*, 201 F. Supp. 3d 1158 (C.D. Cal. 2016) ..................................... 20

*Smith v. AMC Networks, Inc.*, 2019 U.S. Dist. LEXIS 15930 (N.D. Cal., 2019.). 3, 4, 23

*Swirsky v. Carey*, 376 F.3d 841 (9th Cir. 2004) ............................................... passim

*Three Boys Music Corp. v. Bolton*, 212 F.3d 477 (9th Cir. 2000)...................... 4, 10

**Rules**

Fed R. Civ. Proc. 12(d) ............................................................... 5

**Treatises**

4 Nimmer on Copyright § 13.03 (2019) ........................................... passim

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.   INTRODUCTION

"[D]ismissal of a complaint for lack of substantial similarity before any discovery is virtually unheard of." *Astor-White v. Strong*, 733 F. App'x 407, 408 (9th Cir. 2018) (Wardlaw, concur). In practice, dismissal is limited to the weakest cases—which admittedly so abound in Hollywood copyright litigation that case law can seem skewed.

Here, a side-by-side comparison of *Emanuel* and the first three episodes of *Servant* reveals that a reasonable juror could find many highly specific and similarly arranged similarities—all the more so if some of the FAC's more technical allegations are borne out by discovery and expert testimony. Rather than engage in a straightforward evaluation of the works' overlap, Apple seeks to distract with a number of legal gimmicks. Apple's favored tactic is to state isolated similarities at a high level of generality, and then discount them as too general for copyright protection. This neat trick—which has been lampooned by the Ninth and Second Circuits[1]—begins in Apple's opening paragraph with the absurd suggestion that Plaintiff claims ownership of the idea of wealthy parents hiring a nanny.

The sleight of hand is easily spotted. Substantial similarity is evaluated by enumerating commonalities between works *in as much detail as possible*, and then asking whether such fully fleshed-out similarities are specific enough to rise to the level of protectable expression. As discussed below, this is Copyright 101: taught in law school as the famous "abstractions test" for substantial similarity. Plaintiff doesn't claim dominion over nanny stories, or even over the more specific idea of "a privileged mother hiring a nanny to care for the doll she believes to be her deceased baby." But because she can state the commonalities between *Servant* and *Emanuel* in

---

[1] "Each note in a scale, for example, is not protectable, but a pattern of notes in a tune may earn copyright protection." *Metcalf v. Bochco*, 294 F.3d 1069 (9th Cir. 2002). "[I]f we took this argument to its logical conclusion, we might have to decide that 'there can be no originality in painting, because all colors of paint have been used somewhere in the past.,'" *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1003 (2d Cir. 1995).

much more concrete detail (as she does in the FAC), a reasonable juror could find substantial similarity. It is of no consequence that the overlap can also be abstracted to a one-liner.

Apple's bag of tricks also includes:

- Improperly focusing on differences between the works created by its additions to the story, especially episodes that are not alleged to infringe.

- Ignoring that the "selection and arrangement" of otherwise unprotectable elements can be substantially similar.

- Tremendously exaggerating the scope of the scènes à faire doctrine beyond its narrow exclusion for elements "indispensable" to a given premise.

- Relying of a number of controversial assertions of fact meant to disprove allegations of the complaint.

- Mischaracterizing both works (e.g. calling Emanuel a "quintessential American teen.").

- Simply failing to mention—or factor into its analysis—some of the most striking similarities between the works.

- Ignoring that the extrinsic test generally requires expert testimony.

Indeed, under Apple's application of the extrinsic test, it is fair to say that no work could ever infringe any other work—even a remake.

## II.   PLAINTIFF'S ALLEGATIONS

### A.   Plaintiff alleges that Episodes of 1-3 of *Servant* infringe *Emanuel*.

Plaintiff's first and primary claim is that the first three episodes of *Servant* infringe *Emanuel*. Because the works are incorporated, the FAC merely serves as a catalogue to the works' considerable overlap. [FAC ¶¶ 63-82.] Also, because some of the similarities are not obvious (especially to a non-expert on first viewing), the FAC can serve as preview of expert testimony. [e.g. FAC ¶ 64.] For example, the FAC offers allegations regarding the idiosyncrasy of certain of Plaintiff's artistic/directorial choices that also appear in *Servant* [e.g. FAC ¶ 10.]; as well as how both works use

esoteric cinematic tools and language in similar and uncommon ways [e.g. FAC, 39:17-21]. Plaintiff also alleges that some of the differences between the works are dictated by the differing conventions of film and television. [e.g. FAC ¶ 13, 82.]

**B.    Plaintiff alleges that certain earlier scripts for Episodes 1-3 also infringe.**

As her second claim, Plaintiff alleges that certain Defendants sold a first iteration of the scripts for Episodes 1-3 (the "Early Scripts"). [FAC ¶¶ 93-98.] As her third claim, Plaintiff further alleges that all of the non-Apple defendants sold a second iteration of scripts for Episodes 1-3 to Apple Inc. (the "Later Scripts"). [FAC ¶¶ 99-104.]  Plaintiff alleges that these scripts were substantially similar to *Emanuel* in all the ways Episodes 1-3 of *Servant* is—and indeed were even more similar because at that point fewer creatives had left their imprint. [FAC ¶¶ 95, 101.]

**III.    DISMISSAL IS RESERVED FOR CASES WHERE "NO REASONABLE JUROR" COULD FIND SUBSTANTIAL SIMILARITY.**

The Ninth Circuit has cautioned that even summary judgment is disfavored on the question of substantial similarity. *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 848 (9th Cir. 2012); *Kouf v. Walt Disney Pictures & Telev'n*, 16 F.3d 1042, 1045 n.3 (9th Cir. 1994). "A fortiori, this same limitation applies to a motion to dismiss." *Minx Int'l, Inc. v. Around the World Apparel, Inc.*, 2016 U.S. Dist. LEXIS 187021, at *4 (C.D. Cal. 2016); *Smith v. AMC Networks, Inc.*, 2019 U.S. Dist. LEXIS 15930, at *17 (N.D. Cal., 2019.)

Substantial similarity may be determined as a matter of law only if "no reasonable juror could find substantial similarity of ideas and expression." *Swirsky v. Carey*, 376 F.3d 841, 844 (9th Cir. 2004); *see also*, *L.A. Printex Indus.*, 676 F.3d at 851 (in light of similarities ***and*** differences, "there is a genuine dispute of material fact"; court cannot rule that "no reasonable juror could find . . . substantial similar[ity]"). This standard is difficult because "[d]eterminations of substantial similarity of expression are subtle and complex." *Baxter v. MCA, Inc.*, 812 F.2d 421, 424-25 (9th Cir. 1987) (if "reasonable minds could differ as to" substantial similarity,

Court cannot render judgment as a matter of law). According to Nimmer, the question "presents one of the most difficult questions in copyright law." 4 Nimmer on Copyright ("Nimmer ") § 13.03[A] (2019). The handful of cases dismissed based on the extrinsic test were remarkably weak. *See*, *e.g.*, *Gadh v. Spiegel*, 2014 U.S. Dist. LEXIS 64081 (C.D. Cal. 2014).

One reason the extrinsic test cannot be adjudicated at the pleading stage is that expert analysis is required. "The extrinsic test requires analytical dissection of a work and expert testimony." *Swirsky*, 376 F.3d at 845; *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000); *Smith*, 2019 U.S. Dist. LEXIS 15930, at *17.

## IV.   PLAINTIFF PROPERLY PLEADS SUBSTANTIAL SIMILARITY.

### A.   Only Episodes 1-3 are at issue, and properly before the Court.

As a threshold matter, the proper comparison is between *Emanuel* and Episodes 1-3 of *Servant*, which constitute its pilot. [FAC ¶ 13 and 62.] Episodes 4-10, and a trailer for the series, are not properly before the Court. As argued in more detail in her Objection, Plaintiff is the master of her claim—and she unambiguously alleges that what infringes her ninety-minute film is the ninety minutes of Episodes 1-3. [FAC, 6:24-25; Obj., 2:12-18.] In addition, Plaintiff alleges that the first three episodes are an organic and self-contained whole—in part because they were written and sold as a unit, long before the other episodes; and presented to the public together on November 28, 2019 as the series "pilot". [FAC ¶ 2 fn. 1.] These allegations, of course, are taken as true.

Apple protests that Episodes 4-10 "reveal[] crucial information about characters and events from the first three episodes." [MTD, 9:2.] But while that could make the episodes *relevant*, it hardly follows that they are incorporated in the FAC. Apple also claims that "The FAC's own allegations also extend beyond the first three episodes." [*Id.*, 9:4-5 (citing Apple's RJN, § 1).] But that's simply not true, as explained in the Objection. Nor would mere mention of the episodes as background facts mean that they are incorporated. Apple's request for judicial notice of one of the trailers for

1   Servant is even sillier. Plaintiff does not mention or even allude to any trailer. It is not

2   a part of the series, and there is no reason to believe that Apple even created it.

3   **B.      Apple relies on disputed "facts."**

4           Apple's motion relies on several "facts" pivotal enough to seek judicial notice,

5   including that "using a doll to cope with grief is a widely known therapeutic technique

6   in real life." But not only is such purported fact not "beyond dispute"—it is false.

7   Plaintiff specifically alleged, and her expert will testify, that it is *not* a recognized

8   therapeutic technique, and even that most therapists have never heard of it. [FAC ¶ 71,

9   fn. 10.] That Apple disputes these facts highlights the need for a developed factual

10  record and expert testimony. Further, Apple's claimed fact is supported only by

11  citations to evidence not properly before the court, including obscure news articles

12  and blogs that Apple asks the Court to review on the internet.[2] [See Obj., 8:6-9:21.] If

13  the Court however consider Apple's facts, Rule 12(d) requires that the motion be

14  treated as one for summary judgment under Rule 56. Fed R. Civ. Proc. 12(d)

15           Apple also seeks judicial notice that "many expressive works feature…" (1) "a

16  character treating a doll as their child," and (2) the premise of hiring a nanny or

17  babysitter." These requests fail as well, because a value judgment about what "many"

18

19  [2] Also of note, and as explained in more detail in Plaintiff's Objection, the internet

20  sites and videos that Apples cites, even if they were properly before the Court, do not
    show what Apple claims they do. Most of the videos are simply about the

21  remarkable—and for some obsessive—hobby of collecting reborn dolls. If "therapy"

22  is mentioned, it usually refers only to the soothing value of having such a hobby—as
    one might say about needlepoint. If psychologists are quoted, it is usually only to

23  opine that the hobby can go too far. Only a few involve psychological therapy, and

24  some of those are about dementia patients. The few items that even touch on the idea

25  of a bereaved mother owning a reborn are simply testaments to the idea that you can
    find pretty much anything discussed on the internet (especially if you are willing to

26  treat lifestyle sites or the "Malta Independent" as learned treatises). To put it mildly,

27  Apple fails to dispositively refute the allegation that real therapists have never heard
    of doll therapy for bereavement, because such therapy does not exist.

28

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

works feature is too subjective to be beyond dispute, and because the assertion is supported only by random and unauthenticated internet sites. [Obj., 9:22-10:28.]

**C.      Six modern 9th Circuit cases show the proper contours of the extrinsic test.**

Apple imprecisely recites abstract law regarding application of the extrinsic test to literary works. It is correct that courts consider "articulable similarities" in plot, mood, etc.; and filter out non-protectible elements. [MTD, 7:10-8:9.] According to Apple, unprotectable elements include (1) scènes à faire, and (2) "generic or common elements." [*Id.*] But case law refers to this second species of unprotectable element as "general ideas," "common ideas," or "abstract, generic concepts"[3]—the words "idea" or "concept" being critical. Pointing out that Apple avoids these words is not nitpicking. As explained below, Apple exploits its imprecision in trying to "filter" more elements than it should. Indeed, Apple goes on to apply its own crude caricature of the test, which bears little resemblance to what the courts actually do.

> **1.      In comparing elements, courts articulate the full extent of overlap before filtering out unprotectable elements.**

Six times in the last thirty years, the Ninth Circuit has applied the extrinsic test to literary works in published cases. All these cases—including the four cited by Apple—take a common approach, dictated by well-established tenets of copyright law. Below, all six cases are shown to employ the following approach:

- First, articulate similarities in plot in as much detail as the plots allow. Articulate differences as well, as a way to show the limits of the similarities.

- Next, filter out similarities that are non-protectable because when stated in full detail, they are still mere ideas or *necessarily* follow from a general premise.

---

[3] *Cavalier v. Random House, Inc.*, 297 F.3d 815, 823 (9th Cir. 2002)("ideas" or "general ideas"); *Fillmore v. Blumhouse Prods., LLC*, 2017 U.S. Dist. LEXIS 211021, at *16 (C.D. Cal. July 7, 2017)("common ideas"); *Shame on You Prods. v. Banks*, 120 F. Supp. 3d 1123, 1160 (C.D. Cal. 2015) ("abstract, generic concept").

- When filtering, don't throw the baby out with the bath water: ensure that commonalities in the "selection and arrangement" of unprotectable elements do not rise to the level of protectable expression.

- Ask if the remaining plot overlap is sufficiently concrete/specific to support a finding of substantial similarity. If it can be fully described in two or three sentences, it is probably a mere idea or premise.

- Repeat the analysis in an abbreviated way for setting, character, mood, pace, sequence and dialogue.

- After comparing all categories, look at the overall scorecard and ask whether substantial similarity is precluded as a matter of law.

### 2.    Apple's four of the six Ninth Circuit cases employ this approach.

The first thing to notice about Apple's cases are how vastly different the works are, beyond a common general premise that earned the plaintiff's ire. The second thing to notice is that in each case, the court filters only when *a commonality stated as specifically as possible* still amounts to a mere idea or a scène à faire.

The *Cavalier* case presents a simple example of the approach described above, because there was very little to filter. There, the fully articulated plot overlap—"a child, invited by a moon-type character, who takes a journey through the night sky and returns safely to bed to fall asleep"—was far too general for protection. *Cavalier, 297 F.3d at 824*. The court made clear that this was the full extent of plot similarity by noting that beyond this premise, "the actual narratives … do not share much in common..."—and illustrating this lack of further similarity by detailing the divergences. *Id*. The court then found any commonality in the works' settings—the night sky—to be a scène à faire because it flowed necessarily from the unprotectable premise. *Id*. Finally, the court found *no* similarities in pace, dialogue, mood, theme, and characters. *Id., at 824, 825*. Similarly, in *Kouf v. Walt Disney Pictures & TV, 16 F.3d 1042 (9th Cir. 1994)*, the Court laid out the plot of plaintiff's screenplay and the defendants' film—and then needed no filtering to determine that the full extent of their similarity (shrunken children fighting insurmountable dangers) to be merely a "general plot idea." *Id., at 1045*. The court found characters, dialogue, mood, setting and pace bore little or no similarities. *Id., at 1046*. Under the circumstances, it was no

surprise that these courts were able to find a lack of substantial similarity even at the summary judgment stage.

Apple's cases *Benay* and *Funky Films* are more instructive because they involve significant filtering. In *Benay*, the court first articulated plot overlap and made clear that this was its full extent by noting that "[d]espite these similarities, the two narratives are strikingly different." *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 625 (9th Cir. 2010). After filtering historical facts and scènes à faire, the remaining overlap was deemed a mere idea: an American war veteran travelling to train the Japanese army to combat a (historically accurate) samurai uprising. *Id*. At 626. Regarding characters, the court found all similarities between the one arguably similar character—the American veteran—to be dictated by the premise (because beyond going to Japan to fight Samurai, they were very different). *Id*. Regarding other elements, the court found no protectable similarities. *Id*., at 627-628.

In *Funky Films v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072 (9th Cir. 2006) the court articulates the claimed plot overlap in its entirety, and notes that beyond the described similarities "the plots of the two stories develop quite differently." *Id*., at 1077-1078. Next, the court found no similarity in the characters. *Id*., at 1078, 1079. The only similarity in theme was at the most abstract level ("death, relationships, sex"). *Id*., at 1079, 1080. The only articulable setting similarity was the funeral home. *Id*., at 1080. The moods were radically different (farcical versus serious), as were the paces (rapid versus slow); dialogue (pedestrian versus subtle) and sequence (linear vs. non-linear). *Id*., at 1080-1081.

While any number of district court cases follow the same approach, a few are particularly worth mentioning. In *Gadh*, this Court made clear that it was considering the totality of overlap in character (the only element at issue) *before* filtering that similarity as too abstract. *Gadh v. Spiegel*, 2014 U.S. Dist. LEXIS 64081, at *15 (C.D. Cal. 2014) ("[t]hat abstract description is the full extent of any similarity"). Similarly, the court in *Shame on You Prods. v. Banks*, 120 F. Supp. 3d 1123, 1151 (C.D. Cal.

OPPOSITION TO MOTION TO DISMISS

2015), on which Apple relies, states the entire plot overlap before carefully culling scènes à faire, leaving one-sentence plot commonality. *Id.* Differences are mentioned only for the purpose of refuting claimed similarities. *Id.,* at 1152.

> **3.** **The cases Apple avoids follow the same approach—and employ the "selection and arrangement" test.**

As mentioned, Apple avoids two of the six modern published Ninth Circuit literary copyright cases: *Shaw v. Lindheim*, 919 F.2d 1353 (9th Cir. 1990) and *Metcalf v. Bochco*, 294 F.3d 1069 (9th Cir. 2002). As with all the cases already discussed, these courts filter only when similarity is unprotectable even when stated in full detail—but they are also cases (like Plaintiff's) where it makes sense to examine the selection and arrangement of individually unprotectable elements.

*Metcalf* is a simple example. Stating the plot overlap required 166 words—which was enough to require reversal of summary judgment. *Metcalf*, 294 F.3d at 1073-1074. The court acknowledged that "the similarities proffered by the Metcalfs are not protectable when considered individually; they are either generic or constitute scènes à faire. *Id.*, at 1074. But it easily disarmed this argument:

> "[T]he presence of so many generic similarities and the common patterns in which they arise do help the Metcalfs satisfy the extrinsic test. The particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element. Each note in a scale, for example, is not protectable, but a pattern of notes in a tune may earn copyright protection." *Id.*

In *Shaw*, the court stated the plot overlap, in full specificity, in 126 words. *Shaw*, 919 F.2d at 1363. Some of the commonalities were of the sort Apple would filter on sight—such as the main character appearing at a party, uninvited, in a tuxedo. *Id.* As in *Metcalf*, the court declined to filter similarities as generic or scènes à faire, because it found that their common selection and arrangement sufficient to support substantial similarity: "even if none of these plot elements is remarkably unusual in and of itself, the fact that both scripts contain all of these similar events should give rise to a triable question of substantial similarity." *Id.*

The selection and arrangement test represents another reason why it is improper to begin filtering individually unprotectable elements before looking at the entirety of overlap. Apple would have urged the *Shaw* court to toss the common tuxedo from the outset, because tuxedos are "ubiquitous" and follow from the premise of a suave Bond-like character. If the court accepted such an argument, it would have lost the opportunity to evaluate the tuxedo's place in an original selection and arrangement of plot elements, which the court ultimately found to carry the day.

Filtering "must not obscure the general proposition" that "selection and arrangement of unprotected components" may constitute protected expression. Nimmer § 13.03[F][5], n.342. "[T]o disregard" elements as unprotected when performing the extrinsic test "is to ignore the fact that substantial similarity can be found in a combination of elements, even if those elements are individually unprotected." *Swirsky*, 376 F.3d at 841; *Three Boys Music Corp.*, 212 F.3d 477, 485 ("selection and arrangement" of unprotected elements supported substantial similarity); *Satava v. Lowry*, 323 F.3d 805, 811 (9th Cir. 2003) ("a combination of [even] unprotectable elements may qualify for copyright protection"); *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1445 (9th Cir. 1994) ("original selection and arrangement of otherwise uncopyrightable components may be protectable").

**D.  Applying the properly understood extrinsic test yields the conclusion that a reasonable juror could find substantial similarity.**

The extrinsic test is not applied via gimmicks. It requires a common-sense comparison of the works, and then an evaluation of the specificity of their similarities.

**1.  The plot similarities between *Emanuel* and *Servant* are remarkable.**

The following (necessarily abbreviated) plot description applies to both works.

A troubled, moody, and withholding 18-year old motherless girl (who is pretty, slight, with long dark hair and blue eyes), is newly hired by a white, pretty, sophisticated, privileged yet gracious, mid-30's, first-time mom, to help care for her

OPPOSITION TO MOTION TO DISMISS

three-month old baby. The nanny seemingly appears by happenstance—but in truth she has targeted the mother (and sometimes secretly watches the mother). A get to know you Q&A, in which the nanny's awkward answers are partly remedied by knowledge of French, culminates with a gracious level of understanding by the mother. Most of the action takes place in extremely close quarters (which facilitates voyeurism) in the mother's immaculate, stylish, vintage, home.

After fleeting images of what looks like a normal infant in the mother's picture-perfect nursery and home, it is dramatically revealed that the "baby" is really an ultra-realistic "reborn" doll— shattering the illusion of an uber-competent modern mom and rendering the orderliness of the house suddenly unsettling, especially as the mother enters into trance states where the awful truth appears to be percolating to the surface. Rather than recoil, the nanny plays along with the mother's delusion even before the father explains that its cause is the overwhelming grief of recently losing their real three-month-old baby (the precise cause of death remaining unknown).

The nanny buys in, in part for deep-seated reasons relating to her own longing for a mother, who has tragically died years before. She dotes over the doll as if it were real—talking to it on the changing table even when they are alone. Likewise, the mother dotes over the nanny, selecting clothes from her own closet to dress her up, and asking questions about her past while affectionately stroking her face. Finding comfort in the mother's nurturing, the nanny builds a deep emotional connection with the mother—while the mother builds a reciprocal devotion to the nanny as a proxy daughter. This mutual quasi-familial bond coexists, bizarrely, with a subtle and unspoken sexuality, manifested in a spontaneously erotic scene that begins with one helping the other with a painful condition in the mother's bathroom. The complexity of the bond is also depicted in a key scene where the nanny asks probing questions of, and admires, the mother as she readies herself for a date, applying makeup at her vanity. When the mother leaves, the nanny takes her place at the vanity, emulating her by applying makeup in the same way. The nanny also develops a romantic interest in

a boy her own age and initiates a date where she encourages him to steal a bottle of wine, revealing a bold side.

The work unfolds as a psychological thriller because the oblivious mother is one false move away from the house of cards collapsing, which equally threatens the peace the nanny has found with the mother. This suspense, however, is paired quite unusually with strong and escalating supernatural elements, leaving the audience uncertain about what's real—including the baby's apparent rebirth. Water imagery plays a prominent role—including scenes of the nanny underwater. Fine food and cooking play a prominent role. The nanny's troubles are highlighted by a trip to her mother's grave.

As with *Metcalf*, *Shaw*, and *Smith*, there are also differences. But the question is only whether the plot commonalities are sufficiently specific to support substantial similarity. Plaintiff submits that they are, especially when combined with similarities in the other elements.

### 2. Apple ignores many similarities—and uses gimmicks to avoid others.

Of the ninety similarities offered in the FAC, Apple fails to address almost half of them in any meaningful way—including some of the strongest. For example, Apple doesn't mention that the nannies look alike or are often uncommunicative, the mothers' trances, or that both works prominently feature voyeurism. It dismisses even the mothers' identical delusions as unprotectable in isolation. Apple also avoids mention of the most surprising similarities of details, such as the stolen wine to be paired with bread and cheese.  Where Apple does offer a specific rebuttal, it relies on a handful of fallacies, including (1) stating similarities far too generally, and then rejecting them as too general, (2) vast overexuberance in spotting scènes à faire, (3) mischaracterizing the works, (4) ignoring similarities and instead seizing on dissimilarities created by additional content, *especially in the episodes not alleged to be infringing*; and (5) neglecting to evaluate the selection and arrangement of elements.

a.    **Apple speciously dismisses similarities as not protectable in isolation.**

If there is no other way to avoid a similarity, Apple simply *dismisses the general idea of it* as not protectable in isolation. Apple uses this trick to dismiss "hiring a babysitter or nanny" [MTD, 9:15], "get to know you" questions [*Id.*, 9:17], parents treating a doll as their child [*Id.*, 10:1], and even using a therapy doll to cope with the loss of a child [*Id.*, 14:27-15:2]—to name just a few more examples.[4] After a general similarity has been disqualified in this manner, Apple never returns to address the far more specific similarities under that general idea.

But the extrinsic test is applied by comparing similarities stated in as much specificity as possible. [See § IV(C) above.] With rare exceptions, every moment of a film (like every square inch of a painting) is protected by copyright—because it is a particular expression of a premise or idea. When we say that ideas are unprotectable, we mean only that if the totality of the similarities amount to no more than a general idea, they are not protected. See Nimmer § 13.03[A][1][a] (the abstractions test). So while the general premise of "couple nobly sacrifices their love for the greater good"

---

[4] Apple offers several variations on the theme. Sometimes general ideas are dismissed as "explored," "ubiquitous," "taken from real life," and the like [e.g. MTD 10:1-6, twice using "explored" to dismiss the commonality of parents treating a doll as their child; *Id.* at 1:11, using "taken from real life"). But these terms do not derive from copyright law. There is no doctrine that "well-explored" expression is unprotectable. If it were being more precise, Apple would argue these elements as unprotectable because they are mere ideas. But the reason they are mere ideas is, again, that Apple states them so generally—when a much more specific statement of the works overlap in this regard is available. Also, Apple supports its claim that parents caring for a doll is much-explored by referring to a web site called "TV Tropes." *But that is a site that any member of the public can edit or contribute to*. Plaintiff is not suggesting that Apple posted the trope entry for "Baby Doll Baby"—because if it did, it would have done a better job. There is only one entry for a film on the web page, and it is nothing like *Emanuel* or *Servant* ("In the Czech film *Little Otik* (aka *Greedy Guts*), an infertile couple adopt a wooden stump and treat it as though it were their living child").

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

is not protected, *Casablanca's* particular expression of that idea certainly is—an obvious truth that would be lost if the trier filtered out the general idea at the outset.

### b. Apple relies on mischaracterizations of the works.

Apple's quibbles about some of the cited similarities rely on mischaracterizations of the works. For example, Apple claims Leanne treats the doll as a baby from the very outset, while Emanuel hesitates. [MTD, 11:12-18.] But this ignores a key early scene in *Servant* where Leanne secretly enters the nursery alone, and we see her reach down to touch the baby before the scene cuts—giving her ample time to realize and digest the truth before her next interaction with Dorothy. [*Servant,* Ep. 1 5:15-5:45.] As for Emanuel, it takes her only ninety seconds from first discovering the doll to playing along. [*Emanuel* 21:00-22:30.]

Similarly, Apple's contention that Leanne is not looking for a mother figure is belied by her utter fascination with Dorothy (shown through voyeurism, including privately and intently watching Dorothy's news broadcasts [*Servant,* Ep.1 19:45; Ep. 2 16:58], being entranced by her home and belongings, [*Servant,* Ep. 1 2:52 and 26:00]), and the fact that she can only pretend to call her mother when given the opportunity to do so [*Servant,* Ep. 1 8:54-9:37]. Also, Apple's contention that Leanne has supernatural powers ignores that *Servant* is careful to always provide a natural explanation for any surprising phenomenon. Sean's random splinters and loss of taste are the only *possibly* magical elements in Episodes 1-3 and yet reasonable explanations are provided. Sean attributes the splinters to the house "falling apart" and the wooden cooking spoon, and Dorothy dismisses his loss of taste as a ruse. [*Servant,* Ep. 2 18:59, 29:16 and 27:14.] One of Apple's greatest stretches is to inexplicably characterize Emanuel as a "quintessential American teen." [MTD, 1:15 and 16:11.]

### c. Apple greatly exaggerates the importance of its additions.

Apple greatly exaggerates the importance of dissimilarities between the works—ignoring well-established law that "[i]t is entirely immaterial that, in many respects, plaintiff's and defendant's works are dissimilar . . . If substantial similarity is

found, the defendant will not be immunized from liability by reason of the addition in his work of different characters or additional and varied incidents…." *Nimmer § 13.03[B][1][a], n.123* (citing cases). As Judge Hand famously put it, "no plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Sheldon v. Metro-Goldwyn Pictures*, 81 F.2d 49, 56 (2d Cir. 1936); see *Shaw*, 919 F.2d at 1362.

More than half of the dissimilarities cited by Apple are found in Episodes 4-10, which are not alleged to infringe. Similarly, Apple's general descriptions of *Servant's* plot and characters is greatly skewed towards the later episodes—without citations to make that clear. [MTD, 3:25-4:5, 13:19-21 and 21:3-5.] Even with regard to Episodes 1-3, most of the cited differences are simply immaterial additions dictated by the need to maintain an ongoing episodic television series, such as additional characters and Dorothy having a job. [FAC, 42:19-43:13.] But dissimilarities dictated by different formats are of minimal importance. *Bradbury v. CBS*, 287 F.2d 478, 484-485 (9th Cir. 1961) ("adaptation of a story to the stage must necessitate changes and additions"). For this same reason, the fact that the film *Emanuel* ends with a resolution, while the pilot or first season of *Servant* is left open-ended to allow for further episodes, is of little import.

### d.     Apple exaggerates what can constitute a scène à faire.

Apple also dismisses many similarities by vastly overstating what can constitute a scène à faire. It cites *Cavalier* for the proposition that scènes à faire are "elements that flow naturally from a basic premise." This sounds odd, because everything that happens in a motion picture hopefully flows naturally from its premise. As it turns out, Apple misquotes *Cavalier*, which defines scène à faire as an element that "**naturally and necessarily flows** from the basic plot premise." *Cavalier*, 297 F.3d at 824 (emphasis added). Omitting the word "necessarily" makes all the difference, and departs from well-established case law and the phrase's meaning (a scene that "must be done"). Even if Apple can find a case that just uses the word "naturally," "scène à faire" has a specific, limited meaning: only expressions

that "are as a practical matter indispensable, or at least standard, in the treatment of a given" subject or genre." Nimmer § 13.03[B][4]; *Swirsky*, 376 F.3d at 850 (doctrine applies "when certain commonplace expressions are indispensable and naturally associated with the treatment of a given idea").

Apple also uses the same sleight of hand with respect to scènes à faire as it did with general ideas. Apple ignores that the proper analysis is to state a similarity between the works in as much detail as possible, and then ask whether that fully fleshed out commonality is merely something that follows necessarily from a common basic premise. See Nimmer 13.03[B][4]. In *Shaw* (about the television show *Equalizer*), the court made clear that it would not filter individual character traits as scènes à faire without considering their "totality." *Shaw*, 919 F.3d at 1363 ("although James Bond may have the Equalizers' demeanor and the Ghostbusters may have their penchant for unpopular assignments, the totality of the similarities between the two characters goes beyond the necessities of the 'Equalizer' theme"); *MGM, Inc. v. Am. Honda Motor Co., Inc.*, 900 F. Supp. 1287, 1299 (C.D. Cal. 1995) ("attempt to characterize all of the alleged similarities . . . as scènes à faire [is] unavailing").

Films and novels do not contain scènes à faire: Rather, the doctrine applies only to the comparison between two works—inquiring whether their overlap is dictated by premise. Nimmer 13.03[B][4]; *Ets-Hokin*, 225 F.3d at 1081 (scène à faire doctrine is a defense to infringement, not a doctrine regarding copyrightability). Nimmer explains that the scènes à faire doctrine:

> "does not limit the subject matter of copyright; instead, it defines the contours of infringing conduct. Labeling certain stock elements as "scènes à faire" does not imply that they are uncopyrightable; it merely states that similarity between plaintiff's and defendant's works that are limited to hackneyed elements cannot furnish the basis for finding substantial similarity. But similarity beyond that measure can still attract liability." Nimmer 13.03[B][4].

The doctrine of scènes à faire is really a way to prevent double-counting of similarities. If two works share the common premise of a civil war veteran helping to

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

quell a samurai uprising, it adds nothing to the similarity calculus that both works feature a boat journey to Japan.

With this mind, it is possible to show that what Apple claims to be scènes à faire are not. Apple claims that the mothers' privileged statuses necessarily flow from their having a nanny. But there is so much more in common beyond the mothers' status. They are sophisticated, hip, pretty, stylish, confident and self-possessed—none of which can be described as indispensable to the premise, or characteristic of all women with nannies. Likewise, Apple argues:

> [U]sing a doll to cope with grief is a real therapy. *Compare* FAC ¶ 71 n.10 *with* RJN § 2. Numerous alleged similarities flow from this premise. For example, reborn dolls are designed to be lifelike, and thus it naturally flows that the dolls would be "physically realistic." [MTD 9:23-25.]

These sentences makes less and less sense each time one reads them. Even accepting that using a doll is a real therapy (which is not true), the move to "reborn dolls are necessarily realistic" is nonsensical. It was hardly indispensable to the premise to use a reborn doll, which are obscure beyond their fan base, or that it be a three-month old. As pointed out in the FAC, the basic premise would be just as well served by an unrealistic doll, or a newborn doll or a six-month old doll.

Debunking Apple's scènes à faire arguments is made more difficult by the fact that Apple lumps these together with other types of unprotectable elements, such as mere ideas. On pages 9-10 of its Opposition, Apple enumerates three kinds of commonalities it claims are unprotected under one theory or another, and refers to them all as scènes à faire, before also referring to "ubiquitous" concepts as unprotectable (such as a woman holding a doll, walking down a staircase, underwater, or, looking into the camera). [MTD 10:10-15.] None of these are scènes à faire. If Apple is arguing they are unprotectable, it must be because they are general ideas. But once again, Apple's sleight of hand is identifying very general commonalities that could be described much more specifically, and then dismissing them as too general.

### e.     Apple neglects to examine "selection and arrangement."

As mentioned, Apple simply ignores the well-established principle that a unique and original selection and arrangement of otherwise unprotectable elements could be protectable. But like *Metcalf* and *Shaw*, this is a case where the doctrine applies. What the common narrative of the works (in Section (D)(1) above) reveals is that the many similarities enumerated in the FAC is not a random laundry list. Rather, the commonalities hang together to create a common coherent whole. There have been a number of literary works featuring teen nannies, maternal longing, realistic dolls, grief, self-delusion, etc.—but none before *Emanuel* (and now *Servant*) about all of those things, arranged in a particular way.

### 3.     Apple's comparison of the other elements is similarly misguided.

Apple employs the same tricks—and some new ones—with regard to sequence, themes, characters, setting, mood, pace, and dialogue. As threshold matter, substantial similarity is not required as to *all* categories. *Shaw*, 919 F.2d at 1357-61 (denying *summary judgment* motion; genuine issues existed as to plot, dialogue, and some but not all characters); *Fleener v. Trinity Broad. Network*, 203 F. Supp. 2d 1142, 1150 (C.D. Cal. 2001) ("overlap of important plot developments combined with thematic and setting similarities" precluded *summary judgment*). Plot is by far the most important inquiry. Nimmer §13.03[E][3][b][v] ("mood, setting, and pace would not seem able, standing alone, to attract protection. Of course, plot is the essence of a literary work, and sequence of events would seem to be subsumed within plot. In many instances, plot justly forms the essence of the inquiry.")

It's also worth noting that the non-plot similarities in Apple's key cases are overwhelmingly weak—usually involving no similarity at all. On the other hand, *Metcalf* and *Shaw* show that even modest similarities in non-plot elements are treated as factors weighing in favor of substantial similarity.

### a.   Sequence

*Emanuel* has a linear sequence. Apple argues that *Servant* is the opposite because it uses flashbacks. [MTD, 13:18-21.] But there are no such temporal discontinuities in the allegedly infringing episodes. One wouldn't know that, because Apple offers no citation for its *incorrect* assertion that *Servant* "jumps back and forth through time throughout the entire season." [*Id.*] Apple also seeks to poke a hole in Plaintiff's sequence allegations by noting that the "interview" scene in both works is hardly a formal one. That's true—but it's just another way the works are alike. In each work, a spontaneous and informal Q&A develops naturally. The argument also just misses the point: Plaintiff cited the "interview" scenes for their uncanny similarities in the content and tone of the conversation—not the simple fact of a (figurative) interview. [FAC, 30:11-18.] Apple also dismisses the remarkably similar sequencing of makeup scenes at the mother's vanity by lazily asserting, without citation, that "this concept has been explored in countless other works." Has it?

### b.   Theme

In the FAC, Plaintiff stated a number of very specific themes shared by the works, including the highly idiosyncratic pairing of a proxy mother/daughter relationship with latent sexuality. Apple ignores most of these. After insisting that a theme is defined as an "overarching message," Apple then concludes that any candidate for a common theme will be too general to support substantial similarity. Apple also insists that *Servant* is much darker than *Emanuel*: a horror story involving Leanne tormenting Dorothy with a key fob. [MTD, 17:1-4.] But this vignette occurs in Episode 9—and there is no hint of such a theme in the allegedly infringing episodes. Apple also implausibly claims that one theme of *Emanuel* is her father's arc of "losing a spouse and raising a child as a single parent." [*Id.,* at 20:26-27.]

### c.   Characters

Plaintiff catalogued a number of close character similarities in the FAC. In response, Apple cites a district court case for the proposition that character similarities

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

do not support substantial similarity when the characters "have noticeable differences." [MTD, 16:2-4 (citing *Silas*, 201 F.Supp. at 1177).] That impossible standard is obviously wrong. *Silas was discussing the standard for copyright infringement of a character*, which Plaintiff does not allege. *Silas*, 201 F.Supp. at 1177 (discussing the Ninth Circuit's three-part test for copyrightability of a character). Again, what emerges from the Ninth Circuit case law is the commonsense standard that all notable character similarities are a plus in the substantial similarity analysis.

Apple also resists the obvious parallels in the nannies' character traits by arguing that Leanne has supernatural powers, is a cult member, and believes the doll to be real. First, these are hardly character traits. But more important, and as mentioned, there is no unexplained magic in *Servant*, and nothing even close to it in the first three episodes. There is nothing about a cult in Episodes 1-3 (and very little about it in Episodes 4-10). Further, there is no indication that Leanne herself perceives the doll to be real, as Apple appears to suggest. It's true that she plays along and walks him around the block, but always carefully hidden from view. [FAC, 32:6-9.]

Finally, Apple is flat wrong to say that Plaintiff deleted the allegation about Emanuel (like Leanne) seemingly appearing in the mother's life through happenstance. That allegation can be found at ¶ 78 of the FAC, and it is accurate. Plaintiff also alleges that in both works, the apparent happenstance is belied by the nanny's targeting of the mother. [FAC, 29:24-30:4.]

Apple also ignores most of the obvious similarities between the mothers. In another abuse of the scènes à faire doctrine, Apple abstracts all of the mothers' positive traits to general "confidence"—and then stretches to argue that anyone suffering from delusion is necessarily confident in order to keep up the self-ruse. [MTD, 17:25-26.] Apple also flatly denies that Dorothy shows maternal affection for Leanne, as Linda does for Emanuel. [*Id.*, 18:8-9.] But examples abound: Dorothy frequently and affectionately strokes Leanne's face, takes her shopping for clothes, tucks her into bed, and provides extremely nurturing care after Leanne faints. Apple's

ERIKSON LAW GROUP ATTORNEYS LOS ANGELES CA

1    claim that Dorothy considers Leanne "help" is incorrect: it is her husband who refers

2    to Leanne as "staff" [*Id.*, 16:17], which disgusts Dorothy. [*Servant,* Ep. 2 24:08.]

3    Finally, Apple's denial that the two share an erotic moment is manifestly implausible.

4    [*Servant,* Ep. 1 29:55.] *Compare* MTD, 18:12-13 to FAC, 34:8-11.

5            **d.**     **Setting**

6         In almost all of Apple's cited cases, the courts note how different the respective

7    settings were. In its comparison of *Emanuel* and *Servant*, Apple simply ignores the

8    many similarities in the mothers' houses (including the prominent entryway and grand

9    exposed wood staircase) and in its production design (as illustrated in many images in

10    the FAC). Apple's now-familiar refrain is to abbreviate all of those similarities as an

11    "upscale house," which it then claims to be too general and something that flows from

12    having a nanny. [MTD, 21:7-16.] When it comes to the remarkable selection of

13    common specific elements, Apple merely points out that each, on its own, is

14    unprotectable. To the point that the close quarters facilitate voyeurism, Apple

15    responds that it is quite natural that a live-in nanny would "see various goings on."

16    [*Id.*] But the voyeurism/spying, featured prominently in *Emanuel* and *Servant*, are far

17    more specific than the generalized "seeing." [FAC, 30:5-10.] Apple points out that the

18    scenes of the mothers' graves are different in the two works. While that's true,

19    Plaintiff's point was not that this element is protectable—but only that it is notable

20    that each work features such a scene, used to highlight the nanny being motherless.

21            **e.**     **Mood**

22         Again, in almost all of Apple's cases, the courts find the moods to be very

23    different—which is a byproduct of very different stories and themes. Here, watching

24    the two works leaves the viewer with the inescapable conclusion that they feel very

25    much alike—even if it's hard to articulate why. The FAC offers some objective

26    reasons—including the rare pairing of a psychological thriller with magical realism.

27    [FAC, 3:13-16 and 39:4-8.] The FAC's images also demonstrate similarities in mood

28    and tone. Apple's response is again to reduce many specific common elements to

"suspense"—and then argue that suspense is too general for protection. [MTD, 22:12-18.] Apple simply ignores similar use of idiosyncratic cinematography and directing techniques to foster an unusual sense of discomfort. [FAC, 39:17-21 and 41:13-18.]

As to the supernatural, Apple argues that such elements in *Emanuel* are less real, because they are Emanuel's visions. [MTD 22:19-25.] But it is the nature of magical realism that there simply is no answer to the question of whether the supernatural elements are "real." And as mentioned, the supernatural nature of any given phenomenon in *Servant* is always open to question (which is very different than true "horror"). By understating the "reality" of the supernatural in *Emanuel*, and overstating it in *Servant*, Apple unfairly minimizes the works' similarity.

### f.    Pace

Apple abstracts Plaintiff's alleged similarities in pace to the notion that both works proceed rapidly, which it predictably claims is too abstract for protection. [MTD, 23:16-17.] But as with other elements, Plaintiff offered more detail, alleging for example a particular type of rapid pace, in which "the characters can barely keep up with events as they unfold" [FAC, 41:19-20.]—which as Apple points out, is unusually paired with scenes that unfold leisurely. Further there is no "pace" specific enough to achieve substantial similarity on its own. Rather, what is borne out by the cases is that similar paces support (even if it cannot establish) substantial similarity.

### g.    Dialogue

Apple asserts that "for a plaintiff to demonstrate substantial similarity of dialogue, it must show 'extended similarity of dialogue.'" [MTD, 24:2-6.] The quote comes from *Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1450 (9th Cir. 1988), and two district court cases which cite it. But this is a throw-away line in all three cases, because in none of them was similarity of dialogue a key issue. *Shaw* is more instructive. There, the court noted similarities in dialogue—without noting any overlapping quotations—which was established via expert testimony.

at 1363. In *Metcalf*, summary judgment based on the extrinsic test was reversed without any discussion of similarity in dialogue. *Metcalf*, 294 F.3d 1069.

### 4.    Evaluating similarities requires discovery and expert testimony.

Plaintiff intends to dispute Apple's characterization of certain similarities as "common ideas" or scènes à faire via a more developed factual record, as well as expert testimony. Indeed, Apple implicitly concedes that these are fact issues by seeking introduction of media articles to bolster its argument.

"It is inappropriate to grant summary judgment on the basis of *scènes à faire* without independent evidence, unless the allegation of *scènes à faire* is uncontested." *Swirsky*, 376 F.3d at 850. One recent case denied requests for judicial notice remarkably similar to Apple's here, and indeed denied a similar 12(b)(6) motion, for lack of a factual record and expert testimony, holding "[t]he extrinsic test requires analytical dissection of a work and expert testimony." *Smith* 2019 U.S.Dist.LEXIS 15930, at *17-19 (quoting *Swirsky*, 376 F.3d at 850 ).[5] The *Smith* court specifically declined to follow a number of the outlier district court cases that Apple relies on, opting instead to follow the well-established law of this Circuit [*Id.*, *18-19.].

> "The most prudent course of action is to follow Ninth Circuit precedent, which clearly states that "[t]he extrinsic test requires analytical dissection of a work and expert testimony." *Swirsky*, 376 F.3d at 845. In sum, based on the record before the Court, the Court cannot conduct the analysis to separate the unprotectable elements from the protectable elements." [*Smith,* at *19*.]

The need for expert analysis is also particularly great where, as here, a court must compare works of different formats (a movie and a television series) and

---

[5] Other Courts have denied motions to dismiss copyright claims for lack of a full record or expert testimony. *Cabell v. Zorro Prods.*, 2017 U.S.Dist.LEXIS 82413, at *25 (N.D.Cal. 2017) ("case lacks the kind of comprehensive factual record and undisputed facts that would allow the court to apply the 'extrinsic test' at this stage."); *French West, Inc. v. Macy's Inc.*, 2013 U.S.Dist.LEXIS 197448, at *5 (C.D.Cal. 2013)(denied a motion to dismiss a plaintiff's copyright allegations over a textile print design because "we have no threshold understanding of what a 'nautical chain design' is and whether it incorporates any common themes of selection, coordination, and arrangement that are unprotectible).

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

consider the interplay and impact of their literary and aesthetic elements—an inherently "subtle and complex" inquiry requiring expert evidence. *Baxter v. MCA, Inc.*, 812 F.2d 421, 424 (9th Cir. 1987).

Plaintiff intends to offer expert testimony on the following subjects, to name a few: (1) whether using a doll is a recognized grief therapy, as Apple asserts; (2) whether certain creative elements are common or scènes à faire, as Apple suggests; (3) the idiosyncrasy/rarity/originality of many expressive elements in the works; (4) the cinematic language and tools relating to creating suspense and discomfort; (5) whether the works in question feature magical realism—and whether the use of magical realism in a psychological thriller is rare; and (6) the differing mediums, formats and conventions of motion pictures and episodic television.

**E.      The conclusion is the same even if Episodes 4-10 are considered.**

It's worth noting that any dispute about which episodes are before the Court has very little import. Given that the addition of material to an allegedly infringing work, no matter how different, is immaterial to the extrinsic test—it simply doesn't matter whether the Court is considering Episodes 1-3 or 1-10. The commonalities Plaintiff alleges exist with respect to either conception of the allegedly infringing work—and the addition of more differences doesn't dilute them.

**V.      THE SAME ANALYSIS APPLIES TO PLAINTIFF'S OTHER CLAIMS**

For slightly different reasons, Plaintiff's second and third claims (alleging that two distinct sets of interim *Servant* Scripts corresponding to Episodes 1-3 infringe) easily state claims. Apple takes a different approach with respect to these sets of scripts: Rather than seeking judicial notice of the allegedly infringing material and arguing lack of similarity, Apple challenges that Plaintiff's reliance on "information and belief" allegations renders the claims implausible. But such allegations do not detract from plausibility where: (a) the facts are peculiarly within defendant's possession and control; or (b) the belief is based on factual information that makes the inference of culpability "plausible." *Park v. Thompson*, 851 F.3d 910, 928–929 (9th

1   Cir. 2017). Both of these disjunctive conditions are met here. The Defendants

2   obviously know the contents of their scripts. Further, Plaintiff's allegation that the

3   scripts infringe in all the ways the corresponding episodes do—and more—are

4   explicitly based on media interviews with the Defendants. Indeed, it would be

5   unprecedented for the Court to find the extrinsic test unsatisfied, as a matter of law,

6   without requiring the Defendant to allow the Plaintiff and Court to see the work.

7   Because Apple's pleading challenge depends entirely on its challenges to the earlier

8   claims, Plaintiff's fourth claim for secondary liability survives as well.

9   ## VI.    CONCLUSION

10      Apple "battles against the law and facts in attempting to reclassify" virtually

11  "every [] concrete aspect of [*Emanuel*] as a standard element". *Fleener*, 203 F. Supp.

12  2d at 1150 (emphasis in original). It's easy to cite differences even between two very

13  similar films. If Apple had the courage of its convictions, it would offer its own fully

14  detailed statement of the similarities between *Emanuel and Servant*; then honestly

15  filter out unprotectable elements from that fully fleshed out statement; and finally, ask

16  whether what remains rises to the level of protectable expression. As mentioned

17  above, drawing the line is exceedingly difficult. Plaintiff submits that the overlap in

18  this case is as detailed as those in *Metcalf* and *Shaw*—and certainly far more detailed

19  than the very different works compared in the cases Apple relies on. At very least, it

20  cannot be said that no reasonable juror could so determine—especially at this early

21  juncture before discovery and expert testimony.

22
23   DATED: 4/6/2020              ERIKSON LAW GROUP

24                               By: _____

25                                   DAVID A. ERIKSON
                                     Attorneys for Plaintiff Francesca Gregorini
26

27

28

**<u>PROOF OF SERVICE</u>**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California.  My business address is 200 North Larchmont Boulevard, Los Angeles, CA 90004.

On **April 6, 2020**, I served true copies of the foregoing document(s) described as: **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT** on the interested parties in this action as follows:

☑ BY CM/ECF.

☐ BY MAIL: I placed a true and correct copy of the document listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California, addressed as set forth below. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.

☐ BY PERSONAL SERVICE: I caused the document listed above to be personally delivered to the persons at the address set forth below.

Nicolas Jampol
Davis Wright Tremaine LLP
865 S Figueroa Street, Suite 2400
Los Angeles, CA 90017
Email: nicolasjampol@dwt.com

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on **April 6, 2020**, at Los Angeles, California.

*/s/ David A. Erikson*
David A. Erikson


ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

OPPOSITION TO MOTION TO DISMISS