NICOLAS A. JAMPOL (State Bar No. 244867)
   nicolasjampol@dwt.com
DIANA PALACIOS (State Bar No. 290923)
   dianapalacios@dwt.com
CYDNEY SWOFFORD FREEMAN (State Bar No. 315766)
   cydneyfreeman@dwt.com
CAMILA PEDRAZA (State Bar No. 329984)
   camilapedraza@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone:  (213) 633-6800
Fax:  (213) 633-6899

Attorneys for Defendants
BLINDING EDGE PICTURES, INC.; UNCLE
GEORGE PRODUCTIONS, LLC; APPLE INC.;
ESCAPE ARTISTS, INC. (erroneously sued as
ESCAPE ARTISTS LLC); DOLPHIN BLACK
PRODUCTIONS; M. NIGHT SHYAMALAN;
TONY BASGALLOP; ASHWIN RAJAN;
JASON BLUMENTHAL; TODD BLACK;
STEVE TISCH

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCESCA GREGORINI, | Case No. 2:20-cv-00406-JFW-JC |
| Plaintiff, | **DEFENDANTS' [PROPOSED] STATEMENT OF DECISION GRANTING MOTION TO DISMISS WITH PREJUDICE AND REQUEST FOR JUDICIAL NOTICE** |
| vs. | |
| APPLE INC., a California corporation; M. NIGHT SHYAMALAN, an individual, BLINDING EDGE PICTURES, INC., a Pennsylvania corporation; UNCLE GEORGE PRODUCTIONS, a Pennsylvania corporate; ESCAPE ARTISTS LLC, a California limited liability company; DOLPHIN BLACK PRODUCTIONS, a California corporation; TONY BASGALLOP, an individual; ASHWIN RAJAN, an individual; JASON BLUMENTHAL, an individual; TODD BLACK, an individual; STEVE TISCH, an individual; and DOES 1-10, inclusive, | Date:    April 27, 2020<br>Time:    1:30 p.m.<br>Dept.:    7A |
| Defendants. | |

## [PROPOSED] STATEMENT OF DECISION

On March 24, 2020, defendants Blinding Edge Pictures, Inc., Uncle George Productions, LLC, Apple Inc., Escape Artists, Inc. (erroneously sued as Escape Artists LLC), Dolphin Black Productions, M. Night Shyamalan, Tony Basgallop, Ashwin Rajan, Jason Blumenthal, Todd Black, and Steve Tisch (collectively, "Defendants") filed a Motion to Dismiss ("Motion") and Request for Judicial Notice ("RJN"). On April 6, 2020, plaintiff Francesca Gregorini ("Plaintiff") filed her Opposition to the Motion and her Objections to the RJN. On April 13, 2020, Defendants filed replies in support of the Motion and the RJN. After considering the moving, opposing, and reply papers, and all arguments therein, the Court rules as follows:

On January 15, 2020, Plaintiff filed this action. Dkt. 1. On February 18, 2020, Defendants moved to dismiss Plaintiff's Complaint. Dkt. 20. On March 2, 2020, Plaintiff filed a Notice of Non-Opposition to Defendants' Motion (Dkt. 24), and on March 10, 2020, Plaintiff filed her First Amended Complaint ("FAC"). Dkt. 25. In the FAC, Plaintiff alleges two claims against all Defendants: (1) direct copyright infringement regarding the *Servant* television series; and (2) contributory and vicarious copyright infringement. She also alleges one claim of direct copyright infringement against defendants Tony Basgallop and Jason Blumenthal regarding an "Early *Servant* Script," and one claim of direct infringement against all Defendants except Apple Inc. regarding a "Later *Servant* Script." The basis of Plaintiff's lawsuit is that the television series *Servant* infringes her alleged copyright in a film titled *The Truth About Emanuel* ("*Emanuel*"). The Court concludes that Plaintiff's copyright infringement claims fail because she cannot demonstrate that *Emanuel* and *Servant* are substantially similar in protected expression. In addition, Plaintiff's two copyright infringement claims regarding the *Servant* scripts, based entirely on "information and belief," fail because (1) the alleged similarities between *Emanuel* and the scripts are a subset of the alleged

similarities between *Emanuel* and *Servant*, which are insufficient as a matter of law, and (2) Plaintiff failed to plead any non-conclusory facts to support her claims. Because Plaintiff's direct copyright infringement claims fail, so too does her claim for contributory and vicarious copyright infringement.  Accordingly, this Court concludes that all of Plaintiff's claims against Defendants fail as a matter of law.

## I.   FACTUAL BACKGROUND

### A.   *Emanuel*

*Emanuel* is an "emotional story about motherhood and daughterhood."  FAC ¶ 14.  It is told from the point of view of Emanuel, a typical teenager who struggles with the guilt of knowing her mother died giving birth to her, and attempts to coexist with her new stepmother.  Most days, she takes the train to her job at a medical supply store, listening to music or sitting with her boyfriend Claude.  After a single mother (Linda)—who "bears a striking resemblance" to Emanuel's deceased mother—moves in next door, Emanuel offers to babysit.  Emanuel finally meets the "baby," she is stunned to discover that the child is a doll.

Despite this discovery, Emanuel continues to visit Linda (when she is not working or with her family or boyfriend).  At first, Emanuel remains uncomfortable with the doll and refuses to help Linda with it, but she later acquiesces.  Emanuel begins to pretend the doll is a baby in Linda's presence, but generally not when Linda is gone.  Emanuel's affection for Linda grows as she (and the audience) attempts to figure out why Linda is pretending the doll is a real baby.  Emanuel is protective of Linda and concerned about others discovering the truth, routinely making excuses as to why others cannot meet the baby.  She falls deeper into Linda's orbit, until Linda brings home a date (Arthur) who discovers the doll and, assuming that Emanuel harmed the actual child, calls the police.

Linda is committed to an institution, and while she is there, her ex-husband (Thomas) explains that his and Linda's baby died of an unknown cause.  Thomas reveals that Linda refused to go to her daughter's burial and was given a therapy

doll.  When Linda started to believe the doll was real, Thomas tried to have her committed, but Linda fled.  After this discovery, Emanuel decides to free Linda from the institution.  She breaks into the facility and takes Linda to Emanuel's mother's grave, the first time Emanuel has visited.  She sobs while she digs a hole at the gravesite, and the two bury the doll next to Emanuel's mother, each processing her own grief.  The film closes on the pair looking up at the stars, finally headed toward acceptance.

**B.**     *Servant*

*Servant* is a psychological thriller that explores the question asked in the trailer: "do you know who you welcomed into your home?"  The series portrays a wealthy couple (Dorothy and Sean Turner) that hires a full-time, live-in nanny (Leanne) for their baby son Jericho, which—as the audience already knows from the trailer—is a doll that was given to Dorothy to cope with the loss of their child. From the outset, viewers discover that Leanne is no ordinary teenager, but instead a creepy, deeply religious, possibly paranormal, self-flagellating cult member who subsists on cans of tomato soup and creates wooden crosses (and who, the audience later learns, specifically targeted the Turners).

When the audience first sees Leanne with the doll, she picks it up like a real baby, sings to it, changes its diaper, and never treats the doll as anything other than a living child even when nobody is watching and despite Sean telling Leanne she need not pretend around him.  Sean explains to Leanne that the doll is a "reborn doll," which was prescribed to Dorothy after Jericho died.  But Leanne continues interacting with the doll just as she would a real baby.  She never acknowledges that the doll is not real, and does not attempt to shield the doll from public view.

At the end of the first episode, Sean hears crying on the baby monitor and walks into the nursery to find a real baby.  In the next episode, he confronts Leanne, who has no reaction to the child being any different.  When Sean asks her whose baby the child is, she calmly replies, "that's your baby Mr. Turner, it's Jericho."

4

From there, the seemingly supernatural occurrences take flight, each tied back to Leanne.  For example, as Sean's relationship with Leanne sours, he begins to get wooden splinters all over his body, including unlikely places like his throat, and then loses his ability to taste, smell, and, eventually, feel.  Leanne also seemingly has the ability to bring the dead back to life, including a cricket, a stray dog, and, possibly, a human baby.

Wary of Leanne, Dorothy's protective brother Julian hires a private investigator (Roscoe) to track down information about Leanne.  Julian and Roscoe visit Leanne's hometown and discover gravestones for Leanne's parents, *and for Leanne herself*.  This discovery is explained later—Leanne's cult-member aunt (May) and uncle (George) took Leanne in after a fire killed her parents, and pretended Leanne had died so they could raise her "as God instructed."

At the end of the first season, Aunt May pressures Leanne to rejoin their cult, telling her that Dorothy is undeserving of the "second chance" Leanne is giving her. Leanne leaves the Turners, and when Dorothy hurries to the nursery after finding Leanne's room empty, she finds the doll instead of the baby.  In the last scene of the season, Dorothy seems to realize that the doll is not her son.

## II.    LEGAL STANDARD

To state a claim for copyright infringement, a plaintiff must plead facts plausibly showing (1) her ownership of a valid copyright; (2) that the creators of the defendant's work had access to his work; and (3) substantial similarity in protected expression between the two works.  *See Berkic v. Crichton*, 761 F.2d 1289, 1291 (9th Cir. 1985); *Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 826 (C.D. Cal. 2010), *aff'd*, 438 Fed. Appx. 587 (9th Cir. 2011).[1]  When considering a motion to dismiss a copyright infringement claim for lack of substantial similarity, a court

---

[1] Solely for the purposes of this motion, Defendants have not challenged whether they had access to Plaintiff's work.  *See* Dkt. 30 ("Mot.") at 6.

may "take judicial notice of generic elements of creative works" as well as "documents [such as copies of works] which are not physically attached to the complaint but 'whose contents are alleged in [the] complaint and whose authenticity no party questions.'" *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1128-1129 (C.D. Cal. 2007) (citation omitted).

## III.   DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IS GRANTED

Defendants have requested judicial notice of: (1) the works at issue (*Emanuel* and *Servant*, including *Servant*'s trailer); (2) the fact that using a doll to cope with grief is a widely known therapeutic technique in real life; and (3) that many expressive works feature (a) a character treating a doll as their child, and/or (b) the premise of hiring a nanny or babysitter.  *See* Dkt. 30-1.

Plaintiff objects to Defendants' request as to *Servant*'s fourth through tenth episodes and trailer, as she claims her FAC is based solely on *Servant*'s first three episodes.  Dkt. 34-1.  Plaintiff's objection is belied by her FAC and opposition to Defendants' motion, in which she relies on allegations that extend beyond *Servant*'s first three episodes.  *See, e.g.*, FAC ¶ 78; Dkt. 34 ("Opp.") at 11.  Accordingly, the Court takes judicial notice of *Emanuel* and all ten episodes of *Servant* and its trailer. Regardless of whether the Court compares *Emanuel* to *Servant*'s first three episodes, or considers all ten episodes and the trailer, the outcome is the same: the works are not substantially similar as a matter of law.

Plaintiff further objects to Defendants' requests that the Court take judicial notice that using a doll to cope with grief is a widely known therapeutic technique in real life, and the premises of (1) a character treating a doll as their child and (2) hiring a nanny or a babysitter are common to expressive works.  Dkt. 34-1.  The Court finds that these elements are not subject to reasonable dispute and are commonly known within the Court's jurisdiction, and grants Defendants' request. Regardless, the Court finds that even if these elements were not subject to judicial notice, they are unprotectable and so are filtered out when comparing the works.

6

## IV.   PLAINTIFF'S COPYRIGHT INFRINGEMENT CLAIMS FAIL

After reviewing both *Emanuel* and *Servant*, and upon review of the papers the Parties have submitted, the Court concludes that Plaintiff's claims for direct copyright infringement fail because the works clearly are not substantially similar in protected expression under the extrinsic test.  *See Funky Films v. Time Warner Entm't*, 462 F.3d 1072, 1077 (9th Cir. 2006); *Zella*, 529 F. Supp. 2d at 1133 n.8. Plaintiff's alleged similarities largely consist of non-protectable generic ideas, which are not probative of similarity.  *See Cavalier v. Random House*, 297 F.3d 815, 822 (9th Cir. 2002) (the court must "filter out and disregard the non-protectable elements [of each work] in making [a] substantial similarity determination").  To the extent the works share *any* protected expression, that expression falls far short of the "substantial similarity" required to support a copyright infringement claim.

### A.   *Emanuel* And *Servant* Are Not Substantially Similar

Plaintiff's claims fail an analysis of every element of the extrinsic test.

*Plot*.  Plaintiff concedes that the works' purportedly shared premise—in Plaintiff's words, "a mother so traumatized by her baby's death that she cares for a doll she believes to be a real baby"—is a "basic premise."  FAC ¶ 72 n.11.  Beyond that unprotectable premise, the works have different storylines and lack similarity in their "actual concrete" plot elements. *Berkic*, 761 F.2d at 1293; *Funky Films*, 462 F.3d at 1077-1078.

*Emanuel* follows a normal teenager struggling to cope with the guilt of knowing that her mother died giving birth to her.  The audience learns about Emanuel from the start; indeed, some of the first words in the film are Emanuel telling the audience that she killed her mother.  Emanuel works at a medical supply store, lives with her father and stepmother, and begins to babysit for a new next-door neighbor Linda.  When Emanuel first encounters Linda's therapy doll, she is stunned and initially does not play along.  She ultimately treats the doll as a child in

7

front of Linda, but generally not when Linda is gone.  Emanuel even drops and pushes the doll across the floor with her foot at one point, in contrast to Leanne, who never treats the doll any differently than she would a baby.  When Linda brings home a date (Arthur) and Arthur refuses to pretend the doll is a child, Linda's delusion is shattered, and Emanuel suffers her own breakdown.  The film ends with Emanuel breaking Linda out of a mental institution and taking her to bury the doll next to Emanuel's mother's grave, each experiencing her own catharsis.

*Servant* tells an entirely different story.  In *Servant*, an old-money couple hires a full-time, live-in nanny (Leanne) for their baby son, which is a therapy doll given to the mother (Dorothy) to cope with her son's death.  From the beginning of the series, Leanne is portrayed as possibly other-worldly.  The audience is shown upfront that she is a seemingly paranormal, self-flagellating, deeply religious teenager, and the rest of the season is spent puzzling over who she is.  Leanne always treats the doll as a real baby, holding it, singing to it, or taking it on walks, regardless of whether anyone is around.  She also has no reaction when the doll becomes a baby: she treats the doll and the baby exactly the same without expressing any surprise when the doll becomes a baby, leaving the audience to wonder whether she brought the doll to life and leaving other characters wondering what, if anything, should be done about it.  Lastly, Leanne seems to use paranormal powers to inflict harm on the couple whenever she is angry with them, especially Sean, who loses his senses of taste, smell, and touch.

There are numerous other differences between the plots of the works.  *Emanuel* is portrayed from Emanuel's perspective—indeed, the film starts with her voiceover—and spends the majority of the work exploring the question of why Linda is treating a doll as her baby.  In *Servant*, the perspective is the opposite, as the series explores who (or what) Leanne is and where she came from.  Unlike in *Emanuel*, in which the doll is an unexpected "twist," in *Servant* the existence of the doll is not hidden and is fully explained in the trailer.  Instead, *Servant*'s "dramatic

reveal"—the first season's inciting incident—is that the doll seemingly *comes to life*, which never happens in *Emanuel*.  And unlike *Emanuel*'s cathartic end, there is no catharsis and certainly no peace at any point in *Servant*.

**Sequence of Events**.  Plaintiff alleges that *Emanuel* and *Servant* "each unfolds in a roughly linear chronology," FAC ¶ 79, but a "roughly linear chronology" is not protectable.

**Theme**.  "A work's theme is its overarching message," and "there is no protection for stock themes or themes that flow necessarily from a basic premise." *Silas v. Home Box Office*, 201 F. Supp. 3d 1158, 1180 (C.D. Cal. 2016), *aff'd*, 713 Fed. Appx. 626 (9th Cir. 2018).  Plaintiff alleges that both *Emanuel* and *Servant* include themes like "[d]enial and self-delusion as a means of avoiding the unspeakable grief of losing a baby" and "[t]he dangers of shared delusion," including "[t]he safety, sanctity and comfort of home—and the obverse dangers of the outside world."  FAC ¶ 66.  But these themes are extremely broad and encompass innumerable works, and they also flow naturally from the unprotectable premise of a mother treating a therapy doll as if it were her baby and thus must be filtered out before comparing themes.

Beyond grief and delusion, the primary themes in *Emanuel* and *Servant* are drastically different.  As Plaintiff alleges, *Emanuel* is an "emotional story about motherhood and daughterhood," culminating in its main characters finding peace with their grief.  FAC ¶ 14.  It explores the pain of a teenager who never knew her mother and guilt for her mother's death, and a mother who feels grief and guilt for the loss of her only child.  The film also examines what it means to be a family, including exploring stepfamily bonds.  Ultimately, *Emanuel* is hopeful and positive, exploring themes such as forgiveness, healing, acceptance, and redemption.

*Servant*'s primary theme is very different, and much darker (literally and metaphorically).  In *Servant*, little is known of Leanne's past and she does not express any longing for her parents.  The series walks the line between thriller and

horror, with Leanne's seeming powers front and center, as she appears to bring a doll to life and to punish Sean and Dorothy when she finds them undeserving of her assistance. *Servant* also explores themes such as wealth juxtaposed with the treatment of those without such privilege. Lastly, no character in *Servant* finds redemption or acceptance like in *Emanuel*.

Plaintiff concedes the works' themes are different by alleging that *Emanuel* explores themes such as the complexity of the mother/daughter bond and maternal longing, but that *Servant* is an "utter bastardization" of *Emanuel* that completely "miss[es] the female perspective." FAC ¶¶ 16-17, 67.

***Characters***. There is no similarity in characters. "In determining whether characters are similar, a court looks at the totality of the characters' attributes and traits as well as the extent to which the defendants' characters capture the total concept and feel of the figures in the plaintiff's work." *Shame on You Prods. v. Banks*, 120 F. Supp. 3d 1123, 1165 (C.D. Cal. 2015) (internal brackets and quotation marks omitted). Even some shared traits between characters are not enough to prove substantial similarity when the characters "have noticeable differences." *Silas*, 201 F. Supp. 3d at 1177.

- **Emanuel and Leanne**

The FAC repeatedly compares the nanny in *Servant* to the "nanny" in *Emanuel*. But Emanuel is not a nanny—she lives with her family, has a day job, and simply babysits for her neighbor. In fact, Emanuel's stepmother expressly tells Emanuel that Linda was "looking for a *babysitter*." Emanuel is a quintessential teenager who is struggling to cope with the loss of her mother who died in childbirth and to coexist with her stepmother. Her brash, acerbic wit is on display any time she is in a crowd, including, for example, when she lies to train passengers to get them to give up their seats, or riles up her stepmother during a family dinner. In contrast, Leanne in *Servant* is a live-in nanny to Dorothy and Sean, routinely demeaned by them both. They refer to her as "staff," convince her to spend her

1   meager earnings on shoes that Dorothy immediately asks to borrow, and even send

2   her out in a thunderstorm on a fool's errand so they can be intimate.

3        Emanuel and Leanne are almost nothing alike.  Unlike Emanuel, Leanne is

4   quiet and deferential—the "servant."  Unlike Emanuel, Leanne appears to have

5   paranormal powers she uses to punish or reward the Turners depending on their

6   behavior toward her, including the apparent power to create life.  Leanne is deeply

7   involved in her religion and whips herself.  In contrast to Emanuel and Linda's

8   tender relationship in *Emanuel*, Leanne has a complicated relationship with Dorothy

9   in *Servant*, at times seeming obsessed with her (and wanting to be her) and other

10  times torturing her.  Emanuel understands that Linda is suffering from a delusion

11  and pretends for her sake that her doll is real, while attempting to prevent anyone

12  else from discovering the doll.  Leanne, on the other hand, treats the doll as real and

13  does not make any attempt to prevent others from seeing the doll.  Also, in *Servant*,

14  Leanne targeted the Turners based on her childhood meeting of and interest in

15  Dorothy; Emanuel did not "target" Linda, she happened to live next door.

16      • **Linda and Dorothy**

17        Any similarities between Linda and Dorothy flow naturally from the

18  unprotectable concept of a mother using a reborn doll as a tool to cope with the

19  grief of losing a child.  Otherwise, the characters are remarkably different.  Linda is

20  a grieving mother who ran away from her husband to start a new life where no one

21  knows of her loss.  She is not an "effervescent, 'type A' personality" (FAC ¶ 71),

22  but instead is laid-back, calm, and warm.  She does not seem to have a job, instead

23  tending to her garden and home, and spending time with Emanuel.  *Servant*, on the

24  other hand, is set in motion due to Dorothy's desire to return to her job as an on-air

25  reporter.  She hires Leanne to watch her "child" while she works, and the news

26  segments she creates provide key plot and mood moments in the show.  Dorothy

27  does all this with the (at times begrudging) support of her husband and brother.

28

- **Other Characters**

Plaintiff's FAC alleges that other pairs of characters similarly are substantially similar—specifically, fathers Thomas and Sean (FAC ¶ 73), Arthur and Julian (FAC ¶ 76), and Claude and Tobe (FAC ¶ 75). But Plaintiff's allegations grossly mischaracterize or overstate any similarities between these characters, which are drastically different in each work, and her opposition fails to provide any analysis regarding these characters to support a contrary finding.

In addition, the works each include important characters with no counterpart in the other work. *See Funky Films*, 462 F.3d at 1079 (emphasizing characters from one work not in other work). This includes Emanuel's father and stepmother, through whom we learn about Emanuel's mother and explore *Emanuel*'s themes of losing a spouse, raising a child as a single parent, and adjusting to new family dynamics. This also includes Roscoe, *Servant*'s private investigator who is looking into Leanne's past (and who was possibly kidnapped or killed for that), as well as many other characters throughout the season, including Leanne's Aunt May and Uncle George, Dorothy's therapist Natalie, Dorothy and Julian's father Todd, and Wanda (who Julian hired to spy on Leanne).

***Setting***. Most of the alleged similarities in setting flow from the premise of a new mother, hiring a babysitter or nanny, or using a therapy doll to cope with the loss of a child, none of which are protectable. *See, e.g., Benay v. Warner Bros.*, 607 F.3d 620, 627-628 (9th Cir. 2010) (finding that given the works' shared unprotectable premise, it was "not surprising" that the works shared settings like "a scene of the protagonist sailing into Japan, scenes in the Imperial Palace, scenes on the Imperial Army's training grounds, and battle scenes in various places in Japan"). Plaintiff's other allegations regarding setting comprise various generic, unprotectable elements, from having a staircase "overlooking the first floor" to a nursery with "old-fashioned cribs," rocking horses, and even "striped wallpaper," to having "family dinners." FAC ¶ 68.

12

Beyond these unprotectable alleged similarities, the works' settings are very different.  In *Emanuel*, the story takes place in numerous locations, including Emanuel's home, her work, Linda's home, the train, a market, a lake, and a mental institution.  In *Servant*, almost all of the action takes place in and around the house.  When other settings are shown, they are generally seen through a screen at the Turners' residence.

**Mood**.  Plaintiff alleges that both *Emanuel* and *Servant* are psychological thrillers and, accordingly, are "tense throughout," invoking "heightened feelings of suspense, excitement, surprise, anticipation, and anxiety."  FAC ¶ 80.  But these moods are ubiquitous.  *See Fillmore v. Blumhouse Prods.*, 2017 WL 4708018, at *8 (C.D. Cal. July 2, 2017), *aff'd*, 771 Fed. Appx. 756 (9th Cir. 2019) ("[G]eneral suspense is not protectable expression and cannot establish the extrinsic similarity necessary to support a copyright infringement claim").  Otherwise, the works have drastically different moods.  *Emanuel* largely focuses on each of its main characters' grief and their attempts to cope with that grief.  It is, at its core, a story of healing.  In contrast, *Servant* is creepy, and of course suspenseful.  Lastly, there is no mood of healing or positivity in *Servant*, as there is in *Emanuel*.

**Pace**.  Plaintiff contends that "[b]oth works proceed at a rapid pace."  FAC ¶ 80.  Having a rapid pace is not protectable.  Moreover, this is not an accurate characterization of either work.  In *Emanuel*, there are numerous periods of calm.  In *Servant*, the pace quickens throughout toward the ultimate, chaotic end of the first season, without *Emanuel*'s moments of peace.

**Dialogue**.  "[F]or a plaintiff to demonstrate substantial similarity of dialogue, it must show 'extended similarity of dialogue.'"  *Silas*, 201 F. Supp. 3d at 1181 (quoting *Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1450 (9th Cir. 1988)).  Here, Plaintiff fails to allege *any* specific dialogue shared between the work.

In sum, the works at issue are not substantially similar as a matter of law.

## B.   Plaintiff Fails To Show A Protectable "Selection And Arrangement" Of Unprotectable Elements

The Ninth Circuit has long held that "a combination of unprotectable elements is eligible for copyright protection only if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship." *Satava v. Lowry*, 323 F.3d 805, 811 (9th Cir. 2003). *See also Ricketts v. CBS*, 2020 WL 1643864, at *13-*14 (C.D. Cal. Feb. 18, 2020) (rejecting plaintiff's selection-and-arrangement argument where the works "[told] decidedly different stories;" holding that "most of the similarities between the two works flow[ed] from the basic plot" or were "overstate[d]").[2]

Plaintiff's FAC and opposition do nothing to suggest that the alleged overlap between *Emanuel* and *Servant* is so pervasive, important, and sequential as to constitute a separately protectable selection and arrangement. It is clear from an independent review of each work that *Emanuel* and *Servant* are not substantially similar as a matter of law.

---

[2] Plaintiff's reliance on *Shaw v. Lindheim*, 919 F.2d 1353 (9th Cir. 1990), and its progeny *Metcalf v. Bochco*, 294 F.3d 1069 (9th Cir. 2002), does not change this conclusion. In its recent en banc opinion in *Skidmore v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020), the Ninth Circuit overruled *Shaw* because it required the plaintiff to demonstrate a lower degree of similarity based on the now-rejected inverse ratio rule. *See id.* at 1066-1067 (overruling *Shaw*). *See also Shaw*, 919 F.2d at 1363 (because the defendants admitted they had access to the plaintiff's work, "the required degree of similarity" was "somewhat less"). The *Skidmore* court similarly called *Metcalf* into question, and explained that the selection-and-arrangement theory applies only to "substantial amounts" of shared elements combined in the same "novel arrangement." *Id.* at 1067, 1075. Because Skidmore's purported similarities were "just 'random similarities scattered throughout [the relevant portions of] the works'" (*id.* at 1075 (quoting *Shaw*, 919 F.2d at 1362)), the court found them insufficient to support a selection-and-arrangement theory. *Id.* The same is true in *Emanuel*.

PROPOSED STATEMENT OF DECISION
4817-2374-7002v.1 0113237-000003

## C.     Plaintiff's Claims Over the *Servant* Scripts Fail

The FAC contains two direct infringement claims targeted at "early" and "later" *Servant* scripts (the "Scripts"), alleging "on information and belief" that each script is "very similar to *Servant*," and that certain of the alleged similarities between *Emanuel* and *Servant* are equally applicable to the Scripts.  *See* FAC ¶¶ 95, 95 n.15, 101, 101 n.16.  Plaintiff alleges that any similarities between *Emanuel* and the Scripts are a subset of the alleged similarities between *Emanuel* and *Servant*. FAC ¶¶ 95, 101.  Accordingly, because her claims against *Servant* fail, so too do her claims against the Scripts.

Moreover, her claims independently fail because she cannot show infringement of a work based purely on information and belief.  *See Tarantino v. Gawker Media*, 2014 WL 2434647, at *4 (C.D. Cal. Apr. 22, 2014) (Walter, J.) (dismissing claim where plaintiff "merely speculate[d]" that direct copyright infringement "must have taken place"); *McCormick v. Sony Pictures*, 2008 WL 11338582, at *5 (C.D. Cal. Feb. 4, 2008) ("Without such facts neither [the defendant] nor the court has notice of what it is that [plaintiff] alleges was copied.") (dismissing copyright infringement claim where plaintiff "plead[ed] no facts regarding the similarities between [the works]").

## D.     Plaintiff's Secondary Liability Claim Fails

Because Plaintiff's direct infringement claims fail, her claim for contributory and vicarious infringement also fails.  *See Fox Broad. Co. v. Dish Network*, 747 F.3d 1060, 1068 (9th Cir. 2014).

## V.     AMENDMENT WOULD BE FUTILE

The Court concludes that it would be futile to permit Plaintiff to amend her copyright infringement claims.  Where, as here, the contents of the works cannot be altered by allegations, and where, as here, substantial similarity is absent, courts typically dismiss, with prejudice, the copyright claims and all derivative claims.

15

1 | *E.g.*, *Campbell v. The Walt Disney Co.*, 718 F. Supp. 2d 1108, 1116 (N.D. Cal.
2 | 2010).

3 | **VI.    CONCLUSION**

4 | For the foregoing reasons, Defendants' motion to dismiss is **GRANTED**.

5 | Plaintiff's first amended complaint is **DISMISSED without leave to amend**, and

6 | this action is **DISMISSED, with prejudice**.

8 | Dated: _____          By:_____

9 | Honorable John F. Walter
United States District Judge

16