ERIKSON LAW GROUP
David Alden Erikson (SBN 189838)
  david@daviderikson.com
Antoinette Waller (SBN 152895)
  antoinette@daviderikson.com
S. Ryan Patterson (SBN 279474)
  ryan@daviderikson.com
200 North Larchmont Boulevard
Los Angeles, California 90004
Telephone: 323.465.3100
Facsimile: 323.465.3177

Attorneys for Plaintiff Francesca Gregorini

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| FRANCESCA GREGORINI,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>APPLE INC., a California corporation; M. NIGHT SHYAMALAN, an individual, BLINDING EDGE PICTURES, INC., a Pennsylvania corporation; UNCLE GEORGE PRODUCTIONS; a Pennsylvania corporation; ESCAPE ARTISTS LLC, a California limited liability company; DOLPHIN BLACK PRODUCTIONS, a California corporation; TONY BASGALLOP, an individual; ASHWIN RAJAN, an individual; JASON BLUMENTHAL, an individual; TODD BLACK, an individual; STEVE TISCH, an individual; and DOES 1-10, inclusive<br><br>　　　　Defendants. | Case No. 2:20-cv-00406-JFW-JC<br>Hon. John F. Walter<br><br>**PLAINTIFF'S [PROPOSED] STATEMENT OF DECISION DENYING DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Date:　April 27, 2020<br>Time:　1:30 p.m.<br>Crtrm: 7A |

# [PROPOSED] STATEMENT OF DECISION

Plaintiff Francesca Gregorini claims that Defendants infringed her copyright in her feature film, *The Truth About Emanuel* ("*Emanuel*"). On March 10, 2020, Plaintiff filed her First Amended Complaint ("FAC") in this action. Dkt. 25. Plaintiff's first and primary claim—against all Defendants—is that the first three episodes of Defendants' streaming show, *Servant*, are a wholesale copy of *Emanuel*. As her second claim, Plaintiff alleges that certain Defendants sold a first iteration of the scripts for *Servant* Episodes 1-3 (the "Early Scripts") that infringe Plaintiff's copyright. [FAC ¶¶ 93-98.] As her third claim, Plaintiff further alleges that the non-Apple defendants sold a second iteration of scripts for *Servant* Episodes 1-3 to Apple Inc. (the "Later Scripts") that infringe Plaintiff's copyright. [FAC ¶¶ 99-104.] Plaintiff alleges that these scripts were substantially similar to *Emanuel* in all the ways Episodes 1-3 of *Servant* is—and indeed were even more similar. [FAC ¶¶ 95, 101.]

On March 24, 2020, defendants Blinding Edge Pictures, Inc., Uncle George Productions, LLC, Apple Inc., Escape Artists, Inc. (erroneously sued as Escape Artists LLC), Dolphin Black Productions, M. Night Shyamalan, Tony Basgallop, Ashwin Rajan, Jason Blumenthal, Todd Black, and Steve Tisch (collectively, "Defendants") filed a Motion to Dismiss ("Motion") the FAC. Defendants submitted a Request for Judicial Notice ("RJN") in support of their Motion. On April 6, 2020, plaintiff Francesca Gregorini ("Plaintiff") filed her Opposition to the Motion and her Objections to the RJN. On April 13, 2020, Defendants filed replies in support of the Motion and the RJN.

Having considered the moving, opposing, and reply papers, and all arguments therein, as well as the relevant law and the record in this case, the Court DENIES the motion to dismiss. A comparison of *Emanuel* and the first three episodes of *Servant* reveals that a reasonable juror could find many highly specific similarities—even more so if some of the FAC's more technical allegations are borne out by discovery and expert testimony.

## I. FACTUAL BACKGROUND

As alleged in the FAC, *Emanuel*, is a successful psychological thriller, written directed and produced by Plaintiff as her second feature film. After premiering at the Sundance Film Festival in the dramatic competition category in 2013, Tribeca Film released *Emanuel* theatrically in the U.S. by Tribeca Film, followed by release on DVD and Blu-ray. [FAC ¶3.] Since 2014, Apple itself has offered *Emanuel* through iTunes (as has Amazon and others). *Id.* As further alleged in the FAC, *Servant* refers to Season One, Episodes 1-3, of Apple TV+'s original series *Servant*, which were first available for streaming on November 28, 2019. [FAC ¶¶57, 83, fn. 11.]

The central character in both works is a troubled, moody, and withholding 18-year old motherless girl (who is pretty, slight, with long dark hair and blue eyes), who is newly hired by a white, pretty, sophisticated, privileged yet gracious, mid-30's, first-time mom, to help care for her three-month old baby. The nannies seemingly appear by happenstance—but in truth they have targeted the mothers (and sometimes secretly watch the mothers). A get-to-know-you Q&A, in which the nannies' awkward answers are partly remedied by their knowledge of French, culminates with a gracious level of understanding by each mother. Most of the action takes place in extremely close quarters (which facilitates voyeurism) in the mothers' immaculate, stylish, vintage, homes.

In both works, fleeting images of what appear to be normal infants in the mothers' picture-perfect nurseries and homes are followed by a dramatic revelation that the "baby" is actually an ultra-realistic "reborn" doll—shattering the illusion of uber-competent modern moms and rendering the orderliness of their houses suddenly unsettling, especially as the mothers enter into trance states where the awful truth appears to be percolating to the surface. Rather than recoil, both nannies plays along with the mothers' delusions, even before the fathers explain that its cause is the overwhelming grief of recently losing their real three-month-old baby (the precise cause of death remaining unknown).

The nannies buy in to the delusion, in part for deep-seated reasons relating to a longing for their own mothers, both of whom tragically died years before. The nannies dote over the dolls as if they were real—talking to them on the changing table even when they are alone. Likewise, the mothers dote over the nannies, selecting clothes from their own closets to dress the young women up, and asking questions about the girls' past while affectionately stroking their faces. Finding comfort in the mothers' nurturing, the nannies build a deep emotional connection with their employers—while the mothers build a reciprocal devotion to the nannies as proxy daughters. In both works, this mutual quasi-familial bond coexists, bizarrely, with a subtle and unspoken sexuality, manifested in spontaneously erotic scenes in the mothers' bathrooms that begin with the nannies helping the mothers with a painful condition. In both works, the complexity of the bond is also depicted in key scenes where the nannies ask probing questions of, and admire, the mothers as they prepare for a date, applying makeup at her vanity. When the mothers leave, the nannies take her place at the vanity, emulating her by applying makeup in the same way. The nannies also develop a romantic interest in a boy their own age and initiate dates where they encourage their companion to steal a bottle of wine, revealing their bold side.

The works unfold as a psychological thriller because the oblivious mothers are one false move away from the house of cards collapsing, which equally threatens the peace the nannies have found with the mothers. This suspense, however, is paired quite unusually with strong and escalating supernatural elements, leaving the audience uncertain about what's real—including the baby's apparent rebirth. Water imagery plays a prominent role in both works—including substantially similar scenes of the nannies underwater. In both works, fine food and cooking play a prominent role, and the nannies' troubles are highlighted by a trip to their mothers' graves.

## II.   LEGAL STANDARD FOR MOTION TO DISMSS.

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to

relief." The U.S. Supreme Court has held that Rule 8(a) requires a plaintiff to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

When a copyright claim is at issue, to be successful at trial, the plaintiff must show a "substantial similarity" between the plaintiff's work and the defendant's alleged infringing work. *Berkic v. Crichton*, 761 F.2d 1289, 1291 (9th Cir. 1985). The Ninth Circuit has cautioned that even summary judgment is disfavored on the question of substantial similarity. *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 848 (9th Cir. 2012); *Kouf v. Walt Disney Pictures & Telev'n*, 16 F.3d 1042, 1045 n.3 (9th Cir. 1994). "A fortiori, this same limitation applies to a motion to dismiss." *Smith v. AMC Networks, Inc.*, 2019 U.S. Dist. LEXIS 15930, at *17 (N.D. Cal., 2019.)

Substantial similarity may be determined as a matter of law only if "no reasonable juror could find substantial similarity of ideas and expression." *Swirsky v. Carey*, 376 F.3d 841, 844 (9th Cir. 2004). This standard is difficult because "[d]eterminations of substantial similarity of expression are subtle and complex." *Baxter v. MCA, Inc.*, 812 F.2d 421, 424-25 (9th Cir. 1987) (if "reasonable minds could differ as to" substantial similarity, Court cannot render judgment as a matter of law).

### III.    DISSCUSSION

A. **Defendants' Request for Judicial Notice of Matters Outside the Complaint is Denied.**

Courts may take judicial notice of matters that are either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Courts may also consider materials referenced in the complaint under the incorporation by reference doctrine, even if a plaintiff failed to attach those materials to the complaint. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). However, to the extent any facts in documents subject to judicial notice are subject to reasonable dispute, the Court will not take judicial notice of those facts. *See Lee v. City of Los Angeles,* 250 F.3d 668, 689 (9th Cir. 2001), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

Defendants have requested that the Court take judicial notice of: (1) The first three episodes of *Servant* which constitute its pilot and are alleged and referenced in the FAC; (2) Episodes 4-10 of *Servant* that are not at issue or referenced in the FAC; (3) a purported trailer for *Servant*; (4) Plaintiff's film, *Emanuel*; (5) the alleged "fact that using a doll to cope with grief is a widely known therapeutic technique in real life"; and (6) various alleged "generic elements common to expressive works" including that many expressive works purportedly feature (a) a character treating a doll as their child, and/or (b) the premise of hiring a nanny or babysitter. *See* Dkt. 30-1. Plaintiff does not object to the Court taking judicial notice of the first three episodes of *Servant* (constituting its pilot) or of Plaintiff's film. Those materials are referenced in the FAC. Plaintiff provided a copy of *Emanuel* herself to the Court, Dkt. 13. The Court takes judicial notice of the first three episodes of *Servant* and of *Emanuel*. Plaintiff objects to Defendants' remaining requests for judicial notice. The Court sustains those objections.

The Court may not take judicial notice of Episodes 4-10 of *Servant* or the purported trailer for *Servant* as those episodes are not at issue or properly before the

Court. Plaintiff is the master of her claim—and she unambiguously alleges that what infringes her ninety-minute film is the ninety minutes of Episodes 1-3 which constitute *Servant's* pilot. [FAC, 6:24-25; Obj., 2:12-18.] In addition, Plaintiff alleges that the first three episodes are an organic and self-contained whole—in part because they were written and sold as a unit, long before the other episodes; and presented to the public together on November 28, 2019 as the series "pilot". [FAC ¶ 2 fn. 1.] These allegations are taken as true.

Defendants protest that Episodes 4-10 "reveal[] crucial information about characters and events from the first three episodes." [MTD, 9:2.] But while that could make the episodes *relevant*, it hardly follows that they are incorporated in the FAC. Defendants also claims that "The FAC's own allegations also extend beyond the first three episodes." [*Id.*, 9:4-5 (citing Defendants RJN, § 1).] But this is not true. Nor would merely mentioning the episodes as background facts mean that they are incorporated. Defendants' request for judicial notice of one of the alleged trailers for Servant is without foundation. Defendants state without elaboration that the trailer is the "official" trailer for *Servant* released on YouTube by AppleTV+. [Dkt. 30-1 at 3:23-25.] Defendants' provide no authentication for the purported trailer. Moreover, Plaintiff does not mention or even allude to any trailer. It is not a part of the *Servant* series, and there is no basis to believe that Defendants even created it. Defendants' request for judicial notice of Episodes 4-10 of *Servant* and an alleged trailer for *Servant* are DENIED.

In support of the purported "fact" that using a reborn doll is a widely known therapeutic technique, Defendants reference various internet postings, articles, and websites. Dkt. 30-1 at pp. 5-6. But Plaintiff specifically alleged that it is *not* a recognized therapeutic technique, and even that most therapists have never heard of it. [FAC ¶ 71, fn. 10.] That Defendants dispute these facts highlights the need for a developed factual record and expert testimony. Further, Defendants' claimed fact is supported only by citations to evidence not properly before the court, including

obscure news articles and blogs that Defendants ask the Court to review on the internet. [See Obj., 8:6-9:21.] Defendants do not ask that the Court take judicial notice of any of these materials. Rather, Defendants apparently cite these sources as proof of the fact they seek to judicially notice. But Defendants' sources are not established as reliable or authentic. Defendants have fallen far short of establishing any "fact" regarding reborn dolls' use as a recommended therapy in real life. Defendants' request to have the Court take judicial notice of this alleged therapy technique is DENIED.

Finally, Defendants' request that the Court take judicial notice of the alleged "generic concepts" that many expressive works feature (a) a character treating a doll as their child and (b) of the premise of hiring a nanny as a babysitter. In support of these purportedly generic concepts, Defendants reference numerous television shows, novels, films, Wikipedia articles, and websites, none of which are mentioned in the FAC. Notably, Defendants do not ask the Court to take judicial notice of these materials. Rather, Defendants cite these sources to show the contents therein support the generic nature of the referenced concepts. Defendants essentially ask that the Court take judicial notice of the concepts based purely on Defendants' representation that the underlying works, of which the Court is not asked to take judicial notice, show that the above concepts are generic. These requests fail as well, because a value judgment about what "many" works feature is too subjective to be beyond dispute, and because the assertion is supported only by random and unauthenticated internet sites. [Obj., 9:22-10:28.]

Counsel representing Defendants here recently attempted – and failed – to obtain judicial notice of "generic concepts" in this same manner. In *Smith v. AMC Networks, Inc.*, 2019 U.S. Dist. LEXIS 15930 (N.D. Cal., 2019), Judge Koh in the Northern District of California found no legal authority that supports this unusual request for judicial notice. Moreover, the Court found, "whether the above concepts are generic is subject to reasonable dispute, and the Court, pursuant to Ninth Circuit law, cannot take judicial notice of any facts that are subject to reasonable dispute. *Lee*,

250 F.3d at 689." *Smith v. AMC Networks, Inc.*, No. 18-CV-03803-LHK, 2019 U.S. Dist. LEXIS 15930, at *14 (N.D. Cal. Jan. 31, 2019). Defendants' request to have the Court take judicial notice of the alleged "generic" concepts is DENIED.

## B. PLAINTIFF PROPERLY PLEADS SUBSTANTIAL SIMILARITY.

### 1. Defendants' Motion turns on application of the extrinsic test.

To state a claim for copyright infringement, a plaintiff must plead facts plausibly showing (1) her ownership of a valid copyright; (2) that the creators of the defendant's work had access to his work; and (3) substantial similarity in protected expression between the two works. See *Berkic v. Crichton,* 761 F.2d 1289, 1291 (9th Cir. 1985); *Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 826 (C.D. Cal. 2010), aff'd, 438 Fed. Appx. 587 (9th Cir. 2011). Defendants do not contest ownership or access for the purposes of their motion, leaving only the question of substantial similarity.

There are two tests for substantial similarity: an intrinsic test and an extrinsic test. *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006). "[T]he intrinsic test, which examines an ordinary person's subjective impressions of the similarities between two works, is exclusively the province of the jury." *Id.* Thus, the intrinsic test is not relevant here. In determining substantial similarity on a motion to dismiss, district courts employ the extrinsic test. *See, e.g., White v. Twentieth Century Fox Corp.*, 572 Fed. App'x 475, 476-77 (9th Cir. 2014). The extrinsic test is "objective in nature," and "focuses on articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events." *Funky Films*, 462 F.3d at 1077.

As the Ninth Circuit has held, "when applying the extrinsic test, a court must filter out and disregard the nonprotectible elements in making its substantial similarity determination." *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002). For instance, "[s]cenes-a-faire, or situations and incidents that flow necessarily or naturally from a basic plot premise, cannot sustain a finding of infringement." *Id.* at

ERIKSON LAW GROUP
ATTORNEYS
LOS ANGELES CA

8    PLAINTIFF'S [PROPOSED] STATEMENT OF
     DECISION DENYING MOTION TO DISMISS

823. "Under the scenes a faire doctrine, when certain commonplace expressions are indispensable and naturally associated with the treatment of a given idea, those expressions are treated like ideas and therefore not protected by copyright." *Swirsky v. Carey*, 376 F.3d 841, 850 (9th Cir. 2004). Also, "[f]amiliar stock scenes and themes that are staples of literature are not protected." *Cavalier*, 297 F.3d at 822.

**B.    A reasonable juror could find substantial similarity between *Servant* and *Emanuel*.**

The extrinsic test requires a comparison of the works, and then an evaluation of the specificity of their similarities.

**1.    The plot similarities between *Emanuel* and *Servant* are remarkable.**

As illustrated by the extent of the common description of the works, the plot similarities are extensive.

Defendants greatly exaggerate the importance of dissimilarities between the works—ignoring well-established law that "[i]t is entirely immaterial that, in many respects, plaintiff's and defendant's works are dissimilar . . . If substantial similarity is found, the defendant will not be immunized from liability by reason of the addition in his work of different characters or additional and varied incidents…." Nimmer § 13.03[B][1][a], n.123 (citing cases). As Judge Hand famously put it, "no plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Sheldon v. Metro-Goldwyn Pictures*, 81 F.2d 49, 56 (2d Cir. 1936); see *Shaw*, 919 F.2d at 1362.

More than half of the dissimilarities cited by Defendants are found in Episodes 4-10, which are not alleged to infringe. Similarly, Defendants' general descriptions of *Servant's* plot and characters is greatly skewed towards the later episodes—without citations to make that clear. [MTD, 3:25-4:5, 13:19-21 and 21:3-5.] Even with regard to Episodes 1-3, most of the cited differences are simply immaterial additions dictated by the need to maintain an ongoing episodic television series, such as additional characters and Dorothy having a job. [FAC, 42:19-43:13.] But dissimilarities dictated by different formats are of minimal importance. *Bradbury v. CBS*, 287 F.2d 478, 484-

485 (9th Cir. 1961) ("adaptation of a story to the stage must necessitate changes and additions"). For this same reason, the fact that the film *Emanuel* ends with a resolution, while the pilot or first season of *Servant* is left open-ended to allow for further episodes, is of little import.

Accordingly, extensive similarities in the plots of the two works are sufficient to support a reasonable juror in finding substantial similarity.

### 2. Sequence

Both works feature a linear sequence. Defendants argue that *Servant* is non-linear because it uses flashbacks. [MTD, 13:18-21.] But there are no such temporal discontinuities in the allegedly infringing episodes. Accordingly, similarities in the sequencing of the two works are sufficient to support a reasonable juror in finding substantial similarity.

### 3. Theme

In the FAC, Plaintiff stated a number of very specific themes shared by the works, including the highly idiosyncratic pairing of a proxy mother/daughter relationship with latent sexuality. Defendants ignore most of these. After insisting that a theme is defined as an "overarching message," Defendants then conclude that any candidate for a common theme will be too general to support substantial similarity. Defendants also insist that *Servant* is much darker than *Emanuel*: a horror story involving Leanne tormenting Dorothy with a key fob. [MTD, 17:1-4.] But this vignette occurs in Episode 9—and there is no hint of such a theme in the allegedly infringing episodes. Accordingly, similarities in the themes of the two works are sufficient to support a reasonable juror in finding substantial similarity.

### 4. Characters

Plaintiff catalogued a number of close character similarities in the FAC. In response, Defendants cited a district court case for the proposition that character similarities do not support substantial similarity when the characters "have noticeable differences." [MTD, 16:2-4 (citing *Silas*, 201 F.Supp. at 1177).] That impossible

standard is obviously wrong. *Silas was discussing the standard for copyright infringement of a character*, which Plaintiff does not allege. *Silas*, 201 F.Supp. at 1177 (discussing the Ninth Circuit's three-part test for copyrightability of a character). Again, what emerges from the Ninth Circuit case law is the commonsense standard that all notable character similarities are a plus in the substantial similarity analysis.

Defendants also resist the obvious parallels in the nannies' character traits by arguing that Leanne has supernatural powers, is a cult member, and believes the doll to be real. First, these are hardly character traits. But more important, and as mentioned, there is no unexplained magic in *Servant*, and nothing even close to it in the first three episodes. There is nothing about a cult in Episodes 1-3 (and very little about it in Episodes 4-10). Further, there is no indication that Leanne herself perceives the doll to be real, as Defendants appear to suggest. It's true that she plays along and walks him around the block, but always carefully hidden from view. [FAC, 32:6-9.]

Defendants also ignore most of the obvious similarities between the mothers. In an abuse of the scènes à faire doctrine, Defendants abstract all of the mothers' positive traits to general "confidence"—and then argue that anyone suffering from delusion is necessarily confident in order to keep up the self-ruse. [MTD, 17:25-26.] Defendants also flatly deny that Dorothy shows maternal affection for Leanne, as Linda does for Emanuel. [*Id.*, 18:8-9.] But examples abound: Dorothy frequently and affectionately strokes Leanne's face, takes her shopping for clothes, tucks her into bed, and provides extremely nurturing care after Leanne faints. Defendants' claim that Dorothy considers Leanne "help" is incorrect: it is her husband who refers to Leanne as "staff" [*Id.*, 16:17], which disgusts Dorothy. [*Servant,* Ep. 2 24:08.] Finally, Defendants' denial that the two share an erotic moment is manifestly implausible. [*Servant,* Ep. 1 29:55.] *Compare* MTD, 18:12-13 to FAC, 34:8-11.

Accordingly, similarities in the characters in the two works are sufficient to support a reasonable juror in finding substantial similarity.

### 5. Setting

In their comparison of *Emanuel* and *Servant*, Defendants simply ignore the many similarities in the mothers' houses (including the prominent entryway and grand exposed wood staircase) and in its production design (as illustrated in many images in the FAC). Defendants' now-familiar refrain is to abbreviate all of those similarities as an "upscale house," which it then claims to be too general and something that flows from having a nanny. [MTD, 21:7-16.] When it comes to the remarkable selection of common specific elements, Defendants merely point out that each, on its own, is unprotectable. To the point that the close quarters facilitate voyeurism, Defendants respond that it is quite natural that a live-in nanny would "see various goings on." [*Id.*] But the voyeurism/spying, featured prominently in *Emanuel* and *Servant*, are far more specific than the generalized "seeing." [FAC, 30:5-10.] Accordingly, similarities in the settings of the two works are sufficient to support a reasonable juror in finding substantial similarity.

### 6. Mood

The moods of the works are similar. The FAC offers some objective reasons—including the rare pairing of a psychological thriller with magical realism. [FAC, 3:13-16 and 39:4-8.] The FAC's images also demonstrate similarities in mood and tone. Defendants' response is again to reduce many specific common elements to "suspense"—and then argue that suspense is too general for protection. [MTD, 22:12-18.] Defendants ignore similar use of idiosyncratic cinematography and directing techniques to foster an unusual sense of discomfort. [FAC, 39:17-21 and 41:13-18.]

As to the supernatural, Defendants argue that such elements in *Emanuel* are less real, because they are Emanuel's visions. [MTD 22:19-25.] But it is the nature of magical realism that there simply is no answer to the question of whether the supernatural elements are "real." And as mentioned, the supernatural nature of any given phenomenon in *Servant* is always open to question (which is very different than

true "horror"). By understating the "reality" of the supernatural in *Emanuel*, and overstating it in *Servant*, Defendants unfairly minimize the works' similarity.

Accordingly, similarities in the moods of the two works are sufficient to support a reasonable juror in finding substantial similarity.

### 7. Pace

Defendants abstract Plaintiff's alleged similarities in pace to the notion that both works proceed rapidly, which it predictably claims is too abstract for protection. [MTD, 23:16-17.] But as with other elements, Plaintiff offered more detail, alleging for example a particular type of rapid pace, in which "the characters can barely keep up with events as they unfold" [FAC, 41:19-20.]—which as Defendants point out, is unusually paired with scenes that unfold leisurely. Further there is no "pace" specific enough to achieve substantial similarity on its own. Rather, what is borne out by the cases is that similar paces support (even if it cannot establish) substantial similarity. Accordingly, similarities in the pace of the two works are sufficient to support a reasonable juror in finding substantial similarity.

### 8. Dialogue

Defendants assert that "for a plaintiff to demonstrate substantial similarity of dialogue, it must show 'extended similarity of dialogue.'" [MTD, 24:2-6.] The quote comes from *Olson v. Nat'l Broad. Co.,* 855 F.2d 1446, 1450 (9th Cir. 1988), and two district court cases which cite it. But this is a throw-away line in all three cases, because in none of them was similarity of dialogue a key issue. *Shaw* is more instructive. There, the court noted similarities in dialogue—without noting any overlapping quotations—which was established via expert testimony. *Shaw,* 919 F.2d, at 1363. In *Metcalf*, summary judgment based on the extrinsic test was reversed without any discussion of similarity in dialogue. *Metcalf,* 294 F.3d 1069. Dialogue similarities in the two works are sufficient to support a reasonable juror in finding substantial similarity.

### 9. Evaluating similarities requires discovery and expert testimony.

Plaintiff asserts that she intends to dispute Defendants' characterization of certain similarities as "common ideas" or scènes à faire via a more developed factual record, as well as expert testimony. "It is inappropriate to grant summary judgment on the basis of *scènes à faire* without independent evidence, unless the allegation of *scènes à faire* is uncontested." *Swirsky*, 376 F.3d at 850. As noted, a recent case denied requests for judicial notice remarkably similar to Defendants' here, and indeed denied a similar 12(b)(6) motion, for lack of a factual record and expert testimony, holding "[t]he extrinsic test requires analytical dissection of a work and expert testimony." *Smith* 2019 U.S.Dist.LEXIS 15930, at *17-19 (quoting *Swirsky*, 376 F.3d at 850).

The need for expert analysis is also particularly great where, as here, a court must compare works of different formats (a movie and a television series) and consider the interplay and impact of their literary and aesthetic elements—an inherently "subtle and complex" inquiry requiring expert evidence. *Baxter v. MCA, Inc.*, 812 F.2d 421, 424 (9th Cir. 1987).

## IV. THE SAME ANALYSIS APPLIES TO PLAINTIFF'S OTHER CLAIMS

For slightly different reasons, Plaintiff's second and third claims (alleging that two distinct sets of interim *Servant* Scripts corresponding to Episodes 1-3 infringe) easily state claims. Defendants challenge that Plaintiff's reliance on "information and belief" allegations renders the claims implausible. But such allegations do not detract from plausibility where: (a) the facts are peculiarly within defendant's possession and control; or (b) the belief is based on factual information that makes the inference of culpability "plausible." *Park v. Thompson*, 851 F.3d 910, 928–929 (9th Cir. 2017). Both of these disjunctive conditions are met here. The Defendants obviously know the contents of their scripts. Further, Plaintiff's provide a basis for their information and belief: media interviews. Because Defendants' pleading challenge depends entirely on

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

14   PLAINTIFF'S [PROPOSED] STATEMENT OF
DECISION DENYING MOTION TO DISMISS

its challenges to the earlier claims, Plaintiff's fourth claim for secondary liability survives as well.

## V.   CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' motion to dismiss. Plaintiff's first amended complaint.

DATED: _____     By: _____
                              HONORABLE JOHN F. WALTER
                              United States District Judge