# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES -- GENERAL

| | |
|---|---|
| Case No.  **CV 20-406-JFW(JCx)** | Date:  May 28, 2020 |

Title:     Francesca Gregorini -*v*- Apple Inc., et al.

---

**PRESENT:**

**HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

| Shannon Reilly | None Present |
|---|---|
| Courtroom Deputy | Court Reporter |

| **ATTORNEYS PRESENT FOR PLAINTIFFS:** | **ATTORNEYS PRESENT FOR DEFENDANTS:** |
|---|---|
| None | None |

**PROCEEDINGS (IN CHAMBERS):**   ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT [filed 3/24/2020; Docket No. 30]

On March 24, 2020, Defendants Blinding Edge Pictures, Inc., Uncle George Productions, LLC, Apple Inc., Escape Artists, Inc. (erroneously sued as Escape Artists LLC), Dolphin Black Productions, M. Night Shyamalan, Tony Basgallop, Ashwin Rajan, Jason Blumenthal, Todd Black, and Steve Tisch (collectively, "Defendants") filed a Motion to Dismiss Plaintiff's Complaint.  On April 6, 2020, Plaintiff Francesca Gregorini ("Plaintiff") filed her Opposition.  On April 13, 2020, Defendants filed a Reply.  Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found the matter appropriate for submission on the papers without oral argument.  The matter was, therefore, removed from the Court's April 27, 2020 hearing calendar and the parties were given advance notice.  After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff claims that Defendants infringed her copyright in her 2013 feature film, *The Truth About Emanuel* ("*Emanuel*").  Specifically, Plaintiff claims that Episodes 1 through 3 of AppleTV+'s television series *Servant* is a "wholesale copy and unauthorized television adaptation" of *Emanuel*.  First Amended Complaint ("FAC") ¶ 2.  In her First Amended Complaint filed on March 10, 2020, Plaintiff alleges the following claims for relief: (1) copyright infringement against all Defendants with respect to Episodes 1 through 3 of *Servant*; (2) copyright infringement against Defendants Tony Basgallop and Jason Blumenthal with respect to the first iteration of the scripts for Episodes 1 through 3 of *Servant* (the "Early Scripts"); (3) copyright infringement against all Defendants except Apple Inc. with respect to a second iteration of scripts for Episodes 1 through 3 of *Servant* (the "Later Scripts"); and (4) contributory and vicarious copyright infringement against all Defendants.

Defendants move to dismiss Plaintiff's First Amended Complaint on the grounds that *Emanuel* and Episodes 1 through 3 of *Servant* are not substantially similar as a matter of law.

### A.     *Emanuel*

*Emanuel* is an "emotional story about motherhood and daughterhood," packaged as a psychological thriller.  FAC ¶¶ 14, 80.  It is told from the point of view of Emanuel, a moody teenager who struggles with the guilt of knowing that her mother died giving birth to her.  Most days, she takes the train to her job at a medical supply store, listening to music, or sitting with her boyfriend Claude.  After a single mother (Linda) -- who "bears a striking resemblance" to Emanuel's deceased mother -- moves in next door with a three-month old baby, Emanuel offers to babysit.  When Emanuel finally meets the "baby" (approximately 21 minutes into the film), she is stunned to discover that the child is an ultra-realistic doll (known as a "reborn" doll).

Despite this discovery, Emanuel continues to visit Linda (when she is not working or with her family or boyfriend). Emanuel is uncomfortable with the doll at first, but she quickly begins to pretend the doll is a real baby in Linda's presence and plays along with Linda's delusion.  Although Emanuel sometimes treats the doll as a real baby even when Linda is not present, Emanuel is clearly aware that the doll is not a real baby.  Emanuel even drops and pushes the doll across the floor with her foot at one point.

Finding comfort in Linda's nurturing, Emanuel becomes increasingly attached to Linda as a proxy maternal figure, and emulates Linda by, for example, applying Linda's makeup at Linda's vanity.  Linda, likewise, appears to build a deep emotional connection with Emanuel as a proxy daughter.  At times, there are hints of a subtle, perhaps unconscious, sexual tension between Emanuel and Linda.

Emanuel is protective of Linda and is concerned with others discovering the truth about the "baby."  She routinely makes excuses as to why others cannot meet the baby. Ultimately, Linda goes on a date with Emanuel's co-worker Arthur (while Emanuel babysits), and brings him home to meet the baby.  Emanuel frantically attempts to convince Arthur not to go into the nursery, but Arthur, at Linda's urging, meets the "baby."  Arthur is bewildered and alarmed when he sees the doll rather than a baby.  Believing that Emanuel possibly harmed the baby, he calls the police.  Linda's delusion is exposed and Emanuel suffers her own breakdown.

Linda is committed to an institution, and while she is there, her ex-husband (Thomas) explains that their baby (Chloe) died of an unknown cause.  Thomas reveals that Linda refused to go to her daughter's burial and "that's when the doll happened."  When Linda started to believe the doll was real, Thomas tried to have her committed, but Linda fled.  After this discovery, Emanuel decides to free Linda from the institution.  She breaks into the facility and takes Linda to Emanuel's mother's grave.  Emanuel sobs while she digs a hole at the gravesite, and the two bury the doll next to Emanuel's mother, each processing their own grief.  The film closes on the pair (the daughter who lost her mother and the mother who lost her daughter) lying head to toe and looking up at the stars, finally headed toward acceptance.

### B.     Episodes 1 through 3 of *Servant*

*Servant* portrays a wealthy couple (Dorothy and Sean Turner) who hires a full-time live-in

nanny (Leanne) for their baby son Jericho, which is a doll that was given to Dorothy to cope with the loss of their child.  It is a psychological thriller that revolves around the mystery of a doll that seemingly turns into a real baby and a religious, creepy, and seemingly paranormal nanny who might be the cause of supernatural events.

Episode 1 of *Servant* begins with the nanny Leanne arriving at the Turners' home.  After Dorothy gives Leanne a brief tour of the house and asks her awkward getting-to-know you questions, the audience learns (just twelve minutes and thirty seconds into the first episode) that Jericho is a doll. Sean walks into the nursery, picks up the doll by the feet, and casually knocks the doll's head against the crib. Sean then sobs softly, which can be heard over the baby monitor.

When the audience first sees Leanne interacting with the doll, Leanne surprisingly picks it up like a real baby, sings to it, changes its diaper, and never treats the doll as anything other than a living child even when no one is watching (and despite Sean telling Leanne that she need not pretend around him).  Sean explains to Leanne that the doll is a "reborn doll," which was prescribed to Dorothy after Jericho died and after Dorothy had a "full psychotic break."  Leanne, however, continues interacting with the doll just as she would with a real baby.  She never acknowledges that the doll is not real, and does not attempt to shield the doll from public view.

Sean is disturbed by Leanne's behavior, and when Leanne goes out for a walk with Jericho, he searches Leanne's room and finds a handmade wooden cross, which is later seen hanging over Jericho's crib.  At the end of the first episode, Leanne asks Sean to look after the baby for thirty minutes. Sean hears crying on the baby monitor and walks into the nursery and is shocked to find a real baby, instead of a doll.

Episode 2 centers around Sean's attempts to discover the identity of the baby.  Sean confronts Leanne about the baby, angrily asking "Who's is it? Who's baby is that?".  Leanne has no reaction to the baby being any different from the doll, calmly replying, "that's your baby Mr. Turner, it's Jericho."   Sean believes that Leanne replaced the doll with a real baby, and calls Dorothy's brother (Julian) for assistance.  Julian investigates, and learns that there have been no babies reported missing matching the description of the new "Jericho.".

As Sean's relationship with Leanne sours, he discovers long wooden splinters in unlikely places in his body, including in his foot, butt, and throat. He also loses his sense of taste, a critical sense in light of his career as a chef.  And, although Sean previously removed the wooden cross from Jericho's crib, Episode 2 ends with a view of a new cross (made by Leanne) hanging over Jericho's crib.

Episode 3 focuses on Sean and Julian's attempts to learn more about Leanne and her past. Specifically, Julian hires a private investigator (Roscoe) to investigate Leanne. Julian and Roscoe visit Leanne's hometown and discover a cross just like the one hanging over Jericho's crib in Leanne's childhood home (which appears to have been burned in a fire).  Near the end of Episode 3, Julian shows Sean a video of a cemetery, revealing gravestones for Leanne's parents *and for Leanne herself*.  Episode 3 closes with Sean tending to the baby and sitting in the nursery in deep thought.

Other than this basic plot, the first three episodes focus on Dorothy's delusion of believing that the doll, and then the real baby, is her deceased baby Jericho.  At times, Dorothy appears to

enter a trance. Dorothy and Leanne also develop an unusual relationship. Dorothy appears to channel some of her maternal instincts toward Leanne. For example, Dorothy selects clothes from her closet for Leanne to wear, strokes Leanne's cheek, and kisses her hand. In a somewhat bizarre scene with sexual undertones, Leanne helps relieve Dorothy's mastitis. Leanne also seems to have a fascination or obsession with Dorothy. For example, Leanne watches Dorothy's news broadcasts (Dorothy is a reporter) and emulates Dorothy by sitting at Dorothy's vanity while applying Dorothy's makeup. Finally, the first three episodes have a focus on fine food, cooking, and wine, in part because Sean is a gourmet chef.

## II.     LEGAL STANDARD

A motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. "A Rule 12(b)(6) dismissal is proper only where there is either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Summit Technology, Inc. v. High-Line Medical Instruments Co., Inc.*, 922 F. Supp. 299, 304 (C.D. Cal. 1996) (quoting *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988)). However, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and alterations omitted). "[F]actual allegations must be enough to raise a right to relief above the speculative level." *Id.*

In deciding a motion to dismiss, a court must accept as true the allegations of the complaint and must construe those allegations in the light most favorable to the nonmoving party. *See, e.g., Wyler Summit Partnership v. Turner Broadcasting System, Inc.*, 135 F.3d 658, 661 (9th Cir. 1998). "However, a court need not accept as true unreasonable inferences, unwarranted deductions of fact, or conclusory legal allegations cast in the form of factual allegations." *Summit Technology*, 922 F. Supp. at 304 (citing *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981) *cert. denied*, 454 U.S. 1031 (1981)).

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990) (citations omitted). However, a court may consider material which is properly submitted as part of the complaint and matters which may be judicially noticed pursuant to Federal Rule of Evidence 201 without converting the motion to dismiss into a motion for summary judgment. *See, e.g., id.*; *Branch v. Tunnel*, 14 F.3d 449, 454 (9th Cir. 1994).

Where a motion to dismiss is granted, a district court must decide whether to grant leave to amend. Generally, the Ninth Circuit has a liberal policy favoring amendments and, thus, leave to amend should be freely granted. *See, e.g., DeSoto v. Yellow Freight System, Inc.*, 957 F.2d 655, 658 (9th Cir. 1992). However, a Court does not need to grant leave to amend in cases where the Court determines that permitting a plaintiff to amend would be an exercise in futility. *See, e.g., Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987) ("Denial of leave to amend is not an abuse of discretion where the pleadings before the court demonstrate that further amendment would be futile.").

## III.    DEFENDANTS' REQUEST FOR JUDICIAL NOTICE

In Defendants' Request for Judicial Notice, Defendants request that the Court take judicial notice of: (1) the works at issue (*Emanuel* and Episodes 1 through 3 of *Servant*); (2) Episodes 4 through 10 of *Servant*; (3) the trailer for *Servant*; (4) the fact that using a doll to cope with grief is a widely known therapeutic technique in real life; and (5) the fact that many expressive works feature a character treating a doll as their child, and/or the premise of hiring a nanny or babysitter. Plaintiff does not object to the Court taking judicial notice of *Emanuel* or Episodes 1 through 3 of *Servant*, which are incorporated by reference in the First Amended Complaint.. *See* FAC ¶ 64. Accordingly, the Court takes judicial notice of *Emanuel* and Episodes 1 through 3 of *Servant*. Plaintiff, however, objects to the remainder of Defendants' Request for Judicial Notice.

The Court agrees with Defendant that it may take judicial notice of Episodes 4 through 10 of *Servant*. In her First Amended Complaint (and her Opposition to Defendants' Motion to Dismiss), Plaintiff relies on allegations that extend beyond Servant's first three episodes. *See, e.g.,* FAC ¶ 78. However, regardless of whether the Court compares *Emanuel* to *Servant'*s first three episodes, or considers all ten episodes, the outcome is the same: the Court concludes that the works are not substantially similar as a matter of law.

The Court also grants Defendants' Request for Judicial Notice that "many expressive works feature (a) a character treating a doll as their child, and/or (b) the premise of hiring a nanny or babysitter." These common premises or features are not subject to reasonable dispute. *See* Fed. R. Evid. 201(b). In fact, although Plaintiff objects to the Court taking judicial notice of these common premises or features, Plaintiff concedes that "the idea of wealthy parents hiring a nanny" is not protectable, *see* Opp. at 1, and does not claim copyright protection over "a mother so traumatized by her baby's death that she cares for a doll she believes to be her real baby", or over "a privileged mother hiring a nanny to care for the doll she believes to be her deceased baby." *See* FAC ¶ 72 n.11; Opp. at 1.

The Court, however, denies the remainder of Defendants' Request for Judicial Notice. The First Amended Complaint does not incorporate by reference the trailer for *Servant*, and Plaintiff's claims do not rely on the content (or even existence) of a trailer. With respect to Defendants' Request for Judicial Notice that "using a doll to cope with grief is a widely known therapeutic technique in real life," the Court concludes that Defendants have failed to demonstrate that this fact is not subject to reasonable dispute.

## IV.   DISCUSSION

To state a claim for copyright infringement, a plaintiff must plead facts plausibly showing (1) her ownership of a valid copyright; (2) that the creators of the defendant's work had access to her work; and (3) substantial similarity in protected expression between the two works. *See Berkic v. Crichton*, 761 F.2d 1289, 1291 (9th Cir. 1985); *Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 826 (C.D. Cal. 2010). Defendants do not contest ownership or access for purposes of their Motion to Dismiss Plaintiff's Complaint, leaving only the question of substantial similarity.

The test for substantial similarity contains two components: an intrinsic test and an extrinsic test. *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006). "[T]he intrinsic test, which examines an ordinary person's subjective impressions of the similarities between two works, is exclusively the province of the jury." *Id.* Thus, the intrinsic test is not

relevant to the Court's decision on this motion. Instead, in determining substantial similarity on a motion to dismiss, district courts employ the extrinsic test. *See, e.g.*, *White v. Twentieth Century Fox Corp.*, 572 Fed. App'x 475, 476-77 (9th Cir. 2014).

The extrinsic test is "objective in nature" and "focuses on articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events." *Funky Films*, 462 F.3d at 1077. When comparing these features, the Court "must take care to inquire only whether the protectible *elements*, *standing alone*, are substantially similar. Therefore, when applying the extrinsic test, a court must filter out and disregard the non-protectible elements in making its substantial similarity determination." *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002) (internal quotations and citations omitted). "Copyright law only protects expression of ideas, not the ideas themselves." *Id.* at 823. Accordingly, the Court must filter out, for example, "general plot ideas"; "familiar stock scenes and themes that are staples of literature"; and "scenes-a-faire, " i.e., situations and incidents that flow necessarily or naturally from a basic plot premise". *Id.*

"'Although the substantial similarity test is often decided on summary judgment or at trial,' courts may determine as a matter of law that works are not substantially similar." *White v. Twentieth Century Fox Corp.*, 572 F. App'x 475, 477 (9th Cir. 2014) (quoting *Gilbert v. New Line Prods., Inc.*, 2009 WL 7422458, at *2 (C.D. Cal. Nov. 16, 2009)). Substantial similarity may be determined as a matter of law only if no reasonable juror could find that the works are substantially similar. See, e.g., *Swirsky v. Carey*, 376 F.3d 841, 844 (9th Cir. 2004).

    **A.**    **The Court concludes that *Emanuel* and Episodes 1 through 3 of *Servant* are not substantially similar.**

After filtering out the non-protectable elements, the Court concludes, as a matter of law, that *Emanuel* and Episodes 1 through 3 of *Servant* are not substantially similar.

    1.    <u>Plot</u>

Though *Emanuel* and Episodes 1 through 3 of *Servant* share a basic plot premise, they tell completely different stories.

As an initial matter, "[b]asic plot ideas . . . are not protected by copyright law." *Cavalier*, 297 F.3d at 824. "No one can own the basic idea for a story." *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985). Plaintiff concedes that the works' purportedly shared premise -- in Plaintiff's words, "a mother so traumatized by her baby's death that she cares for a doll she believes to be a real baby" -- is an unprotectable "basic premise." *See* FAC ¶ 72 n.11; Opposition at 1 ("Plaintiff doesn't claim dominion . . . over the more specific idea of 'a privileged mother hiring a nanny to care for the doll she believes to be her deceased baby.'"). Beyond this unprotectable shared premise, the works' storylines diverge drastically and quickly.

As described in more detail *supra*, *Emanuel* follows a normal teenager struggling to cope with the guilt of knowing that her mother died at childbirth. Emanuel begins to babysit for a new next-door neighbor Linda, and is stunned when she first encounters Linda's therapy doll. Although she quickly treats the doll as a child in Linda's presence (and even occasionally when Linda is not present), it is always clear that Emanuel knows that the doll is not a real baby. The plot focuses on

the developing maternal relationship between Emanuel and Linda, Emanuel's attempts to keep others from discovering Linda's delusion, the shattering of that delusion, and the resulting catharsis when Linda and Emanuel bury the doll next to Emanuel's mother's grave.

In contrast, the plot of the first three episodes of *Servant* focuses on a deeply religious and possibly paranormal nanny, who possibly brings a doll back to life. The plot lines primarily explore who the nanny is and where she came from. Unlike Emanuel, Leanne *always* treats the doll as a real baby, holding it, singing to it, or taking it on walks, *regardless of whether anyone is around*. She also has no reaction when the doll becomes a baby, leaving the audience to wonder whether she brought the doll to life and leaving other characters wondering what, if anything, should be done about it. Other paranormal or unusual events occur after Leanne's arrival (and as Leanne's relationship with Sean sours), including that Sean discovers splinters in unusual places and loses his sense of taste. And, unlike the cathartic end of *Emanuel*, Episode 3 of *Servant* ends with the intriguing gravestones of Leanne's parents and Leanne herself.

The vast differences between the plots of the two works are not surprising given that each plot is driven by a dissimilar "inciting event" or "catalyst." An "inciting event" or "catalyst" defines the conflict, sets the characters' goals and interrelationships, and in effect drives the remainder of the plot. In *Emanuel,* the inciting event (and unexpected twist) occurs when the audience learns that the baby is not real, but rather is an ultra-realistic doll. *See* FAC ¶ 78. In sharp contrast, *Servant*'s inciting event is not that the baby is an ultrarealistic doll, but that the doll *seemingly comes to life*.[1]
.

      2.      <u>Sequence of Events</u>

Plaintiff alleges that *Emanuel* and Episodes 1 through 3 of *Servant* "each unfolds in a roughly linear chronology." FAC ¶ 79. This by itself is not protectable. Moreover, the other alleged similarities in the sequence of events consist of several discrete scenes that are unrelated to the overall sequence of events of the works. *See* FAC ¶ 79 (alleging a similarity of sequencing based on, for example, an "interview" scene; scene of the nanny/babysitter looking on as mother applies makeup followed by a scene of the nanny applying the mother's makeup at the same vanity; and a scene where the nanny/babysitter faints under stress). And, as further discussed *infra*, the Court is not persuaded by Plaintiff's compilation of these "random similarities scattered throughout the works." *Kouf v. Wlat Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994).

      3.      <u>Theme</u>

"A work's theme is its overarching message," and "there is no protection for stock themes or

---

[1] Although Plaintiff alleges that the doll in *Emanuel* also appears to "come back to life," *see* FAC ¶ 72, the doll in *Emanuel* does not in fact come back to life. Instead, there is a "notable and extended scene" near the end of *Emanuel* in which Emanuel faints in the nursery and has a dream-like vision in which the room fills with water. In this dream sequence, instead of a doll, a real baby swims to Emanuel's deceased mother. Despite Plaintiff's allegations that "[t]he rebirth in each work is ambiguous," *see* FAC ¶ 78, the scene does not leave the audience confused. It is clear that the baby is alive only in Emanuel's dream or vision.

themes that flow necessarily from a basic premise." *Silas v. Home Box Office*, 201 F. Supp. 3d 1158, 1180 (C.D. Cal. 2016).

Plaintiff claims that the works share themes such as "denial and self-delusion as a means of avoiding the unspeakable grief of losing a baby;" "shared secrets and complicity in another's delusion;" "the dangers of a shared delusion;" "the mystery/danger of a stranger coming to town;" and the "safety, sanctity and comfort of home -- and the obverse dangers of the outside world." FAC ¶ 66.  However, these themes are extremely broad and are present in numerous works. Moreover, many of these themes flow necessarily and naturally from the unprotectable premise of a mother treating a doll as if it were her deceased baby.

Beyond grief and delusion, the primary themes in *Emanuel* and Episodes 1 through 3 of *Servant* are drastically different.  As Plaintiff alleges, *Emanuel* is an "emotional story about motherhood and daughterhood," culminating in its main characters finding peace with their grief. FAC ¶ 14.  It explores the pain of a teenager who never knew her mother and guilt for her mother's death, and a mother who feels grief and guilt for the loss of her only child.  Ultimately, *Emanuel* is hopeful and positive, exploring themes such as healing, acceptance, and redemption.

*Servant*'s theme is much darker, and the series walks the line between thriller and horror. Unlike *Emanuel*, which has its primary focus on the proxy mother-daughter bond, *Servant* focuses on Leanne's possible powers, as she appears to bring a doll to life.  Although Leanne appears to have some sort of obsessive interest in Dorothy, it is not clear why (at least from the first three episodes) or that it originates from maternal longing.  In addition, unlike Emanuel, *Servant* explores themes such as wealth juxtaposed with the treatment of those without privilege.  Moreover, no character in the first three episodes of *Servant* (or the rest of the season) finds redemption or acceptance as in *Emanuel*.

Although both *Emanuel* and *Servant* have an unusual element of sexual tension or longing between the mother and the nanny/babysitter, the Court would not describe that element as a theme or "overarching message" of either work.  More importantly, that sexual tension or longing is treated very differently in the works with very different effects.  In *Emanuel,* the audience has the sense that the subtle sexual tension or longing is derived from a misplaced desire for a maternal or familial bond.  In *Servant*, the mastitis scene, where Leanne helps Dorothy relieve her painful mastitis, has an unexpected and bizarre sexual undertone, and only intensifies the audience's anticipation that Leanne is not who she seems.

4.  Characters

The Court also concludes that the characters are not similar.  "In determining whether characters are similar, a court looks at the totality of the characters' attributes and traits as well as the extent to which the defendants' characters capture the total concept and feel of the figures in the plaintiff's works." *Shame on You Prods. v. Banks*, 120 F. Supp. 3d 1123, 1165 (C.D. Cal 2015) (internal brackets and quotation marks omitted).  Even some shared traits between characters are not enough to prove substantial similarity when the characters "have noticeable differences." *Silas v. Home Box Office*, 201 F. Supp. 3d 1158, 1177 (C.D. Cal. 2016)

(a)  Emanuel and Leanne

Other than a few superficial similarities (they are both attractive, white, 18-year old girls who have long dark hair and blue eyes), Emanuel and Leanne are almost nothing alike.

The First Amended Complaint repeatedly compares the nanny in *Servant* to the "nanny" in *Emanuel*. But Emanuel is not a nanny -- she lives with her family, has a day job, and simply babysits for her neighbor. In essence, Emanuel is a quintessential teenager who is struggling to cope with the loss of her mother who died in childbirth and to coexist with her stepmother. She is sarcastic and witty, lies to train passengers to trick them into giving up their seats, and riles up her stepmother during family dinners. Notably, Emanuel understands that Linda is suffering from a delusion and pretends for her sake that the doll is real, while attempting to prevent anyone else from discovering the doll. Although Emanuel has an unhealthy fascination with Linda, that fascination is clearly derived from her maternal longing.

In contrast, Leanne in *Servant* is a live-in nanny to Dorothy and Sean. Unlike Emanuel, Leanne is quiet and deferential -- the "servant" -- who is routinely demeaned by the Turners, especially Sean. Unlike Emanuel, Leanne is deeply religious and appears to have paranormal powers. In addition, in contrast to Emanuel and Linda's tender relationship in *Emanuel*, Leanne has a complicated relationship with Dorothy in *Servant*, at times seeming obsessed with her (or wanting to be her) and at other times (later in the season) torturing her. And unlike Emanuel, Leanne always treats the doll as real and never attempts to prevent others from seeing the doll.

Finally, although Plaintiff claims that both Emanuel and Leanne "targeted" the mothers, FAC ¶ 78, that is an unfair characterization. While Leanne targeted the Turners based on her childhood meeting of and interest in Dorothy,[2] Emanuel did not "target" Linda in any meaningful way. Emanuel happened to live next door when Linda moved in. She was intrigued by Linda's striking resemblance to her deceased mother, and when the opportunity was presented by Emanuel's stepmother, she offered to babysit.

(b)  Linda and Dorothy

There are some basic similarities between Linda and Dorothy. For example, Plaintiff alleges that both mothers: lost their only child; suffer from a similar delusion; enter "a trance-like state several times, which we understand to involve a moment when the awful truth of her baby's death might be percolating toward the surface of her consciousness"; are so committed to their delusion that they hire a nanny or babysitter; are in their mid-thirties; are white, sophisticated, and privileged; wear stylish clothing; and channel some of their maternal longing into the nanny/babystter. FAC ¶ 71. Many of those similarities flow necessarily and naturally from the unprotectable concept of a mother using a doll as a tool to cope with the grief of losing a child. Moreover, other than these similarities, the characters are remarkably and significantly different.

---

[2]That Leanne targeted Dorothy is not revealed in Episodes 1 through 3 of *Servant*. However, because Plaintiff relies on Leanne's targeting of Dorothy in her First Amended Complaint, *see* FAC ¶ 78, the Court has considered it.

Linda is a grieving mother who ran away from her husband to start a new life where no one knows of her loss.  Contrary to Plaintiff's claim, she is not an "effervescent, 'type A' personality," *see* FAC ¶ 71, but instead is laid-back, calm, and warm. She does not appear to have a job, instead tending to her garden and home, and spending time with Emanuel.  Linda is affectionate, likeable, and truly appears to care for Emanuel.

In contrast, Dorothy is an on-air reporter, who hires Leanne so that she can return to her job.  Unlike Linda's sincere affection for Emanuel, Dorothy's attempts to become friendly with Leanne seem insincere and hollow.  For example, although Dorothy takes Leanne shopping, she convinces Leanne to spend her meager earnings on shoes and then immediately asks to borrow them before Leanne has even had a chance to wear them.  Moreover, while the audience feels sympathy for Linda, not so for Dorothy.  Indeed, as a review in *The Atlantic* states (quoted by Plaintiff in the First Amended Complaint):

> [*Servant*] urges you, over and over, to loathe and condemn a woman whose baby has died.  Look at the spectacle of this woman's delusion, the series seems to say, lingering on the frozen plasticity of Jericho's features.  Note her narcissism, her vanity, the ridiculousness of her newscasts. All six of the show's executive producers are men and all 10 episodes are written by Basgallop, which perhaps makes it unsurprising that *Servant*, far from sketching out the contours of maternal grief, instead treats Dorothy with such casual disdain.

FAC ¶ 17.

### (c) Thomas and Sean

Plaintiff alleges that the father in *Emanuel* (Thomas) is similar to the father in *Servant* (Sean) because both explain how their child died and how their wife came to rely on a doll.  FAC ¶ 73.  This similarity is not surprising: who better to understand and explain the situation than the other parent. More importantly, this is the extent of the similarities between Thomas and Sean.  Indeed, Thomas appears in a brief two-minute scene in *Emanuel*, whereas Sean is one of the central and primary characters in *Servant*.

### (d) Arthur and Julian

Plaintiff overstates the similarities between Arthur and Julian, who at most have a passing physical resemblance.  Arthur (in *Emanuel*) is a nerdy, shy, "professorial" (FAC ¶ 76) man who works with Emanuel at a medical supply store.  Arthur takes Linda on a date and comes back to Linda's home to meet the baby, which Emanuel frantically tries to prevent. When Arthur discovers the child is a doll, he is bewildered, believes the child has been taken (or harmed by Emanuel), and calls the police.

In contrast, Julian (in *Servant*), Dorothy's brother, is an abrasive and crass character who always has a drink in his hand.  He knows from the outset how Jericho died, and plays along with Dorothy's delusion for Dorothy's sake.  He mistrusts Leanne and spends significant resources

investigating her background even flying to her hometown with a private investigator.

As with the other main characters, Arthur and Julian's many differences weigh against a finding of substantial similarity.

> (e) Claude and Tobe

Plaintiff alleges that Claude (in *Emanuel*) and Tobe (in *Servant)* are similar, in large part because they are Emanuel and Leanne's "love interests." FAC ¶ 75. These characters, however, are not similar at all. Claude is Emanuel's boyfriend. Emanuel meets Claude on a train and they see who can come up with a more outlandish story to trick strangers into giving up their seats. Claude is happy to be dating Emanuel, but they have their ups (talking and kissing by the lake) and downs (fighting over Emanuel's relationship with Linda). Tobe is Sean's assistant chef. At one point, Tobe cooks dinner with Leanne (because he was paid by Sean to keep an eye on her). Later in the season, Tobe and Leanne go bowling, and when she tries to kiss him afterward, he rejects her advance. That is the extent of their "romantic interlude." FAC ¶ 75.

> (f) The Dolls (Chloe and Jericho)

Plaintiff alleges that the dolls in *Emanuel* and *Servant* are "almost identical." FAC ¶ 72. They are both "ultra-lifelike 'reborn' baby dolls" who "have patchy dark hair" and "look to be about three months old." The Court agrees that the dolls look alike. However, unlike the doll in *Emanuel*, the doll in *Servant* comes back to life, which in the Court's view is a very significant difference.

> (g) Other Characters

The works each include characters with no counterpart in the other work. *See Funky Films*, 462 F.3d at 1079 (emphasizing characters from one work not in the other work). This includes Emanuel's father and stepmother, and Roscoe, *Servant*'s private investigator.

> 5. Setting

Both *Emanuel* and *Servant* feature the mother's home (and nursery) as one of the primary settings. This similarity is not surprising and flows from the premise of a new mother, hiring a babysitter or nanny to care for a doll that the mother believes is her deceased child. *See, e.g., Benay v. Warner Bros*, 607 F.3d 620, 627-28 (9th Cir. 2010) (finding that, given the works' shared unprotectable premise, it was "not surprising" that the works shared settings like "a scene of the protagonist sailing into Japan, scenes in the Imperial Palace, scenes on the Imperial Army's tranining grounds, and battle scenes in various places in Japan"). Plaintiff attempts to expand on this not-surprising similarity, alleging, for example, that "both works showcase a dark but often dramatically lit exposed wood staircase, overlooking the first floor and entry hall," that both works feature a "beautiful, immaculate, old-world, well-appointed, home," and that "in both works, the nurseries are magazine worthy . . . including vertically striped wallpaper, old-fashioned cribs, beautiful vintage baby items, and remarkably, an antique rocking horse . . . ." FAC ¶ 68. The Court concludes that these similarities comprise various generic unprotectable elements that are frequently seen in various works featuring homes and nurseries. Moreover, although there are some similarities between the homes (like the staircase and nursery), there are also many differences, including, for example, the frequently-featured modern kitchen with large island in

*Servant* as compared to the mother's more humble, much smaller kitchen in *Emanuel*.

In addition, although both works feature visits to gravesites (FAC ¶ 68), these visits are dramatically different in both expression and significance. In *Emanuel*, Emanuel takes Linda to visit Emanuel's mother's grave, which Emanuel has never visited, and digs a hole to bury Linda's doll. The trip to the grave is the film's very moving climax, as Emanuel and Linda seemingly come to terms with their grief. In *Servant*, Julian and a private investigator travel to the Midwest to investigate Leanne. Julian and the private investigator visit Leanne's family home (which burned down), and then discover Leanne's parents' graves and a grave for Leanne herself.

Finally, beyond these alleged similarities, the works' settings are very different. In *Emanuel*, the story takes place in numerous locations, including Emanuel's home, her work, Linda's home, the train, a market, a lake, and a mental institution. In *Servant*, almost all the action takes place in and around the house. When other settings are shown, they are generally seen through a screen at the Turners' residence.

### 6. Mood

Plaintiff alleges that both *Emanuel* and *Servant* are psychological thrillers and, accordingly, are "tense throughout," invoking "heightened feelings of suspense, excitement, surprise, anticipation, and anxiety." FAC ¶ 80. But this type of mood is pervasive in films. *See Fillmore v. Blumhouse Pros.*, 2017 WL 4708018, at *8 (C.D. Cal. July 2, 2017) ("[G]eneral suspense is not protectable expression and cannot establish the extrinsic similarity necessary to support a copyright infringement claim").

Moreover, other than the fact that they are both psychological thrillers, the works have different moods. *Emanuel* largely focuses on each of its main characters' grief and their attempts to cope with that grief. At its core, it is a story of healing. *Servant*, on the other hand, is creepy and suspenseful and has no mood of healing or positivity.

### 7. Pace

Plaintiff contends that "[b]oth works proceed at a rapid pace." FAC ¶ 80. However, this is not an entirely accurate characterization of either work. In *Emanuel*, there are numerous periods of calm. In *Servant*, the pace builds and then quickens toward the chaotic end of the first season,[3] without any trace of *Emanuel's* moments of peace.

### 8. Dialogue

"[F]or a plaintiff to demonstrate substantial similarity of dialogue, it must show 'extended similarity of dialogue.'" *Silas*, 201 F. Supp. 3d at 1181 (quoting *Olson v. Nat'l Broad. Co.*, 855 F.2d

---

[3] Leanne's cult member aunt pressures Leanne to rejoin their cult, telling her that Dorothy is undeserving of the "second chance" that Leanne is giving her. Leanne leaves the Turners, and when Dorothy hurries to the nursery after finding Leanne's room empty, she discovers the doll instead of the baby. In the last scene of the season, Dorothy seems to realize that the doll is not her son.

1446, 1450 (9th Cir. 1988)).  In this case, Plaintiff fails to allege *any* specific dialogue shared between the works, and instead merely relies on general descriptions of scenes or conversations, such as "[b]oth works feature scenes where the mother expresses that she sees herself in the nanny -- followed by surprisingly strong exclamations of affection," "[b]oth works feature scenes where the mother gives baby-care direction in extremely realistic terms," and "[b]oth works feature scenes in which the nanny compliments the mother as they discuss an impending date."  FAC ¶ 81. These general allegations are insufficient to show similarity of dialogue.
.
        9.      Other similarities

Plaintiff relies on a random assortment of other alleged similarities between the works including, for example: (1) in both works, the nanny/babysitter directs her love interest to "steal a bottle of wine (to be paired with French bread and cheese)"; (2) both works feature intimate home birthday dinner celebrations; (3) in both works, the nanny/babysitter faints and awakens to the gaze of concerned faces; (4) in both works, the mother considers her post-baby body and stretch marks in a mirror; (5) in both works the nanny/babysitter applies makeup at the mother's vanity; (6) in both works, the dolls appear to "come back to life"; and (7) both works include magical realism and water imagery.  The Court agrees with Defendants that many of the alleged similarities in the First Amended Complaint are mischaracterizations of one or both of the works at issue, stock scenes, or scenes a faire.

For example,  Plaintiff's claim that both dolls appear to "come back to life," FAC ¶ 72, is a gross mischaracterization.  As the Court already discussed *infra* (p. 7 n.1), the doll in *Emanuel* does not appear to come back to life; rather, in Emanuel's vision or dream, a real baby takes the place of the doll and swims to Emanuel's deceased mother.  Unlike *Servant*, It is clear that the baby is alive only in Emanuel's vision or dream.  Likewise, Plaintiff's claim that both works include "stolen wine to be paired with bread and cheese" is a stretch at best, and demonstrates the weakness of Plaintiff's substantial similarity argument.  In *Emanuel*, Emanuel and her boyfriend Claude go to a store to buy bread and cheese for their date.  At Emanuel's prompting, Claude steals some wine while Emanuel distracts the store clerk.  In *Servant,* Sean pays Tobe to keep an eye on Leanne while the Turners are out, and Leanne asks Tobe to pick out a bottle of wine from the Turners' cellar for their dinner.  Tobe rattles through what food he could pair with the wine (including bread and cheese).  Leanne answers the question of what should be paired with the wine by abruptly chopping off an eel's head.  These scenes are not remotely similar.

While  the scenes where the mother considers her post-baby body and stretch marks in a mirror and the scenes where the nanny or babysitter sits at the mother's vanity while applying the mother's makeup are similar in each of the works, these scenes are not unique to these two works and are more akin to "stock scenes."  Moreover, the Court, is "unimpressed" with these types of "random similarities scattered throughout the works."  *Kouf v. Wlat Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994) (quotations and citations omitted).

Acknowledging that the alleged similarities between *Emanuel* and *Servant* might consist of unprotectable elements, Plaintiff argues that the "selection and arrangement" of these elements is protectable.  The Ninth Circuit has held, "a combination of unprotectable elements is eligible for copyright protection only if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship." *Satava v. Lowry*, 323 F.3d 805, 811 (9th Cir. 2003).  The Court concludes, after its independent

review of each work, that the alleged overlap between *Emanuel* and *Servant* is not pervasive enough or substantial enough to demonstrate substantial similarity based on a "selection and arrangement" theory.

In sum, the alleged similarities between the works pale in comparison to the differences in the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events., and the Court concludes that the works at issue are not substantially similar as a matter of law.

### C.  Plaintiff's Claims Over the *Servant* Scripts Fail.

In the Second and Third Claim for Relief of her First Amended Complaint, Plaintiff alleges, "on information and belief" that the Early Scripts and Later Scripts of *Servant* each infringe her copyright in *Emanuel*.  She alleges that each script is "very similar" to *Servant* and incorporates certain of the alleged similarities as equally applicable to the scripts.  *See* FAC ¶¶ 95, 101.  Plaintiff does not allege any other specific similarities between *Emanuel* and the scripts.  Accordingly, because Plaintiff's claims against *Servant* fail, her claims related to the Early Scripts and Later Scripts also fail.

### D.  Plaintiff's Claim for Contributory and Vicarious Copyright Infringement Fails.

Because Plaintiff's direct infringement claims fail, her claim for contributory and vicarious copyright infringement also fails.  *See Fox Broad. Co. v. Dish Network*, 747 F.3d 1060, 1068 (9th Cir. 2014).

## V.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiff's Complaint is **GRANTED**.  Plaintiff's First Amended Complaint is **DISMISSED without leave to amend** and this action is **DISMISSED with prejudice**.

The parties are ordered to meet and confer and agree on a joint proposed Judgment which is consistent with this Order.  The parties shall lodge the joint proposed Judgment with the Court on or before **June 5, 2020**.  In the unlikely event that counsel are unable to agree upon a joint proposed Judgment, the parties shall each submit separate versions of a proposed Judgment along with a Joint Statement setting forth their respective positions on or before **June 5, 2020.**

IT IS SO ORDERED.