# EXHIBIT 2

**ERIKSON LAW GROUP**
David Alden Erikson (SBN 189838)
 david@daviderikson.com
Antoinette Waller (SBN 152895)
 antoinette@daviderikson.com
Jeffrey J. Miles (SBN 293869)
 jeff@daviderikson.com
200 North Larchmont Boulevard
Los Angeles, California 90004
Telephone: 323.465.3100
Facsimile: 323.465.3177

Attorneys for Plaintiff Francesca Gregorini

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| FRANCESCA GREGORINI,<br><br>              Plaintiff,<br><br>        v.<br><br>APPLE INC., a California corporation;<br>M. NIGHT SHYAMALAN, an<br>individual, BLINDING EDGE<br>PICTURES, INC., a Pennsylvania<br>corporation; UNCLE GEORGE<br>PRODUCTIONS; a Pennsylvania<br>corporation; ESCAPE ARTISTS LLC,<br>a California limited liability company;<br>DOLPHIN BLACK PRODUCTIONS,<br>a California corporation; TONY<br>BASGALLOP, an individual; ASHWIN<br>RAJAN, an individual; JASON<br>BLUMENTHAL, an individual; TODD<br>BLACK, an individual; STEVE TISCH,<br>an individual; and DOES 1-10,<br>inclusive<br><br>              Defendants. | Case No. 2:20-cv-00406-SSS-JC<br>Hon. Sunshine S. Sykes<br><br><br>**PLAINTIFF'S RESPONSE TO<br>DEFENDANT UNCLE GEORGE<br>PRODUCTIONS, LLC'S FIRST SET<br>OF INTERROGATORIES** |

PROPOUNDING PARTY:     Defendant Uncle George Productions, LLC

RESPONDING PARTY:     Plaintiff Francesca Gregorini

SET NO.:                          One

Plaintiff Francesca Gregorini ("Plaintiff" or "Responding Party") hereby submits the following responses to Defendant Uncle George Productions, LLC's ("Defendant" or "Propounding Party") first set of Interrogatories.

## PRELIMINARY STATEMENT AND GENERAL OBJECTIONS

1. These responses are made solely for the purpose of this action. Responding Party has not yet completed their investigation of the facts relating to this action, preparation for trial or associated discovery. As discovery proceeds, Responding Party may identify individuals who have knowledge concerning the subject matter of this action, or who participated in some capacity in events underlying (or related to) this action, and/or Responding Party may discover facts, information, evidence, documents, and things which are not set forth in these responses, but which may be responsive.

2. The following responses are based on Responding Party's present knowledge, information and belief and are complete as to Responding Party's best knowledge at this time. More specifically, Responding Party has prepared these responses based on their good faith interpretation and understanding of the individual interrogatories, but Responding Party reserves their right to correct any inadvertent errors or omissions. In addition, Responding Party's responses are based upon information they have been able to obtain pursuant to a reasonably diligent search for the requested information in the location(s) where Responding Party believes such information, if any, is normally maintained.

3. Responding Party also reserves the right to conduct discovery with reference to, or to offer into evidence at the time of trial, all facts, evidence, documents, and things developed during discovery and trial preparation, notwithstanding the reference to certain facts, evidence, documents, and things in this response. In addition, Responding Party reserves the right to revise and further supplement these responses based upon any information, evidence, and

documentation, which may be discovered after the service of these responses as appropriate.

4.      To the extent that any interrogatory seeks information which is protected by the attorney-client privilege and/or attorney work product doctrine, Responding Party will not respond. Inadvertent identification or disclosure of privileged information or documents by Responding Party is not a waiver of any applicable privilege. Production of information and documents does not waive any objection, including, but not limited to relevancy, to the admission of such information or documents into evidence.

5.      Responding Party objects to this set of interrogatories and to each individual interrogatory contained therein to the extent they purport to require disclosure of confidential and/or proprietary business information, the disclosure of which would be competitively harmful, and Responding Party will not produce such information except subject to the confidentiality order in this action.

6.      Responding party objects to any interrogatory herein to the extent that it seeks disclosure of information protected by the attorney-client privilege, the attorney work-product doctrine, the common-interest privilege, or any other applicable privilege, doctrine, or immunity. To the extent that any interrogatory may be construed as seeking such privileged or protected information, Responding Party hereby claims such privilege and invokes such protection. The fact that Responding Party does not specifically object to an individual interrogatory on the grounds that it seeks privileged or protected documents shall not be deemed a waiver of the protection afforded by the attorney-client privilege, the attorney work-product doctrine, the common-interest privilege, or any other applicable privilege or protection.

7.      Responding Party notes that their obligations regarding these responses are set forth by statute, not by the "Instructions" provided by Propounding Party.

ERIKSON LAW GROUP
ATTORNEYS
LOS ANGELES CA

3                          RESPONSE TO INTERROGATORIES

8.     Each of the following responses incorporates as though fully set forth the foregoing Preliminary Statement and General Objections ("General Objections").

## RESPONSES

**INTERROGATORY NO. 1:**

Identify any and all owners of the copyrights for the REGISTERED WORK.

**RESPONSE TO INTERROGATORY NO. 1**

Responding Party incorporates the General Objections as if fully set forth here.

Responding Party objects to this interrogatory on the grounds that it is vague and ambiguous.

Subject to and without waiving these objections, Responding Party responds as follows: Plaintiff Francesca Gregorini is the owner of the copyright registered with the U.S. Copyright Office Reg. No. PA0002213169.

**INTERROGATORY NO. 2:**

Identify any and all owners of the copyrights for the REGISTERED SCRIPT.

**RESPONSE TO INTERROGATORY NO. 2**

Responding Party incorporates the General Objections as if fully set forth here.

Responding Party objects to this interrogatory on the grounds that it is vague and ambiguous.

Subject to and without waiving these objections, Responding Party responds as follows: Plaintiff Francesca Gregorini.

**INTERROGATORY NO. 3:**

Describe the work that was registered with the U.S. Copyright Office Reg. No. PA0002353598 by "Well Go USA Ent."

**RESPONSE TO INTERROGATORY NO. 3**

Responding Party incorporates the General Objections as if fully set forth here.

Responding Party objects to this interrogatory on the grounds that it is vague and ambiguous. Responding Party further objects on the ground that the information sought is not sufficiently related to any of the claims, allegations, or defenses in this

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

4                    RESPONSE TO INTERROGATORIES

case; and the interrogatory is overbroad, unduly burdensome, oppressive, and harassing.

**INTERROGATORY NO. 4:**

Describe any and all transfers of ownership of the copyright to the REGISTERED WORK.

**RESPONSE TO INTERROGATORY NO. 4**

Responding Party incorporates the General Objections as if fully set forth here.

Responding Party objects to this interrogatory on the grounds that it is vague and ambiguous. Responding Party further objects on the ground that the information sought is not sufficiently related to any of the claims, allegations. or defenses in this case; and the interrogatory is overbroad, unduly burdensome, oppressive, and harassing.

Subject to and without waiving these objections, Responding Party responds as follows: Emanuel Film, LLC first applied to register the copyright for Plaintiff's movie in 2012. In 2017, Emanuel Film, LLC was dissolved and cancelled, and the copyright in the Registered Work was assigned to Plaintiff, who is the screenwriter, director, and producer. Since that assignment, Plaintiff has been and still is the sole proprietor of all rights, title, and interest in and to the copyright in the Registered Work. Plaintiff has complied in all respects with the Copyright Act and all other laws governing copyright. Plaintiff has complied with 17 U.S.C. § 411 in that the deposit, application, and fee required for registration have been delivered to the Copyright Office in proper form, and the work has registered—U.S. Copyright Office Reg. No. PA0002213169.

**INTERROGATORY NO. 5:**

Describe any and all transfers of ownership of the copyright to the REGISTERED SCRIPT.

**RESPONSE TO INTERROGATORY NO. 5**


ERIKSON LAW GROUP
ATTORNEYS
LOS ANGELES CA

RESPONSE TO INTERROGATORIES

Responding Party incorporates the General Objections as if fully set forth here. Responding Party objects to this interrogatory on the grounds that it is vague and ambiguous. Responding Party objects on the ground that the information sought is not sufficiently related to any of the claims, allegations, or defenses in this case; and the interrogatory is overbroad, unduly burdensome, oppressive, harassing, and vexatious.

Subject to and without waiving these objections Responding Party responds as follows: None.

**INTERROGATORY NO. 6:**

State all facts to support YOUR contention that EMANUEL and SERVANT are substantially similar.

**RESPONSE TO INTERROGATORY NO. 6**

Responding Party incorporates the General Objections as if fully set forth here. Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, and overbroad.

Subject to and without waiving these objections, Responding Party responds as follows: *Servant* is substantially similar to *The Truth About Emanuel*, in its themes, setting, characters, plot, sequence of events, mood, pace, and dialogue. Accordingly, *Servant* is an unauthorized derivative work of *Emanuel*—a television adaptation of the motion picture. The central subject matter of both works is the relationship between a troubled mother and the nanny who serves as a surrogate daughter figure— ameliorating the unfulfilled longings the mother has for a child, and the nanny for a mother. To explore this subject, the works tell remarkably similar stories, using remarkably similar (and unique) techniques. Any one of the many commonalities enumerated below would be surprising because they represent unique expression and unusual directorial choices—but the odds of them *all* appearing in two independent works would be astronomical. Further, the unique selection and arrangement of these elements—which is substantially similar in *Emanuel* and *Servant*—make it a statistical certainty that Defendants copied *Emanuel* in making *Servant*.

This list of commonalities is necessarily an abbreviation. The only way to fully appreciate the extent of *Servant*'s overlap with *Emanuel* is to view the entirety of both works (i.e. the film *Emanuel* and Episodes 1-3 of Season 1 of *Servant*), with the benefit of further explanation and facts regarding the nature of the similarities, their significance in the works, the rarity/idiosyncrasy of the relevant artistic choices in *Emanuel*, and an analysis of the point of comparison in light of conventions in literature, film, and television. For this reason, the entirety of both works (the film *Emanuel* and Episodes 1-3 of Season 1 of *Servant,* both approximately an hour and a half of content) are incorporated into this response by this reference.

One of Defendants' more brazen misappropriations from *Emanuel*— which runs throughout plot, characters, themes, etc.—is Defendants' liberal use of magical realism: the escalating presence of supernatural elements into an otherwise realistic story. This realism makes *Emanuel* and *Servant* different than most horror or supernatural movies. Like Plaintiff's highly unusual artistic/directorial choice for *Emanuel*, *Servant* purposefully keeps the audience wondering—in a way that is not answerable—as to the objective reality of supernatural elements.

The themes of *Servant* are remarkably similar to those of *Emanuel*. For example, key themes of both works include denial and self-delusion as a means of avoiding the unspeakable grief of losing a baby; and the dangerous, precarious, and ineffective nature of this pathological coping mechanism. The incredible complexity of the mother/child bond and especially its absence (including manners in which the severing of such a bond might give rise to psychological pathologies). • Shared secrets and complicity in another's delusion—particularly in the context of a mother/daughter relationship. The dangers of shared delusion; and how such collusion can lead to crisis, including a collision with reality. The mystery/danger of a stranger coming to town, or a new person in the mix. The redemptive potential of confronting reality (or equivalently, the lack of redemption in failing to confront reality). The safety, sanctity, and comfort of home—and the obverse dangers of the outside world. The

relationship between familial and maternal longing, and sexuality. Most of the themes mentioned in this paragraph are extremely rare in Hollywood, which renders the commonalities between *Emanuel* and *Servant* more striking, and thus more probative of Defendants' illicit appropriation of Ms. Gregorini's protected expression.

*Emanuel* was the *first* film to explore maternal longing by examining its delusional misplacement, while also studying a young woman's misplaced longings for a mother. *Servant* was the second. Likewise, *Emanuel's* surprising depiction of sexual longing as related to misguided maternal sentiments was unprecedented until *Servant* offered a similar take.

In addition, *Servant* unfolds in a setting that is substantially similar to that in *Emanuel*, including as follows: As in *Emanuel*, the central characters in *Servant* (the nanny and mother) live in such close proximity that truths are often revealed by snooping, spying, voyeurism, or inevitable casual observation. As in *Emanuel*, the key action in *Servant* takes place in the mother's home. To facilitate this idea of the characters watching each other, both works showcase a dark but often dramatically lit exposed wood staircase, overlooking the first floor and entry hall where much of the action unfolds—perfect for watching, listening, and snooping.

Additionally, as in *Emanuel*, *Servant* unfolds in the mother's beautiful, immaculate, old-world, well-appointed, home. In both works, the fact that the house is so well put together becomes somewhat disturbing as the story progresses. Obviously, it dawns on the audience, it is easier to maintain a house when the new baby is not real. In both works, the house becomes a symbol of the false edifice of domestic tranquility that the mothers are building, and the nannies are buying into and sustaining. As in *Emanuel*, the house in *Servant* is so important as to almost become a character. In both works, the house is a safe and comfortable sanctuary—as contrasted with the dangers of the outside world, including the key danger of the mother's secrets being exposed. As in *Emanuel*, *Servant* furthers this sanctuary theme by prominently featuring the show-piece entry hall mentioned above, as a kind of portal from the

outside world to the inner sanctum where the family secrets reside. These hallways facilitate scenes of prying eyes entering the house. As in *Emanuel*, the importance of the doorway in *Servant*—as dividing worlds—is highlighted by highly unusual close-up shots of the nanny's feet as she crosses the home's threshold. [*Emanuel* at 18:11 and 39:19; *Servant* Ep. 1 at 2:39.]

Further, both works feature a critical trip to the nanny's mother grave, where important truths are revealed. In both works, the nurseries are magazine-worthy— almost to the point of being hyper-real—including vertically striped wallpaper, old-fashioned cribs, beautiful vintage baby items, and remarkably, an antique rocking horse that obviously won't be pressed into service for a few years. Again, these picture-perfect nurseries, in each work, highlight the lack of a real baby.

In each work, the second-story nursery is introduced by the same idiosyncratic camera technique: a shot from outside the house, pushing in on the second story window, to show a figure fussing over the baby. The shot introduces the nursery in a voyeuristic way.

Like *Emanuel*, *Servant* includes several scenes of family and extended-family dinners. For example, both works feature a key birthday dinner scene in a formal dining room (discussed in more detail below). [*Emanuel* at 55:20; *Servant* Ep. 2 at 25:30.] Both works also contain dinner scenes in which the pleasant mood (and elaborately prepared and described food) is compromised when the conversation moves to talk of the "baby." [*Emanuel* at 24:45; *Servant* Ep. 1 at 20:20.] In both works, these scenes seem to deconstruct conventional ideas of domestic bliss. If one didn't know better, the scene looks like typical domesticity—which is of course at odds with the troubles and secrets bubbling to the surface. For this reason, cracks and tensions reveal themselves at these family dinners—creating a tense mood.

As additional substantial similarities, *Emanuel* and *Servant* also revolve around strikingly similar characters, with similar backgrounds and story arcs. In a sense, the striking plot similarities dictate significant similarities in characters—but here the

similarities go much further. The Nannies in the two works are strikingly similar: Emanuel (*Emanuel*) and Leanne (*Servant*). Emanuel and Leanne are extraordinarily similar, including in the following obvious respects: Both are pretty, white, 18-year-old girls. Emanuel says that she will be "18 in a month." Leanne reports that she is 18. In both works, the nannies' youth and attendant quirks are remarked upon by other characters. Leanne looks very much like Emanuel. Not only are they the same age and race, they also share a slight frame, fair skin, blue eyes, and long dark hair. Like Emanuel, Leanne is moody, withholding, unpredictable, enigmatic to others, and reticent. Neither speaks freely, nor smiles frequently. In both works, other characters must put in considerable effort to get them to enjoy themselves and must coax personal information from them because they are both so private. Both are played by young English actresses—which has the effect of lending an "outsider" quality to their characters. Leanne and Emanuel have similarly troubled histories: Each exists without a mother, who died tragically many years prior—and as a result gravitates to and sympathizes with the mother who has delusionally hired them. Both take on a double maternal role: outwardly caring for the baby, but more fundamentally, caring for the grieving mother. Both also take on a daughterly role, acting as a receptacle for the mother's maternal instincts gone haywire, while also addressing their own longing for a mother figure. Both Leanne and Emanuel "shouldn't be here." They each should have died when their mothers did. Both works include a scene of the nanny taking the initiative to arrange a date with a boy. In each, the nanny is shown to be more of a "bad girl" than the audience might have originally thought, by directing her timid date to steal a bottle of red wine. In *Emanuel*, the wine is to be paired with French bread and cheese, but we never see the meal to fruition because Emanuel takes the date in a different direction. In *Servant*, the nanny's date suggests French bread and cheese, which is not in fact consumed because the nanny has other ideas.

In both works the mothers are strikingly similar. Linda in *Emanuel* and Dorothy in *Servant* are remarkably similar, including in the following respects: Both mothers

RESPONSE TO INTERROGATORIES

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

are sensitive and delicate enough that their grief sends them around the bend into delusion—but at the same time they each have the strength to appear remarkably confident and self-possessed. Both mothers suffered the tragic loss of their first and only baby—resulting in the delusion that a reborn doll is that baby. In other words, both channel their tragically displaced maternal love into a doll—so fully committed to the fantasy that they hire a nanny (towards whom they feel motherly). Both mother characters are in their mid-thirties (slightly older than the average new mom).

As in *Emanuel*, the mother in *Servant* enters a trance-like state several times, which we understand to involve a moment when the awful truth of her baby's death might be percolating toward the surface of her consciousness. In both works, the mothers snap out of these states rather easily due to external distractions. Both are white, sophisticated, and privileged. Both mothers share the same positive, almost effervescent, "type A" personality, flitting around arranging flower vases in their pristine homes wearing stylish clothing. Both are apparently affectionate and doting mothers. Both mothers' displaced maternal longing is channeled not only into a reborn doll, but also into the nanny. In both works, an early indicator of this dynamic is a scene in which the mother takes great joy in choosing clothes from her closet for the nanny to wear. The audience naturally feels even greater sympathy for the mothers, seeing how naturally nurturing they are. In both mother characters, there is an unspoken, perhaps unconscious or repressed, sexual longing, that is subtly directed towards the nanny. This is depicted, in both works, in a key scene in the mother's bathroom, where the mother helps the nanny with a painful condition (*Emanuel*) or vice-versa (*Servant*).

The Dolls in the two works are substantially similar: Chloe (*Emanuel*) and Jericho (*Servant*). The doll in *Servant* looks almost identical to its extremely realistic precursor in *Emanuel*. For example: Both dolls are as physically realistic as possible. As a result, both works include a number of "creepy" shots of the almost-but-not-quite lifelike "baby" (especially shots of the baby's open eyes). Once again, the physical

resemblance of the dolls is the result of casting. Both are ultra-lifelike "reborn" baby dolls. Both dolls look to be about three months old (which of course reflects another remarkable similarity between the works: that both babies died at around this same age). Both dolls appear to "come back to life," as part of the nanny's effort to resolve her own and the mother's grief. In both works, the "reality" of the rebirth is ambiguous, which is achieved through the use supernatural elements or "magical realism." Both dolls have patchy dark hair—which was not at all an obvious choice in *Servant* given that Dorothy has red hair.

The Fathers in the two works are substantially similar characters: Thomas (*Emanuel*) and Sean (*Servant*). In both works, the fathers serve the important role of explaining to the nanny and audience what has happened—birth, death, lack of certainty regarding cause of death, grief, and then a doll. In each work, we find the father somewhat insensitive—perhaps out of exhaustion but perhaps also because he cannot understand a mother's grief. In *Emanuel*, this is shown by Thomas's principal reaction to his wife's grief-induced psychosis: to have her committed to a psychiatric facility. In *Servant*, this is shown by the husband's crass reference to his wife as crazy and talk of whether the nanny is "hot." Casting of the fathers is also similar. Sean and Thomas are cut from the same cloth: both are tall, hipster-type white men who look like they've stepped out of a beer commercial.

The Nannies' Love Interests are similar in the two works: Tobe (*Emanuel*) and Claude (*Servant*)**.** Both Emanuel and Leanne have romantic interludes with a boy their own age. In both works, the boy is timid, shy, sexually immature, and diminutive—although surprisingly intelligent and sophisticated. Both are taken aback by, and unsure how to handle, the nanny's intensity. Both nannies take the romantic initiative: arranging the date and taking control of it. This is depicted in both works by the nanny directing the boy to steal a bottle of red wine; and by the nanny's choreographing the date. The boys in both works simply do as they are told.

1    The Antagonists in the two works are remarkably similar: Arthur (*Emanuel*)
2  and Julian (*Servant*). Both works feature a nebbish, petulant, persnickety, quirky,
3  professorial, twenty-something man who poses a threat to the nanny, and acts as the
4  nanny's primary foil and antagonist. In *Emanuel*, this character is Arthur, whom she
5  works with. Arthur ultimately insinuates himself into the household and questions the
6  nanny's motives, competency, and possible criminality. In *Servant*, this character is
7  Julian, the mother's brother, who also insinuates himself into the household and
8  questions the nanny's motives, competency, and possible criminality. In both works,
9  there is a powerful scene where this character confronts the nanny and threatens to
10  expose her lies and alert the authorities. The two actors who play these characters are
11  very similar in appearance: bowl haircuts, and rumpled suits with loose knit ties. They
12  are both medium height white guys who could be brothers.

13    The plot of *Servant* is substantially similar to that of *Emanuel*. As explained
14  above, and as a threshold matter, *Servant's* premise is identical to *Emanuel's.* Out of
15  grief, a mother replaces her dead infant with a life-like reborn doll. To her husband's
16  concern, she cares for the doll believing it to be their living baby. When she hires a
17  nanny who also treats the doll as if it were alive, the two form a reciprocal fascination
18  and bond stemming from their reciprocal troubled pasts. As a result of the nanny's
19  complicity in the mother's delusion, conflicts of loyalty arise that cause dangerous
20  fissures. But the plot similarities between the two works go much deeper than this
21  premise. For example: • In both works, the nanny is the focal point—as the titles of
22  the works make clear. • As in *Emanuel*, *Servant's* nanny is newly hired by a
23  sophisticated and privileged white new first-time mother, to care for a roughly three-
24  month old baby. As in *Emanuel*, the mother in *Servant* appears to be confident,
25  competent, and cheerful; and gives direction with kindness. • In both works, the nanny
26  seemingly appears in the mother's life through happenstance. In *Emanuel,* she
27  happens to live next door to the mother's new home. In *Servant*, the nanny is
28  presented as "a friend of a colleague of an acquaintance," procured with the help of a

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

13                          RESPONSE TO INTERROGATORIES

"shout on Twitter." Existing alongside this idea that the nanny appears at random is the more important truth, in both works, that the nanny has "chosen" the mother. Emanuel first sees the mother through her window and is immediately intrigued—probably due in large part to the uncanny resemblance to her own deceased mother. Emanuel seizes the first opportunity to get closer to the mother, after learning that she might help with childcare—asking without hesitation "when do I start?" She acts casually, but the effort is extremely deliberate.

As in *Emanuel*, the nanny in *Servant* is revealed to have targeted the mother—to the point where she seemingly has a live baby at the ready. Like Emanuel, Leanne's palpable fascination with the mother is expressed through voyeurism. In *Emanuel*, Emanuel frequently watches the mother through windows, between their houses [12:19], even using binoculars [7:40]. In *Servant*, the nanny goes so far as to watch the mother's news broadcasts [Ep 1 at 19:45]. In both works, the nanny watches surreptitiously as the mother greets a love-interest. [See, e.g., *Emanuel* at 54:44; *Servant* Ep. 3 at 16:20.] • As in *Emanuel*, the nanny in *Servant* endures an awkward yet cute "get to know you" question and answer scene with her employer—in which the nanny is likely cringing at some of her answers as soon as they escape her lips.

In both works, the mother is forgiving. In *Emanuel*, the awkwardness is shown when the nanny struggles to remedy a bad answer. In *Servant*, the awkwardness is shown when the nanny cannot capitalize on an initially promising answer. In each work, the nanny ultimately salvages the moment by demonstrating knowledge of French. In both works, the nanny quietly and contemplatively takes in each detail of the mother's beautiful home when first alone there, clearly seduced by what she sees and wanting to become a part of it. In both works, the nannies seem to imagine themselves becoming their employer's daughter and living in her fantasy house. Early on in each work, the audience is struck by how easy the baby is to care for. The familiar troubles of being a new parent are not present: there are no neglected messes,

harrowing bouts of crying, or googling of symptoms. In each work, early on, the
audience catches a fleeting and unremarkable glimpse of the baby.

Relatively early in both works—minute 21 in *Emanuel* and minute 12 in
*Servant*—the audience learns that the baby is not real, but rather an ultra-realistic
"reborn" doll. In both works, the audience learns this fact by way of a dramatic and
jarring "reveal" when the doll is lifted in the crib to reveal its lifelike but lifeless body
and face. [*Emanuel* at 21:18; *Servant* Ep 1 at 12:24.] This moment, in each work, is
the so-called "catalyst" or inciting incident, which usually occurs like clockwork just
after the "setup" phase of a motion picture (especially in high-concept narratives).
This catalyst—the reveal of the doll—is arguably the single most important moment
in each work, defining the "conflict," and setting the characters' goals and
interrelationships.

As in *Emanuel*, the nanny in *Servant* very quickly realizes the mother truly
believes the doll to be real and plays along with the delusion for reasons of her own.
Notably, neither nanny has even a moment where she confronts the mother or laughs
at the absurdity of the situation. Rather, both nannies almost immediately treat the doll
as real. Within minutes, Emanuel has processed that the mother is delusional and has
decided to treat the baby as real herself [*Emanuel* at 23:50]——and soon after she
treats the doll as human even while alone with her. In *Servant*, the nanny's first sight
of the doll comes when she wanders into the nursery soon after first entering the
house. We see her reach into the crib—and within minutes she is seated at the table
with the mother, showing no sign of shock or surprise. [*Servant* Ep 1 at 5:15-5:45.] It
is a remarkable turn and the engine that drives future events: the presence of the doll
in the crib demonstrates that the mother, far from being a self-possessed supermom, is
in the midst of a psychosis. Now, her high functioning is disturbing.

As in *Emanuel*, the cause of the mother's delusion in *Servant* is the trauma
caused by the death of her real baby at three months old. In each work, the precise
cause of the baby's death is said to be unknown. The nannies in both works speak to

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

15                    RESPONSE TO INTERROGATORIES

the doll/baby as if it were alive, even when they are alone and there would be no need to keep up the ruse. In scenes that are uncannily similar, the nanny dresses and speaks to the doll on the changing table. [*Emanuel* 31:22; *Servant* Ep 1 at 13:30.]

Both works feature a scene in which the father explains what has happened: the death of the baby, the psychotic break which was ameliorated only when the mother came to believe the reborn doll was her baby (putting the mother into what appears to be a hyper-normal state). In both works, the father reports that the precise cause of the baby's death is unknown—although the viewer does not know whether this is true. In both works, the nanny appears annoyed by the father's insensitivity to his wife's grief and her desperate coping mechanism, which causes the nanny to feel closer and more protective of the mother.

Both works contain a scene showing the mother, alone in front a mirror, considering her post-baby body and stretch marks. The disconcerting effect is that we see the mother as a normal mom with normal, if quotidian, post-partum concerns, when of course far more serious issues are looming.

In both works, the nanny's mother died years prior, in a tragic and sudden manner. In both works, the absence of the nanny's mother has left a hole in her life that her relationship with the mother begins to fill—in a way that complements the hole in the mother's life caused by the death of her baby. In both works, the nanny and mother develop an extraordinary reciprocal fondness. In both works, there are hints that the mother's immediate and over-the-top fondness for the nanny is in part motherly and may stem from a further warping of her already-displaced maternal instincts.

In both works, the mothers see themselves in the nanny (as one might say of a daughter). In both works, the mother/daughter bond between the mother and nanny is expressed in a scene where the mother asks about the nanny's past, culminating with the mother gently and affectionately stroking the nanny's face. [See, e.g., *Emanuel* at 14:29; *Servant* ep. 3 at 14:36.]

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

16                    RESPONSE TO INTERROGATORIES

Likewise, both nannies emulate the mothers (including by sitting at the mother's vanity while applying the mother's makeup). In both works, despite the reciprocal motherly-daughterly bond between mother and nanny, the relationship is nuanced with subtle, perhaps unconscious, sexual tension. In both works, this comes to the surface primarily through a scene in the bathroom, where one character helps the other with a painful condition. In *Emanuel*, it is the mother tending to Emanuel's cut in an unmistakably and spontaneously erotic manner, culminating in a lingering kiss on the hand. In *Servant*, it is the nanny tending to the mother's painful mastitis with a breast massage, which turns oddly and spontaneously erotic, culminating in a lingering kiss on the forearm.

In both works, the odd dynamics of the maternal/erotic relationship between nanny and mother is also communicated in a scene where the mother helps dress and then beautify the nanny. In both scenes, the mother takes in and marvels at the nanny's beauty. In both works, other characters question the mother/nanny bond and question the nanny's experience and motivations.

In both works, the bizarreness of the mother/nanny relationship is also expressed by the nanny looking on with a measure of discomfort as the mother readies herself for a date. Both works show the mother applying her makeup at a vanity, with the nanny shown out of focus on a bed behind her. In both works, the nanny remarks on the mother's beauty as they discuss the impending date. The similarity of these scenes goes beyond their plot points—each looks and feels the same down to blocking (the physical placement of actors/characters) and unusual camera focus techniques (a focus pull in a mirror). Following this scene, in each work, the nanny is shown seated at the mother's vanity. In each work, we watch the nanny in the mirror as she oddly applies the mother's makeup to herself—childlike, out of character, and without any apparent reason. The purpose of this scene, in each work, is to show the nanny's daughterly emulation of the mother.

In both works, the plot advances by way of a long and key scene involving an intimate home birthday dinner celebration at a formal dining room table. In both, the birthday setting facilitates an added measure of intimacy (in part forced and in part real) between the characters. At each dinner, conflicts send certain of the characters into other rooms for private conversations, leaving awkward moments for those remaining at the table. In both works, the absurdity of the situation (which the viewer could easily forget given how committed the nanny and mother are to the delusion) is sometimes depicted through unnerving or "creepy" shots of the doll—still (of course), with wide open eyes.

Taking the idea a step further, *Servant*, like *Emanuel*, features a slightly comical scene in which the doll is dropped in the entrance hall, only to be picked up just before the mother sees. These scenes make the viewer slightly uncomfortable because we have come to think of the doll as real, and because the mother seeing the "baby" on the floor would be potentially catastrophic.

Both works feature a re-birth of the dead child as an emotional high point. In each work, the nanny is the key to bringing the dead child back to life, partly in service of moving the mother beyond delusion, and partly as a result of her fascination with the mother. The rebirth in each work is ambiguous in the sense that the reality and/or identity of the baby is open to debate—in keeping with the unusual magical realism elements in each work. In *Servant*, it is not clear whether the nanny smuggled a live baby into the nanny's home (which of course is a "natural" explanation); or whether she has the (supernatural) ability to make the other characters perceive the doll as a live baby.14 Likewise, in *Emanuel*, while the magical realism elements can appear to be digressions in an otherwise realistic story, they can also leave some traces in the "real" world of the film. For example, soon after water appears to flow from under the nursery door, and after water appears to fill a subway car, Emanuel is shown stepping in puddles even when there has been no rainfall.

Both works feature key imagery involving rain, puddles, and water. For example, in *Emanuel*, the notable and extended scene where the doll comes back to life takes place entirely underwater (as shown in beautiful sequences of Emanuel underwater, but with a natural face). Likewise, the nanny in *Servant* is shown underwater, with a natural face. Also, in both works, water (in the form of rain and puddles) helps delineate the boundary between the safe interior of the home and the perilous outside world.

The sequence of events in the two works are substantially similar as well. Because the plots of *Emanuel* and *Servant* are so similar, and because each unfolds in roughly linear chronology, the sequence of events in the two works are extremely similar. But even beyond these stark similarities, there are several examples where the similarity of sequencing is shocking. For example: As mentioned previously, both works include an awkward job interview scene (which obviously occurs early on). The scenes following the "interviews" are uncannily similar as well. In *Emanuel*, it is now night, and we cut back and forth between Emanuel looking out her bedroom window (at the mother as she falls asleep); and the mother as she rocks her baby to sleep. In *Servant*, it's also now night, and we cut back and forth between the nanny and the mother in their respective bathtubs. In each scene, the mother and nanny are shown alternatively in solitary moments—but with a strong sense that they are connected during those moments.

As also mentioned, each work includes a scene of the nanny looking on as the mother applies makeup at her vanity in preparation for a date; followed by a scene of the nanny sitting at the same vanity, applying the mother's makeup in the same manner as was the mother (which we observe in vanity mirror). In both works, the nanny faints under stress—followed by the nanny's point-of view shot as she regains consciousness to the sight of concerned faces.

The mood of the two works is substantially similar. Both are played as ominous "psychological thrillers," with elements of magical realism—a rare combination.

Indeed, Ms. Gregorini's choice to tell her nuanced emotional tale of motherhood as a thriller was a bold and surprising one—and one parroted by Defendants in *Servant*. In particular: Both works are tense throughout. In both works, the risk of secrets being exposed, and the urgent and emotional need to protect those secrets, is meant to feel like a ticking time bomb. One false move, or one prying eye, and the house of cards would come tumbling down. As a result, the audience experiences heightened feelings of suspense, excitement, surprise, anticipation and anxiety. Both works have an ominous mood, created by the use of camera angles, lighting, and the choice of music (including opera playing in the mother's house). As in *Emanuel*, *Servant* employs a technique where actors' eyelines are so close to being directly into the lens that the audience is invited directly into the center of the uncomfortable tension. This technique of breaking the fourth wall is extremely unusual, and uncomfortably amplifies the urgency and intimacy of the mood.

Indeed, both works go so far as to show characters purposefully looking directly into the camera—as a way of depicting the nanny's point of view when, after fainting from stress, she awakens to the gaze of concerned faces.

As in *Emanuel*, *Servant* employs unusually tight shots of characters' faces, sometimes to the point where chins and hairline are cut off. The effect of this camera and cinematographic technique is to create a feeling of uncomfortable intimacy. [See, e.g., *Emanuel* at 25:54; *Servant* Ep. 3 at 24:55.]

Both works use magical realism to create an otherworldly mood. In *Emanuel*, this takes the form of water imagery. At first water escapes from under the nursery door, then it rises up from nowhere in a subway car, culminating in an underwater "rebirth" scene where the entire nursery is submerged. In *Servant*, it's not water but rather wood—that keeps finding a way into the father's body. At first, he gets a splinter on his finger, then in his rear end, then in his mouth, and so on. In both works, the otherworldly magical realism is foreboding and escalating.

Both works create a mood of discomfort and awkwardness by employing the unusual device of featuring long pauses in the characters' dialogue—often in wide shots where both characters are in the frame. This technique is used throughout both works—including in parallel scenes showing the first meeting between nanny and mother. In *Emanuel*, after mother and nanny exchange hesitant greetings, there is an awkward pause before Linda invites Emanuel in. In *Servant*, a wide shot shows the mother at the front door inquiring "Leanne?... Leanne Grayson?" Five awkward seconds pass before the nanny responds with a hello, even though she is standing right in front of her. [*Emanuel* at 9:20; *Servant* Ep. 1 at 2:12.]

As in *Emanuel*, *Servant* uses the unusual cinematographic technique of featuring characters in conversation in dark shadowy rooms—but with the sun in their eyes (through horizontal blinds). In both works, the technique is mixed with quick editing between tightly framed shots of the characters. The overall effect again reflects the mood of both works: uncomfortable and dark. [*Emanuel* at 51:44; *Servant* Ep. 1 at 24:08.]

Both works proceed at a rapid pace. In each, the characters can barely keep up with events as they unfold. As mentioned above, scenes of family dinners are often used to juxtapose intimacy and tension. This mood is furthered by the theme, in both works, of cooking and food. In *Emanuel*, dinners are not simply prepared—they are narrated. The menu is reported in detail, in the manner of a fine restaurant ("herb roasted chicken with porcini mushroom stuffing"). Emanuel's birthday cake is painstakingly decorated by hand. So too in *Servant*, where elaborate and exotic food, and its preparation, are keys to each episode.

*Emanuel* and *Servant* share similar dialogue, including as follows: Both works feature scenes where the mother expresses that she sees herself in the nanny— followed by surprisingly strong exclamations of affection. Both works feature scenes where the mother gives baby-care direction in extremely realistic terms, demonstrating the depth of her commitment to the delusion that the doll is real. Both

works feature awkward question-and-answer scenes, where the mother attempts to better know the nanny, and the nanny does her best to impress by demonstrating a knowledge of French. Both works feature scenes where the father explains that the cause of the baby's death is unknown. Both works feature scenes in which the nanny compliments the mother as they discuss an impending date. Both works feature scenes where characters speculate that the nanny's youth is the explanation for her quirks and reticence.

**INTERROGATORY NO. 7:**

Identify each and every asserted similarity between EMANUEL and SERVANT.

**RESPONSE TO INTERROGATORY NO. 7**

Responding Party incorporates the General Objections as if fully set forth here. Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, and overbroad. Responding Party objects to this interrogatory on the grounds that it contains subparts, is compound, conjunctive, or disjunctive. Responding Party objects to the interrogatory on the grounds that it is not full and complete in and of itself.

Subject to and without waiving these objections Responding Party responds as follows: Similarities between *Emanuel* and *Servant* include but are not limited to those identified in response to interrogatory no. 6 above, the answer to which interrogatory is incorporated here as if set forth in full.

**INTERROGATORY NO. 8:**

Identify each and every asserted similarity of protectable expression between EMANUEL and SERVANT.

**RESPONSE TO INTERROGATORY NO. 8**

Responding Party incorporates the General Objections as if fully set forth here. Responding Party objects to this interrogatory on the grounds that it is vague,



ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

RESPONSE TO INTERROGATORIES

ambiguous, and overbroad. Responding Party further objects to this interrogatory on the grounds that it contains subparts, is compound, conjunctive, or disjunctive.

Subject to and without waiving these objections Responding Party responds as follows: Similarities between *Emanuel* and *Servant* include but are not limited to those identified in response to interrogatory no. 6 above, the answer to which interrogatory is incorporated here as if set forth in full.

**INTERROGATORY NO. 9:**

Identify the selection and arrangement of unprotectable elements, if any, in EMANUEL in which YOU contend that YOU have a copyright.

**RESPONSE TO INTERROGATORY NO. 9**

Responding Party incorporates the General Objections as if fully set forth here. Responding Party objects to this interrogatory on the grounds that it is so vague, ambiguous, and overbroad as to be unintelligible.

Subject to and without waiving these objections Responding Party responds as follows: Similarities between *Emanuel* and *Servant* include but are not limited to those identified in response to interrogatory no. 6 above, the answer to which interrogatory is incorporated here as if set forth in full.

**INTERROGATORY NO. 10:**

Identify each and every person who contributed to the writing of EMANUEL.

**RESPONSE TO INTERROGATORY NO. 10**

Responding Party incorporates the General Objections as if fully set forth here. Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, and overbroad including as to the phrase "contributed to the writing of". Responding Party further objects to this interrogatory on the grounds that it contains subparts, is compound, conjunctive, or disjunctive, and causes or may cause the number of interrogatories to exceed the amount allowed under Federal Rule of Civil Procedure Rule 33.

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

23                    RESPONSE TO INTERROGATORIES

1    Subject to and without waiving these objections, Responding Party responds as

2  follows: Story by: Sarah Thorp & Francesca Gregorini. Screenplay by: Francesca

3  Gregorini.

4  **INTERROGATORY NO. 11:**

5    Identify each and every person who contributed to the development of

6  EMANUEL.

7  **RESPONSE TO INTERROGATORY NO. 11**

8    Responding Party incorporates the General Objections as if fully set forth here.

9  Responding Party further objects to this interrogatory on the grounds that it is vague,

10  ambiguous, and overbroad, including with regard to the phrase "contributed to the

11  development of". Responding Party further objects to this interrogatory on the

12  grounds that it contains subparts, is compound, conjunctive, or disjunctive, and causes

13  or may cause the number of interrogatories to exceed the amount allowed under

14  Federal Rule of Civil Procedure Rule 33. Subject to and without waiving the

15  objections, Responding Party responds as follows: Francesca Gregorini.

16  **INTERROGATORY NO. 12:**

17    Identify each and every person who contributed to the production of

18  EMANUEL.

19  **RESPONSE TO INTERROGATORY NO. 12**

20    Responding Party incorporates the General Objections as if fully set forth here.

21  Responding Party further objects to this interrogatory on the grounds that it is vague,

22  ambiguous, and overbroad, including as to the phrase "contributed to the production

23  of". Responding Party further objects to this interrogatory on the grounds that it

24  contains subparts, is compound, conjunctive, or disjunctive, and causes or may cause

25  the number of interrogatories to exceed the amount allowed under Federal Rule of

26  Civil Procedure Rule 33.

27  **INTERROGATORY NO. 13:**

28    Identify each and every person contributed to the distribution of EMANUEL.

**RESPONSE TO INTERROGATORY NO. 13**

Responding Party incorporates the General Objections as if fully set forth here. Responding Party further objects to this interrogatory on the grounds that it is vague, ambiguous, and overbroad, including with regard to the phrase "each and every person contributed (sic) to the distribution of". Responding Party further objects to this interrogatory on the grounds that it contains subparts, is compound, conjunctive, or disjunctive, and causes or may cause the number of interrogatories to exceed the amount allowed under Federal Rule of Civil Procedure Rule 33.

**INTERROGATORY NO. 14:**

Identify any and all written, visual, or other materials that were a source of inspiration when creating or developing EMANUEL.

**RESPONSE TO INTERROGATORY NO. 14**

Responding Party incorporates the General Objections as if fully set forth here. Responding Party further objects to this interrogatory on the grounds that it is vague, ambiguous, and overbroad, including as to the phrase "a source of inspiration when creating or developing EMANUEL". Responding Party further objects to this interrogatory on the grounds that it contains subparts, is compound, conjunctive, or disjunctive, and causes or may cause the number of interrogatories to exceed the amount allowed under Federal Rule of Civil Procedure Rule 33.

Subject to and without waiving these objections, Responding Party responds as follows: Francesca Gregorini served as her own inspiration and conceived of *Emanuel*.

**INTERROGATORY NO. 15:**

Identify any and all materials related to EMANUEL that YOU provided to any Defendant.

**RESPONSE TO INTERROGATORY NO. 15**

Responding Party incorporates the General Objections as if fully set forth here. Responding Party further objects to this interrogatory on the grounds that it is

unlimited in time, vague, ambiguous, and overbroad, including as to the phrase "materials related to EMANUEL". Responding Party further objects to this interrogatory on the grounds that it contains subparts, is compound, conjunctive, or disjunctive and causes or may cause the number of interrogatories to exceed the amount allowed under Federal Rule of Civil Procedure Rule 33. Subject to and without waiving the objections, Responding Party responds as follows: Plaintiff is not aware of personally or directly providing *Emanuel* to Defendants.

**INTERROGATORY NO. 16:**

Identify any and all materials related to EMANUEL that YOU know were provided by anyone other than YOU to any Defendant.

**RESPONSE TO INTERROGATORY NO. 16**

Responding Party incorporates the General Objections as if fully set forth here. Responding Party further objects to this interrogatory on the grounds that it is vague, ambiguous, and overbroad, including as to the phrase "materials related to EMANUEL". Responding Party further objects to this interrogatory on the grounds that it contains subparts, is compound, conjunctive, or disjunctive.

Subject to and without waiving the objections, Responding Party responds as follows: Plaintiff is aware that Olivia Blaustein, an agent at CAA Agent had an assistant that sent *Emanuel* in March 2017 to producers of *Berlin Station*, including Tony Basgallop (co-executive producer), to showcase Ms. Gregorini's talent for the purpose of being hired.

**INTERROGATORY NO. 17:**

Identify all locations of theatrical distributions of EMANUEL, including but not limited to all theaters, all screenings, and all film festivals where EMANUEL has ever been distributed.

**RESPONSE TO INTERROGATORY NO. 17**

Responding Party incorporates the General Objections as if fully set forth here. Responding Party further objects to this interrogatory on the grounds that it is vague,

ambiguous, and overbroad. Responding Party further objects to this interrogatory on the grounds that it contains subparts, is compound, conjunctive, or disjunctive and causes or may cause the number of interrogatories to exceed the amount allowed under Federal Rule of Civil Procedure Rule 33.

Subject to and without waiving these objections, Responding Party responds as follows: *Emanuel* premiered in Dramatic Competition at the 2013 Sundance Film Festival and was selected to showcase at Sundance UK later that same year. The film went on to screen at many other film festivals in the U.S and around the world, including, without limitation, Marfa Film Festival, Brooklyn Film Festival, and Bend Film Festival. The film was released in U.S. theaters on January 10, 2014. Ms. Gregorini earned a nomination at the Sundance Film Festival for the 2013 Grand Jury Prize – Dramatic and earned the Best Feature Director prize at the 2013 L.A. Femme Film Festival. The film earned awards at the 2013 Ashland Independent Film Festival and 2013 Brooklyn Film Festival.

**INTERROGATORY NO. 18:**

Identify all locations of non-theatrical distributions of EMANUEL, including but not limited to all streaming services where EMANUEL has ever been distributed.

**RESPONSE TO INTERROGATORY NO. 18**

Responding Party incorporates the General Objections as if fully set forth here. Responding Party further objects to this interrogatory on the grounds that it is vague, ambiguous, and overbroad. Responding Party further objects to this interrogatory on the grounds that it contains subparts, is compound, conjunctive, or disjunctive and causes or may cause the number of interrogatories to exceed the amount allowed under Federal Rule of Civil Procedure Rule 33. Subject to and without waiving these objections, Responding Party responds as follows: Since 2014, *Emanuel* has been available for purchase or rental on defendant Apple's own iTunes as well as multiple additional streaming services and platforms.

**INTERROGATORY NO. 19:**

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

RESPONSE TO INTERROGATORIES

1  Identify all dates of distributions of EMANUEL, including but not limited to all

2  theaters, all screenings, all film festivals, and all streaming services where

3  EMANUEL has ever been distributed.

4  **RESPONSE TO INTERROGATORY NO. 19**

5  Responding Party incorporates the General Objections as if fully set forth here.

6  Responding Party further objects to this interrogatory on the grounds that it is vague,

7  ambiguous, and overbroad. Responding Party further objects to this interrogatory on

8  the grounds that it contains subparts, is compound, conjunctive, or disjunctive and

9  causes or may cause the number of interrogatories to exceed the amount allowed

10  under Federal Rule of Civil Procedure Rule 33.

11  Subject to and without waiving these objections, Responding Party responds as

12  follows: *Emanuel* premiered in Dramatic Competition at the 2013 Sundance Film

13  Festival and was selected to showcase at Sundance UK later that same year. The film

14  went on to screen at many other film festivals in the U.S and around the world,

15  including, without limitation, Marfa Film Festival, Brooklyn Film Festival, and Bend

16  Film Festival. The film was released in U.S. theaters on January 10, 2014. Ms.

17  Gregorini earned a nomination at the Sundance Film Festival for the 2013 Grand Jury

18  Prize – Dramatic and earned the Best Feature Director prize at the 2013 L.A. Femme

19  Film Festival. The film earned awards at the 2013 Ashland Independent Film Festival

20  and 2013 Brooklyn Film Festival. Since 2014, *Emanuel* has been available for

21  purchase or rental on defendant Apple's own iTunes as well as multiple additional

22  streaming services and platforms.

23  **INTERROGATORY NO. 20:**

24  Identify the revenues of any and all theatrical releases of EMANUEL, including

25  but not limited to box office receipts.

26  **RESPONSE TO INTERROGATORY NO. 20**

27  Responding Party incorporates the General Objections as if fully set forth here.

28



ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

Responding Party further objects to this interrogatory on the grounds that it is vague, ambiguous, and overbroad.

Responding Party further objects to this interrogatory on the grounds that it contains subparts, is compound, conjunctive, or disjunctive and causes or may cause the number of interrogatories to exceed the amount allowed under Federal Rule of Civil Procedure Rule 33.

**INTERROGATORY NO. 21:**

Identify the number of rentals and/or sales for each streaming service on which EMANUEL was distributed.

**RESPONSE TO INTERROGATORY NO. 21**

Responding Party incorporates the General Objections as if fully set forth here.

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, overbroad, and is unlimited in time.

Responding Party objects to this interrogatory on the grounds that it contains subparts, is compound, conjunctive, or disjunctive and causes or may cause the number of interrogatories to exceed the amount allowed under Federal Rule of Civil Procedure Rule 33.

**INTERROGATORY NO. 22:**

State all facts to support YOUR contention that defendant Uncle George Productions had access to EMANUEL prior to its alleged involvement in SERVANT, as referenced in ¶ 51 of the FAC.

**RESPONSE TO INTERROGATORY NO. 22**

Responding Party incorporates the General Objections as if fully set forth here. Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, and overbroad and is not full and complete in and of itself.

Subject to and without waiving these objections Responding Party responds as follows: Defendant had a reasonable opportunity to view Plaintiff's work before *Servant* was created because, among other things, Plaintiff's work was widely

RESPONSE TO INTERROGATORIES

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

disseminated prior to *Servant's* creation. In addition, the similarities between Plaintiff's work and *Servant* are so striking that it is highly likely the works were not created independent of one another.  *Emanuel* premiered in Dramatic Competition at the 2013 Sundance Film Festival and was selected to showcase at Sundance UK later that same year. The film went on to screen at many other film festivals in the U.S and around the world, including, without limitation, Marfa Film Festival, Brooklyn Film Festival, and Bend Film Festival. The film was released in U.S. theaters on January 10, 2014. Ms. Gregorini earned a nomination at the Sundance Film Festival for the 2013 Grand Jury Prize – Dramatic and earned the Best Feature Director prize at the 2013 L.A. Femme Film Festival. The film earned awards at the 2013 Ashland Independent Film Festival and 2013 Brooklyn Film Festival. Since 2014, *Emanuel* has been available for purchase or rental on defendant Apple's own iTunes as well as multiple additional streaming services and platforms.

**INTERROGATORY NO. 23:**

State all facts to support YOUR contention that defendant Uncle George Productions is directly liable for the alleged infringement.

**RESPONSE TO INTERROGATORY NO. 23**

Responding Party incorporates the General Objections as if fully set forth here. Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, and overbroad.

Subject to and without waiving these objections Responding Party responds as follows: Defendants, including Propounding Party, with full knowledge of Plaintiff's rights, infringed Plaintiff's copyrights by preparing an unauthorized derivative work; and by producing, distributing, streaming, and transmitting Episodes 1 through 3, of Season 1, of the television show entitled "Servant." *Servant* is an unauthorized derivative work of, and substantially similar to, *Emanuel*. All such acts were performed by Defendants without the permission, license, or consent of Plaintiff. Plaintiff notified Defendants in writing of the infringements. All Defendants have

1  continued to stream and otherwise distribute the infringing material even after

2  receiving Plaintiff's protests and demands that such infringement cease.

3  **INTERROGATORY NO. 24:**

4  State all facts to support YOUR contention that defendant Uncle George

5  Productions is contributorily liable for the alleged infringement.

6  **RESPONSE TO INTERROGATORY NO. 24**

7  Responding Party incorporates the General Objections as if fully set forth here.

8  Responding Party objects to this interrogatory on the grounds that it is vague,

9  ambiguous, and overbroad.

10  Subject to and without waiving these objections Responding Party responds as

11  follows: Propounding Party is contributorily liable for the infringements alleged

12  because Propounding Party knowingly induced, participated in, aided and abetted, and

13  profited from the production of and/or subsequent sales of the infringing work.

14  **INTERROGATORY NO. 25:**

15  State all facts to support YOUR contention that defendant Uncle George

16  Productions is vicariously liable for the alleged infringement.

17  **RESPONSE TO INTERROGATORY NO. 25:**

18  Responding Party incorporates the General Objections as if fully set forth here.

19  Responding Party objects to this interrogatory on the grounds that it is vague,

20  ambiguous, and overbroad.

21  Subject to and without waiving these objections Responding Party responds as

22  follows: Propounding Party is vicariously liable for the infringements alleged because

23  each Propounding Party had the right and ability to supervise the infringing conduct,

24  including the practical ability to do so, and because it had a direct financial interest in

25  the infringing conduct.

26

27

28


ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA

RESPONSE TO INTERROGATORIES

1

2

3

4

5

6   DATED: March 13, 2023                ERIKSON LAW GROUP

7

8

9                                By:  _____/s/David Erikson_____
                                      David Erikson, Attorneys for Plaintiff

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ERIKSON
LAW GROUP
ATTORNEYS
LOS ANGELES CA