**ERIKSON LAW GROUP**
David Alden Erikson (SBN 189838)
  david@daviderikson.com
Antoinette Waller (SBN 152895)
  antoinette@daviderikson.com
200 North Larchmont Boulevard
Los Angeles, California 90004
Telephone: 323.465.3100
Facsimile: 323.465.3177

Attorneys for Plaintiff Francesca Gregorini

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| FRANCESCA GREGORINI,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>APPLE INC., a California corporation; M. NIGHT SHYAMALAN, an individual, BLINDING EDGE PICTURES, INC., a Pennsylvania corporation; UNCLE GEORGE PRODUCTIONS; a Pennsylvania corporation; ESCAPE ARTISTS LLC, a California limited liability company; DOLPHIN BLACK PRODUCTIONS, a California corporation; TONY BASGALLOP, an individual; ASHWIN RAJAN, an individual; JASON BLUMENTHAL, an individual; TODD BLACK, an individual; STEVE TISCH, an individual; and DOES 1-10, inclusive<br><br>　　　　　Defendants. | Case No. 2:20-cv-00406-SSS-JC<br>Hon. Sunshine S. Sykes<br><br>**SUPPLEMENTAL DECLARATION OF DAVID A. ERIKSON IN SUPPORT OF PLAINTIFF'S MOTION TO CONTINUE SCHEDULE OF PRETRIAL AND TRIAL DATES [DKT. 114]**<br><br>Discovery cutoff:　November 17, 2023<br>Pretrial conference:　May 24, 2024<br>Trial:　June 10, 2024<br><br>**Hearing Date:　November 17, 2023**<br>**Time:　2:00 pm**<br>**Place:　Remotely via Zoom** |

SUPPLEMENTAL DECLARATION OF DAVID ERIKSON

I, David A. Erikson, declare:

1. I am an attorney for Plaintiff Francesca Gregorini. I make this declaration in support of Ms. Gregorini's reply memorandum in support of her motion seeking a six-month continuance of pretrial deadlines and the trial date set in this case. If called as a witness, I could and would competently testify with respect to the following statements.

2. I offer this additional declaration to update the Court on my health, and to respond to some points made about me in Apple's Opposition papers. As mentioned, I serve as lead counsel on this matter. I have a long friendship and professional relationship with Ms. Gregorini. With regard to my health, someone remarked that my first declaration was likely as bad as anything the court had ever seen. Nevertheless, it manages to get worse in ways that directly bear on our need for a continuance.

## Apple's mischaracterizations of my emails about appointing Ms. Waller as "Lead Discovery Counsel."

3. Apple's Opposition grossly mischaracterizes my "designation" of my colleague Antoinette Waller as "lead discovery counsel" (words I never used) or that I seriously suggested that I was somehow above discovery work. Apple makes much of this designation—using it as a primary reason why Plaintiff doesn't need a continuance (since I am not heavily involved in discovery anyway). The emails are described in the declaration of Cydney Swofford Freeman, not the actual participant, her boss Nick Jampol—perhaps in an effort to justify the loss of context.

4. In my key email of December 19—the one Apple bases their argument on that I designated Ms. Waller as lead discovery counsel, Ms. Freeman fails to mention that I was obviously kidding, as I explained the next day. Apple doesn't mention the thrust and purpose of my email in which I explicitly say that I had come to believe that—after so many months without production of documents by

2 SUPPLEMENTAL DECLARATION OF DAVID ERIKSON IN SUPPORT OF MOTION TO CONTINUE

Defendants—that Apple was taking advantage of how nice I was being. Again, this message was hardly hidden. It came in response to yet another request (by Apple) for an extension of time to respond to discovery, coupled with its audacious demand that Plaintiff hurry up our own responses to requests served many months (years) later:

> You guys are on like Month 30. I'm all for both sides hustling over the next few months, but it is unreasonable for us to expect your responses before ours?  You haven't even turned over the very easy to gather documents, or responded to our requests to meet and confer.
>
> I feel like you might be exploiting my generally agreeable nature, so fortunately I have turned discovery over to Antoinette from our office (who is absolutely reasonable but not reasonable to a fault).

5. The next day, I actually felt the need to apologize for such "harsh" tone, explaining that:

**I dashed that email off thinking you would see it as funny.**

6. I did in fact say in that same email that "I always delegate discovery to someone other than me." I did this for several reasons. For one, there was no need to talk about my illness at that time—perhaps because I had a premonition that one day my complaining about my health would be used against me. But more important, it's simply true that I act like every other partner-level litigator in the world, offloading the drudgery of discovery to the extent possible. This does not mean that the lawyer has designated the other lawyer as "lead discovery counsel" or that I was pronouncing myself above discovery practice. In fact, I continued to participate in written discovery and meet and confer efforts throughout this case and into the summer months of 2023 until I became too sick to do so. This is evidenced, among other ways, by correspondence between me and Mr. Jampol including Mr. Jampol's own discovery letter dated May 1, 2023, to me and Ms. Waller.

**My health.**

7.  Apple suggests that my health concerns were almost an afterthought on seeking this continuance, by saying it did not form a part of the earliest meet and confer discussions. With regard to any of my own discussions, and as far as I know for Ms. Waller, there was no need to focus on my health because other reasons easily provide the prerequisite good cause for the continuance we were talking about. Also, there was a certainly a time when we were asking for a continuance without concentrating on the full extent of my health problems (such as the bleeding and intravenous nutrition and hydration), Apple's counsel long knew that I was experiencing very serious health issues, including generally battling cancer and engaging in chemotherapy.

8.  Since I last reported in, my bleeding patterns have presented new problems for administration of chemotherapy. I reported before that I might have to alternate weeks between blood transfusions and chemotherapy, which would ensure my blood counts were sufficient for chemotherapy. Bloods transfusions are extremely difficult, for several reasons—as is constant bleeding. Lately, we have discovered that my bleeding is too extensive to allow for this schedule. It also turns out that there is no easy way to control chronic bleeding, especially of tissue as soft as a cancerous tumor. My oncologist has begun to talk to other kinds of doctors to figure out strategies for this—but it seems it would have to include some sort of very creative and likely very debilitating surgery that will keep me hospitalized for an extended period. I've been able to work well in the hospital before—but this time it's possible that I would be stuck in an uncomfortable physical position. We are still hoping to avoid this outcome—but at this point it might involve a lot of luck. If I do end up in the hospital, working will be impossible for some period.

9.  I have also previously reported that my chronic low hemoglobin and

bleeding also causes great fatigue and a great difficulty in working—as my body devoted all its energy to replenish what is lost from bleeding.

10. I remind the Court of the overarching hope: that chemotherapy eventually stops the bleeding (and solves a thousand other problems caused by an active cancer) even though it is what is currently causing it. Prior to restarting chemotherapy on October 5, I did not have the problems I do now. I resumed chemotherapy for very good reasons—but I was not quite ready for the temporary problems being caused. Yet none of my doctors are suggesting we slow down chemotherapy (unless necessitated by the bleeding) because we assume it is doing the good things we had hoped. In fact, it might even be true that the problems, including the bleeding, shows that the chemotherapy is doing something.

11. Again, the hope is that chemotherapy puts me in a place where I can resume work more fully. I am hoping that happens quickly. And that it does not happen slowly due to hospitalization or anything else. But either way, the requested continuance will allow me to properly participate in this case. And of course, we are not asking for a stay. As we explain in our Motion, there is almost limitless work to complete before the discovery cutoff, even if it moved back as we request.

12. I also want to mention that I am hardly superfluous, even when it comes to discovery. I hope I have already debunked Apple's disingenuous assertion that I removed myself from discovery long ago by designating Ms. Waller as "lead discovery counsel" (a phrase I certainly never used and turned out to be of Apple's invention, based on my joking comment). But more important, while Ms. Waller and Mr. Patterson have taken or defended depositions in this case, none have been key (although Ms. Waller is certainly capable of taking any deposition). Certainly, neither my client the Plaintiff or any other Defendants have yet been deposed. Nor have several people than my client suspects are being deposed merely to inconvenience or embarrass her, and would prefer than I defend, such as close friends and her mother.

13. I also want to repeat that I can say with confidence that my illness has not slowed down this case a bit.

### Experts.

14. I have been the member of my legal team with sole responsibility for dealing with expert witnesses. Ms. Waller is not involved—and our third lawyer, Ryan Patterson, has dealt with experts only as to procedural issues. I have long identified two obvious areas in which expert opinion makes sense in this case. As Apple points out, the Ninth Circuit largely based its decision on the need for discovery and on expert testimony on issues related to substantial similarity. I have been talking to experts on this topic since we received that decision. Our primary expert in this regard is David Roman, a USC comparative literature professor who worked on other key federal district court cases. The other area in which expert testimony is needed is damages, which in this case equates to disgorgement of Defendants' ill-gotten profits. I have spoken to several experts in this regard, including our primary expert David Offenberg, a tenured professor of finance at LMU. Mr. Offenberg is more than willing to provide our primary expert report in this regard, if the Court allows.

15. We did not submit affirmative expert reports at the applicable deadline stated in the Court's order. In this regard, we are reliant on getting this extension. Because Apple submitted their own expert reports on these same two topics identified above, we thought it wise to submit rebuttal reports. Professor Roman is doing so. We are also submitting rebuttal reports to Apple's financial analysis by Professor Joe Petrucelli and Ellen Pittleman. Professor Offenberg, with great regret, indicates that he could not produce a rebuttal that he would be satisfied with in just two weeks. I explained that the two-week rebuttal period was set by the Court—but this did not change his mind, in part given his schedule in those weeks. And as mentioned, Professor Offenberg is more than willing to produce an affirmative expert report on

the same topic as Apple's reports and Plaintiffs' rebuttals.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed November 3, 2023, at Los Angeles, California.

By: /s/ *David Alden Erikson*
David Alden Erikson