**ROBINS KAPLAN LLP**
Michael A. Geibelson (SBN 179970)
MGeibelson@RobinsKaplan.com
Patrick M. Arenz *(Pro hac vice)*
PArenz@RobinsKaplan.com
Emily E. Niles *(Pro hac vice)*
ENiles@RobinsKaplan.com
Annie Huang *(Pro hac vice)*
AHuang@RobinsKaplan.com
Prateek N. Viswanathan *(Pro hac vice)*
PViswanathan@RobinsKaplan.com

2121 Avenue of the Stars
Suite 2800
Los Angeles, California 90067
Telephone: 310 552 0130
Facsimile: 310 229 5800

*Attorneys for Plaintiff Francesca Gregorini*

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

Francesca Gregorini,

Plaintiff,

v.

APPLE INC., a California corporation; M. NIGHT SHYAMALAN, an individual, BLINDING EDGE PICTURES, INC., a Pennsylvania corporation; UNCLE GEORGE PRODUCTIONS, a Pennsylvania corporate; ESCAPE ARTISTS LLC, a California limited liability company; DOLPHIN BLACK PRODUCTIONS, a California corporation; TONY BASGALLOP, an individual; ASHWIN RAJAN, an individual; JASON BLUMENTHAL, an individual; TODD BLACK, an individual; STEVE TISCH, an individual; and DOES 1-10, inclusive,

Defendants.

Case No. 2:20-cv-00406-SSS-JC

*Hon. Sunshine S. Sykes*

**PLAINTIFF FRANCESCA GREGORINI'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT REPORTS AND TESTIMONY OF ELLEN PITTLEMAN**

Date: November 1, 2024
Time: 2:00 p.m.
Dept.: Courtroom 2

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

## TABLE OF CONTENTS

Page(s)

INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 1

I. At trial, Ms. Gregorini will prove Defendants' access to Emanuel and her right to indirect profits from their infringement ..... 1

II. Ellen Pittleman is an experienced entertainment industry executive ..... 2

III. Ellen Pittleman's opinions will aid the jury's determination of access and indirect profits ..... 4

ARGUMENT ..... 6

I. Ms. Pittleman will offer helpful testimony to the jury about access. ..... 6

A. Ms. Pittleman reliably opined on Emanuel's widespread dissemination. ..... 6

B. Ms. Pittleman's analysis and opinions on Defendants' direct access are admissible. ..... 9

II. Ms. Pittleman will offer helpful testimony to the jury about indirect profits ..... 12

A. Ms. Pittleman is qualified to testimony on causal nexus ..... 13

B. Ms. Pittleman's opinions on causal nexus and indirect profits are reliable ..... 14

CONCLUSION ..... 17

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alfred v. Walt Disney Pictures*,
No. 18-8074 (C.D. Cal. May 13, 2022), Dkt.158-25 .......... 13

*Burns v. Imagine Films Entm't, Inc.*,
164 F.R.D. 589 (W.D.N.Y. 1996) .......... 13

*Charter Sch. Cap., Inc. v. Charter Asset Mgmt. Fund, LP*,
No. 14-3385, 2015 WL 12655550 (C.D. Cal. Mar. 9, 2015) .......... 13

*Cope v. Warner Recs., Inc.*,
No. 22-01384, 2023 WL 11827959 (C.D. Cal. June 5, 2023) .......... 6

*Edgewell Pers. Care Brands, LLC v. Munchkin, Inc.*,
No. 18-3005, 2022 WL 16957834 (C.D. Cal. Oct. 12, 2022) .......... 15

*Focal Point Films, LLC v. Sandhu*,
2020 WL 5760355 (N.D. Cal. Sept. 28, 2020) .......... 15

*Gray v. Perry*,
No. 15-05642, 2018 WL 3954008 (C.D. Cal. Aug. 13, 2018) .......... 7

*Gray v. Perry*,
No. 15-05642, 2020 WL 1275221 (C.D. Cal. Mar. 16, 2020) .......... 12

*Griffo v. Oculus VR, Inc.*,
No. 15-1228, 2018 WL 6265067 (C.D. Cal. Sept. 18, 2018) .......... 13

*Guangzhou Yucheng Trading Co. v. Dbest Prod., Inc.*,
644 F. Supp. 3d 637 (C.D. Cal. 2022) .......... 9

*Hangarter v. Provident Life & Acc. Ins. Co.*,
373 F.3d 998 (9th Cir. 2004) .......... 6

*Hendricks v. DreamWorks, LLC*,
2007 WL 9705916 (C.D. Cal. Nov. 20, 2007) .......... 12, 13

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999) .......... 7

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

*L.A. Printex Indus., Inc. v. Aeropostale, Inc.*,
676 F.3d 841(9th Cir. 2012) ........ 7

*Loomis v. Cornish*,
836 F.3d 991 (9th Cir. 2016) ........ 6

*Oculu, LLC v. Oculus VR, Inc.*,
No. 14-0196, 2015 WL 3619204 (C.D. Cal. June 8, 2015) ........ 17

*Peel & Co. v. Rug Mkt.*,
238 F.3d 391 (5th Cir. 2001) ........ 7

*Polar Bear Prods., Inc. v. Timex Corp.*,
384 F.3d 700 (9th Cir. 2004) ........ 12

*Rearden LLC v. Walt Disney Co.*,
No. 17-04006, 2021 WL 6882227 (N.D. Cal. July 12, 2021) ........ 16

*Reinsdorf v. Skechers U.S.A., Inc.*,
296 F.R.D. 604 (C.D. Cal. 2013) ........ 16

*Three Boys Music Corp. v. Bolton*,
212 F.3d 477 (9th Cir. 2000) ........ 11

*Zaragoza v. Cnty. of Riverside*,
No. 20-01381, 2024 WL 663235 (C.D. Cal. Jan. 18, 2024) ........ 7, 13

**Statutes**

17 U.S.C. § 504(b) ........ 12

**Other Authorities**

Fed R. Evid. 702 ........ *passim*

NIMMER & DAVID NIMMER, Nimmer on Copyright § 12.10[B][2][b] (2019) ........ 12

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

## INTRODUCTION

Ms. Ellen Pittleman's analysis and opinions will aid the jury in deciding the issues of Defendants' access to *Emanuel* and the causal nexus between their infringing episodes 1-3 of *Servant* and the indirect profits they made from episode 4-40 and Apple TV+. She is well-qualified to opine on those issues based on her 30 years of experience in the entertainment industry. Ms. Pittleman reliably assessed the evidence on the issues at hand in view of her substantial industry experience and knowledge, along with documents and deposition testimony from this case. Her rigorous analysis and her qualifications both surpass the requirements for admissibility under Rule 702. At best, Defendants' various critiques go to the weight of Ms. Pittleman's opinions, which Defendants may cross-examine her on at trial. But those criticisms serve no basis to exclude Ms. Pittleman's testimony now. Thus, the Court should deny Defendants' motion.

## FACTUAL BACKGROUND

### I. At trial, Ms. Gregorini will prove Defendants' access to *Emanuel* and her right to indirect profits from their infringement.

Ms. Gregorini's independent film, *The Truth About Emanuel* (*Emanuel*), premiered in 2013 at the Sundance Film Festival. Dkt. 194-9, PSOF ¶ 293. *Emanuel* is a psychological thriller drama. *Id.* at ¶ 351. It revolves around an 18-year-old nanny/caretaker named Emanuel, who forms a tender relationship with a seemingly well-functioning mother who recently lost a baby. *Id.* That mother has a hyper-realistic doll that she believes, and cares for, like it is a real live baby. *Id.* And Emanuel supports the mother's delusion, including by caring for the doll too. *Id.* In 2019, Ms. Gregorini was shocked to see a trailer for Defendants' television show *Servant* with the same distinct story and presentation as her film, *Emanuel*.

Defendants had many opportunities to view *Emanuel*. After Sundance, *Emanuel* was screened at numerous film festivals around the United States and the world. Dkt. 194-9 ¶ 296-97. It received extensive attention and press across the



ROBINS KAPLAN LLP ATTORNEYS AT LAW LOS ANGELES

entertainment industry. *Id.* at ¶ 294. Later it was shown in theaters across the United States and the world. *Id.* at ¶ 298. *Emanuel* was also distributed through DVD sales, rentals such as Redbox, on-demand, and through various streaming services, like iTunes, Hulu, and Amazon. *Id.* at ¶ 299-301, 303. Ms. Gregorini's film was widely available to Defendants since 2013 through many channels. And there is proof that *Emanuel* was directly accessible to Defendants too. Defendants had multiple exposures to Ms. Gregorini and her work, including communications with a direct link to access *Emanuel* before *Servant* even began filming. *Id.* at ¶¶ 322-29, 346-49, 373, 375.

This lawsuit seeks redress for Defendants' infringement of Ms. Gregorini's copyright in *Emanuel*. Ms. Gregorini seeks damages for Defendants' copyright infringement, including direct profits from the infringing episodes 1-3 of Season 1 of *Servant* along with indirect profits from follow-on episodes and Apple TV+. Indeed, Apple used *Servant* as a marquee show to launch its Apple TV+ streaming service. And based on the show's initial success, Defendants continued and repeatedly renewed the series for a total of 40 episodes over four seasons.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

**II. Ellen Pittleman is an experienced entertainment industry executive.**

Ms. Pittleman is an entertainment industry executive with over 30 years of experience. Dkt. 201-9 ¶¶ 3-9, 11, pp. 37-38. To start, she earned her Bachelor of Science degree in Radio, TV, and Film from the Northwestern University School of Communications. *Id.* ¶ 8. From there she worked on numerous cable programming, production, and directing projects. Ex. 151, Pittleman Dep. Tr. at 16:5-23:7. In 1997, she became an executive and worked as the Senior Vice President of Production and Acquisitions at Live Entertainment. *Id.* at 18:9-19:12. There, she was responsible for identifying and supervising the production of numerous multi-million-dollar films each year. Ex. 152. She also worked on the acquisition of third-party content such as feature films, documentaries, children's programming and non-theatrical content. *Id.;* Ex. 151, Pittleman Dep. Tr. at 18:9-20.

After that, Ms. Pittleman spent more than a decade at Paramount Pictures. Ex. 152; Dkt. 201-9 ¶ 5. She was the Senior Vice President of International Co-production and Worldwide Acquisitions. *Id.* Her responsibilities and oversight included both operations and finances, as she developed strategies and led the worldwide acquisition and original production for a slate of theatrical entertainment generating revenues over $200 million a year. *Id.*; Ex. 152; Ex. 151, Pittleman Dep. Tr. at 19:14-22:16, 111:2-21. She has worked on projects with well-known entertainment companies like MTV, Nickelodeon, CMT, VH1, Comedy Central, PBS, Hasbro, and Oprah, among other content and theatrical partners. Ex. 152. Her work included both film and television projects including aspects of development, production, marketing, distribution, and finance strategy and oversight. Ex. 151, Pittleman Dep. Tr. at 35:12-17, 94:17-105:20; Dkt. 201-9 ¶ 5.

Ms. Pittleman has had numerous other relevant experiences too. She has served as a chief programmer for the Infinity Film Festival and attended many film festivals throughout her career. Ex. 152; Ex. 151, Pittleman Dep. Tr. at 19:14-24; 52:16-53:2; 58:1-59:5; 239:3-242:15. She was also the co-founder and CEO of TalkingFlix, a global entertainment streaming start-up serving the visually impaired. Dkt. 201-9 ¶ 6; Ex. 151, Pittleman Dep. Tr. at 45:2-46:1; Ex. 152. Since 2009 when she founded Hybrid Entertainment, Ms. Pittleman has been leading her entertainment company that provides advice to clients on global distribution and marketing strategies. Dkt. 201-9 ¶ 4; Ex. 152; Ex. 151, Pittleman Dep. Tr. at 44:12-48:7.

Ms. Pittleman has extensive entertainment industry experience across the lifecycle of both film and television projects during her career. Dkt. 201-9 ¶ 3; Ex. 151, Pittleman Dep. Tr. at 39:13-22. She is experienced in dealmaking for television and movie content on top of her actual production experience. Ex. 151, Pittleman Dep. Tr. at 104:12-105:20; Ex. 152. As an entertainment executive she has driven the strategy for a broad range of projects and supervised teams

responsible for all aspects of film and television productions, including selecting or developing content, accounting and finance, filming, casting, green-lighting projects, evaluating and hiring directors, among many other aspects of production work. Dkt. 201-9 ¶¶ 3-6; Ex. 152; Ex. 151, Pittleman Dep. Tr. at 105:21-109:12, 126:1-138:9. This breadth of experience also led to her role as a Business of Entertainment instructor for the UCLA Extension. Dkt. 201-9 ¶ 7; Ex. 152; Ex. 151, Pittleman Dep. Tr. at 111:22-125:11. She is well-qualified to testify on the pertinent entertainment industry subjects in this case.

**III. Ellen Pittleman's opinions will aid the jury's determination of access and indirect profits.**

Ms. Pittleman is well-qualified to offer testimony and opinions that will help the jury understand the entertainment industry practices, procedures, and strategies at issue in this case. Dkt. 201-9 ¶ 11. She detailed her analysis across a 33-page report, and her opinions generally fall within two buckets. *See generally* Dkt. 201-9. First, Ms. Pittleman opines on Defendants' access to *Emanuel*. *Id.* ¶¶ 19-42. She came to those opinions by evaluating documentation on the distribution of Ms. Gregorini's film, *Emanuel*, from its debut at Sundance through its theatrical and non-theatrical distribution since. *See id.* ¶¶ 13-14, 20-35. She can provide industry context to the importance and role that film festivals play in the entertainment industry, especially in spotlighting up-and-coming talent like Ms. Gregorini and her independent film, *Emanuel*. *Id.* ¶¶ 20-26. Ex. 151, Pittleman Dep. Tr. at 52:16-53:2, 62:4-63:10. Indeed, Ms. Pittleman explained in her report how "the film festival exposure received by [*Emanuel*] is arguably more important to industry insiders" like the Defendants. *Id.* ¶ 30. Ms. Pittleman also examined documentary evidence and deposition testimony about the Defendants' knowledge of Ms. Gregorini and her work, including *Emanuel*. Dkt. 201-9 ¶¶ 36-42; *see also* ¶¶ 43-48, pp. 39-46. She further examined deposition testimony about Defendants' script development, selection of directors and actors, and other aspects of the pre-production and

production of *Servant*. *See id.* Ms. Pittleman explained how based on her experience she would expect "an individual involved in evaluating and selecting a director for episodes like this would have had access to a candidate's prior works and been expected to review those works in evaluating that potential director, such as [*Emanuel*] for Ms. Gregorini." *Id.* ¶¶38-39. And the documentary evidence supports that. Dkt. 194-4 (Arenz Decl. Ex. 48); Dkt. 194-5 (Arenz Decl. Ex. 87); Ex. 153; *see also* Dkt. 194-5 (Arenz Decl. Ex. 88). Ms. Pittleman provides opinions to aid the jury's determination of Defendants' access to *Emanuel* based on the scope of *Emanuel*'s distribution, accolades, and press that the film received attention for, on top of Defendants' other exposure and interactions with Ms. Gregorini, including a direct link to the film. *Id.* ¶¶ 19-42.

Second, Ms. Pittleman provides opinions on the nexus between Defendants' copyright infringement through episodes 1-3 of *Servant* and any profits they earned from later episodes 4-40 of *Servant* and Apple TV+. *Id.* ¶¶ 51-92. She screened the entire first season of *Servant*, which includes episodes 1-10. *Id.* ¶ 13; Ex. 151, Pittleman Dep. Tr. at 138:19-139:3. In addition, she reviewed plot synopses and summaries for the entire *Servant* series. Dkt. 201-9 ¶¶ 51, pp. 46; Dkt. 194-6 at Arenz. Exs. 99-100; 194-7 at Arenz Ex. 122; Ex. 151, Pittleman Dep. Tr. at 139:4-141:13. She also reviewed deposition testimony from Defendants on the importance of episodes 1-3 and their role and relationship to the rest of the series. Dkt. 201-9 ¶¶ 51-66, 72, 74, 76-80, pp. 39; Ex. 151, Pittleman Dep. Tr. at 139:20-25. She examined the narrative nature of the series and the continuation of certain characters and plots, among other elements. Dkt. 201-9 ¶ 59. And she assessed and explained the season renewals of *Servant* and overall economic motivation for those renewals which factored into her analysis of the relationship between these episodes and Defendants' profits from them. *Id.* ¶¶ 76-78, 80. She also evaluated evidence of the role of *Servant* in Defendant Apple's launch of its new streaming platform Apple TV+, as it was one of the first series released on the much-coveted



ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

Thanksgiving weekend. *Id.* ¶¶ 81-92. Ms. Pittleman concluded based on her analysis and professional experience that Defendants revenues and profits from the entire *Servant* series and from Apple TV+ stem from the infringing episodes 1-3 that set up Defendants' four-season *Servant* series. *Id.* ¶¶ 80, 92.

## ARGUMENT

Defendants' wholesale disagreement with Ms. Pittleman's opinions provides no basis to exclude them. A person who possesses the requisite "knowledge, skill, experience, training, or education" on the subject matter at issue qualifies as an expert. Fed. R. Evid. 702. Ms. Pittleman is qualified to opine on the relevant issues of access and nexus in this copyright infringement case based on her 30+ years of experience in the entertainment industry. Indeed, such "experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (*quoting* Fed. R. Evid. 702 advisory committee's note). And Defendants simply ignore the reliable basis for her opinions through the documentation, deposition testimony, and extensive entertainment industry experience Ms. Pittleman weighed in forming and presenting those opinions throughout her extensive expert report. Thus, the Court should deny Defendants' motion and permit Ms. Pittleman's testimony.

### I. Ms. Pittleman will offer helpful testimony to the jury about access.

#### A. Ms. Pittleman reliably opined on *Emanuel's* widespread dissemination.

Widespread dissemination is not determined by any bright-line scientific or quantitative test. Instead, it is determined based on a work's overall achievement of substantial "commercial success ***or*** notoriety." *Cope v. Warner Recs., Inc.*, No. 22-01384, 2023 WL 11827959, at *4 (C.D. Cal. June 5, 2023). There is no specific threshold for widespread dissemination because sufficient evidence "will vary from case to case." *Loomis v. Cornish*, 836 F.3d 991, 997 (9th Cir. 2016). On issues like



ROBINS KAPLAN LLP ATTORNEYS AT LAW LOS ANGELES

this involving non-scientific testimony, the reliability of an expert's opinions "will depend heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *Zaragoza v. Cnty. of Riverside*, No. 20-01381, 2024 WL 663235, at *2 (C.D. Cal. Jan. 18, 2024) (quotations omitted) (quoting *White v. L.A. Cnty.*, No. CV 19-4669 DSF (RAOx), 2021 WL 9204238, at *7 (C.D. Cal. Apr. 6, 2021)); *see also Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 149-50 (1999) ("In other [non-scientific] cases, the relevant reliability concerns may focus upon personal knowledge or experience."). Ms. Pittleman's opinions on widespread disseminations are well-supported and reliable under this standard.

Ms. Pittleman's opinions on *Emanuel*'s widespread dissemination are admissible under Rule 702. The context for *Emanuel's* dissemination within the entertainment industry is especially important because courts recognize that widespread dissemination is often industry specific and may depend on whether a work is "readily available in the relevant market." *Gray v. Perry*, No. 15-05642, 2018 WL 3954008, at *5 (C.D. Cal. Aug. 13, 2018); *L.A. Printex*, 676 F.3d at 848 (discussing wide disseminated in "the Los Angeles-area fabric industry"); *Peel & Co. v. Rug Mkt.,* 238 F.3d 391, 397 (5th Cir. 2001) (focusing on dissemination in "the United States rug trade"). As summarized above, Ms. Pittleman has substantial experience in the planning, strategy, and execution of distribution, promotion, and marketing of television and films through various channels. In this case, she evaluated numerous sources of evidence on the dissemination of *Emanuel*, including distribution agreements and records, records of film festival screenings, theater screening documentation, documentation of its availability on-demand through cable networks, documentation of its availability on streaming platforms, and substantial press coverage of *Emanuel* in key industry publications. *See* Dkt. 201-9 ¶¶ 20-35. Ms. Pittleman applied her entertainment industry experience in evaluating the level of *Emanuel's* dissemination as an independent film and the

scope of press coverage it received. *Id.* This will be especially helpful for a lay jury to evaluate Emanuel's reach, particularly within the entertainment industry.

Ms. Pittleman will give the jury independent context for her opinions as a Hollywood executive and insider. Her report does far more than just parrot Plaintiff's allegations as Defendants complain. Instead, Ms. Pittleman summarized the facts and data she considered and how they influenced her analysis and conclusion that *Emanuel* was "readily and widely accessible to the Defendants through a variety of means, and the Defendants *had a reasonable opportunity to view* [*Emanuel*] before creating *Servant*." Dkt. 201-9 ¶ 42 (emphasis added); *see also* Dkt. 194-9, PSOF ¶¶ 288-303, 326-330, 346-349, 368-374. Ms. Pittleman's non-scientific opinions based on her professional entertainment industry experience and analysis of documentary evidence are reliable. Her testimony will help aid the jury's understanding of the various avenues for distribution, marketing, and promotion of films and their reach within the entertainment industry to individuals and entities like Defendants.

Defendants complain about a lack of methodology. But widespread dissemination is not an exact science and there is no litmus test for it. *See, e.g.*, *Gray*, 2018 WL 5095118, at *4 (C.D. Cal. Oct. 17, 2018) ("So while plaintiffs have not shown evidence of commercial success, they have demonstrated a triable issue of fact as to access"). Nor do Defendants propose any other methodology through which it should be determined compared to the analysis Ms. Pittleman actually performed. They simply disagree with Ms. Pittleman's conclusions and the weight she afforded particular evidence. But several of Defendants characterizations are flat out wrong.

Ms. Pittleman did not simply rely on the fact that *Emanuel* could be accessed on the internet in reaching her conclusion. Nor did she ignore numerical data available to her for various theatrical and non-theatrical releases such as box office and iTunes figures. Widespread dissemination also does not turn on whether Ms.



ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

Pittleman herself was familiar with *Emanuel*. Instead, it is the Defendants' access to and familiarity with Ms. Gregorini and *Emanuel* that matters in determining their infringement, not Ms. Pittleman's. Defendants may explore their critiques of Ms. Pittleman on cross-examination and present contrary evidence at trial. But their criticisms provide no basis to exclude her testimony. *Guangzhou Yucheng Trading Co. v. Dbest Prod., Inc.*, 644 F. Supp. 3d 637, 658 (C.D. Cal. 2022) (citing *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 968-70 (9th Cir. 2013)). Thus, the Court should deny Defendants' motion to exclude Ms. Pittleman's testimony on widespread dissemination.

**B. Ms. Pittleman's analysis and opinions on Defendants' direct access are admissible.**

Ms. Pittleman will testify about multiple avenues through which the Defendants had direct access to Ms. Gregorini and *Emanuel* before *Servant* was created, and the industry context for that access. Rule 702 allows an expert to present testimony based on specialized knowledge that will help the jury understand the evidence or determine fact at issue. Here too, Ms. Pittleman testimony is based on decades of experience with entertainment industry practices relating to the creation, pre-production, and production of works. Her perspective and knowledge will assist the jury in evaluating the issue of Defendants' direct access to *Emanuel*. Indeed, jurors will likely be unfamiliar with all that goes into creating a television show, including writing, casting, submissions for and selection of directors, among other pertinent industry procedures and processes. This is the industry-specific backdrop through which Defendants had access to *Emanuel*. Just as discussed above, Ms. Pittleman's appropriately applied her industry experience and knowledge in evaluating the documentary and testimonial evidence of Defendants' direct access to *Emanuel*. Dkt. 201-9 ¶¶ 36-42; *see also* Dkt. 194-9, PSOF ¶¶ 288-303, 326-330, 346-349, 368-374. She concluded that *Emanuel* "was accessible to Defendants through the various chain of events" giving Defendants a reasonable

opportunity to view it. Dkt. 201-9 ¶ 42. For the same reasons articulated above, this application of professional industry experience and knowledge to the facts at issue provides a reliable basis for Ms. Pittleman to testify to her opinions and aid the jury in determining access.

Her analysis and opinions on direct access cannot be dismissed as mere speculation. Defendants' arguments presume that there is no evidence of access. But that suggestion is false in spades. Indeed, documentation proves that Defendants had *Emanuel* through at least four avenues. Dkt. 201-9 ¶¶ 36-41. Ms. Pittleman has experience in the same and similar roles as Defendants' and their executives during the events at issue here. She provides industry expertise as to why these individuals would have been familiar with Ms. Gregorini's work, including for example, as part of the director hiring process. Dkt. 201-9 ¶¶ 38-41.

First, Defendant Apple's executives who worked on *Servant* had knowledge of and direct access to *Emanuel* through their prior work at Sony. Ms. Pittleman reviewed the documentary and testimonial evidence of Mr. Aronson, Mr. Van Amburg, and Mr. Erlicht's professional involvement with Ms. Gregorini when they evaluated and then hired her to work on their project *Electric Dreams* at Sony in 2016 into 2017. Dkt. 201-9 ¶¶ 40-41. The television show *Servant* did not exist then, and certainly not in the form it ultimately became after these Apple personnel worked on *Servant* before its release in November 2019. Ms. Gregorini's submission for a potential director role, which Mr. Aronson reviewed and then selected her for, included a Vimeo link to *Emanuel* back in January 2017. Ex. 153; Dkt. 201-9 ¶ 40. Ms. Pittleman evaluated this evidence.

Second, Defendant Apple's executives had direct access to *Emanue*l again after they moved to Apple to build the new Apple TV+ streaming platform. There, Apple considered hiring Ms. Gregorini for director roles too. Mr. Aronson (along with other Apple personnel) received a copy of Ms. Gregorini's director submission

materials in early 2018 that included a direct link to access *Emanuel*. Dkt. 201-9 ¶ 41; Dkt. 194-4 (Arenz Decl. Ex. 48).

Third, M. Night Shyamalan's right-hand man, Ashwin Rajan, from Blinding Edge had access to *Emanuel* also. Mr. Rajan received a submission of Ms. Gregorini for a director role in early 2018. Dkt. 201-9 ¶ 41; Dkt. 194-5 (Arenz Decl. Ex. 87). They also knew about *Emanuel* through their consideration of Jimmi Simpson (who played Arthur in *Emanuel*) to play the roles of Julian or Sean in *Servant*. Dkt. 194-5 (Arenz Decl. Exs. 88, 89); 194-6 (Arenz Decl. Ex. 91). This evidence factored into Ms. Pittleman's analysis of direct access too.

Fourth, Defendant Basgallop was a writer on a television show called *Berlin Station* in 2017. Ms. Pittleman evaluated the documentary and testimonial evidence that Ms. Gregorini was submitted as a potential director for that show, which would have highlighted her significant work on *Emanuel*. Dkt. 201-9 ¶¶ 38-39; 194-4 (Arenz Decl. Exs. 43, 44). Ms. Pittleman opines on Mr. Basgallop's likely role and involvement in director selection, and access to information on Ms. Gregorini and *Emanuel*, based on her industry experience and knowledge. Dkt. 201-9 ¶¶ 38-39, 42.

Ms. Pittleman's opinions on Defendants' direct access to *Emanuel* are thus not based on mere speculation. Nor are they based on an unrelated employee's mere receipt of the infringed work as Defendants' case citations suggest. Ms. Pittleman properly evaluated and offered her opinions on Defendants' avenues of access to *Emanuel* in view of her industry experience and knowledge. "By establishing reasonable access and substantial similarity, a copyright plaintiff creates a presumption of copying. The burden shifts to the defendant to rebut that presumption through proof of independent creation." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 486 (9th Cir. 2000), *overruled on other grounds by Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020). While Defendants may have a chance to present an independent creation defense at

trial, the mere suggestion of a defense, or a dispute about the alleged creation date of *Servant*, is not a ground to exclude Ms. Pittleman's testimony now. Independent creation is a "factual issue . . . for trial to resolve." *Gray v. Perry*, No. 15-05642, 2020 WL 1275221, at *14 (C.D. Cal. Mar. 16, 2020) (omission in original) (citing 3 Nimmer on Copyright § 12.10[B][2][b] (2019)). Defendants present no case excluding an expert's testimony on access simple because a defendant alleges that an independent creation defense may exist. Their motion to exclude Ms. Pittleman's testimony and opinions on direct access should be denied too.

**II. Ms. Pittleman will offer helpful testimony to the jury about indirect profits.**

Defendants misunderstand the law on causal nexus. Section 504(b) of the Copyright Act allows copyright owners to recover both direct and indirect profits. *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 711 (9th Cir. 2004) (citing 17 U.S.C. § 504(b)). A two-step framework exists for establishing entitlement to those indirect profits: "1) the copyright claimant must first show a causal nexus between the infringement and the gross revenue; and 2) once the causal nexus is shown, the infringer bears the burden of apportioning the profits that were not the result of infringement." *Id.* Establishing causal nexus under the first step simply requires showing that the revenue stream "bear[s] a legally significant relationship to the infringement." *Id.* Ms. Pittleman's analysis follows this standard.

Follow-on works like sequels are a quintessential example of legally significant relationship providing a basis for indirect profits. Courts have found a causal nexus under similar circumstances in several cases. First, an initial infringing work may elevate the public's interest in the later non-infringing sequel, such that the profits are "indirectly attributable to the infringement of the plaintiff's screenplays." *Hendricks v. DreamWorks, LLC*, 2007 WL 9705916, at *3 (C.D. Cal. Nov. 20, 2007) (citing *Burns v. Imagine Films Entm't, Inc.,* 164 F.R.D. 589, 592 (W.D.N.Y. 1996)). Second, even if the later work "contained no infringing

materials, it would not exist but for the success of the motion picture that purportedly was based on the screenplays[.]" *Charter Sch. Cap., Inc. v. Charter Asset Mgmt. Fund, LP*, No. 14-3385, 2015 WL 12655550, at *3 (C.D. Cal. Mar. 9, 2015). Third, a causal nexus may exist where follow-on works "contain the same main characters and other key elements from the original film." *Alfred v. Walt Disney Pictures*, No. 18-8074 (C.D. Cal. May 13, 2022), Dkt.158-25 at 5. And a causal nexus may exist even if the infringing material constitutes just a fraction of the total work, if that material "strikes at the core of the product being promoted." *Griffo v. Oculus VR, Inc.*, No. 15-1228, 2018 WL 6265067, at *11 (C.D. Cal. Sept. 18, 2018). Ms. Pittleman's understanding of the law and opinions on causal nexus adhere to these principles and her analysis is also reliable based on application of her industry experience and knowledge to the facts in this case.

**A. Ms. Pittleman is qualified to testimony on causal nexus.**

Ms. Pittleman is qualified to testify on causal nexus for indirect profits from Defendants' *Servant* television series and the Apple TV+ platform it helped launch. Just because causal nexus relates to "profits" does not mean that the expert evaluating the issue must have a formal financial or accounting background. Indeed, the evaluation of the existence of a causal nexus under step 1 relates to the *qualitative* relationship between the infringing and non-infringing works from which Defendants profited. *See Hendricks*, 2007 WL 9705916, at *3; *Burns,* 164 F.R.D. at 592; *Charter Sch. Cap*, 2015 WL 12655550, at *3; *Alfred*, No. 18-8074, Dkt. 243 (C.D. Cal. May 13, 2022), Dkt.158-25 at 5. The actual calculation of profits is an issue for step 2, which Defendants bear the burden to prove. Even so, an expert witness need not "possess specialized qualifications to testify on a particular topic so long as the testimony is within the reasonable confines of his subject area." *Zaragoza*, No. 20-01381, 2024 WL 663235, at *2 (quoting *Avila v. Willits Env't Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011)).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

Ms. Pittleman has extensive executive experience and exposure to the drivers of profit for television and film projects. Ex. 151, Pittleman Dep. Tr. at 81:19-88:14, 88:17-90:10. Her career has depended on evaluating and creating strategies to drive viewership and profitability for those projects. Ex. 151, Pittleman Dep. Tr. at 26:9-27:8, 105:21-106:9, 111:20-125:2. This included experience working on sequels too. Ex. 151, Pittleman Dep. Tr. at 128:24-130:12. No mathematical profit analysis is required to assess the causal relationship between infringing episodes 1-3 and the later episodes 4-40 of *Servant* and related success of Apple TV+. Ms. Pittleman will testify about the qualitative aspects of that relationship, and she is well-qualified to do so. Dkt. 201-9 ¶¶ 52-92; Ex. 151, Pittleman Dep. Tr. at 139:20-141:13, 147:24-148:11, 173:6-20, 182:24-183:24, 185:11-18. None of the cases Defendants cite provides a basis to exclude Ms. Pittleman's qualitative analysis here.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

**B. Ms. Pittleman's opinions on causal nexus and indirect profits are reliable.**

Ms. Pittleman's analysis of causal nexus and indirect profits is reliable and the Court should permit her testimony. Her analysis extends far beyond Defendants' characterization of it as simply a conclusion based on the numerical sequence of the episodes from 1-40. Ms. Pittleman analyzed substantial information on the *Servant* series, including individual episode information along with information on Apple TV+. Dkt. 201-9, pp. 39-46. This included watching the entire Season 1 of *Servant*, studying financial agreements covering all seasons and renewal of *Servant*, summaries and synopses of individual episodes, and other literature on the entire *Servant* series and Defendants' promotion of it. *Id.*; Dkt. 201-9 ¶¶ 81-91; Ex. 151, Pittleman Dep. Tr. at 138:15-141:13. She applied her significant industry experience and knowledge in that evaluation. Dkt. 201-9 ¶¶ 88-90, 92.

Ms. Pittleman's analysis is nothing like *Focal Point Films, LLC v. Sandhu*, where an expert opined on whether a party's input contributed to audience appeal of a film but admitted that "she has not seen the Film or reviewed any evidence reflecting its content or style." No. 19- 02898, 2020 WL 5760355, at *9 (N.D. Cal. Sept. 28, 2020). In contrast, Ms. Pittleman analyzed substantial evidence on the relationship between the episodes in the *Servant* series. But she need not have watched all 40 episodes to understand that Defendants' continued story elements, characters, and other critical aspects of *Servant* that stemmed from *Emanuel* and continued from one episode to the next across seasons. Ex. 151, Pittleman Dep. Tr. at 139:4-141:13. She has analyzed substantial information about the series and individual episodes across all four seasons of *Servant*.

In addition, she reviewed testimony about why Apple green-lit *Servant* for Apple TV+ and renewed it for four seasons. Dkt. 201-9 ¶¶ 52-66; Ex. 151, Pittleman Dep. Tr. at 185:11-18. Even if Defendants continue on with their critique about not watching every episode, they can do so on cross-examination because it goes to the weight of her testimony not its admissibility. And disputes over underlying data is a classic jury function: "The experts can present their dueling opinions at trial, and each can be cross-examined regarding the relevance of the underlying data and information considered." *Edgewell Pers. Care Brands, LLC v. Munchkin, Inc.*, No. 18-3005, 2022 WL 16957834, at *12 (C.D. Cal. Oct. 12, 2022). Even then, Defendants' own expert, Bob Gale, followed the same approach as Ms. Pittleman, as he did not watch the majority of the alleged prior art works referenced in his expert report either.

Ms. Pittleman also opined on the causal nexus between the release of *Servant* and Apple TV+. For example, Ms. Pittleman assesses the timing and impact of *Servant* on the launch of Apple TV+. Her experience on content library creation and launch of television works informed her analysis. Ex. 151, Pittleman Dep. Tr. at 16:5-17:21, 81:19-88:14. She will testify about the importance of the first several

episodes in the success of a series and its platform. Dkt. 201-9 ¶¶ 61-62; Ex. 151, Pittleman Dep. Tr. at 170:2-173:19. And it will aid the jury in understanding the importance and role of marquee original content for an entertainment service like Apple TV+.

Ms. Pittleman was not required to quantitatively apportion profits as part of her causal nexus analysis either. "According to the Ninth Circuit, [the plaintiff] has the initial burden of proving a causal nexus between the alleged infringement and the alleged infringer's gross profits. Only after the plaintiff has established the requisite causal nexus does the burden shift to the defendant to apportion the profits that were not the result of the infringement. *Id.*" *Reinsdorf v. Skechers U.S.A., Inc.*, 296 F.R.D. 604, 617 (C.D. Cal. 2013) (citing *Polar Bear Prods.,* 384 F.3d at 711). Again, Ms. Pittleman's analysis is directed to the qualitative relationship between the infringing episodes 1-3 of *Servant* and the follow-on episodes 4-40 and Apple TV+. Dkt. 201-9 ¶¶ 57-63, 80, 92. No specific financial analysis was necessary or required to establish causal nexus in this case under step 1. The calculation of indirect profits attributable to the infringement is a separate issue under step 2, and Defendants have the burden to apportion those damages, not Plaintiff or Ms. Pittleman.

Defendants' reliance on the *Rearden* and *Ocolu* cases is also misplaced because neither resembles the facts here. *Rearden* involved copyrighted software technology "for capturing the motion of the human face to create images used in motion pictures," not the relationship between episodes in renewed, successive seasons of a single television series. *Rearden LLC v. Walt Disney Co.*, No. 17-04006, 2021 WL 6882227, at *1 (N.D. Cal. July 12, 2021). There, the court rejected the defendant's expert's scientific methodology and analysis of "a correlation between 'uncanny human-like virtual characters in feature films' and the overall 'estimated budge[t]s and gross film takings' based on an analysis of just four films cherry-picked for their poor box office performance. *Id.* at *7. There is



ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

no logical comparison between the attenuated statistical correlation in *Rearden* and the qualitative analysis of the relationship between sequel episodes here. Nor does the evaluation of trademark infringement damages in *Oculu* have any bearing on the issue of causal nexus for indirect copyright infringement damages in this case. *Oculu, LLC v. Oculus VR, Inc.*, No. 14-0196, 2015 WL 3619204, at *21 (C.D. Cal. June 8, 2015). Ms. Pittleman's opinions on causal nexus relating to indirect profits for episodes 4-40 are supported by sufficient facts and data along with her professional knowledge and experience to be admissible under Rule 702.

**CONCLUSION**

None of Defendants' critiques or misrepresentations about Ms. Pittleman's analysis or qualifications provides a basis to exclude her testimony. She is a veteran of the entertainment industry with substantial knowledge and experience that bears on the issues of access and causal nexus in this case. Ms. Pittleman will provide helpful analysis and context to enable the jury to fully decide those issues. Her testimony is admissible under Rule 702, and Defendants' motion should be denied.

Dated: August 2, 2024

ROBINS KAPLAN LLP

By: */s/ Patrick M. Arenz*
Patrick M. Arenz

Attorneys for Plaintiff
Francesca Gregorini

**ROBINS KAPLAN LLP**
Michael A. Geibelson (SBN 179970)
MGeibelson@RobinsKaplan.com
Patrick M. Arenz *(Pro hac vice)*
PArenz@RobinsKaplan.com
Emily E. Niles *(Pro hac vice)*
ENiles@RobinsKaplan.com
Annie Huang *(Pro hac vice)*
AHuang@RobinsKaplan.com
Prateek N. Viswanathan *(Pro hac vice)*
PViswanathan@RobinsKaplan.com

2121 Avenue of the Stars
Suite 2800
Los Angeles, California 90067
Telephone: 310 552 0130
Facsimile: 310 229 5800

*Attorneys for Plaintiff Francesca Gregorini*

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

Francesca Gregorini,

Plaintiff,

v.

APPLE INC., a California corporation; M. NIGHT SHYAMALAN, an individual, BLINDING EDGE PICTURES, INC., a Pennsylvania corporation; UNCLE GEORGE PRODUCTIONS, a Pennsylvania corporate; ESCAPE ARTISTS LLC, a California limited liability company; DOLPHIN BLACK PRODUCTIONS, a California corporation; TONY BASGALLOP, an individual; ASHWIN RAJAN, an individual; JASON BLUMENTHAL, an individual; TODD BLACK, an individual; STEVE TISCH, an individual; and DOES 1-10, inclusive,

Defendants.

Case No. 2:20-cv-00406-SSS-JC

*Hon. Sunshine S. Sykes*

**L.R. 11-6.1 CERTIFICATE OF COMPLIANCE**

Date: August 23, 2024
Time: 2:00 p.m.
Dept.: Courtroom 2

The undersigned, counsel of record for Plaintiff Francesca Gregorini, certifies that this brief contains 5,027 words, which complies with the word limit of L.R. 11-6.1.

Dated: August 2, 2024

ROBINS KAPLAN LLP

By: */s/ Patrick M. Arenz*
Patrick M. Arenz

Attorneys for Plaintiff
Francesca Gregorini

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES