**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FRANCESCA GREGORINI, | Case No. 2:20-cv-00406-SSS-JC |
| Plaintiff, | |
| v. | **ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. 180, 239]** |
| APPLE INC. et al., | |
| Defendants. | |

Before the Court is a Motion for Summary Judgment filed by Apple Inc., M. Night Shyamalan, Blinding Edge Pictures, Inc., Uncle George Productions, Escape Artists LLC, Dolphin Black Productions, Tony Basgallop, Ashwin Rajan, Jason Blumenthal, Todd Black, and Steve Tisch.[1] [Dkt. 239, Defendants' Motion for Summary Judgment ("Motion")].[2] Defendants move for summary judgment on all asserted claims in the first amended complaint. [*See* Dkt. 25, First Amended Complaint ("FAC")]. Plaintiff Francesca Gregorini ("Gregorini") opposes. [Dkt. 276]. Having considered the parties' arguments, the relevant legal authority, and the record in this case, the Court **DENIES** the Motion.

---

[1] Defendants will collectively be referred as "Defendants" unless otherwise specified.

[2] Defendants first filed their Motion on July 12, 2024. [Dkt. 180]. Following the Court's order on their application to seal portions of their Motion, Defendants refiled their Motion on August 19, 2024. [Dkt. 239]. This order addresses the latter filed Motion but applies to the former Motion as well.

## I.    BACKGROUND

This case arises from a dispute regarding the originality of the first three episodes of a popular television series, *Servant*.

### A.    *Servant*

*Servant* is a supernatural thriller that follows a wealthy couple who hires a mysterious nanny to care for a baby doll the mother believes is her deceased child.  [Motion at 12].[3]  The nanny dotes on the doll, seamlessly playing into the mother's delusion, much to the confusion of the husband.  [Dkt. 180 at Ex. 29, *Servant* Episode 1 ("*Servant* Ep. 1")].  At the end of the first episode, however, a live baby appears in the dolls wake.  [*Id*.].  The startled husband blames the nanny and begins investigating the nanny's shadowy past.  [Motion at 12].

*Servant* debuted on Apple TV+ in 2019 to launch Apple's new streaming platform.  [*Id*.; Dkt. 276, Gregorini's Opposition ("Opp."), at 10].  Tony Basgallop ("Basgallop") wrote *Servant* and M. Night Shyamalan ("Shyamalan") directed the first episode.  [Motion at 13].  Shyamalan's production company, Blinding Edge Pictures, Inc. ("Blinding Edge") helped produce the series, attaching Apple Inc. ("Apple") in 2018.  [*Id*. at 14].

### B.    *The Truth About Emanuel*

Three years prior to *Servant*'s release, an independent movie titled *The Truth About Emanuel* ("*Emanuel*") premiered at Sundance Film Festival.  [Opp. at 8].  In *Emanuel*, a mother hires a young nanny to care for a baby doll the mother believes is her deceased child.  [Dkt. 180 at Ex. 79, *Emanuel*].  The nanny's complicity in the mother's delusion, motivated by the nanny's loss of her own mother, facilitates a tender relationship between the two as they both

---

[3] The Court notes all page citations will be to pages numbers designated by ECF upon the documents' filing.

move through their respective grief.  [*Id.*].  Gregorini developed *Emanuel*, and the film has won numerous awards and recognition.  [Opp. at 9].

### C.   This Lawsuit

Gregorini alleges Defendants impermissibly copied from *Emanuel* in the making of *Servant*, charging Defendants with a single claim of copyright infringement under federal copyright law.[4]  [FAC ¶¶ 83-92].  Gregorini pursues this claim against all Defendants under a theory of direct infringement as well as contributory and vicarious infringement.  [*Id.* ¶¶ 105-107].

In 2020, Judge Walter granted Defendants' motion to dismiss on the basis the two works were not substantially similar.  [Dkt. 39].  The Ninth Circuit reversed, holding dismissal was "improper" because "reasonable minds could differ on the issue of substantial similarity."  *Gregorini v. Apple Inc*., No. 20-55664, 2022 WL 522307, at *1 (9th Cir. Feb. 22, 2022) (internal quotations omitted).   Now, Defendants move for summary judgment and assert: (1) Gregorini's copyright is invalid; (2) Defendants did not have access to her work; (3) the works are not substantially similar; and (4) Basgallop independently created *Servant*, among other arguments.  The Court discusses additional relevant facts below.

## II.   LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party has the initial burden of identifying the portions of the pleadings and record that it believes demonstrate

---

[4] Gregorini originally alleged three claims of copyright infringement, one for the television show, and two for earlier scripts of the television show.  [FAC ¶¶ 83-104].  However, Gregorini has since dropped the claims regarding the scripts, so that she is only prosecuting infringement as it pertains to the television series. [Dkt. 317 (Minutes from November 1, 2024 hearing)].

1   the absence of an issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S.

2   317, 323 (1986). The moving party must show that "under the governing law,

3   there can be but one reasonable conclusion as to the verdict." *Anderson v.*

4   *Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

5        If the moving party has sustained its burden, the non-moving party must

6   then show that there is a genuine issue of material fact that must be resolved at

7   trial. *See Celotex*, 477 U.S. at 324. The non-moving party must make an

8   affirmative showing on all matters placed at issue by the motion as to which it

9   has the burden of proof at trial. *See id.* at 322; *Anderson*, 477 U.S. at 252. A

10  genuine issue of material fact exists "if the evidence is such that a reasonable

11  jury could return a verdict for the non-moving party." *Id.* at 248. "This burden

12  is not a light one. The non-moving party must show more than the mere

13  existence of a scintilla of evidence." *Oracle*, 627 F.3d at 387 (citing *Anderson*,

14  477 U.S. at 252).

15       When deciding a motion for summary judgment, the Court construes the

16  evidence in the light most favorable to the non-moving party. *See Barlow v.*

17  *Ground*, 943 F.2d 1132, 1136 (9th Cir. 1991). Thus, summary judgment for the

18  moving party is proper when a "rational trier of fact" would not be able to find

19  for the non-moving party based upon the record taken as a whole. *Matsushita*

20  *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

21  **III.   DISCUSSION**

22       To prove copyright infringement, Gregorini must establish (1)

23  "ownership," (2) "copying," and (3) "unlawful appropriation." *Skidmore v. Led*

24  *Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020). Defendants challenge

25  Gregorini's ability to prove all three elements at trial. [Motion at 17-26].

26  Additionally, Defendants allege the affirmative defense of independent creation,

27  and seek to limit their liability as to Gregorini's claims regarding secondary

28  liability and indirect profits. [Motion at 28-31].

### A.    Ownership

First, Defendants contend Gregorini's copyright registration of *Emanuel* is invalid because it is inaccurate.  [Motion at 18].  A party seeking to invalidate a copyright registration must show that the registrant submitted an inaccurate application with knowledge of the inaccuracies, and the inaccuracies were material to the registration.  *Unicolors v. H&M Hennes & Mauritz*, 52 F.4th 1054, 1067 (9th Cir. 2022).   Federal copyright law requires disclosure of "preexisting works" in copyright applications "in the case of a compilation or derivative work."  17 U.S.C. § 409(9).

Defendants claim Gregorini's application is inaccurate because it did not disclose that Sarah Thorp ("Thorp"), a friend of Gregorini's, provided the initial idea for *Emanuel*.  [Motion at 18].  According to Thorp, she floated to Gregorini the "very basic one-liner" of an "indie thriller about a woman who creates a delusion in which she believes her child is still alive."  [Dkt. 194-3, Deposition of Sarah Thorp ("Thorp Depo."), at 21, 26].  Gregorini, "very inspired" by the conversation, developed the preliminary screenplay of *Emanuel* around "this basic seed of a story," adding plot, characters, scenes, and dialogue.  [*Id.* at 25, 28; Dkt. 180-70, Emails Between Gregorini and Thorp, at 5].  Gregorini also added the central feature of the reborn doll, which Thorp attests "was all Francesca."  [Thorp Depo. at 25].  Ultimately, the two signed an agreement providing that Gregorini owned the screenplay entirely, while Thorp owned the initial story.  [Dkt. 180-73, Screenplay Purchase Agreement].  It is undisputed Thorp has any copyright interest in *Emanuel*.  [Dkt. 285, Response to Statements of Genuine Disputes of Material Fact ("SGD") ¶ 362].

Considering this context, the Court cannot find Gregorini's application inaccurate as a matter of law.  Defendants state Gregorini's application must have disclosed "any preexisting work or works that it is based on" to be accurate.  [Motion at 18].   However, that is only true if *Emanuel* is a "derivative

1   work" or "compilation."  17 U.S.C. § 409(9).  Defendants do not allege or point

2   to facts establishing that *Emanuel* is either.  [*See id.*].  As such, Defendants have

3   not met their burden in showing Gregorini registered her copyright with an

4   inaccuracy.

5        The Court is dubious Gregorini was required to disclose Thorp's minimal

6   involvement in *Emanuel*.  The Copyright Act defines "derivative work" as a

7   work that "recast[s], transform[s], or adapt[s]" a "preexisting work," such as a

8   "translation, musical arrangement, dramatization," etc., and "compilation" as a

9   "work formed by the collection and assembling of preexisting materials or of

10  data."  17 U.S.C. § 101.  "If what is borrowed consists merely of ideas and not

11  the expression of ideas, then, although the work may have in part been derived

12  from prior works, it is not a derivative work."  *Starbuzz Tobacco, Inc. v. Gold*

13  *Star Tobacco Inc*, No. SACV 19-00408 JVS (DFMx), 2019 WL 12446075, at

14  *4 (C.D. Cal. July 3, 2019); *see also Herbert Rosenthal Jewelry Corp. v.*

15  *Kalpakian*, 446 F.2d 738, 741 (9th Cir. 1971) (explaining copyright law's

16  protection of "the particular 'expression' of an idea" but not "the 'idea' itself").

17  Here, Thorp only provided a "very basic one liner," or a mere idea, to Gregorini,

18  who then expressed and augmented that idea to form a screenplay.  [Thorp

19  Depo. at 26].  Similarly, the Court is also hard pressed to find *Emanuel* a

20  compilation.  *Cf. Starbuzz*, 2019 WL 12446075, at *6 (noting the Copyright

21  Office's Form offers "[c]ompilation of 19th century political cartoons" as an

22  example of a compilation).

23       In considering the evidence in a light most favorable to Gregorini, Thorp

24  is a far from co-authoring *Emanuel* as Defendants claim; rather, she lent an idea

25  to Gregorini.  Without any explanation as to why this Court should consider

26  Gregorini's work derivative or a compilation, and thus providing no basis for

27  the underlying inaccuracy in her copyright application, the Court declines to

28  find Gregorini's copyright invalid.

**B.    Copying**

Next, Defendants assert they did not have access to *Emanuel*, and therefore Gregorini cannot prove Defendants copied her work.  [Motion at 18].  A plaintiff may prove copying with either (1) a circumstantial showing defendants had access to plaintiff's work and the two works share similarities[5] or (2) direct evidence. [6]  *Skidmore*, 952 F.3d at 1064.  Ultimately, Gregorini must show that Defendants "had an opportunity to view or copy" her work.  *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482 (9th Cir. 2000).

**1.    *Circumstantial Access***

Access can be demonstrated by a "chain of events linking the plaintiff's work and the defendant's access" or by "showing that the plaintiff's work has been widely disseminated." *Loomis v. Cornish*, 836 F.3d 991, 995 (9th Cir. 2016).  The court's inquiry is if plaintiff shows a "reasonable possibility, not merely a bare possibility" that defendants had "the chance to view the protected work." *Art Attacks Ink, LLC v. MGA Ent. Inc.*, 581 F.3d 1138, 1143 (9th Cir. 2009).

a.    Widespread Dissemination

Gregorini contends *Emanuel* enjoyed enough industry-specific notoriety to at least create a genuine issue regarding Defendants' access.  [Opp. at 14-17].

---

[5] While the Court notes the similarity prong of copying and unlawful appropriation analysis are different, the Court's discussion of the similarities between *Servant* and *Emanuel* in Section C satisfy both inquiries by applying the higher bar required of unlawful appropriation, or the overlap of only protectable elements.  *See Skidmore, 952* F.3d at 1064 (clarifying that copying analysis is based on unprotectable and protectable elements, whereas unlawful appropriation at summary judgment assesses similarity based on protected elements).

[6] Gregorini also argues *Emanuel* and *Servant* are "strikingly similar" such that access can be inferred.  [Opp. at 19].  *See Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*, 922 F.3d 946, 952 (9th Cir. 2019).  However, the Court does not find the works to be strikingly similar, as elaborated on in Section C.

1    Defendants argue *Emanuel* was not widely disseminated because it only

2    generated ticket sales of about $4,000.  [Dkt. 239-1, Defendants Statement of

3    Uncontroverted Facts "SUF", ¶ 240].

4        "The evidence required to show widespread dissemination will vary from

5    case to case." *Loomis,* 836 F.3d at 997.  In "most cases," commercial success

6    will be determinative.  *Id*; *see e.g., Rice v. Fox Broad. Co*., 330 F.3d 1170, 1178

7    (9th Cir. 2003) (holding sale of 17,000 copies of protected video over thirteen

8    years inadequate to establish widespread dissemination); *Art Attacks Ink, LLC v.*

9    *MGA Ent. Inc.*, 581 F.3d 1138, 1144-45 (9th Cir. 2009) (holding sale of 2,000 t-

10   shirts with protected design inadequate).  However, commercial success is not

11   required.  *See Gray v. Perry,*  No. 2:15-cv-05642-CAS (JCx), 2018 WL

12   5095118, at *3 (C.D. Cal. Oct. 17, 2018) (describing how necessitating

13   commercial success "would make it permissible to infringe on a copyrighted

14   work simply because it was never for sale").  So, although $4,000 in ticket sales

15   alone would likely be insufficient to establish access as a matter of law,

16   Gregorini offers a plethora of alternative evidence.

17       To start, *Emanuel* premiered at Sundance Film Festival, one of the most

18   renowned film festivals in the world.  [SUF ¶ 232; Dkt. 182-26, Expert Report

19   of Ellen Pittleman "Pittleman Report" ¶ 20].  The film stars "[w]ell-known"

20   actors, like Jessica Biel.  [*Id.* ¶ 22].  *Emanuel* debuted in the "Dramatic

21   Competition category" with only 15 other films and was nominated for a prize

22   in that category.  [SGD ¶ 293].  Sundance staff dubbed *Emanuel* "arguably the

23   most artistically liberated film at the 2013 Sundance Film Festival."  [SGD ¶

24   295].  THE LOS ANGELES TIMES, ROLLING STONE, DEADLINE, VARIETY, and THE

25   HOLLYWOOD REPORTER all reported on *Emanuel*'s release.  [SGD ¶ 294].  The

26   film was shown at 18 other film festivals internationally and won four other

27

28

awards.[7]  [SGD ¶¶ 296, 297].  This is much more than "mere availability of work online," as Defendants argue.  [*See* Motion at 19, citing *Cope v. Warner Recs., Inc*., No. 2:22-CV-01384-SSS-AS(x), 2023 WL 11827959 (C.D. Cal. June 5, 2023)].  Here, the facts indicate there is at least a genuine dispute of *Emanuel*'s substantial notoriety in the independent film scene.

Further, it is undisputed Defendant Shyamalan asks Blinding Edge employees to scout talent at film festivals and Defendant Apple regularly sends representatives to Sundance to look for films to purchase.  [SGD ¶¶ 367, 370].  It is additionally undisputed Defendant Basgallop routinely watches and enjoys independent films and reads the entertainment industry publications in which *Emanuel* was featured.  [*Id*. ¶¶ 322, 324, 369-71].  Defendant Rajan testified to watching a "movie a week" and Defendant Blinding Edge employs a team to watch movies.  [*Id*. ¶ 370].  Gregorini's expert also supplies that in the film industry, film festivals provide a "crucial platform" for identifying new talent and Sundance in particular "stands out as a festival."  [Pittleman Report ¶ 20].

In *Straughter v. Raymond*, the court held an album with "some level of notoriety in the R & B genre at the same time defendants were actively creating R & B music, and defendants' admission that they have heard thousands of songs from countless artists" supported an inference of access based on widespread dissemination.   No. CV 08-2170 CAS (CWx), 2011 WL 3651350, at *13 (C.D. Cal. Aug. 19, 2011); *see also L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 848 (9th Cir. 2012) (finding a triable issue of access where plaintiff's product was popular in a specific market and defendant routinely participated in that market); *cf. Loomis*, 836 F.3d at 998 (holding Defendants who did not "participat[e] in the relevant market" and whose

---

[7] *Emanuel* was also showed in 12 movie theaters throughout the U.S., and was publicly available on streaming services, like Netflix, Hulu, Amazon Video, Peacock, and iTunes.  [SGD ¶¶ 236, 239, 241, 243].

"responsibilities had nothing to do with listening to local radio, reading local press, or scouting local bands" did not access songs at issue). Here, *Emanuel*'s notoriety in the independent film scene during the same time Defendants consumed independent films, and when *Servant* itself was in development, demonstrate a reasonable possibility Defendants had the chance to view *Emanuel*.

### 2.    *Direct Access*

Gregorini additionally asserts points of direct access. Most prominently, Marc Aronson ("Aronson"), an Apple executive who worked as the "creative executive responsible for *Servant*," received an email on March 7, 2018, that pitched Gregorini as a "Director to Know" and provided a link to view *Emanuel*. [SGD ¶ 330; Dkt. 276-24 at 3; Dkt. 276-11, Deposition of Marc Aronson ("Aronson Depo."), at 27-28]. Thus, Gregorini has established at least one Defendant had direct access to *Emanuel* while *Servant* was in creative development. *See Irish Rover v. Sims,* No. 20-06293, 2023 WL 4317054, at *6 (C.D. Cal. June 30, 2023) (holding one defendant's direct access sufficient to overcome summary judgment for all defendants involved with developing *Stranger Things* television show).

However, Defendants argue the alleged similarities between *Emanuel* and *Servant* were in *Servant* scripts prior to Apple's involvement. [Motion at 21]. *See Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1054 (C.D. Cal. 2010) (to support a claim of copying, "Defendants must have had access to Plaintiff's copyrighted work *before* the creation of the allegedly infringing work") (emphasis in original).

To support their argument, Defendants only point to Gregorini's own complaint alleging infringement based on Early and Later *Servant* scripts and the limited creative role Apple had in *Servant*. [*Id.*]. However, the Court cannot penalize Gregorini for pursuing alternative legal theories in her

complaint.  *See Aetna Life Ins. Co. v. Provident Life & Acc. Ins. Co*., 962 F.2d 13 (9th Cir. 1992) ("[A] policy which permits one claim to be invoked as an admission against an alternative or inconsistent claim would significantly restrict, if not eliminate, the freedom to plead inconsistent claims provided by Rule 8(e)(2)."). Gregorini also offers evidence of Apple, and particularly Aronson, providing "multiple rounds" of creative input in the making of *Servant*. [SGD ¶ 176]. Without more, Defendants have not met their burden in foreclosing Gregorini's direct access theory. *See Celotex*, 477 U.S. at 323 (citing to Fed. R. Civ. P. 560 (holding the moving party "bears the initial responsibility" of "identifying" the portions of the record that "demonstrate an absence of a genuine issue of material fact").

Gregorini also supplies other possibilities for direct access. Aronson may have reasonably had direct access a year prior when he selected Gregorini to direct an episode of another television show, *Electric Dreams*, while working at Sony. [SGD ¶ 328]. Aronson testified he would watch potential directors' material in the selection process, even though he did not testify to specifically watching *Emanuel*. [Aronson Depo. at 5, 49].

Gregorini alleges Basgallop had direct access to *Emanuel* when she was considered as a director for the show Basgallop wrote and produced, called *Berlin Station*. [SGD ¶ 372]. Gregorini's agent sent Gregorini an email confirming she "submitted" her for *Berlin Station* and testified to her office's practice of sending the "materials" of her clients for submission. [Dkt. 180-91, Deposition of Olivia Blaustein, at 6-8]. However, Gregorini's agent was not copied on the email submitting Gregorini, albeit typical in her office's practice, and Gregorini has not produced the exact submission. [*Id*. at 8]. Defendants also contend Basgallop did not have a role in selecting directors, a fact Gregorini disputes. [SGD ¶ 254].

While Gregorini's evidence of direct access is admittedly not the smoking gun she may desire, taken together, it does make it difficult for the Court to conclude that neither Apple nor Basgallop had an "opportunity to view" her work.  *See Three Boys Music Corp.,* 212 F.3d at 482.

While "distinguishing a 'bare' possibility from a 'reasonable' possibility" that Defendants viewed *Emanuel* "present[s] a close question, "[o]ne must remember that the issue this Court must address is not whether Plaintiff has proven access by a preponderance of evidence, but whether *reasonable minds* could find Defendants had a *reasonable opportunity*" to have viewed Gregorini's work before creating *Servant*.  *Kaseberg v. Conaco*, LLC, 260 F. Supp. 3d 1229, 1241 (S.D. Cal. 2017); *Three Boys Music Corp.,* 212 F.3d at 485 (emphasis in original).  Taking the record as a whole, the Court finds a reasonable mind could conclude Defendants had access to *Emanuel.*

## C.   Unlawful Appropriation

To determine unlawful appropriation, the Court must decide whether *Servant* and *Emanuel* share "substantial similarities."  *Skidmore*, 952 F.3d at 1064.  The Court first notes that the Ninth Circuit has held – in this very case – that "summary judgment is not highly favored on questions of substantial similarity in copyright cases."  *Gregorini v. Apple Inc*., No. 20-55664, 2022 WL 522307 (9th Cir. Feb. 22, 2022) (reversing district court's grant of Defendants' motion to dismiss on substantial similarity).  That is because the "question of originality is one of fact, not of law."  *Divine Dharma Meditation Int'l Inc. v. Inst. of Latent Energy Stud*., No. SACV 16-226-JLS (JCGx), 2016 WL 7486286, at *5 (C.D. Cal. May 25, 2016) (citations omitted).  Summary judgment is only appropriate if "no reasonable juror could find substantial similarity of ideas and expression."  *Yonay v. Paramount Pictures Corp*., No. CV 22-3846 PA (GJSx), 2024 WL 2107721, at *5 (C.D. Cal. Apr. 5, 2024).

1    The Ninth Circuit further held, while reviewing the two works at issue

2    here, "reasonable minds could differ on the issue of substantial similarity."

3    *Gregorini*, 2022 WL 522307.  That alone instructs the Court to find substantial

4    similarity sufficient to survive summary judgment.  Nonetheless, the Court has

5    conducted an independent analysis and concludes Gregorini has shown a

6    genuine dispute as to substantial similarity.

7    In a motion for summary judgment, the Court applies the "extrinsic test,"

8    which "compares the objective similarities of specific expressive elements in the

9    two works."[8]  *Johannsongs-Publ'g Ltd. v. Lovland,* No. CV 18-10009-AB

10    (SSx), 2020 WL 2315805, at *3 (C.D. Cal. Apr. 3, 2020), *aff'd,* No. 20-55552,

11    2021 WL 5564626 (9th Cir. Nov. 29, 2021).  The Court "must first distinguish

12    between protectable and unprotectable elements," and then decide whether the

13    protectable elements are substantially similar.  *Hanagami v. Epic Games, Inc.*,

14    85 F.4th 931, 942 (9th Cir. 2023).  For example, "general plot ideas, familiar

15    stock scenes and themes" and "incidents that flow naturally from a basic plot

16    premise" are unprotectable.  *Yonay*, 2024 WL 2107721, at *5; *Cavalier v.

17    Random House, Inc.*, 297 F.3d 815, 822, 823 (9th Cir. 2002).

18    However, a "particular sequence in which an author strings a significant

19    number of unprotectable elements can itself be a protectable element."  *Metcalf

20    v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002).  Here, Gregorini puts forth this

21    "selection-and-arrangement" theory of substantial similarity.   To succeed,

22    Gregorini must identify "a combination of unprotectable elements" as "eligible

23    for copyright protection" by showing "those elements are numerous enough and

24    their selection and arrangement original enough that their combination

25    constitutes an original work of authorship."  *Satava v. Lowry*, 323 F.3d 805, 811

26    _____

27    [8] The "intrinsic test," or a comparison from the "standpoint of the ordinary
reasonable observer" is reserved for the jury.  *Skidmore*, 952 F.3d at 1064;
28    *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1118 (9th Cir. 2018).

1    (9th Cir. 2003).  Original necessitates "at least some minimal degree of

2    creativity," more than "trivial elements of compilation and arrangement."  *Ets–*

3    *Hokin,* 225 F.3d at 1076; *Gray v. Hudson*, 28 F.4th 87, 101 (9th Cir. 2022).

4        A "selection-and-arrangement theory of copyright infringement [] does

5    not entail filtering out unprotected elements."  *WMTI Prods., Inc. v. Healey*, No.

6    CV 20-02726-CJC (MAAx), 2023 WL 5506712, at *6.  The selection-and-

7    arrangement itself becomes a protected element.  *See Moonbug Ent. Ltd. v.*

8    *BabyBus (Fujian) Network Tech. Co.*, No. 21-CV-06536-EMC, 2023 WL

9    11922845 (N.D. Cal. Mar. 7, 2023) (finding selection and arrangement

10   "'original enough' to be protectable").  For instance, "where wavy hair alone

11   may not be protectable, wavy hair combined with a polka dotted dress, stilettos,

12   and a smiling child smelling a flower may form a protectable expression."

13   *Schmidt v. Baldy*, No. CV 16-9368-DSF (AGRx), 2019 WL 5389868, at *6

14   (C.D. Cal. Oct. 19, 2019).  Thus, the "presence of so many generic similarities

15   and the common patterns in which they arise do help [Plaintiffs] satisfy the

16   extrinsic test."  *Metcalf*, 294 F.3d at 1074.

17       Here, both *Servant* and *Emanuel* contain a string of elements that form a

18   unique and substantially similar story.  In both works, a mother loses her only

19   baby.  [Dkt. 180, Ex. 29, *Servant* Episode 1 "*Servant* Ep. 1"; Ex. 79, *Emanuel*

20   "*Emanuel* film"].  At first, the viewer does not know how or why the baby died.

21   [*Id*.].  To cope with her grief, the mother cares for a hyper-realistic doll that she

22   believes is her alive child.  [*Id.*].  The mother hires an 18-year-old nanny to take

23   care of the doll in support of the mother's delusion.  [*Id*.].  The nanny soon

24   participates in the delusion with the mother, taking care of the doll as if it were a

25   baby, both when the mother is there and when the nanny is alone.  [*Id.*].  The

26   shared delusion between mother and nanny creates a strong bond between the

27   two.  [*Id*.; Dkt. 180, Ex. 30, *Servant* Episode 2; Ex. 31, *Servant* Episode 3].  The

28   relationship between the mother and nanny is maternal but overtly sexual.  [*Id*.].

-14-

1    Finally, both works depict the doll becoming a real baby.[9]  [*Servant* Ep. 1;

2    *Emanuel* film].  This is far from "random similarities scattered throughout the

3    works."  *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984).

4        Further, Gregorini's expert fleshes out this pattern of similarities.  *See*

5    *Johannsongs-Publ'g Ltd*, 2020 WL 2315805, at *3 ("The extrinsic test … often

6    requires expert analysis.").  First, the "the mother/nanny/doll triad," present in

7    both works, "complicates the traditional mother/daughter relationship" and is

8    "unusual for the standard fare of Hollywood." [Dkt. 240-18, Expert Report of

9    David Román ("Román Report"), at 35].  Both mother and nanny fall into a

10   "dual maternal role," whereby both mother and nanny take care of each other as

11   well as the doll.  [*Id*. at 27].  The "focus on women" and "exploration of female

12   sexuality," embodied in the complicated relationship between mother and

13   nanny, is atypical, particularly in the supernatural/suspense genre.  [*Id*. at 12-13,

14   23].  The viewer also wonders why the nanny is complicit in the mother's

15   delusion, made more compelling by the nannies' "obsessions with the mother

16   and doll." [*Id*. at 21, 26].  When considering Gregorini's expert report in the

17   light most favorable to Gregorini, as the Court must on summary judgment, the

18   parallel arrangements of both stories are numerous and original.

19       Defendants however, argue "a grieving mother who believes a reborn doll

20   is her dead child and hires a nanny for the doll is an unprotectable idea" because

21   using dolls for grief therapy is a real phenomenon and many works depict

22   parents treating a doll like a child, such as *Pinocchio*.  [Motion at 23; Dkt. 272-

23   15, Expert Report of Bob Gale ("Gale Report"), at 11-12].  But even accepting

24   this argument as true, *Emanuel*'s expression of this story is much more than

25   that.  The combination of shared elements is "numerous" and "original enough"

26   _____

27   [9] Parties dispute whether the doll in *Emanuel* turns into a real baby or represents
     Emanuel's "vision."  [SGD ¶ 29].  However, *Emanuel* does depict the doll
28   coming to life, whether a "vision" or otherwise.  [*Emanuel* film].

1    to form a "common 'pattern that is sufficiently concrete [to] warrant a finding of

2    substantial similarity.'" *Satava*, 323 F.3d at 811;  *Metcalf*, 249 F.3d at 1074

3    (citing *Shaw v. Lindheim*, 919 F.2d 1353, 1356 (9th Cir. 1990)).

4            While Defendants' expert report details the many differences between the

5    two works, it is axiomatic that "no plagiarist can excuse the wrong by showing

6    how much of his work he did not pirate." *Newton v. Diamond*, 388 F.3d 1189,

7    1195 (9th Cir. 2004).  Additionally, "the Court cannot weigh or disregard the

8    parties' expert reports (for which neither party has filed evidentiary

9    objections)." [10]  *Woodall v. Walt Disney Co.*, No. CV 20-3772- CBM-(EX), Dkt.

10   558 (C.D. Cal. Nov. 1, 2024).  Insofar as this case "boils down to a battle of the

11   experts, [] such a battle must be left for the jury's resolution." *Lewert v. Boiron,*

12   *Inc.*, 212 F. Supp. 3d 917, 937 (C.D. Cal. 2016), *aff'd*, 742 F. App'x 282 (9th

13   Cir. 2018).

14           Defendants also argue the extent of any similarities ends after *Servant*'s

15   first episode when the doll inexplicably becomes a real baby.  [Motion at 24].

16   But "[e]ven if a copied portion be relatively small in proportion to the entire

17   work, if qualitatively important, the finder of fact may properly find substantial

18   similarity." *Shaw*, 919 F.2d at 1363.  Here, the reborn doll is particularly

19   important.  Not only does it fuel the plot's development in *Servant* Episodes 2

20   and 3, as the husband attempts to uncover the mystery of the doll-turned-live-

21   baby, but Defendants themselves celebrate the reborn doll idea as "definitely the

22   big idea and should be the focus of the show."  [SGD ¶ 319].

23           Although undeniable "differences exist between the works," there is "too

24   much in common for a court to conclude that 'no reasonable juror could find

25

26

27   _____

28   [10] Parties have not filed evidentiary objections for the present Motion, but only
     Motions to Exclude expert reports for trial.

1    substantial similarity.'"  *Wilson v. Walt Disney Co*., No. 14-CV-01441-VC,

2    2014 WL 4477391, at *1 (N.D. Cal. July 30, 2014).

3        **D.    Independent Creation**

4        Defendants next assert *Servant* was not an infringement, but an

5    independent creation.  [Motion at 27].  Independent creation is a "complete

6    defense" to copyright infringement.  *Jones v. Twentieth Century Studios, Inc*.,

7    No. 2:21-CV-05890-FWS-SK, 2023 WL 9051282, at *8 (C.D. Cal. Nov. 28,

8    2023).  "By establishing reasonable access and substantial similarity," Gregorini

9    creates a "presumption of copying" that Defendants may rebut by proof of

10   independent creation.  *Gray v. Perry*, No. 2:15-cv-05642-CAS (JCx), 2020 WL

11   1275221, at *14 (C.D. Cal. Mar. 16, 2020).  Thus, Defendants "bear the burden

12   of proof at trial."  *Fun With Phonics, LLC v. Leapfrog Enterprises, Inc*., No. CV

13   09-916-GHK (VBXx), 2010 WL 11404474, at *9 (C.D. Cal. Sept. 10, 2010).

14       Generally, courts "do not award summary judgment based *solely* on the

15   grounds of independent creation," but when "evidence of access and substantial

16   similarity are lacking."  *Kaseberg v. Conaco*, LLC, 260 F. Supp. 3d 1229, 1248

17   (S.D. Cal. 2017) (emphasis in original).  If Defendants' independent creation

18   defense relies on a factual dispute or credibility determinations, the Court

19   cannot grant summary judgment.  *Kaseberg*, 260 F. Supp. 3d at 1248 (S.D. Cal.

20   2017) ("To the extent that [a] defendant denies ... copying and maintains

21   independent creation, a factual issue arises, which it is for trial to resolve.");

22   *Fun With Phonics, LLC*, 2010 WL 11404474, at *9 (holding Defendant's

23   independent creation defense insufficient to grant summary judgment because

24   "[w]e are not in a position to make credibility determinations at the summary

25   judgment stage").

26       Defendants argue Basgallop independently created *Servant* years before

27   *Emanuel*'s release in 2013.  [Motion at 27].  Gregorini, however, contends pre-

28   *Emanuel* versions of *Servant*, developed over "15 years with substantial lapses,"

-17-

do not include the critical story arc of a mother and nanny carrying for a doll as a baby.  [Opp. at 26].

In reviewing Basgallop's notes and early scripts on what was to become *Servant*, all of which were written prior to the release of *Emanuel*, the Court does note a number of independently created similarities.  For instance, Basgallop envisions an "18-year-old live-in nanny" [SUF ¶ 93], a "well presented and precise" mother [Dkt. 180-2, Declaration of Tony Basgallop "Basgallop Decl.", ¶ 11], a "successful urban" couple [*Id.*], a "motherly" relationship between mother and nanny [SUF ¶ 112], supernatural features [Basgallop Decl. ¶ 13], and dappling with surrealism [SUF ¶ 99].

However, these notes and scripts do not feature a doll as a baby, the mother's delusions the doll is alive, or the nanny's complicity in the delusion. This is undisputed.  [SUF ¶¶ 309, 310].  All of Basgallop's initial versions of *Servant* distinctly presented a live baby.  [*See generally* Basgallop Decl.; *see e.g. id.* ¶¶ 19, 20 (discussing an early plot point of the mother breast-feeding while returning to work)].  Thus, from 2005 to 2012, *Servant* only included a live baby.  [SUF ¶¶ 309, 310].  It was three years after *Emanuel*'s premiere that the doll concept was allegedly first implemented in 2016.  [SUF ¶ 157].

While some shared elements appear to be independently created, the shared elements that only appear after *Emanuel* – i.e., a mother and nanny caring for a life-like doll instead of a live baby – are an important ones. Defendants' notes on *Servant*'s script call "the reborn doll idea … compelling, fresh, and edgy," and "definitely the big idea and should be the focus of the show."[11]  [Dkt. 276-37, Deposition of Ashwin Rajan ("Rajan Depo."), at 15-16].

---

[11] While Rajan testifies him, Shyamalan, Blumenthal, Escape Artists, Blinding Edge, Apple had meetings to "give collective thoughts" to Basgallop and wrote notes on the script, Rajan does not recall who provided this note.  [Rajan Decl. at 15].

1  Defendant Rajan also received notes that stated, "[t]he reborn idea feels too big,
2  fresh, and edgy not to use."  [SGD ¶ 319].

3        To support Defendants' independent creation defense, they provide
4  Basgallop's testimony claiming he thought of the doll idea after watching an
5  episode of *The Leftovers* in which a mother has life-sized dolls of her lost
6  children laid out on a table and discussing "reborn dolls" in the writers' room of
7  *The Resurrection* in 2014.  [Dkt. 276-4, Deposition of Tony Basgallop
8  "Basgallop Depo.," at 26-27].  Gregorini, however, challenges Basgallop's
9  account, arguing he has inconsistent stories around the origin of dolls in
10 *Servant*, and his inability to fully recall or corroborate the writers' room
11 conversation upsets his credibility.  [Dkt. 193-4, Deposition of Jason
12 Blumenthal, at 5 (testifying Basgallop credited a London tabloid as the origin of
13 the doll idea); Basgallop Depo. at 29 ("I couldn't tell you what we said" in the
14 writers' room; SGD ¶ 148 (noting the lack of "corroborating testimony from
15 other participants")].

16       Taken together, the Court cannot hold *Servant* to be independently
17 created as a matter of law.  The Court has found reasonable evidence of access
18 and substantial similarity, Basgallop's credibility is central to the dispute, and
19 the evidence must be viewed in a light favorable to Gregorini.  Thus,
20 Defendants affirmative defense fails at this stage, and the Motion is **DENIED**
21 on Gregorini's first claim of copyright infringement.

22       **E.    *Servant* Scripts**

23       Gregorini has narrowed her case for presentation at trial to exclude her
24 original claims alleging infringement of the *Servant* scripts.  [Dkt. 317].   Thus,
25 the Court holds this portion of the Motion **MOOT**.

26       **F.    Secondary Liability**

27       Federal copyright law permits liability based on contributory and
28 vicarious liability theories.  *Metro-Goldwyn-Mayer Studios Inc. v. Grokster*,

1  Ltd., 545 U.S. 913, 930 (2005).   A defendant "infringes contributorily by

2  intentionally inducing or encouraging direct infringement and infringes

3  vicariously by profiting from direct infringement while declining to exercise a

4  right to stop or limit it." *Id*. (citations omitted).

5       As a threshold matter, there must be a direct infringement to permit

6  secondary liability. *A&M Records v. Napster*, 239 F.3d 1004, 1013 n.2 (9th Cir.

7  2001).  In this case, as discussed at length above, determination of direct

8  infringement rests on a genuine dispute of material fact.  When viewing the

9  evidence in the light most favorable to Gregorini, the Court finds this initial

10  matter satisfied.

11       Defendants correctly point out Gregorini has failed to identify which of

12  the Defendants she charges with direct versus secondary liability.  [Motion at

13  29].  Gregorini asserts Defendants collaborative work on *Servant* and the

14  credibility determinations necessary to parse infringement require her pursuit of

15  alternative legal theories at trial.  [Opp. 28].  While the Court notes "a defendant

16  cannot be secondarily liable for that defendant's own direct infringement,"

17  Gregorini is permitted to pursue alternative theories of liability at trial.  *Smith v.*

18  *Weeknd*, No. CV 19-2507 PA (MRWx), 2019 WL 6998666, at *3 (C.D. Cal.

19  Aug. 23, 2019).

20       **1.    *Contributory Liability***

21       Contributory copyright infringement requires (1) "knowledge of another's

22  infringement" and (2) either material contribution to the infringement or

23  inducement of the infringement.  *Perfect 10, Inc. v. Giganews, Inc*., 847 F.3d

24  657, 670 (9th Cir. 2017).  Here, Defendants assert Gregorini has not

25  demonstrated Defendants' knowledge of any alleged infringement or material

26  contribution to that infringement.  [Motion at 29].  Gregorini does not dispute

27  this claim, but instead points to the collaborative nature of developing *Servant*.

28  [Opp. at 28; *see* SGD ¶ 333-44].

1    Because Gregorini's direct infringement claim rests on genuine issues of

2    material fact, it follows that Defendants' alleged knowledge of the direct

3    infringement also rests on genuine issues of material fact.  Put in other words,

4    the Court cannot determine Defendants' knowledge of facts that are in dispute.

5    Likewise, while Defendants worked collaboratively on *Servant*, the Court

6    cannot determine which Defendants materially contributed to the genuinely

7    disputed infringement.

8    Additionally, Gregorini offers "more than the mere existence of a scintilla

9    of evidence" to support her contributory liability claims.  *Oracle*, 627 F.3d at

10   387.  First, she points to the collaborative development of *Servant*, which when

11   viewed in the light most favorable to Gregorini, supports a reasonable inference

12   that Defendants had knowledge and materially contributed to the alleged

13   infringement.  Second, Apple funded the production of *Servant*, and when

14   subject to reasonable inferences in Gregorini's favor, could have induced the

15   alleged infringement.

16   **2.    *Vicarious Liability***

17   To prove vicarious liability, Gregorini must show Defendants had "(1) the

18   right and ability to supervise the infringing conduct and (2) a direct financial

19   interest in the infringing conduct."  *Perfect 10, Inc. v. Gigantes, Inc*., 847 F.3d

20   657, 673 (9th Cir. 2017).

21   Defendants do not challenge the financial interest prong, likely because

22   Defendants made a lot of money from *Servant*.  [*See* Dkt. 278-21, Expert Report

23   of Dominic M. Persechini, at 10 (sealed report detailing total profits to each

24   Defendant)].[12]  Defendants only point to Gregorini's alleged lack of evidence

25   regarding the supervision prong.  [Motion at 29].

26   _____

27   [12] Gregorini concedes and her expert report details Steve Tisch did not receive a
     direct financial interest in *Servant*,  [Opp. at 28].  Thus, as a matter of law, Tisch
28   cannot be held liable under a vicarious liability theory, and the Motion is

1    Supervision, here, is "the 'control' element" of vicarious liability.  *Perfect

2    *10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173 (9th Cir. 2007).  A defendant

3    "exercises control over a direct infringer when he has both the legal right to stop

4    or limit the directly infringing conduct, as well as the practical ability to do so."

5    *Id*.  The Court will assess each Defendants' control over *Servant*.

6    First, Basgallop was the writer and an executive producer.  [SGD ¶ 344].

7    It is undisputed the executive producer agreement for *Servant* conferred him

8    supervision over the project.  [*Id*.; Dkt. 278-19, "Executive Producer

9    Agreement"].  Dolphin Black Productions is a "loan-out company" formed by

10    Basgallop such that, according to Basgallop, "Dolphin Black Productions and

11    Tony Basgallop are one and the same."  [SGD ¶ 342; Basgallop Depo. at 4

12    (Dolphin Black Productions is "just me")].

13    In 2016, Basgallop met with Blumenthal to discuss an early script of

14    *Servant*, and Escape Artists began looking for directors for the project.  [SUF ¶

15    159, 162].  In 2017, Blumenthal sent Rajan the *Servant* script; Rajan then passed

16    it on to Shyamalan.  [*Id*. ¶ 163].  Shyamalan's production company, Blinding

17    Edge, then became attached to *Servant*, and Shyamalan directed the first episode

18    of *Servant*.  [*Id.* ¶ 169; SGD ¶ 339].  Uncle George Productions is a production

19    entity Blinding Edge formed to run *Servant*.  [Rajan Depo. at 4-5].  In 2018,

20    Apple made a "straight-to-series order" for *Servant*.  [SUF ¶ 173].  It is

21    undisputed Basgallop, Shyamalan, Rajan, Blumenthal, and Apple "worked

22    collaboratively and had input into directors, casting, scripts, and the creative

23    development of *Servant*."  [SGD ¶ 345].

24    Parties particularly dispute Black's involvement in the series with

25    Defendants alleging Black "was minimally involved in early *Servant* attachment

26    efforts."  [*Id*. ¶ 198].  Gregorini in turn points to Black's executive producer

27    _____

28    **GRANTED** with respect to Tisch's vicarious copyright infringement.

-22-

1  credit and profit from the series.  [*Id*.].  Additionally, the Executive Producer

2  Agreement directed Uncle George Productions to "meaningfully consult" with

3  Blumenthal and Black.  [*Id.* ¶ 341].

4       Viewing the evidence in a light most favorable to Gregorini, Defendants

5  maintained the right and ability to supervise *Servant* such that they could be

6  held vicariously liable for infringement.

7  **G.    Indirect Profits**

8       Federal copyright law enables broad recovery for "any profits of the

9  infringer that are attributable to the infringement."  17 U.S.C. § 504(b).  Courts

10  permit plaintiffs to retrieve "indirect profits" upon establishing a "causal link"

11  between the infringing and subsequent works.  *Mackie v. Rieser*, 296 F.3d 909,

12  914 (9th Cir. 2002).  If the works are "only remotely or speculatively

13  attributable to the infringement," the Court may deny recovery of Defendants'

14  profits.  *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc*., 772 F.2d 505, 517

15  (9th Cir. 1985).  Ultimately, Gregorini must show "some evidence to create a

16  triable issue regarding whether the infringement at least partially caused the

17  profits that the infringer generated as the result of the infringement."  *Mackie*,

18  296 F.3d at 911.

19       In *Frank Music Corp*., the seminal case on indirect profits, the Ninth

20  Circuit permitted plaintiff to recover profits from the entirety of a ten-act show

21  at the MGM Grand Hotel, even though only one act of the show was the source

22  of the infringement.  772 F.2d at 517.  In addition, the court permitted plaintiff

23  recovery of "indirect profits from the hotel and gaming operations" of MGM

24  Grand because the show provided "promotional value."  *Id*.

25       Here, Gregorini is seeking profits from the entire *Servant* series while

26  alleging only the first three episodes infringe on *Emanuel*.  [First Amended

27  Complaint; Opp. at 28-30].  Gregorini's expert supplies the initial three episodes

28  were critical in the development of the series and the revenues it enjoyed.

[Pittleman Report ¶ 80].  Defendants point out Pittleman did not watch Seasons 2-4 of *Servant*, however Pittleman did read a synopsis of each episode of Seasons 2-4.  [SGD ¶ 284].  Additionally, another of Gregorini's experts testified to the causal nexus between profits from the first three episodes and profits of future episodes and seasons.  [SGD ¶ 278].  *Servant* was one of Apple TV+'s flagship television shows, used to promote Apple TV+ and associate its brand with "the finest creative storytellers."  [Pittleman Report ¶¶ 82-85].

Therefore, Defendants profits are not simply "remotely or speculatively attributable to the infringement."  *Mackie v. Rieser*, 296 F.3d 909, 914 (9th Cir. 2002).  It is reasonable to conclude the infringement at least partially resulted in "boosted [] profitability" to the *Servant* series.  *Cf. Hendricks v. DreamWorks, LLC,* No. CV-05-8271 CAS (Ex), 2007 WL 9705916, at *3 (C.D. Cal. Nov. 20, 2007) (foreclosing recovery of indirect profits because the infringing work did not have "any promotional value that could have boosted the profitability" of later works).  Thus, Defendants' Motion is **DENIED** with respect to indirect profits.

## IV.    CONCLUSION

For the above reasons, the Motion is **GRANTED** only as to Defendant Steve Tisch's vicarious liability and **DENIED** with respect to the rest of the Motion.


**IT IS SO ORDERED.**


Dated: November 25, 2024


SUNSHINE S. SYKES
United States District Judge

-24-